JFN:DAS/PKC
F. #2009R02161

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK            12-379 M
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA               **TO BE FILED UNDER SEAL**

    -against-                        COMPLAINT & AFFIDAVIT IN
                                       SUPPORT OF ARREST WARRANT
 PETER LIOUNIS,                         AND SEARCH WARRANT
      also known as                     (18 U.S.C. § 1343)
      "Mark Anderson,"
      "Andrew Black,"
      "James Weston" and
      "Mike Sloli,"

               Defendant.

- - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND
DESCRIBED AS 59 GENESEE AVENUE,
STATEN ISLAND, NEW YORK

- - - - - - - - - - - - - - - - - X

      BRIAN COLICA, being duly sworn, deposes and states as

follows:

      Upon information and belief, there is probable cause to

believe that, in or about and between December 2008 and April

2012, within the Eastern District of New York and elsewhere, the

defendant PETER LIOUNIS, also known as "Mark Anderson,""Andrew

Black," "James Weston" and "Mike Sloli," together with others,

having devised a scheme and artifice to defraud and to obtain

money by means of materially false and fraudulent pretenses, representations and promises, did knowingly and intentionally transmit and cause to be transmitted writings, signs, signals, pictures and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing said scheme and artifice.

(Title 18, United States Code, Section 1343)

Upon information and belief, there is probable cause to believe that there is currently concealed in THE PREMISES KNOWN AND DESCRIBED AS 59 GENESEE AVENUE, STATEN ISLAND, NEW YORK (the "SUBJECT PREMISES") further described in Attachment A, the things described in Attachment B, which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1343, wire fraud.

(Title 18, United States Code, Section 1343)

1.  I am a Special Agent of the Department of Homeland Security, Homeland Security Investigations ("HSI") assigned to the New York Office.

2.  During my tenure with HSI, I have participated in numerous white collar fraud investigations; and have participated in all aspects of investigations, including conducting surveillance, debriefing defendants and informants, interviewing witnesses, analyzing information obtained from court-ordered pen register/trap and trace intercepts, monitoring wiretapped

2

conversations of subjects committing fraud, and reviewing line sheets prepared by wiretap monitors.  Through my training, education and experience, I have become familiar with (a) the manner in which frauds are committed; (b) the methods used by persons committing fraud to launder the proceeds of their criminal activities; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3.  I am familiar with the facts and circumstances of the investigation set forth below through discussions with other agents and officers of HSI and other law enforcement agents, which includes information obtained through surveillance, interviews with victim-investors and intercepted telephone calls obtained pursuant to judicially authorized wiretaps, and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who

conducted such surveillance.  Since this affidavit is being submitted for the limited purpose of securing a search warrant and arrest warrant, I have not included details of every aspect of the investigation.  Facts not set forth herein are not being relied on in reaching my conclusion that the requested warrants should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

PROBABLE CAUSE

I.   Overview of Investment Fraud Schemes

4. As set forth below, between approximately December 2008 and April 2012, PETER LIOUNIS and his co-conspirators executed three successive fraudulent investment schemes through which they obtained millions of dollars from investors based on false promises about investment opportunities.  A summary of these schemes is set forth below.

A.   The Rockford Group Scheme

5.  Between approximately December 2008 until at least November 2009, PETER LIOUNIS, together with others, executed a fraudulent investment scheme through a company called the Rockford Group.

6.  Through its website, www.rockfordgroupllc.com ("the Rockford Website") an entity known as the Rockford Group marketed itself as "[a] leading private equity firm equipped with an $800

million dollar pipeline of investments, designed to provide opportunities for income, capital appreciation and preservation."

7.   The website provided a toll-free number for investors to contact the Rockford Group.  The Rockford 800 Number was maintained by Voice Nation LLC ("Voice Nation"), a telephone service that provides an 800-number which can be routed to a user's telephone.  Voice Nation also provided a "live answering" service in which employees of Voice Nation answered the 800-number and provided pre-arranged information to outside callers. This service was designed in part to create the impression that the Voice Nation employees worked exclusively for the company paying for the "live answering" service.

8.   On the Rockford Website and in telephone calls to investors, the Rockford Group touted the investment value of the "Fixed Dividend Contract" in which the Rockford Group purchased plaintiffs' rights to future recoveries in personal injury and other lawsuits.

9.   Through unsolicited telephone calls, representatives of the Rockford Group solicited investments in Fixed Dividend Contracts, and claimed that the Rockford Group had special experience and expertise in this area of investment.  The representatives also promised investors that they would earn a fixed rate of return of 15% on investments with the Rockford Group.  The representatives further told investors that they

could earn higher guaranteed rates of return if they invested larger amounts of money.

10.   On or about June 30, 2009, the Rockford Group mailed a media release ("the Media Release") to existing Rockford Group investors, several of whom later provided copies of the Media Release to law enforcement authorities.  The Media Release contained numerous false statements.  For example, the Media Release falsely identified twenty large, well-known corporations as the Rockford Group's "major institutional pension plan clients."  The investigation revealed, however, that at least nineteen of these twenty companies never had a relationship with the Rockford Group.[1]

11.   The Media Release also falsely claimed that since 1999, the Rockford Group's cumulative annual rate of return through June 30, 2009 was 251%, outperforming the Dow Jones Index by 238%.  Contrary to these claims, records from the New York Department of State reflect that the Rockford Group did not exist until December 22, 2008, and law enforcement authorities have found no evidence to suggest that the Rockford Group engaged in any investment activity that would generate returns for investors, much less its claimed returns.

---

[1] The twentieth company did not respond to law enforcement inquiries.

12.   During the period March 23, 2009 to April 21, 2009, the Rockford Website represented that the Rockford Group was a member of the Securities Investor Protection Corporation ("SIPC") and that its investors were protected by SIPC insurance. The Rockford Group made the same false representation in a sales brochure ("the Rockford Sales Brochure") it distributed to prospective and existing Rockford Group investors by mail.

13.   SIPC has confirmed that investments with the Rockford Group were never insured by SIPC and that the Rockford Group was never a member of or in any way affiliated with SIPC.

14.   The investigation has revealed that the Rockford Group did not use investor funds as it promised its investors it would.   Instead, nearly all of the investor funds were wired to bank accounts overseas.   Investors with the Rockford Group often received a relatively small portion of their investment as dividend payments in the months following their initial investment.   By November 2009, however, investors stopped receiving payments altogether, and none of the Rockford Group investors have received any payments since November 2009.

15.   Approximately 200 Rockford Group investors in the United States and Canada invested over $11 million with the Rockford Group.   Although a few investors successfully withdrew all of their funds prior to November 2009, the overwhelming majority of investors lost all of their principal investment, and

have had no contact with anyone purporting to be from the
Rockford Group since November 2009.

      16.   On December 8, 2009, the Securities and Exchange
Commission obtained an order ("the SEC Order") from the Southern
District of New York, in which the Court froze all assets that
the Rockford Group held in the United States, based on the
allegations described above.  Shortly after the SEC Order was
entered, the Rockford Group abandoned its office space and shut
down its telephone service.

    B.   General Motors IPO Scheme

      17.   According to several Rockford investors, they
invested funds with the Rockford Group in 2009 after receiving
numerous phone calls from a person identifying himself as "James
Weston," a representative of the Rockford Group.

      18.   On September 21, 2010, one such investor
("Investor #1") received a telephone call from the person whose
voice Investor #1 recognized as the person who had previously
identified himself as "James Weston."  This time, the caller
identified himself as "Andrew Black from UBS" and attempted to
solicit Investor #1 to purchase stocks, including an initial
public offering ("IPO") of General Motors stock.  During this
same call, the person purporting to be "Andrew Black from UBS"
stated that UBS had acquired Charles Schwab.  Investor #1
recorded this conversation and thereafter contacted law

enforcement authorities, who instructed Investor #1 to continue to record any future conversations with "Andrew Black."

19.   After receiving the call from "Andrew Black," Investor #1 received a letter purportedly from UBS and an account application, as well as a return envelope which included an address where Investor #1 should send funds.

20.   In or about October 2010, law enforcement authorities contacted a representative of UBS, who stated that no person named "Andrew Black" had ever worked for UBS and that UBS had not acquired Charles Schwab.  Further investigation revealed that the address where "Andrew Black" had instructed Investor #1 to send funds ("the UBS Address") was a commercial mailbox operated by Regus Management Group LLC ("Regus").  On its Website, Regus described itself as a company which provides "Virtual Offices" including "mail and call handling services."

21.   Further investigation revealed that two other investors, Investor #2 and Investor #3, each sent checks payable to "UBS Clearing" to the UBS Address in November 2010.   Investor #2 and Investor #3 each told law enforcement authorities that they received a series of unsolicited telephone calls from a person identifying himself as "Andrew Black from UBS" beginning in approximately late October or early November 2010.  As with Investor #1, the person purporting to be "Andrew Black" solicited Investor #2 and Investor #3 to invest in an IPO of General Motors

stock.  Based on the representations made by "Andrew Black,"
Investor #2 and Investor #3 each sent money to the UBS Address in
the form of a check made payable to "UBS Clearing."

22.  Law enforcement authorities confiscated the
proceeds of these checks and returned the funds to Investor #2
and Investor #3.

C.  The Grayson Hewitt Scheme

23.  In July 2011, law enforcement authorities
contacted Investor #2 to arrange final details for the return of
the funds Investor #2 had invested with "UBS Clearing Corp."  At
that time, Investor #2 informed law enforcement authorities that
in or about March 2011, Investor #2 had received a voice mail
message from a person whose voice Investor #2 recognized as the
same "Andrew Black" with whom Investor #2 had dealt in connection
with Investor #2's investments with "UBS Clearing Corp."  This
time, however, the caller identified himself as "Mark Anderson
from Grayson Hewitt," stated that he had a new investment
opportunity for Investor #2, and asked Investor #2 to call him at
a telephone number with a New York area code ("the Mark Anderson
Telephone").

24.  Investor #2 provided law enforcement authorities
with a copy of the recorded voicemail left by "Mark Anderson" as
well as a recording of an earlier voicemail left by "Andrew
Black."  Law enforcement authorities have compared these

recordings with the voice of "Andrew Black" from the recordings made by Investor #1.  These voices appear to be of the same person.  Law enforcement authorities therefore began an investigation into Grayson Hewitt.

25.  Records from the New York Department of State reflect that "Grayson Hewitt Funding LLC" was founded in 2010.  Bank records from JP Morgan Chase ("the Chase Account") reflect that an account was opened for "Grayson Hewitt Funding LLC" on May 24, 2010.  These bank records further reflect that the Chase Account was opened using at least one false document.

26.  Telephone records for the Mark Anderson Telephone reveal numerous calls to out-of-state numbers.  In September 2011, law enforcement authorities contacted two of these numbers, corresponding to Investor #4 and Investor #5.  Investor #4 and Investor #5 each stated that they had received telephone calls from a person identifying himself as "Mark Anderson from Grayson Hewitt."

27. Investor #4 and Investor #5 each further informed law enforcement authorities that "Mark Anderson" stated that Grayson Hewitt purchases plaintiffs' rights to future recoveries in personal injury and other lawsuits and promised a fixed rate of return of 15 percent -- the same false claims made by representatives of the Rockford Group.  Moreover, the person purporting to be "Mark Anderson" sent Investor #4 and Investor #5

11

sales brochures which claimed that Grayson Hewitt was located in New York, founded in 2006, and has provided over $100 million to more than 2,000 customers. As noted above, however, Grayson Hewitt was only founded in April 2010.

28. As a result of the misrepresentations made to them by "Mark Anderson," Investor #4 and Investor #5 each invested money with Grayson Hewitt. As with the General Motors IPO scheme, the address to which Investor #4 and Investor #5 sent their investments with Grayson Hewitt corresponds to a commercial mailbox facility ("the Grayson Hewitt Mailbox" or "the Grayson Hewitt Address"). The Grayson Hewitt Mailbox facility is located at 1204 Avenue U in Brooklyn, New York. Records obtained from the company which owns the Grayson Hewitt Mailbox facility reveal that the Grayson Hewitt Mailbox was opened on April 6, 2010.

29. Investor #4 provided law enforcement agents with a copy of a sales brochure for Grayson Hewitt ("the Grayson Hewitt Sales Brochure") which Investor #4 had received in the mail from the person claiming to be "Mark Anderson." The Grayson Hewitt Sales Brochure refers to a Website, graysonhewittfundinggroup.com ("the Grayson Hewitt Website"). The Grayson Hewitt Sales Brochure and the Grayson Hewitt Website make claims similar to those made in the Rockford Sales Brochure and the Rockford Website, including a detailed description of Grayson Hewitt's purported business of funding lawsuits. The Grayson Hewitt Sales

12

Brochure also referenced an 800 number, (800) 560-4405 ("the Grayson Hewitt 800 Number") for investors to call.

30.  Much like the Rockford Group scheme, the Grayson Hewitt 800 Number was maintained by Professional Answering Service ("the Answering Service"), a telephone service that provides a toll-free number ("the Grayson Hewitt 800 Number") which can be routed to a user's telephone.[2]  The Answering Service also provides a "live answering" service in which employees of the service answer the 800-number and provide pre-arranged information to outside callers.  This service is designed in part to create the impression that the Answering Service employees work exclusively for the company paying for the "live answering" service.

31.  Records provided by the Answering Service indicate that an account for the 800 Number was opened for "Grayson Hewitt Funding" on or about May 15, 2010.  The Answering Service provided law enforcement authorities with a written record of messages transcribed during the Grayson Hewitt scheme.  These messages reveal that "Mark Anderson" was frequently communicating with Grayson Hewitt investors concerning their investments.

_____

[2]On or about September 26, 2011 the Grayson Hewitt 800 Number was deactivated, and Grayson Hewitt opened a new 888 number with the Answering Service.  This new number, together with the initial number provided by Grayson Hewitt, is referred to herein as the Grayson Hewitt 800 Number.

32. As with the Rockford Group scheme, Grayson Hewitt investors often received monthly dividend payments reflecting a relatively small portion of their investment. Like the Rockford Group, Grayson Hewitt did not invest its funds as it promised its investors it would. Instead, a large portion of funds in the Grayson Hewitt bank account was used to purchase gold, meals, clothing and other consumer items.

II.  The Identification of Peter Liounis

33. On September 19, 2011, the Honorable Lois Bloom, United States Magistrate Judge, Eastern District of New York, signed an order, Misc. 11-649, ("the First GPS Order") authorizing disclosure of precise location data for the Anderson Telephone for a period of 30 days. On October 18, 2011, Judge Joan M. Azrack, United States Magistrate Judge, Eastern District of New York, signed an order extending the First GPS Order for an additional thirty days. On January 6, 2012, Judge Azrack signed another order, Misc. 12-010, ("the Second GPS Order") authorizing disclosure of precise location data for the Anderson Telephone for a period of 30 days.

34. The service provider for the Anderson Telephone was unable to provide precise location data, and instead provided records reflecting the tower and antenna face ("cell site") used by the Anderson Telephone during the time period covered by the First GPS Order and the Second GPS Order ("the GPS Time Period").

14

These records reflect that, during the GPS Time Period, the Anderson Telephone was located within a radius of approximately 0.5 miles of an area of Staten Island ("the Anderson Telephone Area") when nearly every call was made or received by the Anderson Telephone.

35.   The residence of PETER LIOUNIS at 59 Genesee Avenue, Staten Island, New York ("the SUBJECT PREMISES") is located within the Anderson Telephone Area.  Between October 2011 and March 2012, law enforcement authorities conducted several inspections of trash ("the Liounis Trash") which had been removed from outside the SUBJECT PREMISES by local trash collectors.[3]

36.   An inspection of the Liounis Trash conducted on October 25, 2011 revealed a handwritten note.  The first line of the handwritten note contained the name of Investor #6 (with a slight misspelling) and a number which telephone records reveal corresponds to Investor #6.  Bank records for the Chase Account indicate that Investor #6 invested with Grayson Hewitt.  Another line of the handwritten note contained the last name of Investor #7 (with a slight misspelling) and the number "62.50-5k."  Bank records from the Chase Account indicate that Investor #7 invested

[3]Local trash collectors provided the Liounis Trash to law enforcement authorities immediately after they had obtained it from outside the SUBJECT PREMISES and before mixing it with any other trash.

$5,000 with Grayson Hewitt and received regular monthly dividend payments, frequently in the amount of $62.50.

37.   The October 25, 2011 inspection of the Liounis Trash also yielded shipping paperwork that had been sent to PETER LIOUNIS at the SUBJECT PREMISES and which listed a telephone number ("the Liounis Telephone") in PETER LIOUNIS'S name.  A November 4, 2011 inspection of the Liounis Trash revealed a receipt for the purchase of the Liounis Telephone and a service agreement for the Liounis Telephone in the name PETER LIOUNIS.  A January 31, 2012 inspection of the Liounis Trash revealed one page of a bill from AT&T Wireless for the Liounis Telephone. Moreover, telephone records obtained from AT&T Wireless reflect that the Liounis Telephone was activated on June 3, 2011.

38.   Law enforcement authorities conducted surveillance of the SUBJECT PREMISES on several days in September and October 2011.  During this surveillance, law enforcement authorities learned that at least one other person appears to reside in the SUBJECT PREMISES along with PETER LIOUNIS.  Nonetheless, on two occasions, law enforcement authorities observed that PETER LIOUNIS appeared to be the only person present inside the SUBJECT PREMISES when the Anderson Telephone was in use.  As noted above, the Anderson Telephone remained within a 0.5 mile radius of the SUBJECT PREMISES during this time period.

16

39.   On November 27, 2011, a law enforcement agent ("the Agent") drove past the SUBJECT PREMISES and observed PETER LIOUNIS standing outside the SUBJECT PREMISES and speaking on a cellular telephone.  LIOUNIS was standing on the sidewalk adjacent to the street and next to a stop sign.  The Agent recognized PETER LIOUNIS from a copy of LIOUNIS's United States Passport application obtained from the United States Department of State.  While observing LIOUNIS, the Agent was able to hear LIOUNIS's voice, which matched the voice of the person purporting to be "Mark Anderson of Grayson Hewitt" and "Andrew Black of UBS" on recordings which the Agent had reviewed.[4]

III.  <u>Wiretap of the Anderson Telephone</u>

40.   On December 7, 2011, United States District Court Judge Sandra L. Townes signed an order authorizing the interception of wire communications over the Anderson Telephone. On January 6, 2012 and again on February 8, 2012, Judge Townes signed orders reauthorizing the interception of wire communications over the Anderson Telephone.  Virtually all of the communications on the Anderson Telephone monitored pursuant to these orders ("the Anderson Wiretap Orders") involved the voice law enforcement authorities previously identified as PETER LIOUNIS.

---

[4]LIOUNIS has a distinctive voice.

17

41. Intercepted communications over the Anderson Telephone pursuant to the Anderson Wiretap Orders included hundreds of telephone calls between the Anderson Telephone and various victim-investors related to the Grayson Hewitt scheme described above, as well as a related scheme involving a purported initial public offering of Grayson Hewitt stock.  Set forth below is a sampling of such calls.

A.   Investor #8 & Investor #9

42. On December 19, 2011, at approximately 6:00 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #8.  In an earlier voicemail to the Anderson Telephone on December 19, 2011 at approximately 5:00 p.m., Investor #8 had identified himself as the son of Investor #9, an investor with Grayson Hewitt.  Records from the Chase Account reflect that Investor #9 had invested approximately $38,000 with Grayson Hewitt since November 2010.  During the December 19, 2011 call with LIOUNIS, Investor #8 indicated that his father had suffered a heart attack and had been "showing some signs of some dementia type things, to where he's getting overdrawn on his accounts and got some get rich quick schemes going on, that I'm trying to settle, settle out and get, get rid of..."  LIOUNIS responded that "right, right... oh, that's terrible... this program was really good to him because it's a monthly income and it's... I'm sure he's told you, we're

18

clockwork... our company is really strong and I'll give you the details also, as far as in case you did need money back for any reason, uh when, when the contract actually expires, you know, I'll, I'll have all those details for you tomorrow...."

43.   On December 21, 2011, at approximately 2:19 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #8.  During this call, Investor #8 asked LIOUNIS for information about Grayson Hewitt.  LIOUNIS responded that "what we are, we're a funding company.  We, we lend money to lawsuit victims and we do structured settlements and we make about 30 to 40 percent a year, so what we do, is we give our customers a good dividend pay out every month....[W]e're an institutional fund.  You never heard of us because we're not on TV and commercials.  You know, we don't really deal, deal with what's called like uh, small plaintiffs.  We, we actually buy uh, you know, monstrous accounts. In other words, we're a liquid company."

44.   Later in the conversation, Investor #8 stated that his father's contract with Grayson Hewitt had already matured on November 15, 2011, and that, "I'm trying to get together the finances to be able to put him into an assisted living...and I have to have all the facts and figures and, no offense, but you guys are the hold up."  LIOUNIS responded, "well I'll put it to you this way if you need the funds back...that's not a problem...

19

but uh... it's two steps here... let me get you on the account, number one, and then I'll put in a request uh, if you say the contract is, is, is gonna be over or it is over... compliance will let me know that as well... then I could simply put in a request for the funds that's not a problem....Unfortunately for all of us, right now, the holidays are right here...let's get through uh, Christmas...and uh, and then we could uh, we get right back to business here."

45.   LIOUNIS's description of Grayson Hewitt's investments is contrary to the Chase Account records and other evidence uncovered in the investigation.  As noted above, there is no evidence that Grayson Hewitt has used investor funds to purchase "structured settlements" as LIOUNIS described to Investor #8.  Instead, as noted above, investor funds were wired overseas and/or used to purchase food, clothing, gold and other items.

46.   On December 29, 2011, at approximately 12:25 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #8.  During this call, LIOUNIS stated that he had reviewed the account of Investor #8's father, Investor #9, and that Investor #9 had been "tapping into his, his principal" and periodically withdrawing principal from the account.  As a result, LIOUNIS stated there was only $3,000 remaining in the account.

47.   In fact, records from the Chase Account reveal that Investor #9 withdrew approximately $15,000 of principal investment, leaving a remaining principal investment of approximately $23,000.  Aside from the repayment of this $15,000 principal investment, the only payments from the Chase Account to Investor #9 since Investor #9's initial investment in November 2010 were regular interest payments.  LIOUNIS also indicated that Grayson Hewitt had sent Investor #9 a "get well fruit basket," which Investor #8 indicated they had received.

B.   <u>Investor #10</u>

48.   On December 19, 2011, at approximately 6:07 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #10.  Records from the Chase Account, as well as statements made by Investor #10 during other telephone calls monitored pursuant to the Anderson Wiretap Orders, reveals that Investor #10, together with Investor #10's spouse, have invested over $100,000 with Grayson Hewitt.  During this call, LIOUNIS solicited Investor #10 to invest additional funds with Grayson Hewitt in connection with an initial public offering of Grayson Hewitt stock.

49.   Specifically, LIOUNIS told Investor #10, "I can give you, if you want, I can give you up to fifteen thousand shares.  If you want it..."  When Investor #10 asked how much that would cost, LIOUNIS replied "it would be forty-five

21

[thousand dollars] and you don't have to take it, Mr. [Investor #10].  Trust me!  I told ya, the rest [of the stock] is gone, I just wanted you to really take that, it'll help you make up some losses..."  LIOUNIS further promised that Investor #10 would receive a $30,000 profit from this investment by January 15, 2012, noting "by the fifteenth, you're gonna be liquid...thirty k on top of what you're already making.  You're, you're pretty sweet.  That's a great holiday for ya!"

50.  Investor #10 agreed to the investment.  LIOUNIS directed Investor #10 to wire the funds in the same manner as LIOUNIS had previously instructed Investor #10.  LIOUNIS stated "I'm gonna pull these last fifteen thousand shares off the board and let me bury them into your account.  Just when you get a chance, as long as it's before the first or second [of January] please, just get that wire out."

51.  Later during the call, LIOUNIS instructed Investor #10 to wire the funds to an entity called "Haleen Bank," rather than the Chase Account where Investor #10 had previously wired the funds.  LIOUNIS explained that the funds should go to "Haleen Bank" because "that's the people we're getting the shares from." Investor #10 indicated that he had the wiring instructions for "Haleen Bank" which LIOUNIS had previously provided to him. Towards the end of the call, Investor #10 stated, "That would be something of a windfall if everything goes as, as you have

22

indicated." LIOUNIS replied, "Everything I've indicated is going to happen 100% - everything!" Investor #10 then said, "I trust you implicitly. All right."

52. Using the information on this call, as well as other information obtained through subpoenas, law enforcement authorities were able to identify "Haleen Bank" as Hellenic Bank located in Cyprus.

53. On January 9, 2012, at approximately 3:11 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #10. During this call, Investor #10 asked when the IPO was scheduled, and LIOUNIS replied "during the month of January, with the extension...guaranteed!" Investor #10 then stated that "you gave me the name of Morgan...I did call Morgan and spoke to their...uh department that issues um, stock, you know, IPOs. They have no record of an IPO for Grayson Hewitt." LIOUNIS replied, "absolutely! Because they're gonna file it exactly four days before it goes public and whoever you spoke to, there's thousands of employees in Morgan. We're dealing with the head of a department...and I don't know who you spoke to, and...and I wish you really didn't make that call, Mr. [Investor #10]... I assure you they're the ones doing our IPO and if they don't wanna mention it for the reasons they told us not to mention it, that's fine. But I promise you, that's the company doing it. I assure you on everything...I can't tell you

their reasons, but when we have board meetings, and a rep comes down, they tell us the same thing.  This is a close[d] door IPO."

54.   Contrary to LIOUNIS's promises to Investor #10 and other Grayson Hewitt investors, there is no public record of any IPO of Grayson Hewitt occurring in January 2012 or since that date.

55.   During the same January 9, 2012 call between Investor #10 and LIOUNIS, Investor #10 further stated that he had looked up the Grayson Hewitt Address on Google and "I'm not encouraged by the fact that uh, you have a business address in a neighborhood above a mail deposit, uh, place." LIOUNIS replied, "they are suites.  I know what you're thinking, but they're suites."  Later in the call, Investor #10 stated, "I was shocked by...the very modest uh, appearance of the neighborhood that you... that you use for your suite."  LIOUNIS replied "I will show you...I will show you companies that are worth ridiculous amounts of money and you could walk into their office, you wouldn't put your bag down...means nothing!  I could show you companies with glass offices who are bankrupt!"

56.   Contrary to the claims made by LIOUNIS in this call, surveillance of the Grayson Hewitt Address revealed that the building located at the Grayson Hewitt Address does not contain "suites" as described by LIOUNIS, but is instead solely a commercial mailbox facility.

C.   <u>Investor #11</u>

57.   On January 24, 2012, at approximately 3:17 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #11 on the Anderson Telephone. Records from the Chase Account reveal that Investor #11 has invested $5,000 with Grayson Hewitt since April 2011.   The investigation has revealed that LIOUNIS often solicited investors to invest additional funds by stating that another investor has ended their investment prematurely, thus creating an opportunity to assume the departing investor's investment with Grayson Hewitt through a "short contract."   In response to LIOUNIS's attempt to solicit Investor #11 to invest in a "short contract," Investor #11 expressed skepticism of Grayson Hewitt, noting "I see this as a Bernie Madoff deal...cause I'm seeing that the front runners are getting their money and the other guys are putting money to the front guys. For some reason, I just... I'm just scared to death about this."   In response, LIOUNIS stated, "try to understand one thing. You got banks and institutions taking your money...and they put it with us...they're not putting it in the stock market...and this is... this is no way, no how, a Bernie Madoff...believe that! That is not happening and... and you gotta understand, the amount of money we handle here, uh, we'd go away for a hell of a lot longer than Bernie did."

25

58.   Bank records and other evidence obtained in the investigation have shown that all investors in Grayson Hewitt are individual investors, and law enforcement authorities have found no evidence of any banks or other financial institutions investing in Grayson Hewitt.   Moreover, as noted above, the investigation has revealed that Grayson Hewitt is, in fact, quite similar to a Bernie Madoff-type Ponzi scheme.   Indeed, the Chase Account holds only a small fraction of the funds which investors have provided to Grayson Hewitt, and nearly all investor funds have been transferred overseas and/or used to purchase gold, meals, clothing and other consumer items.

D.   Investor #12

59.   On February 2, 2012, at approximately 11:32 a.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #12.   Records from the Chase Account reveal that Investor #12 has invested over $1.6 million with Grayson Hewitt since July 2010.   During this call, LIOUNIS discussed Investor # 12's investment in a "short contract" with Grayson Hewitt.   LIOUNIS and Investor #12 discussed amended wiring instructions for the funds which Investor #12 planned to invest in the "short contract."   LIOUNIS dictated the following wiring instructions to Investor #12, which LIOUNIS stated had to be provided as an amendment to the wire: "Please further credit 87,750 to the account of Innovative Commerce.   I understand that

26

Innovative Commerce is involved in different businesses including selling car parts.  And I have agreed to do business with this company."

60.  LIOUNIS then stated, "now let me explain, the manager explained to us that this exact company -- I know they deal in auto parts 'cause it's our account -- but, they actually have many different businesses.  And that's why we have to distinguish.  And that was the best part. When you say you're gonna buy auto parts is [sic] no questions asked, it goes right in and we further credit and we put in your account and it's done."  Investor #12 expressed some concern, noting "the only [thing that] concerns me here is I basically made a legally binding obligation and uh, warrant that I understand fully the company and the businesses they are in and therefore still want that money put in there, um, you know that, with a foreign national corporation is something to me that sends up a flag of concern.  LIOUNIS assured Investor #12 that Innovative Commerce was "our in-house client, we have the funds.  That's not an issue...you know, you trust me with 1.5[million], I mean come on...you gotta do this....We're gonna simply credit your account with the funds in-house."  Investor #12 agreed to send the amended wiring instructions.

61.  Information obtained from Fed Wire, an interstate wire-tracking service, revealed that at least two Grayson Hewitt

investors wired funds to a bank account at Hellenic Bank in
Cyprus held in the name of an entity called "Innovative Commerce
Ltd.," which is located outside of the United States.[5]  Records
from Chase Bank indicate only one wire from "Innovative Commerce"
to the Grayson Hewitt account, in an amount of $3,000 - far below
the approximately $87,000 which Investor #12 is paying to assume
the purported "Innovative Commerce" investment.  Moreover,
records from Chase Bank further show that the balance in the
Chase Account throughout February 2012 was substantially below
$87,000.  Instead, it appears that LIOUNIS and his co-
conspirators funneled the proceeds of their investment fraud
schemes through "Innovative Commerce," and other overseas
entities and accounts, likely in an attempt to avoid detection by
law enforcement authorities.  Indeed, a website operated by the
Registrar of Companies for the United Kingdom indicates that
"Innovative Commerce, Ltd." was only incorporated on November 11,
2011.

    E.   <u>Investor #13</u>

      62.  On February 13, 2012, at approximately 11:51 a.m.,
PETER LIOUNIS, posing as "Mark Anderson," used the Anderson
Telephone to call Investor #13.  During the call, Investor #13
asked, "is business still going good for you guys?"  LIOUNIS

---

[5]One of the investors incorrectly identified the company as
"Innovated Commerce."  However, the funds were wired to the same
Hellenic Bank account.

28

responded that "there's no better business, [Investor #13]...where you gonna' to make fifty to sixty percent parking money in real safe investments...believe me, they don't give money -- they don't give money to cases unless these cases are absolutely solid....Our book value is over $800 million right now...we know what we're doing."

63.   Bank records for the Grayson Hewitt account at Chase Bank reflect that, as of January 31, 2012 -- less than one week after LIOUNIS told Investor #13 that Grayson Hewitt's "book value is over $800 million" -- there was a cash balance of less than $2,000.  Moreover these records further reflect that the balance in the Chase Account never exceeded $61,000 during the entire month of January 2012.

F.   Use of Computers to Further the Scheme

64.   In addition to telephone calls and wire transfers, emails were used to perpetrate the fraudulent investment schemes of PETER LIOUNIS and his co-conspirators.

65.   On January 26, 2012, at approximately 2:40 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #12 in connection with the purported "Innovative Commerce" investment.  See supra paragraphs 59-61. LIOUNIS asked Investor #12 if he had received "that email we sent you."  Investor #12 confirmed that he had and then asked why he was being instructed to send the money to "Chase, but with a

29

redirect into the U.K.[,]" rather than simply "sending the funds to Grayson and then [Grayson] advancing them through to [its] client." LIOUNIS, _inter alia_, assured Investor #12 that this is "done all the time" and that Investor #12 should not "worry about any kind of film flam here[.]" Several days later, on February 2, 2012, at approximately 11:32 a.m., LIOUNIS called Investor #12 again and directed him to amend his wiring instructions to credit $87,750 to the account of Innovative Commerce. In response to Investor #12's concern about the re-direction of funds to an unknown company, LIOUNIS assured Investor #12 that "once they post [the funds], within one hour, you're gonna get an email from our company" confirming a transfer of the "full hundred," _i.e._, the principal plus a return on the investment, to Investor #12's Grayson Hewitt account. Investor #12 agreed to call and email his banker with the wiring instructions provided by LIOUNIS.

66. On January 23, 2012, at approximately 3:22 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to speak to Investor #13, who had questions about an email he had received from Grayson Hewitt. The email contained instructions for Investor #13 to use in wiring money to Grayson Hewitt. Investor #13 expressed concern about the fact that the email contained two different "wire numbers" and that Investor #13's money first went to "Chase, but then, it seems like it goes over to London." Referencing a "contract" involving the

30

"Innovative" bank account as he had with Investor # 12, LIOUNIS, in part and substance, assured Investor #13 that his Grayson Hewitt account would be fully credited for the money he was wiring pursuant to the instructions in the email.[6]  During the conversation, Investor #13 also said that he had tried calling Grayson Hewitt's 800 number without success.  LIOUNIS told Investor #13 that Grayson Hewitt had been having "problems with all of [its] phone lines" and had to change its 800 number.[7] LIOUNIS told Investor #13 that he should have received an email about the change in the company's 800 number.

        67.  On January 23, 2012, at approximately 3:32 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to call Investor #14.  LIOUNIS and Investor #14 discussed emails sent to both Investor #14 and his wife about a "short contract" investment opportunity.[8]  LIOUNIS explained, in part, "the way we do a short is we send you everything with the wiring instructions[.]"  Investor #14 told LIOUNIS that he could

---

[6]This appears to be the same fraudulent "Innovative Commerce" investment that LIOUNIS marketed to Investor #12.  See supra paragraphs 59-61, 65.

[7]As previously noted, the Grayson Hewitt 800 Number was deactivated in September 2011, and a new 888 number was opened with the Answering Service thereafter.  See supra footnote 2.

[8]This appears to be the same fraudulent "Innovative Commerce" investment that LIOUNIS marketed to Investors #12 and #13.  See supra paragraphs 59-61, 65-66.

wire money via email.  LIOUNIS asked Investor #14 to wire the
money "whenever you get a minute."

68.  On January 24, 2012, at approximately 1:50 p.m.,
PETER LIOUNIS, posing as "Mark Anderson," used the Anderson
Telephone to speak to Investor #10's wife about closing the
couple's Grayson Hewitt account.  LIOUNIS asked Investor #10's
wife for the couple's email address so that he could close their
account.  After taking down the email address, LIOUNIS told
Investor #10's wife: "Here is what's gonna happen, you're gonna
get an email stating that your account is going to be closed and
the only way to stop the process from happening is if you or
[Investor #10] call in personally and say that you do not want to
close the account...."

69.  A short time later on January 24, 2012, at
approximately 2:15 p.m., PETER LIOUNIS, posing as "Mark
Anderson," used the Anderson Telephone to speak to Investor #15,
who was also seeking to close his account with Grayson Hewitt.
Investor #15 told LIOUNIS that he had received the email from
Grayson Hewitt about closing his account.  As with Investor #10's
wife, LIOUNIS told Investor #15 "the only way to stop [the
closing of the account] from going forward is if you call in
personally and you say you don't want your account closed."
LIOUNIS assured Investor #15 that he and Investor #10 were "fine"

and that "within ten business days, you're gonna have all your money, no penalties, nothing.  I took care of it."

70. Later on January 24, 2012, at approximately 8:10 p.m., Investor #10 left a voice mail message on the Mark Anderson Telephone, indicating that while Investor #15 had received the email, Investor #10 had not.  Investor #10 provided his email address in the message, and said that he hoped to receive an email the next morning.[9]

G.    The End of the Grayson Hewitt Scheme

71.   Between February 21, 2012 and February 23, 2012, investors left 12 messages for "Mark Anderson" on the Anderson Telephone.  On February 23, 2012, at approximately 12:19 p.m., LIOUNIS used the Anderson Telephone to review these messages, in many instances deleting them before the end of the message.  LIOUNIS did not return any of these calls.

72.   On February 23, 2012 at approximately 12:54 p.m., LIOUNIS, posing as "Mark Anderson," contacted the Answering Service and stated that he "just wanted to let them know that, as of tomorrow morning, the services will not be needed any longer."

---

[9]In addition, the government previously obtained a warrant to search a Gmail account that was used by LIOUNIS's co-conspirators in furtherance of the Grayson Hewitt scheme.  The account contained several emails relating to or referencing Grayson Hewitt.  However, the investigation also revealed that the perpetrators of the Grayson Hewitt scheme used a different email account that was hosted on the company's website.  Law enforcement authorities have been unable to search that account because the server is located in Canada.

Since this call, numerous investors, including Investor #10, left voicemails on the Anderson Telephone, but LIOUNIS did not retrieve any messages or use the Anderson Telephone to contact any investors from February 24, 2012 through March 9, 2012, when monitoring of the Anderson Telephone pursuant to the Anderson Wiretap Orders ceased.  It therefore appears that the Grayson Hewitt scheme has ended.

73.  Since the conclusion of the monitoring of the Anderson Telephone, law enforcement authorities have communicated with at least six Grayson Hewitt investors.  Each of these six investors lost all or substantially all of their principal investment, and have had no contact with anyone purporting to be from Grayson Hewitt since February 23, 2012.  Records from the Chase Account and Fed Wire reflect that Grayson Hewitt investors appear to have lost approximately $5 million from the scheme.

IV.  The Express Mail Shipments

74.  Records from the United States Postal Service indicate that between February 16, 2012 and March 6, 2012, six packages were sent to "Mike Slolli," "Mike Sloli" or "Mike Solli" at the SUBJECT PREMISES ("the Six Packages").  A search of law enforcement databases revealed that there was no record of any person named "Mike Slolli," "Mike Sloli" or "Mike Solli" residing at the SUBJECT PREMISES.

34

75.   The sender of each of the Six Packages was listed as "Alex James," "Al Jason" or "Mark Berg."  Each of the Six Packages listed a different address for the sender.  Law enforcement databases have revealed that there was no record of any person named "Alex James," "Al Jason" or "Mark Berg" residing at any of the addresses provided as the sender's address on the Six Packages.  Moreover, several of the addresses do not exist.

76.   It therefore appears that the person sending the Six Packages used fictitious names for both the sender and recipient.  Moreover, five of the Six Packages, including a package sent on February 22, 2012, listed telephone number 347-453-1874 ("the 347 Number") as the contact number for the recipient of the package.  Telephone records reveal that the 347 Number is subscribed to "Michael Price, 87 College Road, Staten Island, New York."  The investigation has revealed, however, that this address does not exist.  Moreover, phone records reveal that, at approximately 11:11 p.m. on February 23, 2012, the 347 Number called the Anderson Telephone.[10]  Notably, this call occurred one day after one of the Six Packages was sent.

77.   On March 22, 2012, the Post Office received a package ("the Seventh Package") addressed to "Mike Sloli" at the

---

[10]Law enforcement authorities were not monitoring the Anderson Telephone when this call was placed, and therefore it was not recorded on the Anderson Wiretap.

SUBJECT PREMISES.  The sender was listed as "Alex James."  The Seventh Package therefore appears to be another package sent as part of the same series of packages as the Six Packages.

78.  On March 22, 2012, a male claiming to be "Mike Sloli" called the Post Office in Staten Island where the Seventh Package was supposed to be received.  The caller provided the Liounis Telephone as the caller's telephone number.  The caller asked whether the Seventh Package had arrived.  When advised that the Seventh Package had been routed to Albany, instead of Staten Island,[11] the caller responded that the Seventh Package contained "very important" documents that the caller needed.  When told that he could call tomorrow to see if the Seventh Package had arrived, the caller responded impatiently, asking whether he could call later in the afternoon to see if the package was being re-routed to Staten Island.

79.  On March 22, 2012, Magistrate Judge Joan M. Azrack signed a warrant ("the Package Search Warrant") authorizing agents to search the contents of the Seventh Package.  Pursuant to this warrant, law enforcement authorities opened the Seventh Package and discovered $3,400 in cash.  After photocopying this cash, agents reinserted the cash into the Seventh Package,

---

[11]The Seventh Package, in fact, was not routed to Albany, but was instead held in New York City by Postal Inspectors.  The story about the package being routed to Albany was a ruse to disguise the fact that the Seventh Package was being investigated.

resealed it, and the postal service delivered the Seventh Package
to the SUBJECT PREMISES.

## THE SUBJECT PREMISES

80.  The SUBJECT PREMISES is located at 59 Genesee
Avenue, Staten Island, New York and is described as a two-story
brick-faced home.  The sides of the SUBJECT PREMISES are covered
with yellow siding, and the front face of the second level is
covered in brown siding.  The front door of the SUBJECT PREMISES
is brown and contains a window.  There are no markings on the
front door. The house is located on the corner of Genesee Avenue
and Abingdon Avenue facing south on Genesee Avenue and east on
Abingdon Avenue.

81.  Inspections of trash removed from the SUBJECT
PREMISES between October 2011 and March 2012 resulted in the
recovery of bank records, shipping paperwork, telephone records,
receipts, contracts and handwritten notes, some of which are
addressed to or reference PETER LIOUNIS or others of which relate
to the fraudulent investment schemes perpetrated by PETER LIOUNIS
and his co-conspirators.  See supra paragraphs 35-37.

82.  Based on surveillance conducted outside the
SUBJECT PREMISES, law enforcement authorities have determined
that PETER LIOUNIS, along with at least one other individual,
reside at that location and that LIOUNIS appears to be using the

Anderson Telephone inside the SUBJECT PREMISES.  See supra paragraph 38.

83.  As noted above, between February 16, 2012 and March 22, 2012, seven packages were sent to the SUBJECT PREMISES address using fictitious sender and recipient names.  Five of these packages also listed as a contact number a telephone number that corresponds to a fictitious subscriber and that has been in contact with the Anderson Telephone.  See supra paragraphs 74-79. On March 22, 2012, the day the Seventh Package arrived at the Staten Island Post Office for the SUBJECT PREMISES, a male claiming to be "Mike Sloli" called and told the postal employee that the package contained "very important" documents that the caller needed.  The male caller provided the Liounis Telephone as his telephone number.  A search of the Seventh Package revealed that it contained $3,400 in cash.  The Seventh Package was resealed and delivered to the SUBJECT PREMISES on or about March 23, 2012.  See supra paragraphs 78-79.

84.  On April 17, 2012, law enforcement authorities conducting surveillance at the SUBJECT PREMISES observed LIOIUNIS leave the SUBJECT PREMISES.

SEARCH OF SUBJECT PREMISES

85.  I have been informed by an Assistant U.S. Attorney that, under the relevant case law, in the event of a search of business premises that are "permeated with fraud," a broad search

38

warrant that authorizes the search and seizure of voluminous business records does not run afoul of the Fourth Amendment. National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980) (citing United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)); see also United States v. Johnson, 108 F.3d 1370, 1997 WL 136332, at *3 (2d Cir. Mar. 21, 1997) (unpublished summary order) (affirming broad search where affidavit "show[ed] ample ground for finding pervasive fraud").  In this case, given that there were no actual offices corresponding to PETER LIOUNIS's purported investment companies and that LIOUNIS appeared to be operating his fraudulent investment schemes out of the SUBJECT PREMISES, a broad seizure of data in the SUBJECT PREMISES is warranted.

86.  Moreover, based on my training and experience, individuals engaged in investment fraud schemes such as that described above often retain the items set forth in paragraph 86 below.

87.  Wherefore, this affidavit seeks authority to search for the following at the SUBJECT PREMISES:

> a.  Bank records and financial records, including bank statements, wire transfer records, cancelled checks, check stubs, deposit slips, withdrawal slips, and ATM cards and records, relating to the fraudulent investment schemes of PETER LIOUNIS and others, including the Rockford Group, UBS and Grayson Hewitt;

39

b.   Business records, including certificates of incorporation and incorporation documents, contracts, ledgers, financial statements, journals, notebooks, invoices, correspondence and notes, relating to the fraudulent investment schemes of PETER LIOUNIS and his co-conspirators, including the Rockford Group, UBS and Grayson Hewitt;

c.   Correspondence and notes relating to the fraudulent investment schemes of PETER LIOUNIS and his co-conspirators, including the Rockford Group, UBS and Grayson Hewitt;

d.   Notebooks or journals documenting conversations between PETER LIOUNIS and other individuals;

e.   Computer and Internet passwords, User-IDs, log-ins and log-in names, Internet Protocol ("IP") numbers ad addresses issued;

f.   Cell phones and other personal communication devices;

g.   Computers, computer hardware, computer software, personal digital assistant ("PDA"), passwords, data security devices, computer-related documentation, computer data, laptop computers, notebook computers, servers, hard drives, diskettes, memory storage devices, including thumb drives and memory sticks, and other magnetic storage media and files, data and information contained thereon, used to store the records and information described in this attachment as well as drafts and final versions of documents described in this attachment;

h.   Cash and other forms of currency and monetary instruments, including checkbooks, ATM cards, credit cards, debit cards and precious metals;

i.   Documents relating to the purchase of consumer items, including credit card

statements, invoices, bills, receipts and delivery or shipping paperwork in the name of PETER LIOUNIS, "Mark Anderson," "Andrew Black," "James Weston," "Mike Slolli," "Mike Sloli," "Mike Solli," "Grayson Hewitt," UBS" or "Rockford Group."

j. All packages addressed to PETER LIOUNIS, "Mark Anderson," "Andrew Black," "James Weston," "Mike Slolli," "Mike Sloli," "Mike Solli," "Grayson Hewitt," UBS" or "Rockford Group;" or addressed from "Alex James," "Al Jason" or "Mark Berg."

k. Documents and other items, including mail, notes, photographs and videotapes, relating to the identities of individuals involved in the fraudulent investment schemes of PETER LIOUNIS and others, including the Rockford Group, UBS and Grayson Hewitt;

l. Documents and other items, including mail, utility bills, notes, photographs and videotapes, relating to the identities of the occupants of the SUBJECT PREMISES.

<u>TECHNICAL BACKGROUND</u>

88. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

89. I submit that if a computer or storage medium is

41

found on the SUBJECT PREMISES, there is probable cause to believe

those records will be stored on that computer or storage medium,

for at least the following reasons:

a.    Based on my knowledge, training, and
experience, as well as that of my fellow investigators, I know
that computer files or remnants of such files can be recovered
months or even years after they have been downloaded onto a
storage medium, deleted, or viewed via the Internet.  Electronic
files downloaded to a storage medium can be stored for years at
little or no cost.  Even when files have been deleted, they can
be recovered months or years later using forensic tools.  This is
so because when a person "deletes" a file on a computer, the data
contained in the file does not actually disappear; rather, that
data remains on the storage medium until it is overwritten by new
data.

b.    Therefore, deleted files, or remnants of
deleted files, may reside in free space or slack space that is,
in space on the storage medium that is not currently being used
by an active file – for long periods of time before they are
overwritten.  In addition, a computer's operating system may also
keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files,
computer storage media – in particular, computers' internal hard
drives – contain electronic evidence of how a computer has been
used, what it has been used for, and who has used it.  To give a
few examples, this forensic evidence can take the form of
operating system configurations, artifacts from operating system

43

or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.    As imparted to me by my other agents and based on the interceptions of the Anderson Telephone, I am aware that a computer was used to send emails to victims of the fraudulent investment schemes perpetrated by PETER LIOUNIS and others.  The investigation also revealed that bank accounts throughout the world, including Cyprus, were used as part of the scheme, which likely required PETER LIOUNIS and his co-conspirators to access bank information and carry out banking transactions via the Internet.  Accordingly, there is reason to believe that there is a computer system currently located on the SUBJECT PREMISES and that any such computer system contains direct evidence of the criminal activities described in the warrant.

90.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on

44

the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, email programs, and chat programs configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.   Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search

45

warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

   c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a  storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

91.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.    The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time

47

on the SUBJECT PREMISES could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

92.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant.  The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

93.   Because one other person may be residing at the SUBJECT PREMISES with PETER LIOUNIS, it is possible that the SUBJECT PREMISES will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

<u>CONCLUSION</u>

94.   WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant PETER

49

LIOUNIS so that he may be dealt with according to law, and
that the requested search warrant be issued for THE PREMISES
KNOWN AND DESCRIBED AS 59 GENESEE AVENUE, STATEN ISLAND, NEW
YORK.

        95.   IT IS FURTHER REQUESTED that all papers submitted
in support of this application, including this affidavit and the
arrest and search warrants, be sealed until further order of the
Court.  I believe that sealing these documents is necessary
because the items and information to be seized are relevant to an
ongoing investigation.  I believe that sealing is also necessary
to preserve the confidentiality of prior court-authorized
electronic surveillance in this investigation.  Based upon my
training and experience, I have learned that criminals actively
search for criminal affidavits and search warrants via the
Internet, and disseminate them to other criminals as they deem
appropriate, _e.g._, by posting them publicly through online
forums.  There are several co-conspirators and targets of the
investigation who have not been arrested and, upon information
and belief, are unaware of this investigation.  Therefore,
premature disclosure of the contents of this affidavit and
related documents will seriously jeopardize the investigation,
including by giving targets an opportunity to flee, destroy or

tamper with evidence, notify confederates and change patterns of

behavior.

Dated:      Brooklyn, New York
            April 17, 2012

                              S/ Brian Colica
                        _____
                        BRIAN COLICA
                        Special Agent
                        Homeland Security Investigations

Sworn before me this
 17   day of April, 2012

 S/ Marilyn Go
_____
THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**ATTACHMENT A**

**DESCRIPTION OF THE SUBJECT PREMISES**

The SUBJECT PREMISES is located at 59 Genesee Avenue, Staten Island, New York and is described as a two-story brick-faced home.  The sides of the SUBJECT PREMISES are covered with yellow siding, and the front face of the second level is covered in brown siding.  The front door of the SUBJECT PREMISES is brown and contains a window.  There are no markings on the front door. The house is located on the corner of Genesee Avenue and Abingdon Avenue facing south on Genesee Avenue and east on Abingdon Avenue.

**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED**

1.    All records relating to violations of 18 U.S.C. § 1343 involving PETER LIOUNIS, the Rockford Group, UBS Clearing Corp. and Grayson Hewitt, since December 2008, including:

A.  Bank records and financial records, including bank statements, wire transfer records, cancelled checks, check stubs, deposit slips, withdrawal slips, and ATM cards and records, relating to the fraudulent investment schemes of PETER LIOUNIS and others, including the Rockford Group, UBS and Grayson Hewitt;

B.  Business records, including certificates of incorporation and incorporation documents, contracts, ledgers,  financial statements, journals, notebooks, invoices, correspondence and notes, relating to the fraudulent investment schemes of PETER LIOUNIS and his co-conspirators, including the Rockford Group, UBS and Grayson Hewitt;

C.  Correspondence and notes relating to the fraudulent investment schemes of PETER LIOUNIS and his co-conspirators, including the Rockford Group, UBS and Grayson Hewitt;

D.  Notebooks or journals documenting conversations between PETER LIOUNIS and other individuals;

E.  Computer and Internet passwords, User-IDs, log-ins and log-in names, Internet Protocol ("IP") numbers ad addresses issued;

F.  Cell phones and other personal communication devices;

G.  Computers, computer hardware, computer software, personal digital assistant ("PDA"), passwords, data security devices, computer-related documentation, computer data, laptop computers, notebook computers, servers, hard drives, diskettes, memory storage devices, including thumb drives and memory sticks, and other magnetic  storage media and files, data and information contained thereon, used to store the records and information described in this attachment as well as drafts and final versions of documents described in this attachment;

H.   Cash and other forms of currency and monetary instruments, including checkbooks, ATM cards, credit cards, debit cards and precious metals;

I.   Documents relating to the purchase of consumer items, including credit card statements, invoices, bills, receipts and delivery or shipping paperwork in the name of PETER LIOUNIS,  "Mark Anderson," "Andrew Black," "James Weston," "Mike Slolli," "Mike Sloli," "Mike Solli," "Grayson Hewitt," UBS" or "Rockford Group."

J.   All packages addressed to PETER LIOUNIS, "Mark Anderson," "Andrew Black," "James Weston,"  "Mike Slolli," "Mike Sloli," "Mike Solli," "Grayson Hewitt," UBS" or "Rockford Group;" or addressed from "Alex James," "Al Jason" or "Mark Berg."

K.   Documents and other items, including mail, notes, photographs and videotapes, relating to the identities of individuals involved in the fraudulent investment schemes of PETER LIOUNIS and others, including the Rockford Group, UBS and Grayson Hewitt;

L.   Documents and other items, including mail, utility bills, notes, photographs and videotapes, relating to the identities of the occupants of the SUBJECT PREMISES.