1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,    :   12-CR-350 (ILG)
                             :
                             :
                             :
     -against-               :   United States Courthouse
                             :   Brooklyn, New York
                             :
                             :
                             :
PETER LIOUNIS,               :   Monday, August 12, 2013
                             :   11:30 a.m.
          Defendant.         :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
BEFORE THE HONORABLE I. LEO GLASSER
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:    LORETTA E. LYNCH, ESQ.
                       United States Attorney
                       BY: **DANIEL SPECTOR, ESQ.**
                           Assistant United States Attorney

For the Defendant:     PRO SE - **PETER LIOUNIS**
                       Assisted By CJA Counsel:
                           **MICHAEL H. GOLD, ESQ.**
Also Present:          Special Agent:  **RICHARD DeLISIO**
                       Postal Inspector: **MICHELLE PURNAVEL**

Courtroom Deputy:  Stanley Kessler

Court Reporter:   Mary Agnes Drury, RPR
                  Official Court Reporter
                  Telephone: (718) 613-2615
                  E-mail:  Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

```
                    PROCEEDINGS                        2
```

1          (In open court.)

2          (Defendant is present in open court.)

3          COURTROOM DEPUTY:  All rise, the United States

4     District Court for the Eastern District of New York is now

5     in session, the Honorable I. Leo Glasser is now presiding.

6          (Honorable I. Leo Glasser takes the bench.)

7          COURTROOM DEPUTY:  Calling Criminal Cause for

8     Suppression Hearing in Docket No. 12-CR-350, *United States*

9     *of America against Peter Liounis*.

10          (Honorable I. Leo Glasser takes the bench.)

11          THE COURT:  As soon as Mr. Gold gets here we'll

12     start.  I believe he had another matter on this morning,

13     didn't he?

14          MR. SPECTOR:  I believe that's what he said, your

15     Honor, yes.

16          THE COURT:  Do you recall where?

17          MR. SPECTOR:  I don't know if he said.  I don't

18     remember, Judge.

19          THE COURT:  All right.  I know it was someplace in

20     the courthouse, I don't remember before whom.

21          (Mr. Gold has entered the courtroom.)

22          COURTROOM DEPUTY:  Criminal cause for hearing,

23     United States versus Peter Liounis.  Counsel, please state

24     your appearances for the record.

25          MR. SPECTOR:  Good morning, your Honor, Daniel

PROCEEDINGS                                3

1    Spector for the government.  Also seated with me at counsel

2    table is Special Agent Richard DeLisio and Postal Inspector

3    Michelle Purnavel.

4              MR. GOLD:  Stand-by counsel, Michael Gold, for

5    Liounis.  Good morning.

6              THE COURT:  Good morning.  Mr. Liounis, are you

7    ready to proceed?

8              THE DEFENDANT:  Yes, your Honor.  Before we

9    start --

10             THE COURT:  Before we start the motion, I'll hear

11   you.  Why don't you come on up here.

12             Before we proceed, you may want to look at a

13   letter I've received this morning.  I'll share it with you.

14             MR. SPECTOR:  I have a copy of it already.

15             THE COURT:  All right.  Mr. Liounis, your motions

16   are first, to suppress the evidence that has been obtained

17   by search warrant for E-mails.  Do you want to be heard on

18   that?

19             THE DEFENDANT:  No, your Honor.

20             THE COURT:  Your second motion is to suppress

21   aliases.  Do you want to be heard on that?

22             THE DEFENDANT:  Just the fact that --

23             THE COURT:  Do you want to be heard on any of the

24   motions that you made?

25             THE DEFENDANT:  Yes, I do.

PROCEEDINGS                                     4

1          THE COURT:  Which one?

2          THE DEFENDANT:  The wiretap, I'd like to add

3    something.

4          THE COURT:  Go ahead.

5          THE DEFENDANT:  I'd like to add that on the

6    wiretap, District Judge Townes authorized a wire application

7    on a telephone for an individual named Mark Anderson.  This

8    was done for three straight months.  On the third month, on

9    the third extension, which by the way I'm also challenging

10   based on Title III, I'm not aware of how she re-up'd the

11   same order three times, but that's not the issue right now

12   -- what I'd like to say is on the third re-up, somebody took

13   my iPhone, my personal phone belonging to me, it's in my

14   name, it's in my address, there is nothing wrong with that

15   phone.  There is nothing fictitious with that phone.  The

16   phone has absolutely no contact whatsoever with the Mark

17   Anderson phone that was previously tapped for the past two

18   applications, not including the third.  My iPhone has never

19   had any contact with any kind of victims for any of these

20   schemes, any of these aliases.  It has absolutely nothing to

21   do with any of this and it was just thrown on as if --

22   again, to give you an example, three applications, all three

23   of them have this Mark Anderson phone that's allegedly being

24   used in this scheme.

25          On the third application they add my iPhone to

1   that application and they called it "subject telephone

2   number two," now referencing as if that Mark Anderson phone

3   belongs to me and the iPhone belongs to me or both belong to

4   Mark Anderson.  Whatever the case is, that's not the case,

5   okay?  And I've reviewed, I have discussed, I've looked at

6   these wiretaps, I've heard them thoroughly on my iPhone.

7   It's not my business when it comes to the Mark Anderson

8   phone, but on my iPhone there is no nexus, there is no

9   relevance, there is nothing related to this case, sir.

10          THE COURT:  With respect to the first two, your

11   only objection is with respect to Mark Anderson, is that

12   you're only objection to the first two applications?

13          THE DEFENDANT:  Well, the first one also, there is

14   a probable cause issue, which I've addressed in my motion

15   already, and I am absolutely challenging that as to -- there

16   is agent -- Postal Inspector Purnavel conducted an

17   investigation and she put her findings in this original

18   application affidavit.  And to be perfectly honest with your

19   Honor, it is completely reckless.

20          And in my affidavit I am more than willing to

21   elaborate on each and every part of that affidavit that is

22   completely reckless.  And that original application

23   obviously derived some kind of information or some kind of

24   fruits which went on to the next one and went on to the next

25   one.  And if you look at the affidavits, they're very

PROCEEDINGS                              6

1    similar.  It appears that what's being found or produced in

2    the first affidavit now appears in the second one.  And then

3    once again, it now appears in the third one.  And once it's

4    in the third one, they join my iPhone together.

5              It's kind of a mess, to be perfectly honest with

6    you.  That's the way I'm looking at this.  And today I have

7    a witness, I don't see him here yet, but my investigator,

8    Joe Dwyer, he did a reenactment.  I have questions all

9    prepared.  I'm all ready for him to be here today to discuss

10   the probable cause end of that as well.

11             THE COURT:  With respect to what I'm hearing, if

12   I'm hearing correctly, you're alleging that the entire

13   affidavit of Inspector Purnavel was reckless and false?

14             THE DEFENDANT:  I'm saying that it is reckless,

15   your Honor.

16             THE COURT:  And false?

17             THE DEFENDANT:  Let's say it's reckless.

18             THE COURT:  Well, if I recall your motion

19   correctly, the only two allegations of falsity are with

20   respect to the overhearing of your voice while you were on a

21   street corner, that has to do with Mr. Dwyer's

22   investigation, and the other had to do with the telephone,

23   which I think was seized five years apart or were seized

24   five years apart.  Those are the only two things that you're

25   complaining about?

PROCEEDINGS                          7

1        THE DEFENDANT:  Well, the second argument, I'm not

2   sure, can you -- I'm sorry.

3        THE COURT:  All right.  Mr. Spector, do you want

4   to respond?

5        MR. SPECTOR:  Judge, the defendant has not met the

6   criteria.

7        THE COURT:  Pardon?

8        MR. SPECTOR:  The defendant has not met the

9   criteria for a Franks Hearing, with respect to any aspect of

10  his challenge of the wiretap.

11       First of all, he's failed to file an affidavit

12  based on personal knowledge.  The Dwyer affidavit to which

13  he was referring was actually filed by his formal counsel,

14  which then at Mr. Liounis' insistence, all of those papers

15  were withdrawn.  So there is actually nothing before the

16  Court as a procedural matter to merit a hearing.

17       Second, even if the affidavit was before the

18  Court, it does not actually contradict Inspector Purnavel's

19  statements in the wiretap affidavit.  And even if there was

20  a contradiction and even if it was before the Court, it's

21  irrelevant, because frankly, the one paragraph that

22  Mr. Liounis challenges out of the entire affidavit was not

23  necessary for the government to obtain a wiretap affidavit.

24       THE COURT:  Do you want to respond to any of the

25  other motions that he's made?

PROCEEDINGS                                8

1        MR. SPECTOR:  Judge, unless you have questions, I

2   think we've fleshed it out sufficiently in our papers.

3   Suffice to say, we do not believe that any of the

4   defendant's arguments have merit or even really come close

5   to requiring a hearing.

6        THE COURT:  All right.

7        THE DEFENDANT:  Your Honor, to be very clear,

8   before you answer, before you decide, I challenged pretty

9   much all of that affidavit.  I mean, I've challenged -- I

10  didn't challenge one aspect of it or two, I did a

11  reenactment of one, but I made it very clear that

12  Ms. Purnavel -- excuse me, Postal Inspector Purnavel was

13  wrong about a lot of things.  She was really off about a lot

14  of things.  This is saying garbage belonged to me, which is

15  reckless, based on me living in the house with one other

16  person, when I'm living with three other people and there

17  are two other people living in the back, we share the

18  garbage pails.  I mean, it goes on and on.

19        The cell site data, the fact that she said all of

20  these calls are made within 0.5 miles or further of my home

21  does not make it that the phone is in my possession.  You

22  are talking about hundreds of homes and thousands of people.

23  That doesn't work.  It's -- it's reckless.  And if you

24  combine the three or four -- I believe three or four

25  findings by Inspector Purnavel, and you look at them

1   individually, I mean, it's reckless, it's reckless.  There

2   is no nexus whatsoever on her opinion.  And the reenactment,

3   Joe Dwyer, if I'm allowed to call him, I think it's very

4   relevant, did a re- enactment with Mr. McHale.  Mr. McHale

5   is present today.  They measured different voices, they did

6   high pitches, low pitches, approaching, passing.  They

7   re-enacted this completely and both of them concluded it's

8   impossible, it's impossible.

9           I also want to add that even after the wiretap

10  that concerns the iPhone that was used and compared, okay,

11  there were things the Court needs to know here.  Number one,

12  that iPhone, even after being tapped, the government

13  themselves still says "we believe", "it appears to be,"

14  nobody came out and said, "that's him."  The only one who is

15  saying that's him is Postal Inspector Purnavel.

16          In fact, Ms. Purnavel also -- also did a test.

17  She conducted a voice exam.  She took the voices of

18  individuals who are allegedly involved in these schemes,

19  okay, and she got in touch with victim investors.  And these

20  are victim investors who dealt directly with these people

21  over a telephone, I'm sure more than once, okay, and she had

22  them listen to tapes to see if they can pick who the person

23  is, is that the person they dealt with, is that the voice

24  related to the salesman, and those tests were inconclusive.

25          So Ms. Purnavel pulling up in a car parking could

PROCEEDINGS                              10

1  be 30 feet or 40 feet away listening to me on a cell phone

2  is reckless.

3          And there is more.  I mean, if I get my witnesses

4  in here, I'm all ready to present everything to the Court.

5          THE COURT:  Mr. Spector, is there anything that

6  you want to say to the Court, is there anything that you

7  want to respond to?

8          MR. SPECTOR:  Judge, I'm happy to respond in more

9  detail, if you'd like.

10          THE COURT:  Well, Mr. Spector, a motion has been

11  made and you're asking me whether I want a response from

12  you.  If you think a response is appropriate, then make one.

13          MR. SPECTOR:  Certainly, Judge.  Just to --

14          THE COURT:  What it is that you -- I don't quite

15  understand what it is that you have in mind as to whether I

16  want a response.

17          MR. SPECTOR:  Well, Judge, I think we're really

18  repeating what has been set forth in the papers already.

19  The Dwyer affidavit that Mr. Liounis relies on so heavily,

20  which is --

21          THE COURT:  I'm familiar with that.

22          MR. SPECTOR:  Yes.

23          THE COURT:  Now, there is something about an

24  iPhone that was added later?

25          MR. SPECTOR:  I'm frankly not exactly sure what

1    the defendant is talking about with respect to the iPhone.

2    I think he's referring to the phone that was in his name,

3    which was the subject of the third round of wiretaps when we

4    wiretapped both the phone in the Mark Anderson name and the

5    phone in the defendant's name.  I believe that is what he's

6    referring to.  Beyond that, I'm not really sure what his

7    application is other than a general suppression of that

8    wiretap, so I don't really know how to respond to that.

9              The wiretap affidavit for that phone as well as

10   the other phones laid out quite extensively the government's

11   investigation, our probable cause, how we had met the

12   necessity requirements, and I frankly don't believe that the

13   defendant either orally or in his papers has come close to

14   really challenging the government's basis for a wiretap of

15   either phone.

16             THE COURT:  All right.

17             THE DEFENDANT:  May I respond?

18             THE COURT:  Let me deal with --

19             THE DEFENDANT:  May I respond to that, your Honor?

20             THE COURT:  Pardon?

21             THE DEFENDANT:  May I respond to what Mr. Spector

22   just said?

23             THE COURT:  Yes.

24             THE DEFENDANT:  I want to make it very clear that

25   the subject number two phone that he is referring to, the

PROCEEDINGS                    12

1    phone number (917) 370-6944 is in fact my phone number, it's

2    related to my iPhone, an iPhone the government seized when I

3    was arrested, okay.  And, again, I reiterate that there is

4    no nexus whatsoever in any way to victims, to anyone

5    relating to any of those alias schemes related to that

6    phone, nothing.

7              THE COURT:  Does that assist you in any way?

8              MR. SPECTOR:  Judge, I think what we have here is

9    the defendant is really making guilt/innocence arguments.

10   The basis for tapping the phone was laid out in the

11   affidavit.  There was ample evidence to believe that the

12   Mark Anderson phone was in -- was being used by the

13   defendant; and therefore, that the phone in the defendant's

14   name would provide additional evidence of the criminal

15   activity.

16             THE COURT:  All right.  Let me go through the

17   various motions that Mr. Liounis has made.

18             First, the motion to suppress the search warrant

19   evidence.  The claim or allegation for the challenge which

20   he makes is that the warrant was overbroad and lacked

21   specificity.  I examined the warrant, which was used by

22   Judge Carter, I believe, and I inspected the affidavit by

23   Inspector Purnavel in support of that search warrant.  The

24   affidavit provides as much probable cause as any affidavit

25   could conceivably provide with respect to the basis for the

PROCEEDINGS                          13

1    search warrant.

2          And insofar as the search warrant itself is

3    concerned, the warrant quite specifically provides that the

4    purpose of it is to seize evidence related to wire fraud,

5    fraud by the evidence of a scheme to defraud, by defrauding

6    investors of the Rockford Group, and it was supported by --

7    support of that warrant is an affidavit set out in some

8    detail by Michelle Purnavel, the postal inspector, which

9    contained detailed descriptions of the fraudulent scheme.

10         The motion to suppress the E-mail evidence is

11   based upon overbreadth and a lack of specificity is denied

12   as being completely meritless.

13         The second motion that he made is a motion to

14   suppress aliases.

15         THE DEFENDANT:  That, I would like to comment on,

16   your Honor.

17         THE COURT:  Excuse me?

18         THE DEFENDANT:  If it's possible.

19         THE COURT:  Excuse me.

20         THE DEFENDANT:  Sorry.

21         THE COURT:  Insofar as the motion to suppress

22   aliases is concerned, those aliases are critical to the

23   fraudulent scheme alleged in this indictment, and the

24   aliases are plainly relevant.  I think I wrote on aliases at

25   least three cases in which I cited; Scarpa and Rutger and

PROCEEDINGS                    14

1    Coppa (phonetic) years ago.

2         The motion to be provided with Brady material, the

3    government says it is unaware of any Brady material, so

4    there is nothing to provide.  But I would like to believe

5    that if the government becomes aware of any Brady material,

6    it will furnish it speedily to Mr. Liounis.

7         MR. SPECTOR:  Of course, your Honor.

8         THE COURT:  As far as Diglio material is

9    concerned, that would be appropriately supplied and in

10   accordance with the requirements of the law, supplied at a

11   time when it could be effectively used at trial.

12        I think I dealt with that in Coppa, it is the case

13   which is the case where there was a lot of discussion on

14   that, derived from Coppa, which was the United States versus

15   Schwartz.

16        404(b) evidence which Mr. Liounis has requested,

17   that also will be provided reasonably in advance of trial.

18   The cases are fairly clear on that.

19        Next motion for Rule 16 discovery.  The

20   government's response is that they have already provided

21   Rule 16 discovery with respect to everything that was

22   obtained from the Google and Go Daddy post searches.  The

23   government will provide, as Mr. Liounis requests, the names

24   of the numbered investors which have been referred to in the

25   affidavits, I think also in the complaint and in the

1  indictment.

2          The lineup recording I'm not too sure what that's

3  referring to, but in any event the government's response is

4  that that has been disclosed.  And a Department of Justice

5  document which is numbered, what is that referring to?

6          MR. SPECTOR:  Your Honor, there was a point at

7  which we had recordings of the defendant's voice and we had

8  several agents and other individuals make a recording making

9  a similar statement to the defendant, and then we played

10 that voice lineup, so to speak.

11         THE COURT:  Okay.  Well, that's been provided to

12 him?

13         MR. SPECTOR:  Yes, your Honor.  And just one other

14 matter, the previous issue, the Court raised the names of

15 investors by investor number, that's already been provided.

16         THE COURT:  Yeah, okay.

17         Mr. Liounis also requested fingerprints or

18 analysis or handwriting analysis of the trash, which was

19 found outside his home and was told there wasn't any

20 fingerprint analysis or handwriting analysis, so there is

21 nothing to be provided.

22         Mr. Liounis requested certified copies of

23 Rapoport's credit card statement.  The government's response

24 is we don't have a certified copy of a Rapoport credit card

25 statement, but you've already provided to Mr. Liounis this

PROCEEDINGS                                    16

1    credit card record.

2          Now, Mr. Liounis also asked for the shipping

3    receipts, the packages which were sent to Mike Sloli, and

4    the government's response is those were already given to

5    him.

6          Mr. Liounis requested certified letters of the

7    residence search, which was already provided and received.

8          Now, with respect to details regarding a silver

9    Samsung phone, the government indicates that counsel --

10   stand-by counsel has been invited and is invited to examine

11   that phone and whatever documents related to it.  I don't

12   know whether that invitation has been extended to you.

13         MR. GOLD:  I wasn't.

14         THE COURT:  Pardon?

15         MR. GOLD:  I was not aware of it, but I appreciate

16   the offer.

17         THE COURT:  I think it's on page 27 of the

18   government's memorandum.

19         MR. GOLD:  Thank you.

20         THE COURT:  Paragraph eight says Liounis seeks

21   specific details concerning a silver Samsung phone

22   discovered during the April 18, 2012, search.  The

23   government previously invited Liounis' CJA counsel to

24   inspect this telephone.  Liounis may send his current

25   stand-by counsel to inspect the telephone and obtain the

PROCEEDINGS                    17

1    information that he seeks.

2            Mr. Liounis has also sought a fingerprint analysis

3    of the telephone, and the government's response is no such

4    analysis has been conducted.

5            Mr. Liounis has requested pre and post arrest

6    statements.  Those have already been provided.

7            He requested video footage, if any, of his

8    interrogation at John F. Kennedy Airport, and the

9    government's response is there are no such video recordings.

10   There was also no video on a pole outside his home.  He

11   requested, but there isn't any.

12           And Mr. Liounis also requested documents that the

13   Securities and Exchange Commission may have accumulated in

14   investigating Rockford, it's neither Rule 16 nor Brady, and

15   so those motions I think are denied or moot.

16           And so we have remaining, the Bill of Particulars,

17   motion for Bill of Particulars, and it is denied.  The Bill

18   of Particulars which have been provided are more than enough

19   to give Mr. Liounis all the information he needs as to what

20   it is that he's charged with.  And to avoid any

21   constitutional issue, which another indictment may present,

22   which are the purposes of the Bill of Particulars.

23           So what is left are the wiretaps.  There are three

24   wiretaps or applications, three affidavits for wiretaps.

25   Those affidavits I've examined very carefully and have no

PROCEEDINGS                    18

1   hesitation in saying that the probable cause detail provided

2   by those affidavits provide as much probable cause as could

3   conceivably be provided in an indictment charging very

4   complex, a very complex scheme to defraud another, not only

5   with respect to one group, the Rockford Group or the General

6   Motors IPO and the Grayson Hewitt scheme to defraud now

7   investigative information which has been provided in those

8   affidavits to warrant any magistrate to find probable cause

9   is beyond question more than enough.

10          Insofar as a Franks Hearing is concerned, before a

11  Franks Hearing -- and I've written on this a number of

12  occasions a good many years ago in cases in which I did, I

13  don't recall offhand, but before a Franks Hearing, the

14  person requesting one must make substantial showing and

15  offer of proof based on personal knowledge of allegations of

16  deliberate falsehood and offer proof as shown.

17          The only obligation in falsehood, which I've been

18  able to distract from the motions that were made attacking

19  those Title III affidavits is an affidavit from an

20  investigator with respect to whether he could or could not

21  have heard Mr. Liounis' voice on a cell phone while standing

22  on a corner.

23          Without commenting on the government's affidavit

24  in response indicating that the affidavit is significantly

25  flawed for a variety of reasons set out in the government's

PROCEEDINGS                    19

1    memorandum, Franks v Delaware makes it very, very clear that

2    if the court should find that there has been some false or

3    reckless, in Mr. Liounis' words, information in an

4    affidavit.  But what else is in the affidavit, which is

5    neither false nor reckless, but excluding the challenged or

6    complained of information, you have an affidavit which more

7    than could possibly be required, provide probable cause for

8    the issuance of that Title III authorization, no Franks

9    Hearing is required.

10            And there will be no Franks Hearing with respect

11   to that motion, because the affidavits in support of those

12   Title III applications are replete with as much probable

13   cause as could be provided with respect to the complexity of

14   this investigation.

15            Insofar as the other claim of invalidity or flaw

16   in the affidavits; that is, there was no sufficient showing

17   of necessity, I think I've written on that a number of

18   times.  I think the last time I did it was in that Coppa,

19   but I'm not sure about the name of that case, there is no

20   requirement in Title III that every conceivable avenue of

21   investigation be exhausted.  But looking at the affidavits

22   in support of a Title III, the applications here, I don't

23   know what else could have been pursued in terms of

24   investigations, given the fact that not every conceivable

25   investigative technique need be employed.

PROCEEDINGS                    20

1          You have an undercover person who I think investor

2     number five had undermined.  You had every other conceivable

3     technique which was available, surveillance wouldn't provide

4     the information which was inherent to this investigation,

5     which was E-mails and telephone calls.  Surveillance

6     wouldn't provide any usefulness in that regard.  The

7     necessity requirements is more than clearly satisfied in the

8     affidavit, and so the application and motion to suppress the

9     evidence attained from wiretaps is also denied.

10          And what is left is a motion to suppress

11     statements which were made and prepared.  I'm prepared to go

12     forward with the hearing, if the government is.

13          MR. SPECTOR:  Yes, your Honor.

14          THE COURT:  Okay.  You can call your witness.

15          MR. SPECTOR:  Thank you, Judge.  Judge, do you

16     have a preference if I question from here or the back

17     podium?

18          THE COURT:  Do it right here.

19          MR. SPECTOR:  The Government calls Special Agent

20     Richard DeLisio.

21          THE DEFENDANT:  Excuse me, your Honor, as far as

22     the wiretap, you just said, there was a second part of that,

23     which was the iPhone which was related to -- to those

24     wiretaps.  I'm not sure if you ruled on that part.  And I

25     also have a speedy trial issue which is --

PROCEEDINGS                              21

1              THE COURT:  I think I already decided that a long

2     time ago.  I think I issued an order.

3              MR. SPECTOR:  Yes, your Honor, that's correct.

4              THE COURT:  A long, long time ago.

5              THE DEFENDANT:  But that was based on a date that

6     was not correct, your Honor.  And to be very honest with

7     you --

8              THE COURT:  Mr. Liounis, you know, you keep

9     repeating "to be very honest" with me.  I would like to

10    believe that everything you're saying, Mr. Liounis, is

11    because you're being very honest, but you needn't assure me,

12    I'm assuming everything you are saying is honest and

13    truthful.

14             But with respect to speedy trial, I've already

15    decided that some time ago.  If you think that I made some

16    error with respect to my determination to speedy trial,

17    there is recourse, it's known as the United States Court of

18    Appeals for the Second Circuit.

19             Let's proceed with respect to the motion to

20    suppress statements.

21

22    **RICHARD DeLISIO**, called by The Government, having been first

23                    duly sworn, was examined and testified as

24                    follows:

25

R. DeLISIO - DIRECT/MR. SPECTOR                22

1          COURTROOM DEPUTY:  Please state and spell your

2     name for the record.

3          THE WITNESS:  Richard DeLisio, D-E-L-I-S-I-O.

4          MR. SPECTOR:  May I proceed, your Honor?

5          THE COURT:  Yes.

6     DIRECT EXAMINATION

7     BY MR. SPECTOR:

8     Q    Agent DeLisio, what do you do for a living?

9     A    I'm a special agent with US Immigration and Customs

10    Enforcement.

11    Q    And where are you currently assigned?

12    A    JFK Airport.

13    Q    How long have you been --

14         THE COURT:  You're with Homeland Security, are,

15    you?

16         THE WITNESS:  Correct.

17    Q    How long have you been a special agent with Homeland

18    Security?

19    A    Approximately five years.

20    Q    And what did you do before that?

21    A    I was a postal inspector with the US Postal Inspection

22    Service.

23    Q    So altogether how long have you been a federal law

24    enforcement agent?

25    A    22 years.

1   Q    Can you briefly describe your current duties?

2   A    I'm assigned to a financial crimes group at JFK

3   Airport.  We investigate a variety of financial crimes,

4   including bulk cash smuggling, money laundering, wire fraud.

5   Q    And did there come a time that you arrested the

6   defendant, Peter Liounis, pursuant to an arrest warrant?

7   A    Yes.

8   Q    When was that?

9   A    It was April 17, 2012.

10  Q    Where did you arrest him?

11  A    It was during a vehicle stop.  He was driving a vehicle

12  on Staten Island.

13  Q    And approximately what time was he arrested?

14  A    About 6:40 p.m.

15  Q    Were you alone or with other law enforcement agents

16  when the defendant was arrested?

17  A    Other agents were present.

18  Q    Were you altogether in one car or multiple cars?

19  A    Multiple cars.

20  Q    What happened after the defendant was arrested?

21  A    His -- the car he was driving was secured.  It was

22  secured in a legal spot on the street.  A few minutes later

23  Mr. Liounis was transported to Homeland Security's office at

24  JFK Airport.

25  Q    Were you in the car that transported Mr. Liounis?

1   A    No.

2   Q    To your knowledge was Mr. Liounis interrogated at all

3   during the ride back to JFK?

4   A    He was not.

5   Q    What happened when the defendant arrived at JFK?

6   A    He was placed in a holding cell for about 10 or

7   15 minutes.  After that he was put into an interview room.

8   I was present with two other agents.

9   Q    And other than those present in the interview room was

10  there anyone else who was able to observe the activity in

11  the interview room?

12  A    Yes.  There were about three agents observing the

13  interview from a separate room through a one-way glass.

14  Q    Were there any cameras in the interview room?

15  A    No.

16  Q    Were there any cameras in the observation room with the

17  one-way glass?

18  A    No.

19  Q    What happened after Mr. Liounis arrived in the

20  interview room?

21  A    First thing I told him is not to make any statements,

22  that he was there to listen.  I explained why he was being

23  arrested.  I explained that it was a very serious charges

24  that were against him.  It was a long-term investigation,

25  there was a wiretap involved, and it was extensive

1    surveillance.

2    Q    And what happened next?

3    A    I also showed him a copy of the federal sentencing

4    guidelines that he was potentially facing, and then I played

5    -- after that, I played a series of phone calls from the

6    wiretap.

7              MR. SPECTOR:  May I approach?

8              THE COURT:  Yes.

9    Q    Showing you what's been previously marked as 3500 RD-4?

10   A    Yes.

11   Q    What is that document?

12   A    These are my handwritten notes documenting the wiretap

13   calls that were placed for Mr. Liounis.

14   Q    And how many calls did you play for him?

15   A    Five.

16   Q    Can you describe the recordings as a general matter

17   that you played?

18   A    Two of the recordings were phone calls between

19   Mr. Liounis posing as Mark Anderson and two of the investors

20   from the fraud scheme.  One of the phone calls was between

21   Mr. Liounis posing as Mark Anderson and an answering service

22   that was utilized by Grayson Hewitt, and two of the phone

23   calls were between Mr. Liounis and two of his associates.

24   Q    And after you finished playing the recordings how did

25   Mr. Liounis react?

1   A    At some point he said he didn't want to make any

2   statement, because he didn't want to incriminate himself.

3   Q    And did there come a time after that, that you left the

4   interview room?

5   A    Yes.  I left for a few minutes, a brief period.  One of

6   the agents stayed behind in the room with Mr. Liounis.  When

7   I came back that agent told me that Mr. Liounis, on his own,

8   said basically words to the effect "I'm a piece of shit."

9   Q    And was that statement made in response to any

10  questioning?

11  A    No.

12  Q    What happened next?

13  A    He was -- Mr. Liounis was brought into a holding cell

14  for, again, maybe 10 or 15 minutes.  After that he was

15  brought into a separate room where he was processed, he was

16  fingerprinted, photographs were taken, and he provided

17  pedigree information.

18  Q    What happened after the defendant's processing was

19  completed?

20  A    He was placed back in the holding cell.  A short period

21  of time went by and Mr. Liounis said that he wanted to talk.

22  Q    And how did you respond?

23  A    I said "fine."  I was with another agent in the holding

24  cell.  I said we can proceed right here.  He said he didn't

25  want to talk in the cell, because there were cameras in the

1   cell.  So at that point I offered, well, let's go back to

2   the interview room, we can talk there.  And he said, I don't

3   want to talk there, because there are cameras in that room

4   as well, which there are not.

5   Q    Just to clarify are there cameras in either the holding

6   cell or the interview room?

7   A    No.

8   Q    Did you tell Mr. Liounis there were not cameras in

9   those places?

10  A    Yes.

11  Q    What happened next?

12  A    I offered, well, we can speak in the agent's lunch

13  room, there are no cameras in that room, and he agreed.

14  Q    And are there any cameras in the agent's lunch room?

15  A    No.

16  Q    What happened next?

17  A    We brought him into the -- myself and a couple of

18  agents were in the lunch room, we sat him down.  I offered

19  him, if he wanted something to eat at that point, he

20  declined.  And I said, it's going to be a long night, you

21  should at least have something to drink or eat.  Ultimately

22  he did accept -- we bought him some water from the vending

23  machine, we bought him a bag of pretzels, which he didn't

24  eat.  I think he ate a couple of pretzels later.

25          Before we got started or anything, he was

1   complaining that he was congested.  At that point I said, we

2   can bring you to a hospital right now.  Do you need to see a

3   doctor?  He said no, no, I just have bad allergies, it's

4   fine, I need medication.  I asked him where his medication

5   was, he said it was in his car that we secured when we

6   arrested him.  His car was on Staten Island still.

7   Q    So what did you do at that point?

8   A    Immediately at that point I told another agent, go back

9   to his car, we have the keys, get the medication, and bring

10  it back.

11  Q    And had any questioning begun at that point?

12  A    No.

13  Q    While -- how long approximately did it take for that

14  agent to retrieve the medication?

15  A    It was less than an hour.

16  Q    And while you were waiting for the medication did you

17  ask the defendant if he wanted to wait for his medication or

18  proceed with the questioning?

19  A    Yes.  He said I'm fine to proceed.  He said, I want my

20  medication, but I can go, I'm fine.

21  Q    What happened next?

22  A    I read him his Miranda rights from the Miranda form.  I

23  gave him a copy of the form, which he read.  I asked him if

24  he understood his rights, he said he did, and he ultimately

25  signed the waiver section of the form.

R. DeLISIO - DIRECT/MR. SPECTOR                    29

1          MR. SPECTOR:  May I approach, your Honor?

2          THE COURT:  Yes.

3    Q    Showing what's been marked as Government's Exhibit 7 --

4          MR. SPECTOR:  Your Honor, I believe it's toward

5    the end of the binder that we had provided.

6    Q    What is Government's Exhibit 7?

7    A    It's a Statement of Rights form.

8    Q    And did you witness Mr. Liounis fill out the bottom

9    portion of the form and sign it?

10   A    Yes.

11         MR. SPECTOR:  The government offers Exhibit 7.

12         THE COURT:  It's received.

13         (Government Exhibit 7 is admitted into evidence.)

14   Q    Did you sign the form as well?

15   A    Yes, I did.

16   Q    Did another agent also sign it?

17   A    Yes.

18   Q    And you reviewed the form with the defendant?

19   A    Yes.

20   Q    And after the Miranda form had been signed what

21   happened next?

22   A    I began the interview.  I asked him a series of

23   questions and he provided answers.

24   Q    Now, other than the defendant's initial request for his

25   allergy medications, did Mr. Liounis ever complain that he

1    was not feeling well?

2    A    No.

3    Q    Did he ever say that he was having trouble breathing?

4    A    No.

5    Q    Did you ever observe him having difficulty breathing?

6    A    No.

7    Q    Did he ever fall to the floor?

8    A    No.

9    Q    Suffer a seizure?

10   A    No.

11   Q    Suffer a panic attack?

12   A    No.

13   Q    At any time while the defendant was in custody on

14   April 17th, did he ever ask for an attorney?

15   A    No.

16   Q    Was the defendant permitted to use his phone to contact

17   anyone?

18   A    Yes, he was.

19   Q    Can you tell us about be that?

20   A    Yes.  He said he was concerned that he wanted to speak

21   to his girlfriend, because he speaks to her every night

22   before they both go to sleep, so we allowed another agent to

23   send a text message to his girlfriend, and then he

24   ultimately also made a phone call her to later.

25            MR. SPECTOR:  May I approach, your Honor?

R. DeLISIO - DIRECT/MR. SPECTOR                    31

1       THE COURT:  You needn't ask, you have a standing.

2    Q    Showing you what's been marked 3500 RD-2 --

3       MR. SPECTOR:  And I believe that's toward the

4    front of the binder, Judge.

5    Q    -- what is that document?

6    A    Those are my handwritten notes documenting text

7    messages and the phone call.

8       MR. SPECTOR:  The government offers RD-2 into

9    evidence.

10       THE COURT:  It's received.

11       (Government Exhibit RD-2 is admitted into

12    evidence.)

13    Q    Agent DeLisio, when the interview concluded, what, if

14    anything, did the defendant say about how he had been

15    treated?

16    A    Multiple times he thanked me and the other agents that

17    were present, multiple times, thanked us for treating him

18    like a gentleman.

19    Q    After the interview ended what happened next?

20    A    Mr. Liounis was brought to a medical facility which was

21    located in the same building as my office where he was

22    examined by a doctor.

23    Q    Is that a private facility or a government facility?

24    A    It's a private facility.

25    Q    Why did you take him to the medical facility?

R. DeLISIO - DIRECT/MR. SPECTOR                32

1    A    Well, I didn't take him, two other agents took him to

2    the facility.  Basically as a precaution, because he was

3    going to lodged at the Metropolitan Detention Center, and

4    normally they require if someone is on medication, they have

5    been known to require a fit for confinement letter, where

6    the prisoner would be examined by a doctor before being

7    brought to the facility.

8    Q    Showing you what's been marked as Government Exhibits 5

9    and 6, what are those documents?

10   A    These are the documents from the JFK Advanced Medical

11   documenting the examination.

12   Q    And if you can just read aloud the conclusion in

13   Government's Exhibit 5?

14   A    "Shows little to none abnormalities based upon exam

15   with no signs of distress or discomfort."

16   Q    And if you can read aloud the conclusion from

17   Government Exhibit 6?

18   A    There is a series of boxes that -- there is a box

19   checked next to it as "stable for confinement."

20          MR. SPECTOR:  The government offers Exhibits 5 and

21   6 into evidence.

22          THE COURT:  Received.

23          (Government Exhibits 5 & 6 are admitted into

24   evidence.)

25   Q    And after the defendant was cleared by the medical

1   facility what did you do?

2   A     Two other agents transported him to the MDC.

3            MR. SPECTOR:  No further questions, your Honor.

4            THE COURT:  Mr. Liounis, you can cross.

5            THE DEFENDANT:  Can I grab my exhibit, please?

6            THE COURT:  Pardon?

7            THE DEFENDANT:  Could I grab my exhibits?

8            THE COURT:  Sure.

9   CROSS-EXAMINATION

10  BY THE DEFENDANT:

11  Q     Mr. DeLisio, on April 17, 2012, did you arrest Peter

12  Liounis?

13  A     Yes.

14  Q     Could you tell me the time again that you arrested

15  Mr. Liounis?

16  A     It was about 6:40 p.m.

17  Q     And are you absolutely, 100 percent when you are giving

18  an exact time, 6:40, correct?

19  A     Giving an approximate time of 6:40.

20  Q     Is there a possibility that you might be wrong by an

21  hour?

22           MR. SPECTOR:  Objection.

23           THE COURT:  I'll allow it.

24           THE DEFENDANT:  Excuse me?  I didn't -- is it

25  okay?

1       THE COURT:  I'll allow it.

2   Q    Is there a possibility that you might be off by

3   approximately an hour?

4   A    Absolutely not.

5   Q    Absolutely not?

6   A    Absolutely not.

7   Q    Okay.  How many cars were used to pull Mr. Liounis over

8   that day, please, if you don't mind?  Do you want me to --

9   I'll go over here.  How many cars were used that day?

10  A    Between four and five.

11  Q    Four and five.  Mr. DeLisio, you made a reference that

12  you pulled over a car and you said that many times during

13  your testimony.  Are you saying that I was driving a car

14  when you pulled me over?

15  A    Vehicle, car.  It was an Mercedes SUV.

16  Q    It was an ML350 Mercedes truck?

17  A    I don't recall the model offhand, it was a Mercedes

18  sport utility vehicle.

19  Q    Okay.  Was it a truck?

20  A    It's an SUV, a truck, yes.

21  Q    So it was a truck.  When you pulled Mr. Liounis over in

22  the truck did your agents read Mr. Liounis' Miranda rights?

23  A    I don't recall agents reading you your Miranda rights

24  at that time.

25  Q    Okay.  Do you recall the agents searching the truck

1  right then and there on the street?

2  A    The truck was searched incident to arrest, yes.

3  Q    And you said Mr. Liounis was transported to --

4  A    Homeland Security investigation at JFK Airport.

5  Q    Okay.  Who gave you the authority to arrest Peter

6  Liounis on 4/17/12?

7  A    It was a federal search warrant, a federal arrest

8  warrant issued by the Eastern District of New York.

9  Q    Can you tell me who issued that arrest warrant?

10 A    I don't recall the name.

11        MR. SPECTOR:  Objection, relevance.

12        THE COURT:  Overruled.

13 Q    Can you please tell me the judge who signed off on that

14 arrest warrant, please?

15 A    I don't recall the name of the judge at this time.

16 Q    You don't?  Do you recall the date that the judge who

17 you cannot recall signed this affidavit in support of an

18 arrest warrant?

19 A    I believe the warrant was signed on April 17th.

20 Q    Do you recall the case number referenced on the warrant

21 that you believe was signed on the 17th?

22 A    No.

23        THE DEFENDANT:  Your Honor, may I show an exhibit?

24        THE COURT:  Surely.

25 Q    Take a look at that please and please take a look at

1   that?

2           THE COURT:  Could you tell us what it is that you

3   are showing to the witness?

4           THE DEFENDANT:  I'm sorry.  I just handed Agent

5   DeLisio a copy of an arrest warrant M12079 and a copy of a

6   search warrant M120379.

7           THE COURT:  We'll mark them for identification as

8   Defendant's A and B.

9           THE DEFENDANT:  Thank you, your Honor.

10  Q    Just tell me when you have a minute, let me know when

11  you are ready.  I have some questions about that.

12  A    I'm ready.

13  Q    Okay.  Let's talk about the arrest warrant that you

14  have in front of you.  Could you please tell me the date

15  that is written on that arrest warrant?

16  A    April 17, 2012.

17  Q    Is there also another date under the 17th, the number

18  17 on that affidavit?

19  A    16, and there is a line through it.

20  Q    Okay.  So the number 16, is that typed?

21  A    Yes.

22  Q    And the number 17, is that typed or handwritten?

23  A    Handwritten.

24  Q    Okay.  So we agree that the 16 is typed on that

25  affidavit and it appears that it's been crossed.  Please

R. DeLISIO - CROSS/THE DEFENDANT            37

1   tell me if I'm mistaken, has it be been crossed out by hand?

2   A    Yes.

3   Q    And was there a 17 put over the 16?

4   A    Yes.

5   Q    Okay.

6   A    It appears.

7   Q    Thank you.  As far as the search warrant, can you

8   please tell me the date of the search warrant?

9   A    April 17, 2012.

10  Q    Okay.

11          THE DEFENDANT:  Your Honor, I'd like to show

12  Mr. DeLisio a copy of an affidavit in support of an arrest

13  and search warrant, and may it be marked for identification.

14          THE COURT:  Well, we'll mark it as Defendant's C.

15          THE DEFENDANT:  Exhibit C, thank you.

16          MR. SPECTOR:  Judge, may I see the document first?

17          THE COURT:  Sure.

18          COURTROOM DEPUTY:  So marked.

19          THE DEFENDANT:  Here you go, sir.

20          (Handed over.)

21          THE DEFENDANT:  Good.  Here you go.

22          (Handed to witness.)

23  BY THE DEFENDANT:

24  Q    Have you had a chance to review that document?

25  A    Yes.

R. DeLISIO - CROSS/THE DEFENDANT                    38

1   Q    Could you tell me the date that that document was

2   filed?

3   A    It was filed where I see a date that says "sworn before

4   me the 17th day of April."

5   Q    Okay.  So that would be...

6   A    2012.

7   Q    Okay.  Above where you just read there will be a typed

8   date.  Can you please tell me the date on that affidavit

9   that is typed?

10  A    April 17, 2012.

11  Q    Okay.  And the April 17th, that you referenced below

12  the typed 17, was that handwritten?

13  A    No.

14  Q    That is also typed?

15  A    Yes.

16  Q    Okay.  They're both typed?

17  A    Yes.

18  Q    Can you please read the case number on the cover for

19  that affidavit?

20  A    Are you talking about on top?

21  Q    No.  No.  The case number, I believe it starred with a

22  12?

23  A    12-379M.

24  Q    12-379M?

25  A    Correct.

R. DeLISIO - CROSS/THE DEFENDANT                    39

1    Q     You stated earlier I was arrested on April 17, 2012?

2    A     Yes.

3    Q     Approximately 6:40 p.m.?

4    A     Yes.

5    Q     Is that the affidavit that was used in support of the

6    arrest warrant to arrest me at that time?

7    A     I didn't swear to the affidavit so you should ask the

8    agent that did.

9    Q     Well, my question is, right there it's the 17th, is

10   there any other affidavit that you're aware of that I was

11   arrested with, perhaps signed previously or after?  I

12   mean --

13   A     You're providing me with a copy of a document that I

14   just got a chance to look at today.  I wasn't the agent who

15   actually swore to that document, so how am I going to say

16   this is the same document.

17   Q     Okay.  Again, who gave you the authority to arrest

18   Peter Liounis on 4/17?

19              MR. SPECTOR:  Objection.

20              THE DEFENDANT:  That is very relevant, your Honor.

21              THE COURT:  He's already answered it, he said it

22   was an arrest warrant.

23              THE DEFENDANT:  Okay.

24   Q     Where is the affidavit in support of that arrest

25   warrant?  Where is that, sire?

R. DeLISIO - CROSS/THE DEFENDANT                    40

1          MR. SPECTOR:  Objection.

2          THE COURT:  Overruled.

3   A    As a law enforcement officer, as a federal agent, I'm

4   not required to see the affidavit in support of the warrant.

5   As long as there is a valid, legal warrant issued, I'm

6   authorized execute an arrest, which I did.

7   Q    How do you know it's a valid, legal warrant?

8          MR. SPECTOR:  Objection.

9          THE COURT:  Sustained.

10         THE DEFENDANT:  I have another affidavit that I'd

11  like to put in as an exhibit, as Exhibit D, your Honor.  I

12  apologize, there is some handwritten notes on this exhibit.

13         THE COURT:  So marked.

14         THE DEFENDANT:  I cannot find another copy of this

15  anywhere.

16         THE COURT:  Show it to Mr. Spector.

17         THE DEFENDANT:  Here you go, Mr. Spector.

18         (Handed over to Mr. Spector.)

19         THE COURT:  What is your question?

20         THE DEFENDANT:  I'll give him a minute to review

21  it.

22  BY THE DEFENDANT:

23  Q    Okay.  You stated earlier that the case number on the

24  arrest warrant was M120379; is that correct?

25  A    I said 12-379M.

R. DeLISIO - CROSS/THE DEFENDANT            41

1    Q    No, sir.

2    A    You asked me from that document.

3    Q    The case number on the actual arrest warrant and search

4    warrant is what case number?

5              THE COURT:  I have the documents here.

6              THE WITNESS:  Thank you, Judge.

7    A    M12-379.

8    Q    The document that I just handed you is an affidavit in

9    support of an arrest warrant.  Could you please read the

10   case number on that affidavit?

11   A    M12-0379.

12   Q    Can you please turn to the signature page on that

13   document?

14   A    Okay.

15   Q    Can you please tell me the date of that document?

16   A    On the date it says April 16, 2012, and it's signed the

17   17th day of April, 2012.

18   Q    The date that says the 16th of April, is that typed or

19   handwritten?

20   A    It's typed.

21   Q    That is typed.  Okay.  The date that says the 17th, is

22   that handwritten or typed?

23   A    That's handwritten.

24   Q    It's handwritten.  Okay.  The magistrate judge who

25   signed off on that affidavit is who?

1   A    Marilyn D. Go.

2         MR. SPECTOR:  Judge, I don't know how any of this

3   is relevant to the issue for the hearing?

4         THE DEFENDANT:  I promise you, I'm getting there.

5   I assure you of that.

6   Q    So that affidavit is an arrest in support of -- excuse

7   me, an affidavit in support of an arrest warrant.  Now, we

8   have two affidavits in support of an arrest affidavit.  You

9   have two of them.  One says the 16th, but it's changed to

10  the 17th.  One says the 17th, and then it's written the --

11  handwritten the 17th.  Which one of these affidavits were

12  used?  I'm sure they weren't both filed the same day, so

13  which one of these were used to arrest Peter Liounis?

14  A    Maybe you should ask the agent that was present who

15  swore to it that day.

16  Q    Who is the agent?

17  A    Brian Colica.

18  Q    Is Mr. Colica here today?

19  A    No, he is not.

20        THE COURT:  Excuse me, Mr. Liounis, what is the

21  relevance of your argument?  Are you suggesting that the

22  affidavit is forged, was tampered with?  Are you suggesting

23  that the arrest warrant, which was signed by Magistrate

24  Judge Go is a forged, false document, is that your --

25        THE DEFENDANT:  No, your Honor, that is not what

1   I'm alleging.

2          THE COURT:  What is the point to this?  What is

3   the relevance of these questions?

4          THE DEFENDANT:  The relevance of this question is

5   that believe there was an arrest warrant issued on the 16th,

6   okay.  I was arrested on the 17th.  And it is my right on

7   the 17th to be produced, produced in Marilyn Go's courtroom.

8   That was not the case.  I was arrested and I was taken to a

9   warehouse, not a courthouse.

10          THE COURT:  Excuse me.  Mr. Liounis, if your point

11   is that an arrest must be made on the day on which an arrest

12   warrant has been issued, I doubt very much whether you can

13   find authority to support that proposition.

14          Now, why don't you move on to something else.

15          THE DEFENDANT:  Okay.  So the point being -- I'll

16   go past that.

17   BY THE DEFENDANT:

18   Q    Once you arrested me and taken me to a warehouse, okay,

19   can you please explain again, what was the first thing that

20   happened?  What was the first event?  I'm sorry, could you

21   repeat what you said earlier?  So we came to the warehouse

22   and what did you do with me?

23   A    My office is located at building 75, which happens to

24   also be a warehouse.  So when you reference it as a

25   warehouse, it's the office of Homeland Security

R. DeLISIO - CROSS/THE DEFENDANT                44

1   Investigations.

2   Q    But as you just testified, and I apologize for that, it

3   does resemble a warehouse?

4   A    Yes.

5             THE COURT:  Move on, Mr. Liounis.  You were taken

6   to his office.

7   Q    So you put me into a room.  And did you read me any

8   Miranda rights?

9   A    No, not at that time.

10  Q    You did not.  Did you play any recordings for me?

11  A    Yes.

12  Q    Are you saying under oath that during these recordings

13  I never asked you for an attorney?  Is that what you're

14  saying under oath?

15  A    Absolutely.

16  Q    Are you also saying under oath that I called myself a

17  piece of shit while these recordings are being played or

18  afterward?

19  A    That's what another agent told me, yes.

20  Q    Another agent told you.  Are you aware that there were

21  other agents who didn't hear that?

22  A    There was only one agent present in the room at the

23  time.

24  Q    There was only one?

25            THE COURT:  Can I have please that thick binder

1   right there, if you don't mind?

2          Your Honor, this is -- I'd like to mark this as

3   identification Exhibit E.  This is a government opposition

4   or response, government opposition to my pretrial motions;

5   "Government Memorandum of Law and Opposition to Defendant's

6   Pretrial Motions."  Referring to page eight, the footnote,

7   if I could just show the agent.

8          (Handed to the witness.)

9          THE DEFENDANT:  Can I get that back?

10          (Handed back.)

11  BY THE DEFENDANT:

12  Q    So you just said that there was one agent present,

13  that's correct?  Is that what you just testified?

14  A    Yes.

15          THE DEFENDANT:  Your Honor, may I read the

16  footnote into the record; is that okay?

17          THE COURT:  Sure.

18          THE DEFENDANT:  Okay.  The footnote states, "One

19  agent present while the recordings were being played recalls

20  Liounis making this statement.  The other agents, some of

21  whom were not present in the room during the entirety of the

22  playing of the recordings, do not have a clear recollection

23  of whether Liounis made any statements while the recordings

24  were being played."

25  Q    The term, "piece of shit," you're swearing under oath

R. DeLISIO - CROSS/THE DEFENDANT                46

1   came out of my mouth.  That is not the case.  I would not

2   call myself a piece of shit, okay?  When I asked for an

3   attorney and it was not even you, sir, it was another agent

4   who looked at me and called me a piece of shit.

5           MR. SPECTOR:  Objection, Judge.

6   Q   That is what happened.

7           THE COURT:  Overruled.

8   Q   That is a lie.

9           THE COURT:  Mr. Liounis, I told you when you

10  wanted to proceed pro se, you're going to have to abide by

11  all the rules of evidence and all the procedures.  Now, the

12  function of cross-examination is not to be argumentative and

13  make speeches on your own behalf, your function is to ask

14  the agent questions which are questions relating to the

15  questions and answers he gave on direct examination.

16          THE DEFENDANT:  Okay.

17          THE COURT:  Now, I'm going to hold you to the

18  rules that an attorney follows.  I warned you about that

19  when you decided to appear pro se.  Now, move on.

20  BY THE DEFENDANT:

21  Q   So after the questioning in your interrogation room, at

22  that point you what -- what did you do with the defendant?

23  A   Placed in a holding cell.

24  Q   Okay.  Did you administer his Miranda rights at that

25  point?

1   A    No.

2   Q    Still haven't.  Okay.  How long was he in the holding

3   cell, approximately?

4   A    15 minutes or so.

5   Q    About 15 minutes?

6   A    It could have been shorter, it could have been longer.

7   Q    Okay.  And at that point what was done next?

8   A    You were brought into a processing room where you were

9   processed.

10  Q    Okay.  So what time would you say that was,

11  approximately?

12  A    9:30, 9:45 possibly.

13  Q    You're saying about 9:30, 9:45 p.m., correct?

14  A    It could have been sooner, 9:15.

15  Q    Okay.  Or 9:15.  Now, you had mentioned earlier that

16  there was medications in the truck, correct?

17  A    Yes.

18  Q    And the truck was located in Staten Island in a secured

19  location, correct?

20  A    Yes.

21  Q    Was that near the scene where I was arrested?

22  A    Yes.

23  Q    Approximately how close did you park it from where the

24  arrest took place?

25  A    I didn't actually park it, another agent did, but I

1    believe it was within a block or two.

2    Q    Okay.  Your best recollection from point A to point B;

3    point A being where the truck is parked, and even where the

4    arrest took place to JFK, your office, approximately how

5    long is that ride by car?

6    A    It all depends on the traffic.

7    Q    Let's say without traffic.

8    A    Without traffic?  Maybe a half hour.

9    Q    Okay.  With traffic it could be anything?

10   A    It could be two hours.

11   Q    It could be anything.  Okay.  So you said I got

12   arrested at approximately what, 6:40, is that what you said?

13   A    Yes.

14   Q    Okay.  So do you recall that day what the traffic

15   conditions were?

16   A    No.

17   Q    You don't recall that at all?  You don't remember going

18   down to -- do you remember the route you took?

19            THE COURT:  Excuse me, Mr. Liounis, I'm going to

20   ask you to move on, because I'm having some difficulty with

21   the relevance of these questions.  Now, move on.

22            THE DEFENDANT:  Okay.  I was just trying to

23   establish a timeline.

24            THE COURT:  I understand.  Move on.

25            THE DEFENDANT:  Okay.

R. DeLISIO - CROSS/THE DEFENDANT                    49

1    BY THE DEFENDANT:

2    Q     So, okay, we went to Staten Island, you dropped me off.

3    Now, you processed me approximately 9:30.  At any time did

4    the defendant, the defendant ever become ill?

5    A     What do you mean become ill?

6    Q     Did he become sick?  Did he have an asthma attack or

7    any kind of symptoms that he needed medical attention?

8    A     No.  I actually offered you medical attention and asked

9    you if you needed to see a doctor, we can bring you to the

10   hospital right now, and you said no, just bring me my

11   medication, I'll be okay.

12   Q     What is your protocol when you have a defendant in

13   custody who requires medical help or even their medications

14   because they're suffering some type of reaction or something

15   like that, what's your protocol?

16   A     Explain "suffering," what do you mean by that?

17   Q     Well, I'd like to know if you sent an agent to drive

18   30, 45 minutes each way while I'm in your custody and

19   processed, why would you send an agent 45 minutes each way

20   when you have a medical office right down the hall that's

21   only about 50 feet away?  Why would you send an agent 45

22   minutes each way?

23   A     The first thing I did was myself and other agents

24   offered you medical attention.  I offered to bring you to a

25   hospital right on the spot and you declined, you said no,

R. DeLISIO - CROSS/THE DEFENDANT          50

1   no, no I'm fine, just bring in my medication, I'll be okay.

2   You asked me for some tissues, I gave you some tissues.

3          The reason why I sent the agent was to be

4   accommodating to you.  For that reason you asked me for your

5   medication, and immediately we sent an agent to bring it

6   back to accommodate you.  At no point did you exhibit or say

7   that you needed medical attention.  You didn't fall to the

8   floor.  You said, I'll be fine, just get my some tissues,

9   and you proceeded.  That's what happened.

10  Q    Mr. DeLisio, when I was locked in the holding room, how

11  long was I locked in that holding room for, do you recall

12  that?

13  A    You were placed in the room two different times.

14  Q    Let's call it the first time; how long was I in the

15  holding room, approximately?

16         THE COURT:  Excuse me, again, I'm sustaining an

17  objection to that on relevance.  Please move on.

18         THE DEFENDANT:  Your Honor, the defendant suffered

19  an attack.

20         THE COURT:  I said "please move on."

21         THE DEFENDANT:  Okay.

22  Q    So you just extended a courtesy and had the agent

23  drive, get my medicine and bring it back; is that correct?

24  A    That's correct.

25  Q    You're saying I never asked for any medical attention

1    at all, you are saying I didn't need medical attention at

2    all; is that correct?

3            MR. SPECTOR:   Objection.

4    A    Yes, I did.

5    Q    And you're saying I never collapsed, didn't get sick,

6    none of it happened; is that correct?

7    A    Absolutely.

8    Q    Okay.  So, Mr. DeLisio, at that point you had me

9    processed, is that what you're saying?

10   A    At a certain point, yes, you were processed.

11   Q    Can you tell me the time frame difference between the

12   medications being supplied to me, thanks to your driver, the

13   other agent, and the time that I was actually walked down

14   the hall and received a checkup by a physician?

15   A    Approximately an hour, maybe a little bit more.

16   Q    Approximately an hour?

17   A    Maybe a little longer.

18   Q    Did you say I was processed about 9:40, 9:35?

19   A    You asked me what time the agent was sent to get your

20   medication, so approximately an hour or maybe a little more

21   from that time to the time that you were brought to the

22   medical facility.

23   Q    Okay.  Again, I was questioned at 9:45 approximately,

24   right, is that what you said?

25   A    That's not what I said.

R. DeLISIO - CROSS/THE DEFENDANT                52

1    Q    Okay.  I was processed?

2    A    You were processed.

3    Q    Thank you for correcting me.  I was processed at

4    approximately 9:30 p.m.

5             What time did the agent go get the medicine, what

6    time did you dispatch that, approximately?

7    A    I'd say approximately maybe 10:45.

8    Q    About 10:45 p.m., okay.

9    A    Yes.

10   Q    And when was I examined by that physician?

11   A    It was after midnight, the next morning, early.

12   Q    Which would be the 18th?

13   A    Yes.

14   Q    Approximately?

15   A    I don't know approximately, but it was before I would

16   say 1:00, shortly after midnight I'd say.

17   Q    Okay.  You also said that you asked the defendant

18   questions about the said schemes; is that correct?

19   A    Yes.

20   Q    Have you had a chance to review the notes, the notes of

21   the alleged statements that were given?  Have you seen that?

22   A    What notes are you referring to?

23   Q    Your agent notes of the interview?

24   A    I didn't take notes of the interview.

25   Q    Have you had a chance to review those notes?  Have you

R. DeLISIO - CROSS/THE DEFENDANT                53

1    seen those notes?

2    A    I was present at the interview.

3    Q    You were present.

4         THE DEFENDANT:  Can I -- your Honor, can I please

5    have an exhibit?  Thank you.

6         (Pause.)

7         THE DEFENDANT:  Your Honor, I'd like to enter this

8    into an exhibit.  It's been previously marked as Government

9    Exhibit 3500 MP-1, and the case is 12-CR-350 ILG.

10        THE COURT:  Okay.

11        THE DEFENDANT:  And it's one of seven pages.

12        (Handed to the witness.)

13        THE COURT:  It's 3500 -- what was that previously

14   marked?

15        MR. SPECTOR:  It's MP-1.  It's also marked as

16   Government's Exhibit 2 in your binder.  It's the same

17   document.

18        THE COURT:  Okay.  All right.

19   BY THE DEFENDANT:

20   Q    Okay.  Mr. DeLisio, does that document look familiar to

21   you at all?

22   A    No.

23   Q    Does it say who was present on there during that

24   alleged statement?

25        MR. SPECTOR:  Objection.  The witness said he's

1  unfamiliar with the document.

2          THE COURT:  Pardon?

3          MR. SPECTOR:  The witness said he's unfamiliar

4  with the document.

5          THE COURT:  That wasn't the question.  The

6  question was:  Does it say who was present?

7          THE WITNESS:  My name is listed, the detective,

8  Inspector Purnavel and the Secret Service agent.

9  BY THE DEFENDANT:

10 Q    Okay.  Now, you're name is there.  Would that mean you

11 were present during that statement being taken?

12 A    I testified to that I was present.

13 Q    You testified that you were present?

14 A    I was present.

15 Q    Okay.  I'm going to cut right to the chase,

16 Mr. DeLisio, Agent DeLisio:  Anywhere in those notes does it

17 say anything about Peter Liounis admitting that he is Mark

18 Anderson?  I'd like you to answer as I -- I'm going to name

19 them.  You can take a minute to look at that if you'd like

20 and I'll ask you.

21          MR. SPECTOR:  Judge, I object to the question

22 about the substance of Mr. Liounis' statement, it's really

23 outside the scope of the hearing.  This hearing concerns

24 whether or not he was properly Mirandized before the

25 statements were made.

1          THE COURT:  This is a document which has been

2     received, will be received in evidence, it's your exhibit

3     isn't it?

4          MR. SPECTOR:  Yes, your Honor.

5          THE COURT:  And so the question is:  Does it say

6     whatever it is he's asking it says on the document.  All

7     right.  I'll allow it.  The document will it speaks for

8     itself, it either does or doesn't say anything.  Now, what's

9     the point of this?

10          THE DEFENDANT:  The point is, your Honor, that I

11     was charged in an indictment --

12          THE COURT:  Excuse me.  You were charged in an

13     indictment.  Whether or not the indictment is going to be

14     proved, should you go to trial, is another matter.

15          Now, what's the point of the question with respect

16     to this piece of paper?

17          THE DEFENDANT:  I would like to know if Agent

18     DeLisio asked me specifically in that document if I was the

19     individual who was Mark Anderson.  I just want to put it on

20     the record.

21          THE COURT:  Excuse me.  Excuse me.  You are

22     objecting to the introduction into evidence, should you go

23     to trial, of statements that you made while you were in

24     custody.  And the basis of your objection is that the

25     statements you made were made without you having been given

1    the appropriate warnings, which are known as the Miranda

2    warnings.  Now, we've heard the agent testify as to what

3    transpired between the time you were arrested and the time

4    that you were begun to ask questions.

5               THE DEFENDANT:  Okay.

6               THE COURT:  As I heard the testimony of the agent,

7    you weren't asked anything until after you were given your

8    Miranda warnings.

9               Now, you can inquire about that, but the testimony

10   as I heard it was you weren't asked any questions at all

11   until you were brought to the agent's lunch room.  And

12   before you were asked anything, you were given your Miranda

13   warnings and there is a Miranda warnings sheet which has

14   been received in evidence which appears to have been signed

15   by you.

16              THE DEFENDANT:  Right.

17              THE COURT:  Now, if the basis of your motion is

18   that you were never given any Miranda warnings, that all of

19   this is a sham, then inquire about that.

20              THE DEFENDANT:  Okay.  Thank you.

21              THE COURT:  That's the purpose of this hearing,

22   whether the statements that are sought to be received in

23   evidence were obtained lawfully.

24              THE DEFENDANT:  Okay, your Honor.

25              THE COURT:  We're not trying the indictment.  Got

R. DeLISIO - CROSS/THE DEFENDANT                    57

1   it?

2          THE DEFENDANT:  Got it.  At this point I would

3   like to ask Agent DeLisio about the voluntariness --

4          THE COURT:  The what?

5          THE DEFENDANT:  The voluntariness of the

6   statement, if that's okay.

7   BY THE DEFENDANT:

8   Q    In my motion, I filed a pretrial motion to the court,

9   which was addressed earlier today.  I did make it very clear

10  in the pretrial motion.

11         THE COURT:  Excuse me, if you have a question to

12  the agent, ask it.

13  Q    When you were asking the defendant --

14         THE COURT:  That's you.

15         THE DEFENDANT:  Yeah.  Should I just say my name?

16         THE COURT:  Sure.  "Me", you say me, you say when

17  you were questioning me.

18  Q    When you were questioning me was it before or after the

19  agent you dispatched to get the medications came back with

20  the actual medications?

21  A    I believe we started the questioning before he came

22  back with the medication.

23  Q    Okay.  You started it before.  At any time did you stop

24  questioning because you sent the agent to get the

25  medications?

R. DeLISIO - CROSS/THE DEFENDANT                58

1   A    Not that I'm aware, no.  You said you were fine to

2   proceed.

3   Q    You said I'm fine to proceed?

4   A    You said you were fine to proceed.

5   Q    No, I never said that.  Okay.  So the agent returned

6   with the medications, correct, at some point?

7   A    Yes.

8   Q    Could you describe how many medications were in the bag

9   the agent was holding?

10  A    I don't recall.

11  Q    You don't recall?

12  A    I don't remember.  I remember he came back with

13  medication, I don't remember how many bottles or whatever.

14  Q    How about the size of the bag, do you remember it being

15  in a bag?

16           THE COURT:  Excuse me, move on, it's irrelevant.

17           THE DEFENDANT:  It was a lot of medications, your

18  Honor, in my vehicle.

19           THE COURT:  Excuse me, move on.

20           THE DEFENDANT:  Okay.  Your Honor, I have here a

21  memorandum of an interview.  I'd like to mark it for

22  identification as Exhibit F.

23           THE COURT:  So marked.  Show it to Mr. Spector.

24           THE DEFENDANT:  Mr. Spector?

25           (Handed to Mr. Spector.)

R. DeLISIO - CROSS/THE DEFENDANT                    59

1          THE COURT:  And when you're finished with that

2     exhibit we're going to recess for lunch.

3     BY THE DEFENDANT:

4     Q    Okay.  Agent DeLisio, could you please tell me the

5     difference in the first document, the first exhibit of the

6     statement you took and the second one?  I'm sorry, is your

7     name on the exhibit I just gave you as well?

8     A    Yes.

9     Q    Okay, so --

10          THE COURT:  This is 3500 papers?

11          MR. SPECTOR:  It's Government Exhibit 1, your

12    Honor, in the binder.

13          THE COURT:  Okay.

14    Q    So we agree your name is on both of those alleged

15    affidavits, correct?

16          THE COURT:  Documents.

17          MR. SPECTOR:  This is more than an affidavit.

18    Q    Alleged statement; is that correct?

19    A    Yes, my name is on both.

20    Q    Okay.  Based on your experience as an agent, when you

21    reviewed both of these documents, did they appear to be

22    different in any way?

23          MR. SPECTOR:  Objection.

24          THE COURT:  What is the other document you are

25    referring to?  What's the other document, what two

1    documents?

2            THE DEFENDANT:  The first one is the agent notes,

3    which Mr. -- Agent DeLisio was present for.

4            THE COURT:  Yeah.

5            THE DEFENDANT:  And the second one I believe is --

6    is that an Amendment?  What is that, I'm sorry?

7            THE WITNESS:  Memorandum of interview.

8            THE DEFENDANT:  It's a memorandum of interview,

9    your Honor.

10           THE COURT:  Yes.

11           THE DEFENDANT:  That's the second exhibit.

12           THE COURT:  So what's your --

13           THE DEFENDANT:  Well, I'd like to know, what's the

14   difference in the meaning of the memorandum and the actual

15   notes, I'm asking the agent.

16           THE COURT:  One is a memorandum and one is notes.

17   Do you want --

18           THE DEFENDANT:  Does the memorandum explain it?

19   That's what I'm asking.

20           THE COURT:  Mr. Liounis, I don't understand your

21   question.  What is it that you are asking the agent?

22           THE DEFENDANT:  I'm asking the agent as to why

23   both of these statements were taken the same day, but they

24   differ, that's what I'm asking.

25           THE COURT:  You have to ask, Mr. Liounis, the

1   agent precisely where the difference is, all right, point

2   out if there is some inconsistency that you're claiming

3   effects the validity or credibility of the document, you

4   have to indicate it, but we'll do that after lunch.  We'll

5   resume at 2 o'clock.

6               THE DEFENDANT:  Your Honor, can I take those two

7   exhibits with me just to compare them?

8               THE COURT:  Sure.

9               THE DEFENDANT:  And I'll bring them back.

10              THE COURT:  Sure.

11              THE DEFENDANT:  Those two exhibits, please?

12   Please, sir.

13              THE COURT:  Sure.  We'll resume at 2 o'clock.

14   Well, make it 2:15, I see it's almost 1:50 now.

15              MR. SPECTOR:  Thank you, Judge.

16              THE COURT:  Oh, by the way, there are some returns

17   of your subpoenas.  We have a return from AT&T, and we have

18   a return of telephone calls from the MDC.  You can look at

19   those during the luncheon recess with the assistance of your

20   stand-by counsel, if you'd like.

21              THE DEFENDANT:  Your Honor, can I -- am I -- can I

22   get permission to have a -- something to write with while

23   I'm --

24              THE MARSHAL:  You have a pen downstairs.

25              (Defendant is out of the courtroom.)

1           (Proceedings were recessed for a lunch break and

2    recalled at 2:14 p.m.)

3           (Honorable I. Leo Glasser takes the bench.)

4           MR. GOLD:  Judge, Mr. Liounis has advised me

5    during the lunch hour that he will be taking the stand.

6           THE COURT:  You're still under oath, agent.

7           THE WITNESS:  Yes.

8           THE COURT:  Mr. Liounis, why don't you continue?

9           THE DEFENDANT:  May I begin, your Honor?

10          THE COURT:  Yeah, please.

11   BY THE DEFENDANT:

12   Q    I just have a few more questions.

13          Agent DeLisio, do you recall prior to handcuffing

14   me and arresting me on 4/17/12, was it pre-planned before

15   you arrested me to bring me to your office located by JFK

16   Airport, or did you have intentions perhaps of bringing me

17   to court?  What were the intentions that they -- prior to

18   arresting me of where you were going to take me?

19          MR. SPECTOR:  Objection.

20          THE COURT:  Sustained.

21          THE DEFENDANT:  Sustained?

22   Q    Okay.  You mentioned while you were testifying that

23   when you first brought me into the interrogation room to

24   hear the tapes, you said in your testimony that I didn't

25   want to make a statement because I didn't want to

1    incriminate myself; is that correct?

2    A    Correct.

3    Q    Okay.  At that time did you place me into a holding

4    cell?

5    A    Yes.

6    Q    Okay.

7    A    At the end of that session.

8    Q    At the end of the session.  Okay.  How long after being

9    in the holding room did I allegedly change my mind?

10   A    It was after you were processed, under an hour, 40

11   minutes possibly, I don't recall.

12   Q    Are you aware of anything that took place within that

13   45 minutes or an hour to make me change my mind?

14   A    No.

15   Q    Just an example, was I promised anything?

16   A    No.

17   Q    Was I threatened by anyone?

18   A    No.

19   Q    Did I become ill, sick?

20   A    No.

21   Q    Okay.  How many times while I was in your custody on

22   4/17 was I processed by agents?  How many times would you

23   recall that I was actually processed, fingerprinted, the

24   whole processing?  Do you recall how many times that was

25   done that day?

R. DeLISIO - CROSS/THE DEFENDANT               64

1   A     You were only processed once.

2   Q     Okay.  Is there a possibility that there might be two

3   different processing times and prints?  Is that a

4   possibility?

5              MR. SPECTOR:  Objection.

6              THE COURT:  Sustained.

7              THE DEFENDANT:  Sustained?

8              THE COURT:  Yeah.

9   Q     Okay.  My next question is this:  Can you explain why I

10  would be so concerned about a camera if I was willing to

11  give a statement and waive my Miranda rights?

12             MR. SPECTOR:  Objection.

13             THE COURT:  Sustained.

14             THE DEFENDANT:  I have no more questions, sir.

15             THE COURT:  Thank you.  Do you have any redirect?

16             MR. SPECTOR:  No redirect, your Honor.

17             THE COURT:  Thank you.  You're excused, agent.

18  Thank you very much.

19             THE DEFENDANT:  Can I have a quick minute, your

20  Honor?

21             THE COURT:  Oh, sure.

22             THE DEFENDANT:  Thank you, Agent DeLisio.

23             THE WITNESS:  You're welcome.

24             MR. GOLD:  Your Honor, Mr. Liounis has advised me

25  that he wishes to take the stand.  The -- I'm prepared to

1    proceed and question him.  If the Court would prefer him to

2    have a narrative or ask himself questions, it's a little

3    unusual circumstance here, but however the court wishes to

4    proceed.

5            THE COURT:  He's his own counsel, so he can

6    testify in a narrative style with respect to matters

7    pertinent to the suppression hearing.

8            MR. GOLD:  He understands that.

9            THE COURT:  Okay.

10

11   **PETER LIOUNIS**, called by The Defendant, having been first

12              duly sworn, was examined and testified as

13              follows:

14

15           COURTROOM DEPUTY:  State and spell your full name

16   for the record.

17           THE WITNESS:  Peter Liounis.

18           THE COURT:  Mr. Liounis.

19           THE DEFENDANT:  Okay.  Should I just narrate?

20   What's the best way?  I could have Mr. Gold ask me

21   questions.

22           THE COURT:  Pardon?

23           THE DEFENDANT:  Can I have my distinguished

24   counsel ask me questions that we talked about previous, is

25   that okay or do you want me to narrate?

1          THE COURT:  Mr. Liounis, you undertook to

2   represent yourself and I caution had you at that time of the

3   ill advisability of doing that.  You're your own lawyer, so

4   you can proceed, you can tell your own story relating to the

5   issue before the Court, which is whether or not your

6   statements to the agents were received unlawfully, that's

7   the only issue.  You're asking that statements you made be

8   suppresses, I take it, because you weren't given your

9   Miranda warnings.  And if you did, they weren't given

10  voluntarily.

11         THE DEFENDANT:  Both.

12         THE COURT:  So you can state whatever you believe

13  the facts to be.

14         THE DEFENDANT:  Okay.

15         THE COURT:  As you understand them.

16         THE DEFENDANT:  On 4/17/2012, approximately

17  between 2 and 3:00 p.m. I was pulled over while driving an

18  Mercedes Benz ML350 truck.  I was pulled over by

19  approximately four vehicles, and this happened adjacent to

20  train tracks, which is a Staten Island -- I believe, the

21  main train station as far as the location.  I was taken out

22  of the vehicle, excuse me, the truck, I was handcuffed, I

23  was not given my Miranda rights, and I was placed into a

24  transport vehicle.

25         At that time while sitting in the transport

1  vehicle I noticed the agents who just arrested me pulled me

2  over and arrested me, began to search the truck I was

3  driving.  As they continued to search, two agents drove me.

4  They drove me to a location near Kennedy Airport, the

5  El Dorado headquarters.

6          The route we took was pretty much Hylan Boulevard.

7  We got up to Hylan Boulevard and then we went to the

8  Verrazano and then go on the Belt Parkway and eventually we

9  ended up near Kennedy Airport.  The approximate time was

10  about 45 minutes, maybe an hour.

11          Upon arrival I was asking the transport drivers,

12  for instance, where are you talking me?  And the driver gave

13  me a shhhh, like, don't say anything, we'll let you know

14  when we get there, which made me a little nervous, but

15  that's what took place.  Eventually upon arrival we pulled

16  up to what appeared to be, in my eyes, appeared to be a

17  warehouse.  I had no idea that it was any kind of Homeland

18  Security offices.  It looks like an industrial warehouse.

19  So immediately I began to not feel very well with the

20  situation.  I started thinking some scary thoughts, but deep

21  down, I realized I was pulled over in public by many, many

22  agents, this can't be what I'm thinking.

23          Eventually, I was escorted upstairs, I believe, to

24  the second floor, and I was taken into an interrogation

25  room, approximately two to three agents that were present,

1    very nice, you know, asked me how I was feeling.  They told

2    me to remain silent.  They asked me why I was here.  I

3    didn't answer, because I didn't know.  They continued to say

4    that we're going to play some tapes for you and, you know,

5    we want you to stay quiet, don't say anything, and that's

6    what they did.  They started playing these tapes.  While

7    they were playing the tapes, at one point one of the agents

8    was getting a little bit upset.  It was not Agent DeLisio.

9    I don't know the name of that individual, but it definitely

10   wasn't Agent DeLisio.  He was playing a recording that

11   referred to garbage bags, and he asked me questions about

12   the garbage bags, like, making fun of me, yeah, yeah, the

13   garbage bags, yeah, yeah, what are they, what are they.  And

14   I did burst out and I did say, they're garbage bags, that's

15   what they are, they're garbage bags.  At no point or time

16   did I ever in that interrogation call myself a piece of

17   shit.  That did not happen.

18          The agent continued on.  At this point he

19   continued playing tapes and I just sat there very quiet, I

20   did not say anything.  Eventually, I did ask for an

21   attorney.  I just turned around and I says, I want a lawyer.

22   That's all I said.  I said nothing else, and that's when one

23   of the agents who was present in that room called me a piece

24   of shit.

25          At that time I was escorted into a holding room.

P. LIOUNIS - DIRECT/THE DEFENDANT                69

1   I was in the holding room for quite awhile, it could have

2   been half an hour, an hour.  I wasn't feeling well.  But I

3   did get a break from that holding room, as I recall, I was

4   taken to a processing room.  Not a room, that's one big

5   room, that's let's call it a processing area, and I was able

6   to sit there and be processed and, of course, feel free I

7   was out of that room feeling a little bit better.

8           Eventually, I was put back into that holding room.

9   The next time I was put into that holding room, it was for a

10  longer period of time, and this is when I began to really

11  feel not well.  When I say "not well" I mean I felt asthma

12  coming on, I felt dizzy, I felt nauseous.  I was not feeling

13  well and it was only get worse and worse.

14          There was an agent who was peeking in on me

15  probably every ten minutes, maybe even every 15 minutes, but

16  he would come and look through the glass and just check on

17  me.  And eventually I was asking him for help, and I wasn't

18  given help.  I was not given help.  In fact, the agent who

19  checked on me when things started to get very bad started to

20  say, tell me what I want to know, Mike Sloli.  Now, this is

21  the first time the name Mike Sloli came up, and I was very,

22  very confused why he just said that, because Mike Sloli is

23  my roommate.  I lived with the guy at that point for almost

24  two years.

25          So anyway, I'll continue.  Eventually, I did get

1    very, very sick and I did fall to one knee.  I went down.

2    At that point I was helped.  Agents did help me, and they

3    walked me into a cafeteria where, I might add, the cafeteria

4    had a camera, because while I was talking to the agents in

5    that room, there was an agent even posing for the camera,

6    looking at the camera while we were describing Mike Sloli,

7    who was my roommate.  And he was like this on the cameras,

8    he is this tall, he is -- he was almost like flashing for

9    the camera, but the camera was a wide shade camera.

10          I would be very clear as far as questioning and

11   medications and medical assistance.  I didn't know at that

12   time there was even a medical office right down the hall.  I

13   did not get help.  Agents did give me cold water.  Agents

14   did fan me.  Agents were very concerned.  There was an agent

15   that was dispatched to drive 45 minutes to an hour back to

16   my truck to get a very large bag of medicine.  Anything that

17   was done and said between that period is completely,

18   completely involuntary.  Completely.  I was sick.  I was

19   scared.  I was suffering.  I did not receive any help, and

20   you're talking about a good hour and a half or longer that

21   it took to actually get my medications.

22          Did agents stop?  The answers is no.  I was

23   questioned.  And when he was dispatched to go get the

24   medications, I was still questioned.  The Miranda that they

25   showed you is a perfect signature, a perfect signature.  I

1  recall, I recall signing a document that my letters of my

2  name that day were probably a good inch high, because it was

3  signed quickly.  I didn't read nothing, and I didn't care, I

4  just signed it, because I wanted to get medical help and I

5  wanted my medications.  There was no one in this entire

6  place to intervene for me.  There wasn't a janitor.  There

7  was nobody, okay.  It was me, and I'm not going to say every

8  agent didn't care, because that is not true.  Some of them

9  did and some of them didn't.  But at the end of the day

10  that's what transpired that day.

11          THE COURT:  Thank you.  Mr. Spector, do you wish

12  to inquire?

13          MR. SPECTOR:  Yes.  May I have one moment, your

14  Honor?

15          (Pause.)

16  CROSS-EXAMINATION

17  BY MR. SPECTOR:

18  Q    Mr. Liounis, let's go back to when you were first

19  arrested.  When the agent arrested you in front of your

20  car --

21  A    Truck.

22  Q    -- and put you into their vehicle, no one questioned

23  you at that time, right?

24  A    No.

25  Q    No one questioned you on the drive from where you were

1   arrested to JFK?

2   A    No, sir.

3   Q    And when you were taken to the interrogation room they

4   told you stay quiet?

5   A    Yes.

6   Q    They told you don't say anything?

7   A    Yes.

8   Q    They said we're going to play some tapes, we don't want

9   you to talk?

10  A    Yeah.

11  Q    And that's what they did?

12  A    That's not what they he did.

13  Q    They played tapes?

14  A    They played tapes, but they also talked, they asked

15  questions.

16  Q    Well, when they were playing the tapes you were quiet?

17  A    The only time I wasn't quiet is when I had enough of

18  him, the one agent.  I'm sorry, I don't know his name.  When

19  I got frustrated, when he was saying yeah, yeah garbage

20  bags, garbage bags, it got annoying.  I wasn't saying it

21  like this.

22  Q    Other than that, you were quiet?

23  A    Other than that I was quiet, until I insisted on an

24  attorney.

25  Q    And you were nervous at that point in time?

1    A    Of course I was nervous.

2    Q    You thought you were in trouble?

3    A    I sure did.

4    Q    And the more you heard those tapes you thought you

5    would be in trouble.

6    A    Absolutely not.  I was in trouble the minute I walked

7    up to the warehouse and saw a warehouse instead of a

8    courthouse, that's when I was concerned.

9    Q    Showing what's been marked as Government's Exhibit 7,

10   Mr. Liounis, you've seen this document before, right?

11   A    Yep.

12   Q    And it's entitled, "A Statement of Rights"?

13   A    I guess so, yep.

14   Q    And it lists a series of rights you have?

15   A    Okay.

16   Q    Correct?

17   A    That's what it says.

18   Q    And then there's a line in the middle, right?

19   A    Um-huh.

20   Q    Do you see a line in the middle of the paper?

21   A    Yes.

22   Q    And below that there is a section entitled "waiver"?

23   A    Yes.

24   Q    And then there is a place that says "print name."  Can

25   you read the name written?

1  A    There it says Peter Liounis.

2  Q    And there's a signature?

3  A    Yes, there is.

4  Q    What's the signature line say?

5  A    It looks like my signature.  It looks like it from that

6  day.

7  Q    Now, you testified, I believe, that you were arrested

8  at 2:00 p.m., right?

9  A    I said roughly between 2 and 3:00 p.m.

10  Q    And do you remember earlier today you were questioning

11  Agent DeLisio and he -- when he said you were arrested at

12  6:40, you told him you believed that was wrong, right?

13  A    Yes.

14  Q    Do you see in the waiver section the last sentence of

15  that paragraph beginning, "I was taken," can you read that

16  aloud?

17  A    It says, "I was taken into custody at 6:40 p.m."

18  Q    And that 6:40 p.m., that's handwritten in there,

19  correct?

20  A    It sure it is.

21  Q    By the way you -- the agents did allow you to call your

22  girlfriend while you were in custody, right?

23  A    That is correct.  Late at night, yes.

24  Q    Late at night.  After you were questioned?

25  A    I would say it was approximately 10:30.  Yeah.

1  Q    And after you say you started to have medical problems?

2  A    That's not correct, I had medical problems way before

3  that.

4  Q    Well, started not to feel well?

5  A    That's when I was actually feeling very well.  That's

6  after I had my medications, around that time, maybe even

7  sooner.

8  Q    Okay.  Well, when you contacted your girlfriend you

9  didn't tell her, I want an attorney?

10  A    I was told by the agent who gave me the courtesy phone

11  call do not mention you were arrested, do not mention

12  nothing about what just took place, just tell her you are

13  okay and you'll get back to her.  I was admonished not to

14  say another word about where I was and why I was there.

15  Q    So the answer is no, you did not ask her to get you an

16  attorney?

17  A    I said nothing about what just occurred, not even that

18  I was arrested, nothing.

19  Q    You didn't tell her that you had been feeling ill?

20  A    On the telephone?

21  Q    Right.

22  A    I might have made an excuse by saying I was busy, or I

23  tried to make an excuse why I didn't return her call for

24  hours, when we never had that problem, we communicate all

25  day, every day.

1  Q    Sir, my question is:  Isn't it true that you did not

2  tell your girlfriend that you were feeling ill, yes or no?

3  A    I don't recall.  I don't recall that.  I don't recall

4  nothing more than what the agent told me not to say, and

5  that's what I did.  It was brief, to the point, and that was

6  it.  And the reason, I just want to put on the record, that

7  I was told not to say that --

8              MR. SPECTOR:  Judge, move to strike as

9  nonresponsive.

10             THE DEFENDANT:  -- it's because there was a search

11 warrant --

12             THE COURT:  Excuse me, Mr. Liounis.

13             THE DEFENDANT:  Okay.

14             THE COURT:  The answer was you did not tell your

15 girlfriend you wanted an attorney?

16             THE DEFENDANT:  I told her nothing.

17             THE COURT:  Excuse me.  That was your answer; is

18 that right, you did not tell her?  That was the question.

19             THE DEFENDANT:  I guess so, yeah, I didn't tell

20 her nothing.

21             THE COURT:  All right.

22             THE DEFENDANT:  About that.

23 BY MR. SPECTOR:

24 Q    Mr. Liounis, you remember being taken to a doctor at

25 the JFK facility?

1  A    Yes, I do.

2  Q    Okay.  And you told the doctor you were feeling fine?

3  A    I told the doctor I was feeling fine?

4  Q    I'm asking you.

5  A    No, I did not.

6  Q    What did you tell the doctor?

7  A    Nothing.  I said I can't believe you're here, I could

8  have used you hours ago.

9  Q    Well, did you tell the doctor you collapsed and had a

10  seizure?

11  A    I didn't tell him anything.

12  Q    Did you tell the doctor you had not been able to

13  breathe?

14  A    I didn't tell him anything, because I was feeling fine.

15  I didn't even know he was there.

16  Q    And you didn't tell the doctor anything about these

17  supposed medical ailments you had had just a few hours

18  earlier?

19  A    I didn't because I was feeling fine, it was hours after

20  my medicine was administered.  What am I going to tell him,

21  what happened four hours ago?  What good would that do?

22  Q    Mr. Liounis, you've actually lied to this Court before

23  in this case, isn't that right?

24  A    No, that is not true.  When did I lie?

25  Q    Well, didn't you tell the Court that you never wanted

1   to waive your preliminary hearing?

2   A    Yes, I did.

3   Q    You told the Court that you instructed Ms. Sharkey not

4   to waive your preliminary hearing, right?

5   A    That's right, in the bull pen, and that's what she did.

6   Q    And do you remember being arraigned, and at the time of

7   your arraignment you were present in court?

8   A    That's right.

9   Q    And you were standing next to Ms. Sharkey?

10  A    That's right.

11  Q    And Ms. Sharkey told the Court that you're going to

12  waive the preliminary hearing?

13  A    No.  Ms. Sharkey said verbatim, "the defendant waives

14  preliminary hearing."

15  Q    Correct.

16  A    That's what she said.

17  Q    Do you remember that?

18  A    Oh, I'll never forget it.

19  Q    And you didn't say anything?

20  A    Of course I did.

21  Q    You said something to the Court?

22  A    I said, "what are you doing?"  I said it to

23  Ms. Sharkey.

24  Q    You did not indicate to the Court that you had a

25  problem with that?

1   A    When I indicated to Ms. Sharkey what are you doing,

2   Ms. Sharkey turned around aggressively and told me to shush,

3   they can indict you in a week if they want, keep quiet.

4   Magistrate Marilyn Go said for me to keep quiet, I have an

5   attorney, and let's continue, and that's what I did.  She

6   did waive my preliminary hearing.

7   Q    Do you remember filing an affidavit of indigency in

8   this case?

9   A    I don't recall.

10  Q    Do you remember filing a piece of paper, filling out a

11  piece of paper that said you could not afford an attorney?

12  A    I don't recall.

13  Q    You don't remember filling a piece of paper out about

14  your finances?

15  A    I remember signing papers that would give me an

16  attorney.

17  Q    Do you remember in a piece of paper saying you had $500

18  in total assets?

19  A    I don't recall.

20  Q    Well, is that true?

21  A    I don't recall.

22  Q    Is that true, you have $500 in total assets?

23  A    I probably don't even have that.

24  Q    And isn't it true that you had leased a 2012

25  Volkswagon?

1  A    Yes.

2  Q    At the time of your arrest you were leasing that,

3  right?

4  A    At the time of my arrest?  Prior.

5  Q    Immediately prior to your arrest?

6  A    No, that's not true.

7  Q    Well, when did that lease expire?

8  A    I can't recall the exact dates, but I had that car for

9  a very long time before you arrested me.

10  Q    And that's worth about $25,000?

11  A    I think the sticker on that car is roughly 20,000.

12  Q    Okay.

13  A    I didn't finance or buy that car, it was a lease, and

14  my mother co-signed for the vehicle.

15  Q    And how much were the monthly payments?

16  A    Approximately 300 change.

17  Q    How is it that your were able to afford monthly

18  payments of 300 and change?

19  A    Well, I have a family that helps me quite a bit.  I

20  also incurred some debt by borrowing funds from friends in

21  hopes of also repaying them, which I made very clear.

22  Q    Isn't it true that before you were asked arrested you

23  had cash sent to you in the mail?

24  A    I had cash sent to me, is that what you're saying?

25  Q    That's what I'm asking you.

1   A    No.

2   Q    You didn't have cash sent to you in the name of Mike

3   Sloli?

4   A    No.  Mike Sloli's name is on that package.  Mike Sloli

5   is a real person.

6   Q    Sir, you pled guilty to committing fraud in a case in

7   the Southern District, right?

8   A    That is correct.

9   Q    And that fraud involved lying to investors, right?

10  A    If I had my transcript, I think you would disagree with

11  that statement.

12  Q    Well, I have the transcript.

13  A    Because a prosecutor, we made an issue to the judge and

14  I actually was one of the few people who didn't actually

15  mislead the clients, my issue was more of excessive

16  commissions.

17         THE COURT:  Mr. Spector, why don't you move on and

18  let's no go too far afield.

19         MR. SPECTOR:  All right.  Thank you, Judge.

20  Q    Mr. Liounis, I'll just -- let me end with one final

21  point.  It's fair to say you don't have much respect for

22  court orders.  Right?

23  A    I actually do respect court orders, sir.

24  Q    Do you remember you were -- part of your prior case

25  involved a restitution, right?

1   A    Yes, sir.  Yes, I do.

2   Q    And that was in the millions of dollars?

3   A    Yes, it was.

4   Q    Fair to say?

5   A    Yes.

6   Q    And when you were released that was in approximately

7   2007?

8   A    I believe in the middle of 2007.

9   Q    Okay.  And at the time of your release that restitution

10  was still owed, right?

11  A    Yes, sir.

12  Q    In fact, it's still owed today, right?

13  A    I'm not sure how that works.

14  Q    Well, did you ever pay it?

15  A    To be honest with you, I never missed a month during

16  probation, I paid it every month.

17  Q    What was your monthly payment?

18  A    Ten percent of whatever my salary may have been at the

19  time.

20  Q    Well, didn't you take a lot of trips to Atlantic City

21  after you were released in 2007, you took two trips to

22  Atlantic City?

23          THE DEFENDANT:  I object to that question.  It has

24  nothing to do with this case.

25          THE COURT:  Sustained.

PROCEEDINGS                    83

1          THE DEFENDANT:  That has nothing to do with the

2    case.

3          THE COURT:  Excuse me, I sustained the objection.

4          MR. SPECTOR:  Nothing further.

5          THE COURT:  Thank you.  Is there anything further

6    you'd like to say?  If not, you may step down, you're

7    excused.  Thank you.

8          THE DEFENDANT:  Okay.  Thank you.

9          THE COURT:  All right.  The hearing has been held

10   on the defendant's motion to suppress statements which were

11   made at a point in time that I'll get to in a minute.

12         The government calls one witness, Special Agent

13   Richard DeLisio, an agent of Homeland Security.  Agent

14   DeLisio and fellow agents of Homeland Security and perhaps

15   some other law enforcement agents arrested Mr. Liounis at

16   approximately 6:40 p.m. on April 17, 2012.  An arrest was

17   made pursuant to an arrest warrant that was issued by

18   Magistrate Judge Go.

19         The issuance of that warrant was supported by an

20   affidavit of approximately 60 pages which provided a

21   detailed account of the events and the probable cause to

22   issue.  The warrant specified the crime believed to have

23   been committed and the evidence believed to be seized to

24   establish that crime.  The evidence sought to be seized was

25   listed in significant detail in an attachment to that

PROCEEDINGS                                    84

1     warrant.

2          The challenge to the arrest now gathered on the

3     questions Mr. Liounis put to Agent DeLisio centered around

4     the date on the arrest warrant, which was typed April 16th.

5     April 16th or the number 16 was stricken and 17 was written

6     above it; 17, being the date of the arrest.  The defendant

7     apparently has a misunderstanding with respect to the

8     validity of an arrest warrant as having to be executed on

9     the very day that the warrant is issued, which is obviously

10    not correct.  The warrant was perfectly good on its face and

11    good in all other respects.  We'll get into a discussion of

12    agents acting in good faith based upon the validity of

13    whether it is an arrest warrant or a search warrant.  The

14    arrest warrant was perfectly valid.

15         The defendant was transported following his arrest

16    to John F. Kennedy Airport where he was placed in a holding

17    cell for about 10 to 15 minutes before being taken to an

18    interview.  While there he was told to say nothing, make no

19    statements, while the agents advised him of why he was

20    arrested and placed segments of about five telephones calls

21    that were intercepted pursuant to an order that was issued

22    pursuant to Title III.  He was also given some information

23    as to what the guidelines might advise what the perspective

24    sentence might be.

25         The defendant in response said that he didn't want

PROCEEDINGS                    85

1    to make any statements because he didn't want to incriminate

2    himself.  Agent DeLisio left the room for awhile leaving the

3    defendant there with another agent, who later told Agent

4    DeLisio that the defendant made himself a derogatory

5    statement, the precise meaning of which may be viewed by

6    some as ambiguous.

7              The defendant was then processed; that is,

8    fingerprinted, photographed, given pedigree information.

9    It's important to know at this point in time, although he

10   was in custody, no questions had been put to him.  There

11   wasn't anything to ask of him.  He shortly thereafter

12   indicated he wanted to talk, but not in the holding cell or

13   the interview room because he believed they were equipped

14   with cameras.

15             He was then taken to the agents' lunch room, where

16   he agreed that he'll talk.  Agent DeLisio testified that

17   there were no cameras in the agents' lunch room.

18             Before being questioned while in the agents' lunch

19   room, he was offered and advised to eat something, which he

20   did after some coaxing, after he had some pretzels and he

21   had some water.  An offer was made for him to be examined

22   and taken to a hospital if he liked, but he declined, saying

23   he didn't need to be, he said he would be fine if he had his

24   medicine, which were left in the vehicle at the time he was

25   arrested.

PROCEEDINGS                         86

1          Agent DeLisio testified -- I find Agent DeLisio's

2    testimony to be entirely credible, confirmed by Mr. Liounis,

3    that an agent was dispatched to retrieve his medicine.

4    Miranda rights were read to the defendant, which he said he

5    understood, and then signed a Miranda rights form, which was

6    received in evidence as the Government's Exhibit 7.  Miranda

7    rights warns immediately above Mr. Liounis' printed name,

8    which he printed, and immediately above his signature, which

9    he seems to be ambivalent as to whether it is his signature,

10   it looks like his signature.  It is his signature.  It

11   indicates that he understood what it was that he was

12   signing, the waiver of his rights and he was doing so

13   voluntarily.

14          He was, in all respects, competent at the time,

15   suffering from no debilitating effects.  Medical

16   examination, not terribly long thereafter, which has been

17   received in evidence as Government's Exhibit 5 I think it

18   was, indicates the medication that he was taking.  Zyrtec,

19   Claritin, Sinex nasal spray.  His vital signs and pulse and

20   temperature were all normal.  The physical examination

21   showed little to no abnormalities based upon an exam with no

22   signs of distress or discomfort.  He was able for

23   confinement.

24          At no time Agent DeLisio testified, that he

25   requested an attorney.  He expressed concern for his

PROCEEDINGS                    87

1   girlfriend, concern that she may be wondering where he was,

2   and he was permitted to call her and eventually transferred

3   to the MDC.

4           Statements that were the made, the only statements

5   which I gather are the statements sought to be suppressed,

6   are the statements that were made in the lunch room after he

7   was advised of his Miranda rights.  Statements are

8   voluntary, knowingly made.  The motion to suppress is

9   denied.  The evidence leaves me with no doubt that no

10  statement was obtained from Mr. Liounis unlawfully.

11          Now, let's set it down for trial, if that's where

12  we are, because I think there are no outstanding motions.  I

13  think the motions have just been decided.  So let's put it

14  down for trial.

15          MR. SPECTOR:  What we would request, if the Court

16  is willing, I think, now that the motions have been decided,

17  we may be able to make some headway in resolving the case,

18  and I would ask if the Court would give us a period of

19  perhaps 60 days to try to work it out.  I'm going to be out

20  for a little bit of time and it's a little more difficult

21  because the defendant is confined.  If we could set a status

22  conference 60 days from now, and if we don't have a

23  disposition, at that point we can have a trial date.  I

24  think given the complexity of the case, it's worth this time

25  to try to wrap the case up, if we can.

```
                    PROCEEDINGS                    88
```

1           MR. GOLD:  Excuse me, your Honor.

2           THE DEFENDANT:  Your Honor, with all due respect,

3    I'm in the building.  Every day is effecting me at this

4    point, so to sit in that building another 60 days, I

5    disagree.  30 days, if it's okay with Mr. Spector, I'll be

6    ready, I'll be ready.

7           MR. GOLD:  Your Honor, Mr. Liounis has

8    communicated to me that he is not interested in a 60-day

9    adjournment and is seeking a trial date.

10          THE COURT:  We'll set it down for 30 days.  I was

11   not inclined to grant the government 60 days.  This case has

12   been here now for almost a year.  I don't know how many

13   adjournments have been requested and granted for the reason

14   we are engaged in plea negotiations.  I think there have

15   been at least half-a-dozen adjournments, which have been

16   made, asked for and granted, because there were plea

17   negotiations going on.  And apparently the only reason, I'm

18   gathering, that the plea negotiations were not fruitful

19   because these motions were pending.

20          MR. SPECTOR:  Well, Judge, if I may, that was

21   certainly my understanding, the significant portion of the

22   adjournment was because of the motions.

23          THE COURT:  Well, excuse me.  Before you go any

24   further, the motions were continuously requested of me to be

25   held in abeyance.

PROCEEDINGS                    89

1          MR. SPECTOR:  That's correct, Judge.

2          THE COURT:  Because there were plea negotiations

3    going on.

4          MR. SPECTOR:  Yes, that is correct.

5          THE COURT:  So it wasn't because the motions were

6    pending.

7          MR. GOLD:  Your Honor, I can assure the Court that

8    every application that sets forth the party's interest in

9    potential plea negotiations were substantial, real at all

10   times, and were accurate and truthful requests at the time.

11         THE COURT:  I have not, I don't think, said

12   anything that would suggest that they weren't legitimate

13   or --

14         MR. GOLD:  I appreciate that.

15         THE COURT:  I haven't said a word.  All I said was

16   there have been many, many adjournments based upon on-going

17   plea negotiations, which they haven't been successful plea

18   negotiations after all this time, I don't see any useful

19   purpose in continuing for another 60 days, so we'll set it

20   down for a trial.

21         MR. SPECTOR:  Judge, can I be heard on the

22   scheduling, please?

23         THE COURT:  Yes.

24         MR. SPECTOR:  There are a couple of other reasons.

25   One, I have a personal situation which will require me to be

PROCEEDINGS                    90

1    out of the office for most of the next 30 days, and I'm very

2    familiar with this case, it would be difficult to give it to

3    another assistant, in short order.  Second, we have numerous

4    victims who are outside of the area who are elderly, who

5    will need, I think, a significant amount of time to prepare

6    and to travel.  And I think, with all due respect, 30 days

7    is unreasonable to the victims to have that compressed of a

8    time frame.  My request is a trial date four months from

9    now.

10            THE COURT:  A trial date what?

11            MR. SPECTOR:  I think given the complexity of the

12   case --

13            THE COURT:  I'm sorry, when?

14            MR. SPECTOR:  Four months from now.

15            THE DEFENDANT:  Michael, can I speak?

16            THE COURT:  Mr. Spector, if you were requesting an

17   adjournment of time because initially you believed on-going

18   plea negotiations would be a sufficient reason for it and

19   now you are telling me there are completely different

20   reasons for it, I will not put this case off for

21   four months.  60 days is as long as I will put this case off

22   and I'll make a finding of exclusion of time between now and

23   whenever the trial date is for the reasons indicated later,

24   not because there are plea negotiations.  I think the

25   reasons that you advance of elderly victims, numerous

PROCEEDINGS                              91

1  victims, which I would understand is an accurate

2  representation, given the affidavits that I've read

3  involving many victims or alleged victims of the crime with

4  which Mr. Liounis is charged, I think would justify a

5  finding by me under 3161(a)(7) in the interest of justice

6  would warrant that exclusion of time.  But four months is

7  beyond question.  I won't grant it.  At least not now.  Let

8  me have a date.

9              COURTROOM DEPUTY:  October 7th at 10:00 a.m.

10              MR. GOLD:  Judge, I'm sure it's been placed on the

11  record before, but if we can get a sense of how long the

12  trial is expected to be, I just have no idea.

13              MR. SPECTOR:  I would think two to three weeks.

14              MR. GOLD:  Would you be sitting on Fridays?

15              THE COURT:  Probably not.

16              THE DEFENDANT:  Your Honor, may I make a comment

17  on that?

18              THE COURT:  Sure.

19              THE DEFENDANT:  I want to put on the record that

20  I'm detained.  I understand exactly what Mr. Spector is

21  saying, this has been a very long, on-going investigation,

22  and I'm locked in a building, I've been in the building for

23  16 months, I'm completely deteriorating, I'm being very

24  honest with and I'm really being honest with you, the

25  conditions in MDC are very harsh.  It almost makes it

PROCEEDINGS                              92

1  impossible for me to defend.  I work night and day.  I work

2  very hard.  And the conditions are overcoming me, they're

3  overcoming my family, it's impeding my defense and another

4  60 days is going to put me over the edge.  I already asked

5  for a speedy trial.  I understand there were motions

6  pending.  I asked for a speedy trial when I filed my

7  pretrial motions, okay.

8          I don't have no one, excuse me, Mr. Gold helps the

9  best he could, Mr. Dwyer comes and helps me when he can get

10 into the building.  There is a separation between myself and

11 somebody else in that building.  I can't even get visits;

12 Mr. Gold, I'm sure, will back me up on this, so it's almost

13 like I don't have a shot.  I don't even have access to a

14 printer.  And I'm defending my case, I've never complained

15 and I will never complain, but I don't even have access to a

16 printer.  And I am telling the Court, why did I ask for

17 30 days?  Because I've worked very hard and I'm ready to go,

18 okay, and I cannot sit in that building another 60 days, and

19 it's just going to deteriorate me even more and more, and

20 it's going to make fighting this case very difficult.  I'm

21 not facing one, two years.  This is a long time.  I'm

22 41 years old, okay, and I am putting on it that I completely

23 objecting for those reasons.

24          THE COURT:  Thank you very much.  Anything

25 further?

PROCEEDINGS                          93

1          MR. SPECTOR:  No, your Honor.

2          MR. GOLD:  No, your Honor.

3          THE COURT:  Thank you very much.

4          (Proceedings adjourned at 3:10 p.m.)

5

6                          *****

7

8          (Proceedings were recalled at 4:47 p.m.)

9

10          (In open court.)

11          COURTROOM DEPUTY:  Criminal cause, United States

12     versus Peter Liounis.

13          MR. SPECTOR:  Good afternoon, your Honor.

14          MR. GOLD:  Stand-by counsel for Mr. Liounis,

15     Michael Gold.  Good afternoon, your Honor.  And I thank the

16     Court and chambers for accommodating us.

17          When we were in court earlier this afternoon,

18     Mr. Liounis expressed his opposition to the government's

19     request for a 60-day adjournment to try and resolve this

20     case by way of a disposition.

21          Subsequent to that appearance the government and I

22     have spent the last, whatever it was, hour or hour and a

23     half in direct negotiations with Mr. Liounis, which at this

24     point there is a framework that I think all parties believe

25     could bear -- could result in a disposition.

Case 1:12-cr-00350-ILG   Document 125   Filed 10/16/13   Page 94 of 113 PageID #: 1236

1           The issue now, and Mr. Liounis would like to

2   withdraw his objection and request for the speedy trial of,

3   I forgot the date, I'm sorry, October 7th, and would request

4   a 30-day adjournment, which would allow Mr. Spector to put

5   together something in his office that would be along the

6   lines that have been discussed, it would allow me then time

7   to bring it to Mr. Liounis and to finalize things.  And if

8   at the end of that 30-day period or sooner if it appears

9   that there will not be a disposition, we could advance the

10  case.  Although, actually, that may not be possible, I

11  withdraw that, Mr. Spector, I believe is out the last two

12  weeks --

13          MR. SPECTOR:  I'll be here the last week of

14  August.

15          MR. GOLD:  Oh, in that case perhaps we could

16  advance the case one way or another, to either put it on for

17  a plea or to advise the court two weeks from now or three

18  weeks from now that a plea is not going to work.  So it

19  would be our request that if the court would consider; and

20  again, Mr. Liounis is making this request for an opportunity

21  for one last time for the parties to try and resolve this.

22          THE COURT:  30 days from when, from October 7th?

23          MR. GOLD:  No.  No.  30 days from now.

24          THE COURT:  All right.  First with respect to the

25  objection to my 60-day adjournment, it occurred to me after

1    I left the courtroom, I didn't have to exclude any time, all

2    the time was excluded up until now, so we had 70 days to put

3    off for trial, but I'll adjourn it for another 30 days.

4              MR. GOLD:  Thank you, sir.

5              THE COURT:  Which would be what, September what?

6              COURTROOM DEPUTY:  The closest return date would

7    be September 23rd.

8              THE COURT:  All right.  I take it that the parties

9    may be working on a proposed plea agreement for the Court to

10   consider?

11             MR. SPECTOR:  Correct, your Honor.

12             MR. GOLD:  Yes, sir.

13             THE COURT:  So I will exclude the time pursuant to

14   the 3161 (h)(1)(G).  I could also exclude the time pursuant

15   to 3161(h)(6).  I could also exclude the time pursuant to

16   3161(7)(A)(B)(ii)(iv).  For all those reasons I'm making the

17   appropriate finding; although, no appropriate finding has to

18   be made for the exclusion of time other than (7)(A) and

19   (7)(B), but in any event, what's the date?

20             COURTROOM DEPUTY:  September 23rd, Judge.

21             THE COURT:  At what time?

22             COURTROOM DEPUTY:  10:00 a.m.

23             THE COURT:  Excuse me?

24             MR. SPECTOR:  And that's for a plea or status

25   conference, correct?

1          THE COURT:  Either plea or we'll pick a trial

2    date.

3          MR. SPECTOR:  At that time?

4          THE COURT:  Yes.  And the trial date will be very,

5    very shortly thereafter.

6          MR. SPECTOR:  Understood, your Honor.

7          THE DEFENDANT:  Thank you, your Honor.

8          MR. GOLD:  Thank you, your Honor.  I appreciate it

9    again for the Court's willingness to come out and hear us.

10          THE DEFENDANT:  Thank you, your Honor.

11          (Proceedings adjourned at 4:52 p.m.)

12

13                    * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**RICHARD DeLISIO**

DIRECT EXAMINATION BY MR. SPECTOR                    22

CROSS-EXAMINATION BY THE DEFENDANT                   33


**PETER LIOUNIS**

CROSS-EXAMINATION BY MR. SPECTOR                     71




**EXHIBITS**

Government Exhibit 7                                 29

Government Exhibit RD-2                              31

Government Exhibits 5 & 6                            32

* * * * *

98

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4   _____

5   Official Court Reporter          August 12, 2013

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## $

**$25,000** [1] - 80:10
**$500** [2] - 79:17, 79:22

## 0

**0.5** [1] - 8:20

## 1

**1** [1] - 59:11
**10** [3] - 24:6, 26:14, 84:17
**100** [1] - 33:17
**10:00** [1] - 91:9, 95:22
**10:30** [1] - 74:25
**10:45** [2] - 52:7, 52:8
**11:30** [1] - 1:8
**12** [2] - 1:7, 38:22
**12-379M** [3] - 38:23, 38:24, 40:25
**12-CR-350** [3] - 1:3, 2:8, 53:9
**15** [6] - 24:7, 26:14, 47:4, 47:5, 69:15, 84:17
**16** [10] - 14:19, 14:21, 17:14, 36:19, 36:20, 36:24, 37:3, 41:16, 84:5, 91:23
**16th** [5] - 41:18, 42:9, 43:5, 84:4, 84:5
**17** [13] - 23:9, 33:11, 36:16, 36:18, 36:22, 37:3, 37:9, 38:10, 38:12, 39:1, 83:16, 84:5, 84:6
**17th** [14] - 30:14, 35:19, 35:21, 36:17, 38:4, 38:11, 39:9, 41:17, 41:21, 42:10, 42:11, 43:6, 43:7
**18** [1] - 16:22
**18th** [1] - 52:12
**1:00** [1] - 52:16
**1:50** [1] - 61:14

## 2

**2** [5] - 53:16, 61:5, 61:13, 66:17, 74:9
**20,000** [1] - 80:11
**2007** [3] - 82:7, 82:8, 82:21
**2012** [12] - 16:22, 23:9, 33:11, 36:16, 37:9, 38:6, 38:10, 39:1, 41:16, 41:17, 79:24, 83:16
**2013** [1] - 1:7
**22** [1] - 22:25, 97:5
**23rd** [2] - 95:7, 95:20
**27** [1] - 16:17
**29** [1] - 97:13
**2:00** [1] - 74:8
**2:14** [1] - 62:2
**2:15** [1] - 61:14

## 3

**30** [10] - 10:1, 49:18, 88:5, 88:10, 90:1, 90:6, 92:17, 94:22, 94:23, 95:3
**30-day** [2] - 94:4, 94:8
**300** [1] - 80:16, 80:18
**31** [1] - 97:14

**3161** [1] - 95:14
**3161(7)(A)(B)(ii)(iv)** [1] - 95:16
**3161(a)(7** [1] - 91:5
**3161(h)(6)** [1] - 95:15
**32** [1] - 97:15
**33** [1] - 97:6
**3500** [5] - 25:9, 31:2, 53:9, 53:13, 59:10
**370-6944** [1] - 12:1
**3:00** [2] - 66:17, 74:9
**3:10** [1] - 93:4

## 4

**4/17** [2] - 39:18, 63:22
**4/17/12** [1] - 35:6, 62:14
**4/17/2012** [1] - 66:16
**40** [2] - 10:1, 63:10
**404(b** [1] - 14:16
**41** [1] - 92:22
**45** [6] - 49:18, 49:19, 49:21, 63:13, 67:10, 70:15
**4:47** [1] - 93:8
**4:52** [1] - 96:11

## 5

**5** [6] - 32:8, 32:13, 32:20, 32:23, 86:17, 97:15
**50** [1] - 49:21

## 6

**6** [5] - 32:9, 32:17, 32:21, 32:23, 97:15
**60** [9] - 83:20, 87:19, 87:22, 88:4, 88:11, 89:19, 90:21, 92:4, 92:18
**60-day** [3] - 88:8, 93:19, 94:25
**613-2615** [1] - 1:21
**6:40** [10] - 23:14, 33:16, 33:18, 33:19, 39:3, 48:12, 74:12, 74:17, 74:18, 83:16

## 7

**7** [7] - 29:3, 29:6, 29:11, 29:13, 73:9, 86:6, 97:13
**7)(A** [1] - 95:18
**7)(B** [1] - 95:19
**70** [1] - 95:2
**71** [1] - 97:9
**718** [1] - 1:21
**75** [1] - 43:23
**7th** [1] - 91:9, 94:3, 94:22

## 9

**917** [1] - 12:1
**9:15** [2] - 47:14, 47:15
**9:30** [4] - 47:12, 47:13, 49:3, 52:4
**9:35** [1] - 51:18
**9:40** [1] - 51:18

**9:45** [3] - 47:12, 47:13, 51:23

## A

**a.m** [3] - 1:8, 91:9, 95:22
**abeyance** [1] - 88:25
**abide** [1] - 46:10
**able** [7] - 18:18, 24:10, 69:5, 77:12, 80:17, 86:22, 87:17
**abnormalities** [2] - 32:14, 86:21
**absolutely** [4] - 4:16, 4:20, 5:15, 33:17, 34:4, 34:5, 34:6, 44:15, 51:7, 73:6
**accept** [1] - 27:22
**access** [2] - 92:13, 92:15
**accommodate** [1] - 50:6
**accommodating** [2] - 50:4, 93:16
**accordance** [1] - 14:10
**account** [1] - 83:21
**accumulated** [1] - 17:13
**accurate** [2] - 89:10, 91:1
**acting** [1] - 84:12
**activity** [2] - 12:15, 24:10
**actual** [2] - 41:3, 57:20, 60:14
**add** [5] - 4:2, 4:5, 4:25, 9:9, 70:3
**added** [1] - 10:24
**additional** [1] - 12:14
**address** [1] - 4:14
**addressed** [2] - 5:14, 57:9
**adjacent** [1] - 66:19
**adjourn** [1] - 95:3
**adjourned** [2] - 93:4, 96:11
**adjournment** [6] - 88:9, 88:22, 90:17, 93:19, 94:4, 94:25
**adjournments** [3] - 88:13, 88:15, 89:16
**administer** [1] - 46:24
**administered** [1] - 77:20
**admitted** [3] - 29:13, 31:11, 32:23
**admitting** [1] - 54:17
**admonished** [1] - 75:13
**advance** [4] - 14:17, 90:25, 94:9, 94:16
**Advanced** [1] - 32:10
**advisability** [1] - 66:3
**advise** [2] - 84:23, 94:17
**advised** [5] - 62:4, 64:24, 84:19, 85:19, 87:7
**affidavit** [48] - 5:18, 5:20, 5:21, 6:2, 6:13, 7:11, 7:12, 7:17, 7:19, 7:22, 7:23, 8:9, 10:19, 11:9, 12:11, 12:22, 12:24, 13:7, 18:19, 18:23, 18:24, 19:4, 19:6, 20:8, 35:17, 36:18, 36:25, 37:12, 38:8, 38:19, 39:5, 39:7, 39:10, 39:24, 40:4, 40:10, 41:8, 41:10, 41:25, 42:6, 42:7, 42:8, 42:22, 59:17, 79:7, 83:20
**affidavits** [14] - 5:25, 14:25, 17:24, 17:25, 18:2, 18:8, 18:19, 19:11, 19:16, 19:21, 42:8, 42:11, 59:15, 91:2
**afford** [2] - 79:11, 80:17

**afield** [1] - 81:18
**afternoon** [3] - 93:13, 93:15, 93:17
**Agent** [25] - 1:17, 3:2, 20:19, 22:8, 31:13, 36:4, 54:16, 55:17, 57:3, 59:4, 60:3, 62:13, 64:22, 68:8, 68:10, 74:11, 83:12, 83:13, 84:3, 85:2, 85:3, 85:16, 86:1, 86:24
**agent** [63] - 5:16, 22:9, 22:17, 22:24, 26:7, 26:23, 28:8, 28:14, 29:16, 30:22, 39:8, 39:14, 40:3, 42:14, 42:16, 44:19, 44:20, 44:22, 45:7, 45:12, 45:19, 46:3, 46:14, 47:25, 49:17, 49:19, 49:21, 50:3, 50:5, 50:22, 51:13, 51:19, 52:5, 52:23, 54:8, 56:2, 56:6, 57:12, 57:19, 57:24, 58:5, 58:9, 59:20, 60:2, 60:15, 60:21, 60:22, 61:1, 62:6, 64:17, 68:18, 69:14, 69:18, 70:5, 70:14, 71:8, 71:19, 72:18, 75:10, 76:4, 83:13, 85:3, 86:3
**agent's** [3] - 27:12, 27:14, 56:11
**agents** [35] - 15:8, 23:15, 23:17, 24:8, 24:12, 26:6, 27:18, 31:16, 32:1, 33:2, 34:22, 34:23, 34:25, 44:21, 45:20, 49:23, 63:22, 66:6, 67:1, 67:3, 67:22, 67:25, 68:7, 68:23, 70:2, 70:4, 70:13, 70:14, 70:22, 74:21, 83:14, 83:15, 84:12, 84:19
**agents'** [3] - 85:15, 85:17, 85:18
**aggressively** [1] - 79:2
**Agnes** [1] - 1:20
**ago** [7] - 14:1, 18:12, 21:2, 21:4, 21:15, 77:8, 77:21
**agree** [2] - 36:24, 59:14
**agreed** [2] - 27:13, 85:16
**agreement** [1] - 95:9
**ahead** [1] - 4:4
**aided** [1] - 1:24
**ailments** [1] - 77:17
**Airport** [9] - 17:8, 22:12, 23:3, 23:24, 35:4, 62:16, 67:4, 67:9, 84:16
**alias** [1] - 12:5
**aliases** [7] - 3:21, 4:20, 13:14, 13:22, 13:24
**allegation** [1] - 12:19
**allegations** [2] - 6:19, 18:15
**alleged** [6] - 13:23, 52:21, 53:24, 59:14, 59:18, 91:3
**allegedly** [3] - 4:23, 9:18, 63:9
**alleging** [2] - 6:12, 43:1
**allergies** [1] - 28:3
**allergy** [1] - 29:25
**allow** [6] - 33:23, 34:1, 55:7, 74:21, 94:4, 94:6
**allowed** [2] - 9:3, 30:22
**almost** [6] - 61:14, 69:23, 70:8, 88:12, 91:25, 92:12
**alone** [1] - 23:15
**aloud** [3] - 32:12, 32:16, 74:16
**altogether** [2] - 22:23, 23:18
**ambiguous** [1] - 85:6
**ambivalent** [1] - 86:9

**Amendment** [1] - 60:6
**AMERICA** [1] - 1:3
**America** [1] - 2:9
**amount** [1] - 90:5
**ample** [1] - 12:11
**analysis** [6] - 15:18, 15:20, 17:2, 17:4
**Anderson** [13] - 4:7, 4:17, 4:23, 5:2, 5:4, 5:7, 5:11, 11:4, 12:12, 25:19, 25:21, 54:18, 55:19
**annoying** [1] - 72:20
**answer** [6] - 8:8, 54:18, 68:3, 75:15, 76:14, 76:17
**answered** [1] - 39:21
**answering** [1] - 25:21
**answers** [1] - 29:23, 46:15, 70:22
**anyway** [1] - 69:25
**apart** [2] - 6:23, 6:24
**apologize** [2] - 40:12, 44:2
**Appeals** [1] - 21:18
**appear** [2] - 46:19, 59:21
**appearance** [1] - 93:21
**appearances** [1] - 2:24
**appeared** [2] - 67:16
**application** [8] - 4:6, 4:25, 5:1, 5:18, 5:22, 11:7, 20:8, 89:8
**applications** [6] - 4:18, 4:22, 5:12, 17:24, 19:12, 19:22
**appreciate** [3] - 16:15, 89:14, 96:8
**approach** [3] - 25:7, 29:1, 30:25
**approaching** [1] - 9:6
**appropriate** [4] - 10:12, 56:1, 95:17
**appropriately** [1] - 14:9
**approximate** [2] - 33:19, 67:9
**April** [17] - 16:22, 23:9, 30:14, 33:11, 35:19, 36:16, 37:9, 38:4, 38:10, 38:11, 39:1, 41:16, 41:17, 41:18, 83:16, 84:4, 84:5
**area** [2] - 69:5, 90:4
**argument** [2] - 7:1, 42:21
**argumentative** [1] - 46:12
**arguments** [2] - 8:4, 12:9
**arraigned** [1] - 78:6
**arraignment** [1] - 78:7
**arrest** [45] - 17:5, 23:6, 23:10, 33:11, 35:2, 35:5, 35:7, 35:9, 35:14, 35:18, 36:5, 36:13, 36:15, 37:12, 39:6, 39:17, 39:22, 39:24, 40:6, 40:24, 41:3, 41:9, 42:6, 42:7, 42:8, 42:13, 42:23, 43:5, 43:11, 47:24, 48:4, 80:2, 80:4, 80:5, 83:16, 83:17, 84:2, 84:4, 84:6, 84:8, 84:13, 84:14, 84:15
**arrested** [31] - 12:3, 23:5, 23:13, 23:16, 23:20, 24:23, 28:6, 33:14, 39:1, 39:11, 43:6, 43:8, 43:18, 47:21, 48:12, 56:3, 62:15, 67:1, 67:2, 71:19, 72:1, 74:7, 74:11, 75:11, 75:18, 80:9, 80:22, 83:15, 84:20, 85:25
**arresting** [2] - 62:14, 62:18
**arrival** [2] - 67:11, 67:15
**arrived** [2] - 24:5, 24:19

**aspect** [2] - 7:9, 8:10
**assets** [2] - 79:18, 79:22
**assigned** [2] - 22:11, 23:2
**assist** [1] - 12:7
**assistance** [2] - 61:19, 70:11
**assistant** [1] - 90:3
**Assistant** [1] - 1:15
**Assisted** [1] - 1:16
**associates** [1] - 25:23
**assuming** [1] - 21:12
**assure** [3] - 21:11, 42:5, 89:7
**asthma** [2] - 49:6, 69:11
**AT&T** [1] - 61:17
**ate** [1] - 27:24
**Atlantic** [2] - 82:20, 82:22
**attachment** [1] - 83:25
**attack** [3] - 30:11, 49:6, 50:19
**attacking** [1] - 18:18
**attained** [1] - 20:9
**attention** [6] - 49:7, 49:8, 49:24, 50:7, 50:25, 51:1
**attorney** [13] - 30:14, 44:13, 46:3, 46:18, 68:21, 72:24, 75:9, 75:16, 76:15, 79:5, 79:11, 79:16, 86:25
**Attorney** [2] - 1:14, 1:15
**August** [2] - 1:7, 94:14
**authority** [3] - 35:5, 39:17, 43:13
**authorization** [1] - 19:8
**authorized** [2] - 4:6, 40:6
**available** [1] - 20:3
**avenue** [1] - 19:20
**avoid** [1] - 17:20
**aware** [7] - 4:10, 14:5, 16:15, 39:10, 44:20, 58:1, 63:12

**B**

**bad** [2] - 28:3, 69:19
**bag** [5] - 27:23, 58:8, 58:14, 58:15, 70:16
**bags** [7] - 68:11, 68:12, 68:13, 68:14, 68:15, 72:20
**based** [11] - 4:10, 7:12, 8:15, 13:11, 18:15, 21:5, 32:14, 59:20, 84:12, 86:21, 89:16
**basis** [5] - 11:14, 12:10, 12:25, 55:24, 56:17
**be..** [1] - 38:5
**bear** [1] - 93:25
**become** [4] - 49:4, 49:5, 49:6, 63:19
**becomes** [1] - 14:5
**BEFORE** [1] - 1:11
**began** [4] - 29:22, 67:2, 67:19, 69:10
**begin** [1] - 62:9
**beginning** [1] - 74:15
**begun** [2] - 28:11, 56:4
**behalf** [1] - 46:13
**behind** [1] - 26:6
**belong** [1] - 5:3

**belonged** [1] - 8:14
**belonging** [1] - 4:13
**belongs** [2] - 5:3
**below** [2] - 38:11, 73:22
**Belt** [1] - 67:8
**bench** [3] - 2:6, 2:10, 62:3
**Benz** [1] - 66:18
**best** [3] - 48:2, 65:20, 92:9
**better** [1] - 69:7
**between** [11] - 25:18, 25:20, 25:23, 34:10, 51:11, 56:3, 66:17, 70:17, 74:9, 90:22, 92:10
**beyond** [3] - 11:6, 18:9, 91:7
**big** [1] - 69:4
**Bill** [4] - 17:16, 17:17, 17:22
**binder** [5] - 29:5, 31:4, 44:25, 53:16, 59:12
**bit** [5] - 51:15, 68:8, 69:7, 80:19, 87:20
**block** [1] - 48:1
**borrowing** [1] - 80:20
**bottles** [1] - 58:13
**bottom** [1] - 29:8
**bought** [2] - 27:22, 27:23
**Boulevard** [2] - 67:6, 67:7
**box** [1] - 32:18
**boxes** [1] - 32:18
**Brady** [4] - 14:2, 14:3, 14:5, 17:14
**break** [2] - 62:1, 69:3
**breathe** [1] - 77:13
**breathing** [2] - 30:3, 30:5
**Brian** [1] - 42:17
**brief** [2] - 26:5, 76:5
**briefly** [1] - 23:1
**bring** [11] - 28:2, 28:9, 49:9, 49:10, 49:24, 50:1, 50:5, 50:23, 61:9, 62:15, 94:7
**bringing** [1] - 62:16
**Brooklyn** [1] - 1:5
**brought** [9] - 26:13, 26:15, 27:17, 31:20, 32:7, 47:8, 51:21, 56:11, 62:23
**building** [9] - 31:21, 43:23, 88:3, 88:4, 91:22, 92:10, 92:11, 92:18
**bulk** [1] - 23:4
**bull** [1] - 78:5
**burst** [1] - 68:14
**business** [1] - 5:7
**busy** [1] - 75:22
**buy** [1] - 80:13
**BY** [19] - 1:14, 22:7, 33:10, 37:23, 40:22, 43:17, 45:11, 46:20, 49:1, 53:19, 54:9, 57:7, 59:3, 62:11, 71:17, 76:23, 97:5, 97:6, 97:9

## C

**cafeteria** [2] - 70:3
**camera** [7] - 64:10, 70:4, 70:5, 70:6, 70:9
**cameras** [11] - 24:14, 24:16, 26:25,

27:3, 27:5, 27:8, 27:13, 27:14, 70:7, 85:14, 85:17
**cannot** [3] - 35:17, 40:14, 92:18
**car** [15] - 9:25, 23:18, 23:21, 23:25, 28:5, 28:6, 28:9, 34:12, 34:13, 34:15, 48:5, 71:20, 80:8, 80:11, 80:13
**card** [3] - 15:23, 15:24, 16:1
**care** [2] - 71:3, 71:8
**carefully** [1] - 17:25
**cars** [4] - 23:18, 23:19, 34:7, 34:9
**Carter** [1] - 12:22
**case** [36] - 5:4, 5:9, 14:12, 14:13, 19:19, 35:20, 38:18, 38:21, 40:23, 41:3, 41:4, 41:10, 43:8, 46:1, 53:9, 77:23, 79:8, 81:6, 81:24, 82:24, 83:2, 87:17, 87:24, 87:25, 88:11, 90:2, 90:12, 90:20, 90:21, 92:14, 92:20, 93:20, 94:10, 94:15, 94:16
**cases** [3] - 13:25, 14:18, 18:12
**cash** [4] - 23:4, 80:23, 80:24, 81:2
**CAUSE** [1] - 1:10
**caution** [1] - 66:2
**cell** [15] - 8:19, 10:1, 18:21, 24:6, 26:13, 26:20, 26:24, 26:25, 27:1, 27:6, 46:23, 47:3, 63:4, 84:17, 85:12
**Center** [1] - 32:3
**centered** [1] - 84:3
**certain** [1] - 51:10
**certainly** [2] - 10:13, 88:21
**certified** [3] - 15:22, 15:24, 16:6
**challenge** [4] - 7:10, 8:10, 12:19, 84:2
**challenged** [3] - 8:8, 8:9, 19:5
**challenges** [1] - 7:22
**challenging** [3] - 4:9, 5:15, 11:14
**chambers** [1] - 93:16
**chance** [4] - 37:24, 39:14, 52:20, 52:25
**change** [4] - 63:9, 63:13, 80:16, 80:18
**changed** [1] - 42:9
**charged** [4] - 17:20, 55:11, 55:12, 91:4
**charges** [1] - 24:23
**charging** [1] - 18:3
**chase** [1] - 54:15
**check** [1] - 69:16
**checked** [2] - 32:19, 69:19
**checkup** [1] - 51:14
**Circuit** [1] - 21:18
**circumstance** [1] - 65:3
**cited** [1] - 13:25
**City** [2] - 82:20, 82:22
**CJA** [2] - 1:16, 16:23
**claim** [2] - 12:19, 19:15
**claiming** [1] - 61:2
**clarify** [1] - 27:5
**Claritin** [1] - 86:19
**clear** [9] - 8:7, 8:11, 11:24, 14:18,

19:1, 45:22, 57:9, 70:10, 80:21
**cleared** [1] - 32:25
**clearly** [1] - 20:7
**clients** [1] - 81:15
**close** [3] - 8:4, 11:13, 47:23
**closest** [1] - 95:6
**co** [1] - 80:14
**co-signed** [1] - 80:14
**coaxing** [1] - 85:20
**cold** [1] - 70:13
**Colica** [2] - 42:17, 42:18
**collapsed** [2] - 51:5, 77:9
**combine** [1] - 8:24
**coming** [1] - 69:12
**comment** [2] - 13:15, 91:16
**commenting** [1] - 18:23
**Commission** [1] - 17:13
**commissions** [1] - 81:16
**committed** [1] - 83:23
**committing** [1] - 81:6
**communicate** [1] - 75:24
**communicated** [1] - 88:8
**compare** [1] - 61:7
**compared** [1] - 9:10
**competent** [1] - 86:14
**complain** [2] - 29:25, 92:15
**complained** [2] - 19:6, 92:14
**complaining** [2] - 6:25, 28:1
**complaint** [1] - 14:25
**completed** [1] - 26:19
**completely** [10] - 5:19, 5:22, 9:7, 13:12, 70:17, 70:18, 90:19, 91:23, 92:22
**complex** [2] - 18:4
**complexity** [3] - 19:13, 87:24, 90:11
**compressed** [1] - 90:7
**Computer** [1] - 1:24
**Computer-aided** [1] - 1:24
**computerized** [1] - 1:23
**conceivable** [3] - 19:20, 19:24, 20:2
**conceivably** [2] - 12:25, 18:3
**concern** [2] - 86:25, 87:1
**concerned** [8] - 13:3, 13:22, 14:9, 18:10, 30:20, 64:10, 70:14, 73:8
**concerning** [1] - 16:21
**concerns** [2] - 9:10, 54:23
**concluded** [2] - 9:7, 31:13
**conclusion** [2] - 32:12, 32:16
**conditions** [3] - 48:15, 91:25, 92:2
**conducted** [3] - 5:16, 9:17, 17:4
**conference** [2] - 87:22, 95:25
**confined** [1] - 87:21
**confinement** [3] - 32:5, 32:19, 86:23
**confirmed** [1] - 86:2
**confused** [1] - 69:22
**congested** [1] - 28:1
**consider** [2] - 94:19, 95:10
**constitutional** [1] - 17:21
**contact** [3] - 4:16, 4:19, 30:16

contacted [1] - 75:8
contained [1] - 13:9
continue [3] - 62:8, 69:25, 79:5
continued [4] - 67:3, 68:3, 68:18, 68:19
continuing [1] - 89:19
continuously [1] - 88:24
contradict [1] - 7:18
contradiction [1] - 7:20
copies [1] - 15:22
Coppa [4] - 14:1, 14:12, 14:14, 19:18
copy [9] - 3:14, 15:24, 25:3, 28:23, 36:5, 37:12, 39:13, 40:14
corner [2] - 6:21, 18:22
correct [31] - 21:3, 21:6, 22:16, 33:18, 38:25, 40:24, 45:13, 47:13, 47:16, 47:19, 50:23, 50:24, 51:2, 51:6, 52:18, 58:6, 59:15, 59:18, 63:1, 63:2, 73:16, 74:19, 74:23, 75:2, 78:15, 81:8, 84:10, 89:1, 89:4, 95:11, 95:25
correcting [1] - 52:3
correctly [2] - 6:12, 6:19
Counsel [1] - 1:16
counsel [12] - 2:23, 3:1, 3:4, 7:13, 16:9, 16:10, 16:23, 16:25, 61:20, 65:5, 65:24, 93:14
couple [3] - 27:17, 27:24, 89:24
course [4] - 14:7, 69:6, 73:1, 78:20
COURT [169] - 1:1, 1:11, 2:11, 2:16, 2:19, 3:6, 3:10, 3:15, 3:20, 3:23, 4:1, 4:4, 5:10, 6:11, 6:16, 6:18, 7:3, 7:7, 7:24, 8:6, 10:5, 10:10, 10:14, 10:21, 10:23, 11:16, 11:18, 11:20, 11:23, 12:7, 12:16, 13:17, 13:19, 13:21, 14:8, 15:11, 15:16, 16:14, 16:17, 16:20, 20:14, 20:18, 21:1, 21:4, 21:8, 22:5, 22:14, 25:8, 29:2, 29:12, 31:1, 31:10, 32:22, 33:4, 33:6, 33:8, 33:23, 34:1, 35:12, 35:24, 36:2, 36:7, 37:14, 37:17, 39:21, 40:2, 40:9, 40:13, 40:16, 40:19, 41:5, 42:20, 43:2, 43:10, 44:5, 44:25, 45:17, 46:7, 46:9, 46:17, 48:19, 48:24, 50:16, 50:20, 53:10, 53:13, 53:18, 54:2, 54:5, 55:1, 55:5, 55:12, 55:21, 56:6, 56:17, 56:21, 56:25, 57:4, 57:11, 57:14, 57:16, 58:16, 58:19, 58:23, 59:1, 59:10, 59:13, 59:16, 59:24, 60:4, 60:10, 60:12, 60:16, 60:20, 60:25, 61:8, 61:10, 61:13, 61:16, 62:6, 62:8, 62:10, 62:20, 64:6, 64:8, 64:13, 64:15, 64:17, 64:21, 65:5, 65:9, 65:18, 65:22, 66:1, 66:12, 66:15, 71:11, 76:12, 76:14, 76:17, 76:21, 81:17, 82:25, 83:3, 83:5, 83:9, 88:10, 88:23, 89:2, 89:5, 89:11, 89:15, 89:23, 90:10, 90:13, 90:16, 91:15, 91:18, 92:24, 93:3, 94:22, 94:24, 95:5, 95:8, 95:13, 95:21, 95:23, 96:1, 96:4
Court [25] - 1:20, 1:20, 2:4, 7:16, 7:18, 7:20, 9:11, 10:4, 10:6, 15:14,

21:17, 65:1, 66:5, 77:22, 77:25, 78:3, 78:11, 78:21, 78:24, 87:15, 87:18, 89:7, 92:16, 93:16, 95:9
court [13] - 2:1, 2:2, 19:2, 57:8, 62:17, 65:3, 78:7, 81:22, 81:23, 93:10, 93:17, 94:17, 94:19
Court's [1] - 96:9
courtesy [1] - 50:22, 75:10
courthouse [3] - 2:20, 43:9, 73:8
Courthouse [1] - 1:5
Courtroom [1] - 1:19
COURTROOM [11] - 2:3, 2:7, 2:22, 22:1, 37:18, 65:15, 91:9, 93:11, 95:6, 95:20, 95:22
courtroom [4] - 2:21, 43:7, 61:25, 95:1
cover [1] - 38:18
credibility [1] - 61:3
credible [1] - 86:2
credit [3] - 15:23, 15:24, 16:1
crime [3] - 83:22, 83:24, 91:3
crimes [2] - 23:2, 23:3
Criminal [1] - 2:7
CRIMINAL [1] - 1:10
criminal [3] - 2:22, 12:14, 93:11
criteria [2] - 7:6, 7:9
critical [1] - 13:22
cross [2] - 33:4, 46:12
CROSS [4] - 33:9, 71:16, 97:6, 97:9
cross-examination [1] - 46:12
CROSS-EXAMINATION [4] - 33:9, 71:16, 97:6, 97:9
crossed [2] - 36:25, 37:1
current [2] - 16:24, 23:1
custody [8] - 30:13, 49:13, 49:18, 55:24, 63:21, 74:17, 74:22, 85:10
Customs [1] - 22:9
cut [1] - 54:15

# D

D-E-L-I-S-I-O [1] - 22:3
Daddy [1] - 14:22
Daniel [1] - 2:25
DANIEL [1] - 1:14
data [1] - 8:19
date [26] - 21:5, 35:16, 36:14, 36:17, 37:8, 38:1, 38:3, 38:8, 41:15, 41:16, 41:18, 41:21, 84:4, 84:6, 87:23, 88:9, 90:8, 90:10, 90:23, 91:8, 94:3, 95:6, 95:19, 96:2, 96:4
dates [1] - 80:8
days [17] - 87:19, 87:22, 88:4, 88:5, 88:10, 88:11, 89:19, 90:1, 90:6, 90:21, 92:4, 92:17, 92:18, 94:22, 94:23, 95:2, 95:3
deal [1] - 11:18
dealt [3] - 9:20, 9:23, 14:12
debilitating [1] - 86:15
debt [1] - 80:20

decide [1] - 8:8
decided [5] - 21:1, 21:15, 46:19, 87:13, 87:16
declined [3] - 27:20, 49:25, 85:22
deep [1] - 67:20
defend [1] - 92:1
defendant [35] - 1:8, 7:5, 7:8, 11:1, 11:13, 12:9, 12:13, 15:9, 23:6, 23:16, 23:20, 24:5, 28:17, 29:18, 30:13, 30:16, 31:14, 32:25, 46:22, 49:4, 49:12, 50:18, 52:17, 57:13, 61:25, 78:13, 84:6, 84:15, 84:25, 85:3, 85:4, 85:7, 86:4, 87:21
DEFENDANT [112] - 3:8, 3:19, 3:22, 3:25, 4:2, 4:5, 5:13, 6:14, 6:17, 7:1, 8:7, 11:17, 11:19, 11:21, 11:24, 13:15, 13:18, 13:20, 20:21, 21:5, 33:5, 33:7, 33:10, 33:24, 35:23, 36:4, 36:9, 37:11, 37:15, 37:19, 37:21, 37:23, 39:20, 39:23, 40:10, 40:14, 40:17, 40:20, 40:22, 42:4, 42:25, 43:4, 43:15, 43:17, 45:9, 45:11, 45:15, 45:18, 46:16, 46:20, 48:22, 48:25, 49:1, 50:18, 50:21, 53:4, 53:7, 53:11, 53:19, 54:9, 55:10, 55:17, 56:5, 56:16, 56:20, 56:24, 57:2, 57:5, 57:7, 57:15, 58:17, 58:20, 58:24, 59:3, 60:2, 60:5, 60:8, 60:11, 60:13, 60:18, 60:22, 61:6, 61:9, 61:11, 61:21, 62:9, 62:11, 62:21, 64:7, 64:14, 64:19, 64:22, 65:19, 65:23, 66:11, 66:14, 66:16, 76:10, 76:13, 76:16, 76:19, 76:22, 82:23, 83:1, 83:8, 88:2, 90:15, 91:16, 91:19, 96:7, 96:10, 97:6
Defendant [3] - 1:16, 2:2, 65:11
defendant's [7] - 8:4, 11:5, 12:13, 15:7, 26:18, 29:24, 83:10
Defendant's [3] - 36:8, 37:14, 45:5
defending [1] - 92:14
defense [1] - 92:3
definitely [1] - 68:9
defraud [3] - 13:5, 18:4, 18:6
defrauding [1] - 13:5
Delaware [1] - 19:1
deliberate [1] - 18:16
DeLisio [34] - 1:17, 3:2, 20:20, 21:22, 22:3, 22:8, 31:13, 33:11, 34:11, 36:5, 37:12, 50:10, 51:8, 53:20, 54:16, 55:18, 57:3, 59:4, 60:3, 62:13, 64:22, 68:8, 68:10, 74:11, 83:13, 83:14, 84:3, 85:2, 85:4, 85:16, 86:1, 86:24, 97:4
DeLisio's [1] - 86:1
denied [5] - 13:11, 17:15, 17:17, 20:9, 87:9
Department [1] - 15:4
Deputy [1] - 1:19
DEPUTY [11] - 2:3, 2:7, 2:22, 22:1, 37:18, 65:15, 91:9, 93:11, 95:6, 95:20, 95:22
derived [2] - 5:23, 14:14

derogatory [1] - 85:4
describe [3] - 23:1, 25:16, 58:8
describing [1] - 70:6
descriptions [1] - 13:9
detail [4] - 10:9, 13:8, 18:1, 83:25
detailed [2] - 13:9, 83:21
details [2] - 16:8, 16:21
detained [1] - 91:20
detective [1] - 54:7
Detention [1] - 32:3
deteriorate [1] - 92:19
deteriorating [1] - 91:23
determination [1] - 21:16
differ [1] - 60:24
difference [4] - 51:11, 59:5, 60:14, 61:1
different [5] - 9:5, 50:13, 59:22, 64:3, 90:19
difficult [3] - 87:20, 90:2, 92:20
difficulty [2] - 30:5, 48:20
Diglio [1] - 14:8
direct [2] - 46:15, 93:23
DIRECT [2] - 22:6, 97:5
directly [1] - 9:20
disagree [2] - 81:10, 88:5
disclosed [1] - 15:4
discomfort [2] - 32:15, 86:22
discovered [1] - 16:22
discovery [2] - 14:19, 14:21
discuss [1] - 6:9
discussed [2] - 5:5, 94:6
discussion [2] - 14:13, 84:11
dispatch [1] - 52:6
dispatched [4] - 57:19, 70:15, 70:23, 86:3
disposition [4] - 87:23, 93:20, 93:25, 94:9
distinguished [1] - 65:23
distract [1] - 18:18
distress [2] - 32:15, 86:22
DISTRICT [3] - 1:1, 1:1, 1:11
District [5] - 2:4, 4:6, 35:8, 81:7
dizzy [1] - 69:12
Docket [1] - 2:8
doctor [11] - 28:3, 31:22, 32:6, 49:9, 76:24, 77:2, 77:3, 77:6, 77:9, 77:12, 77:16
document [28] - 15:5, 25:11, 31:5, 37:16, 37:24, 38:1, 39:13, 39:15, 39:16, 41:2, 41:8, 41:13, 41:15, 42:24, 53:17, 53:20, 54:1, 54:4, 55:1, 55:6, 55:7, 55:18, 59:5, 59:24, 59:25, 61:3, 71:1, 73:10
documenting [3] - 25:12, 31:6, 32:11
documents [8] - 16:11, 17:12, 32:9, 32:10, 41:5, 59:16, 59:21, 60:1
dollars [1] - 82:2
done [4] - 4:8, 47:7, 63:25, 70:17
Dorado [1] - 67:5

doubt [2] - 43:12, 87:9
down [12] - 27:18, 48:18, 49:20, 51:13, 67:21, 70:1, 70:12, 83:6, 87:11, 87:14, 88:10, 89:20
downstairs [1] - 61:24
dozen [1] - 88:15
drink [1] - 27:21
drive [4] - 49:17, 50:23, 70:15, 71:25
driver [2] - 57:12, 67:12
drivers [1] - 67:11
driving [5] - 23:11, 23:21, 34:13, 66:17, 67:3
dropped [1] - 49:2
drove [2] - 67:3, 67:4
Drury [1] - 1:20
due [2] - 88:2, 90:6
duly [2] - 21:23, 65:12
during [11] - 16:22, 23:11, 24:3, 34:12, 44:12, 45:21, 53:23, 54:11, 61:19, 62:5, 82:15
duties [1] - 23:1
Dwyer [5] - 6:8, 7:12, 9:3, 10:19, 92:9
Dwyer's [1] - 6:21

## E

E-mail [2] - 1:21, 13:10
E-mails [2] - 3:17, 20:5
early [1] - 52:11
EASTERN [1] - 1:1
Eastern [2] - 2:4, 35:8
eat [4] - 27:19, 27:21, 27:24, 85:19
edge [1] - 92:4
effect [1] - 26:8
effecting [1] - 88:3
effectively [1] - 14:11
effects [2] - 61:3, 86:15
eight [2] - 16:20, 45:6
either [6] - 11:13, 11:15, 27:5, 55:8, 94:16, 96:1
EI [1] - 67:5
elaborate [1] - 5:21
elderly [2] - 90:4, 90:25
employed [1] - 19:25
enacted [1] - 9:7
enactment [1] - 9:4
end [7] - 6:10, 29:5, 63:7, 63:8, 71:9, 81:20, 94:8
ended [2] - 31:19, 67:9
Enforcement [1] - 22:10
enforcement [4] - 22:24, 23:15, 40:3, 83:15
engaged [1] - 88:14
enter [1] - 53:7
entered [1] - 2:21
entire [3] - 6:12, 7:22, 71:5
entirely [1] - 86:2
entirety [1] - 45:21
entitled [2] - 73:12, 73:22
equipped [1] - 85:13

error [1] - 21:16
escorted [2] - 67:23, 68:25
ESQ [3] - 1:13, 1:14, 1:17
establish [2] - 48:23, 83:24
event [3] - 15:3, 43:20, 95:19
events [1] - 87:2
eventually [8] - 67:8, 67:15, 67:23, 68:20, 69:8, 69:17, 69:25, 87:2
evidence [23] - 3:16, 12:11, 12:14, 12:19, 13:4, 13:5, 13:10, 14:16, 20:9, 29:13, 31:9, 31:12, 32:21, 32:24, 46:11, 55:2, 55:22, 56:14, 56:23, 83:23, 83:24, 86:6, 86:17, 87:9
exact [2] - 33:18, 80:8
exactly [2] - 10:25, 91:20
exam [3] - 9:17, 32:14, 86:21
examination [5] - 32:11, 46:12, 46:15, 86:16, 86:20
EXAMINATION [6] - 22:6, 33:9, 71:16, 97:5, 97:6, 97:9
examine [1] - 16:10
examined [8] - 12:21, 17:25, 21:23, 31:22, 32:6, 52:10, 65:12, 85:21
example [4] - 4:22, 63:15
excessive [1] - 81:15
Exchange [1] - 17:13
exclude [4] - 95:1, 95:13, 95:14, 95:15
excluded [1] - 95:2
excluding [1] - 19:5
exclusion [3] - 90:22, 91:6, 95:18
excuse [26] - 8:12, 13:17, 13:19, 20:21, 33:24, 42:6, 42:20, 43:10, 48:19, 50:16, 55:12, 55:21, 57:11, 58:16, 58:19, 66:22, 75:22, 75:23, 76:12, 76:17, 83:3, 88:1, 88:23, 92:8, 95:23
excused [2] - 64:17, 83:7
execute [1] - 40:6
executed [1] - 84:8
exhausted [1] - 19:21
Exhibit [18] - 29:3, 29:6, 29:11, 29:13, 31:11, 32:13, 32:17, 40:11, 45:3, 53:9, 53:16, 58:22, 59:11, 73:9, 86:6, 86:17, 97:13, 97:14
exhibit [13] - 33:5, 35:23, 37:15, 40:11, 40:12, 50:6, 53:5, 53:8, 55:2, 59:2, 59:5, 59:7, 60:11
EXHIBITS [1] - 97:12
exhibits [3] - 33:7, 61:7, 61:11
Exhibits [4] - 32:8, 32:20, 32:23, 97:15
expected [1] - 91:12
experience [1] - 59:20
expire [1] - 80:7
explain [4] - 43:19, 49:16, 60:18, 64:9
explained [2] - 24:22, 24:23
expressed [2] - 86:25, 93:18
extended [2] - 16:12, 50:22

extension [1] - 4:9
extensive [1] - 24:25
extensively [1] - 11:10
eyes [1] - 67:16

**F**

face [1] - 84:10
facility [10] - 31:20, 31:23, 31:24, 31:25, 32:2, 32:7, 33:1, 51:22, 76:25
facing [2] - 25:4, 92:21
fact [7] - 3:22, 8:19, 9:16, 12:1, 19:24, 69:18, 82:12
facts [1] - 66:13
failed [1] - 7:11
fair [2] - 81:21, 82:4
fairly [1] - 14:18
faith [1] - 84:12
fall [3] - 30:7, 50:7, 70:1
false [5] - 6:13, 6:16, 19:2, 19:5, 42:24
falsehood [2] - 18:16, 18:17
falsity [1] - 6:19
familiar [3] - 10:21, 53:20, 90:2
family [2] - 80:19, 92:3
fan [1] - 70:14
far [6] - 14:8, 20:21, 37:7, 66:21, 70:10, 81:18
federal [5] - 22:23, 25:3, 35:7, 40:3
feet [3] - 10:1, 49:21
fellow [1] - 83:14
felt [3] - 69:11, 69:12
few [5] - 23:22, 26:5, 62:12, 77:17, 81:14
fictitious [1] - 4:15
fighting [1] - 92:20
file [1] - 7:11
filed [6] - 7:13, 38:2, 38:3, 42:12, 57:8, 92:6
filing [2] - 79:7, 79:10
fill [1] - 29:8
filling [2] - 79:10, 79:13
final [1] - 81:20
finalize [1] - 94:7
finance [1] - 80:13
finances [1] - 79:14
financial [2] - 23:2, 23:3
findings [2] - 5:17, 8:25
fine [14] - 26:23, 28:4, 28:19, 28:20, 50:1, 50:8, 58:1, 58:3, 58:4, 77:2, 77:3, 77:14, 77:19, 85:23
fingerprint [2] - 15:20, 17:2
fingerprinted [3] - 26:16, 63:23, 85:8
fingerprints [1] - 15:17
finished [2] - 25:24, 59:1
first [22] - 3:16, 5:10, 5:12, 5:13, 6:2, 7:11, 12:18, 21:22, 24:21, 37:16, 43:19, 43:20, 49:23, 50:14, 59:5, 60:2, 62:23, 65:11, 69:21, 71:18, 94:24
fit [1] - 32:5

five [8] - 6:23, 6:24, 20:2, 22:19, 25:15, 34:10, 34:11, 84:20
flashing [1] - 70:8
flaw [1] - 19:15
flawed [1] - 18:25
fleshed [1] - 8:2
floor [3] - 30:7, 50:8, 67:24
following [1] - 84:15
follows [3] - 21:24, 46:18, 65:13
footage [1] - 17:7
footnote [5] - 45:6, 45:16, 45:18
FOR [1] - 1:10
forged [2] - 42:22, 42:24
forget [1] - 78:18
forgot [1] - 94:3
form [9] - 28:22, 28:23, 28:25, 29:7, 29:9, 29:14, 29:18, 29:20, 86:5
formal [1] - 7:13
forth [2] - 10:18, 89:8
forward [1] - 20:12
four [10] - 8:24, 34:10, 34:11, 66:19, 77:21, 90:8, 90:14, 90:21, 91:6
frame [2] - 51:11, 90:8
framework [1] - 93:24
frankly [3] - 7:21, 10:25, 11:12
Franks [7] - 7:9, 18:10, 18:11, 18:13, 19:1, 19:8, 19:10
fraud [6] - 13:4, 13:5, 23:4, 25:20, 81:6, 81:9
fraudulent [2] - 13:9, 13:23
free [1] - 69:6
Fridays [1] - 91:14
friends [1] - 80:20
front [3] - 31:4, 36:14, 71:19
fruitful [1] - 88:18
fruits [1] - 5:24
frustrated [1] - 72:19
full [1] - 65:15
fun [1] - 68:12
function [2] - 46:12, 46:13
funds [1] - 80:20
furnish [1] - 14:6

**G**

garbage [9] - 8:14, 8:18, 68:11, 68:12, 68:13, 68:14, 68:15, 72:19, 72:20
gather [1] - 87:5
gathered [1] - 84:2
gathering [1] - 88:18
general [2] - 11:7, 25:16
General [1] - 18:5
gentleman [1] - 31:18
girlfriend [7] - 30:21, 30:23, 74:22, 75:8, 76:2, 76:5, 76:15, 87:1
given [17] - 16:4, 19:24, 52:21, 55:25, 56:7, 56:12, 56:18, 66:8, 66:9, 66:23, 69:18, 84:22, 85:8, 87:24, 90:11, 91:2
glass [3] - 24:13, 24:17, 69:16

GLASSER [1] - 1:11
Glasser [4] - 2:5, 2:6, 2:10, 62:3
Go's [1] - 43:7
GOLD [21] - 1:17, 3:4, 16:13, 16:15, 16:19, 62:4, 64:24, 65:8, 88:1, 88:7, 89:7, 89:14, 91:10, 91:14, 93:2, 93:14, 94:15, 94:23, 95:4, 95:12, 96:8
gold [4] - 2:11, 65:20, 92:8, 92:12
Gold [3] - 2:21, 3:4, 93:15
Google [1] - 14:22
Government [1] - 1:13, 20:19, 21:22, 29:13, 31:11, 32:8, 32:17, 32:23, 45:5, 53:8, 59:11, 97:13, 97:14, 97:15
government [19] - 3:1, 7:23, 9:12, 12:2, 14:3, 14:5, 14:23, 16:9, 16:23, 20:12, 29:11, 31:8, 31:23, 32:20, 45:3, 45:4, 83:12, 88:11, 93:21
Government's [7] - 29:3, 29:6, 32:13, 53:16, 73:9, 86:6, 86:17
government's [12] - 11:10, 11:14, 14:20, 15:3, 15:23, 16:4, 16:18, 17:3, 17:9, 18:23, 18:25, 93:18
grab [2] - 33:5, 33:7
grant [2] - 88:11, 91:7
granted [2] - 88:13, 88:16
Grayson [2] - 18:6, 25:22
Group [2] - 13:6, 18:5
group [2] - 18:5, 23:2
guess [2] - 73:13, 76:19
guidelines [2] - 25:4, 84:23
guilt/innocence [1] - 12:9
guilty [1] - 81:6
guy [1] - 69:23

**H**

h)(1)(G) [1] - 95:14
half [4] - 48:8, 69:2, 70:20, 88:15, 93:23
half-a-dozen [1] - 88:15
hall [3] - 49:20, 51:14, 70:12
hand [1] - 37:1
handcuffed [1] - 66:22
handcuffing [1] - 62:13
handed [9] - 36:4, 37:20, 37:22, 40:18, 41:8, 45:8, 45:10, 53:12, 58:25
handwriting [2] - 15:18, 15:20
handwritten [12] - 25:12, 31:6, 36:22, 36:23, 38:12, 40:12, 41:19, 41:22, 41:23, 41:24, 42:11, 74:18
happy [1] - 10:8
hard [2] - 92:2, 92:17
harsh [1] - 91:25
headquarters [1] - 67:5
headway [1] - 87:17
hear [4] - 3:10, 44:21, 62:24, 96:9
heard [10] - 3:17, 3:21, 3:23, 5:6, 18:21, 56:2, 56:6, 56:10, 73:4, 89:21
HEARING [1] - 1:10

**Hearing** [7] - 2:8, 7:9, 18:10, 18:11, 18:13, 19:9, 19:10

**hearing** [17] - 2:22, 6:11, 6:12, 7:16, 8:5, 20:12, 42:3, 54:23, 56:21, 65:7, 78:1, 78:4, 78:12, 78:14, 79:6, 83:9

**heavily** [1] - 10:19

**held** [2] - 83:9, 88:25

**help** [8] - 49:13, 69:17, 69:18, 70:2, 70:13, 70:19, 71:4

**helped** [1] - 70:2

**helps** [3] - 80:19, 92:8, 92:9

**hesitation** [1] - 18:1

**Hewitt** [2] - 18:6, 25:22

**high** [2] - 9:6, 71:2

**himself** [4] - 26:2, 65:2, 85:2, 85:4

**hold** [1] - 46:17

**holding** [20] - 24:6, 26:13, 26:20, 26:23, 27:5, 46:23, 47:2, 50:10, 50:11, 50:15, 58:9, 63:3, 63:9, 68:25, 69:1, 69:3, 69:8, 69:9, 84:16, 85:12

**home** [3] - 8:20, 15:19, 17:10

**Homeland** [8] - 22:14, 22:17, 23:23, 35:4, 43:25, 67:17, 83:13, 83:14

**homes** [1] - 8:22

**honest** [9] - 5:18, 6:5, 21:6, 21:9, 21:11, 21:12, 82:15, 91:24

**Honor** [60] - 2:15, 2:25, 3:8, 3:19, 5:19, 6:15, 8:7, 11:19, 13:16, 14:7, 15:6, 15:13, 20:13, 20:21, 21:3, 21:6, 22:4, 29:1, 29:4, 30:25, 33:3, 35:23, 36:9, 37:11, 39:20, 40:11, 42:25, 45:2, 45:15, 50:18, 53:4, 53:7, 55:4, 55:10, 56:24, 58:18, 58:20, 59:12, 60:9, 61:6, 61:21, 62:9, 64:16, 64:20, 64:24, 71:14, 88:1, 88:2, 88:7, 89:7, 91:16, 93:1, 93:2, 93:13, 93:15, 95:11, 96:6, 96:7, 96:8, 96:10

**HONORABLE** [1] - 1:11

**Honorable** [4] - 2:5, 2:6, 2:10, 62:3

**hopes** [1] - 80:21

**hospital** [4] - 28:2, 49:10, 49:25, 85:22

**hour** [17] - 28:15, 33:21, 34:3, 48:8, 51:15, 51:16, 51:20, 62:5, 63:10, 63:13, 67:10, 69:2, 70:15, 70:20, 93:22

**hours** [6] - 48:10, 75:24, 77:8, 77:17, 77:19, 77:21

**house** [1] - 8:15

**hundreds** [1] - 8:22

**Hylan** [2] - 67:6, 67:7

**I**

**idea** [2] - 67:17, 91:12

**identification** [4] - 36:7, 37:13, 45:3, 58:22

**Ill** [7] - 4:10, 18:19, 19:8, 19:12, 19:20, 19:22, 84:22

**ILG** [2] - 1:3, 53:9

**ill** [6] - 49:4, 49:5, 63:19, 66:3, 75:19, 76:2

**immediately** [6] - 28:8, 50:5, 67:19, 80:5, 86:7, 86:8

**Immigration** [1] - 22:9

**impeding** [1] - 92:3

**important** [1] - 85:9

**impossible** [3] - 9:8, 92:1

**inch** [1] - 71:2

**incident** [1] - 35:2

**inclined** [1] - 88:11

**including** [2] - 4:18, 23:4

**inconclusive** [1] - 9:24

**inconsistency** [1] - 61:2

**incriminate** [3] - 26:2, 63:1, 85:1

**incurred** [1] - 80:20

**INDEX** [1] - 97:2

**indicate** [2] - 61:4, 78:24

**indicated** [3] - 79:1, 85:12, 90:23

**indicates** [3] - 16:9, 86:11, 86:18

**indicating** [1] - 18:24

**indict** [1] - 79:3

**indictment** [8] - 13:23, 15:1, 17:21, 18:3, 55:11, 55:13, 56:25

**indigency** [1] - 79:7

**individual** [3] - 4:7, 55:19, 68:9

**individually** [1] - 9:1

**individuals** [2] - 9:18, 15:8

**industrial** [1] - 67:18

**information** [10] - 5:23, 17:1, 17:19, 18:7, 19:3, 19:6, 20:4, 26:17, 84:22, 85:8

**inherent** [1] - 20:4

**initial** [1] - 29:24

**inquire** [3] - 56:9, 56:19, 71:12

**insisted** [1] - 72:23

**insistence** [1] - 7:14

**Insofar** [1] - 18:10

**insofar** [3] - 13:2, 13:21, 19:15

**inspect** [2] - 16:24, 16:25

**inspected** [1] - 12:22

**Inspection** [1] - 22:21

**Inspector** [10] - 1:18, 3:2, 5:16, 6:13, 7:18, 8:12, 8:25, 9:15, 12:23, 54:8

**inspector** [2] - 13:8, 22:21

**instance** [1] - 67:12

**instead** [1] - 73:7

**instructed** [1] - 78:3

**intentions** [2] - 62:16, 62:17

**intercepted** [1] - 84:21

**interest** [2] - 89:8, 91:5

**interested** [1] - 88:8

**interrogated** [1] - 24:2

**interrogation** [6] - 17:8, 46:21, 62:23, 67:24, 68:16, 72:3

**intervene** [1] - 71:6

**interview** [20] - 24:7, 24:9, 24:11, 24:13, 24:14, 24:20, 26:4, 27:2, 27:6, 29:22, 31:13, 31:19, 52:23, 52:24,

53:2, 58:21, 60:7, 60:8, 84:18, 85:13

**introduction** [1] - 55:22

**invalidity** [1] - 19:15

**investigate** [1] - 23:3

**investigating** [1] - 17:14

**investigation** [9] - 5:17, 6:22, 11:11, 19:14, 19:21, 20:4, 24:24, 35:4, 91:21

**Investigations** [1] - 44:1

**investigations** [1] - 19:24

**investigative** [2] - 18:7, 19:25

**investigator** [2] - 6:7, 18:20

**investor** [2] - 15:15, 20:1

**investors** [7] - 9:19, 9:20, 13:6, 14:24, 15:15, 25:19, 81:9

**invitation** [1] - 16:12

**invited** [3] - 16:10, 16:23

**involuntary** [1] - 70:18

**involved** [4] - 9:18, 24:25, 81:9, 81:25

**involving** [1] - 91:3

**iPhone** [14] - 4:13, 4:18, 4:25, 5:3, 5:6, 5:8, 6:4, 9:10, 9:12, 10:24, 11:1, 12:2, 20:23

**IPO** [1] - 18:6

**irrelevant** [2] - 7:21, 58:16

**Island** [5] - 23:12, 28:6, 47:18, 49:2, 66:20

**issuance** [2] - 19:8, 83:19

**issue** [12] - 4:11, 5:14, 15:14, 17:21, 20:25, 42:3, 66:5, 66:7, 81:13, 81:15, 83:22, 94:1

**issued** [9] - 21:2, 35:8, 35:9, 40:5, 43:5, 43:12, 83:17, 84:9, 84:21

**itself** [2] - 13:2, 55:8

**J**

**janitor** [1] - 71:6

**JFK** [11] - 22:12, 23:2, 23:24, 24:3, 24:5, 32:10, 35:4, 48:4, 62:15, 72:1, 76:25

**Joe** [2] - 6:8, 9:3

**John** [2] - 17:8, 84:16

**join** [1] - 6:4

**JUDGE** [1] - 1:11

**judge** [5] - 35:13, 35:15, 35:16, 41:24, 81:13

**Judge** [28] - 2:18, 4:6, 7:5, 8:1, 10:8, 10:13, 10:17, 12:8, 12:22, 20:15, 31:4, 37:16, 41:6, 42:2, 42:24, 46:5, 54:21, 61:15, 62:4, 76:8, 81:19, 83:18, 88:20, 89:1, 89:21, 91:10, 95:20

**justice** [1] - 91:5

**Justice** [1] - 15:4

**justify** [1] - 91:4

**K**

**keep** [3] - 21:8, 79:3, 79:4

**Kennedy** [4] - 17:8, 67:4, 67:9, 84:16

**Kessler** [1] - 1:19
**keys** [1] - 28:9
**kind** [6] - 4:19, 5:23, 6:5, 49:7, 67:17
**knee** [1] - 70:1
**knowingly** [1] - 87:8
**knowledge** [3] - 7:12, 18:15, 24:2
**known** [3] - 21:17, 32:5, 56:1

## L

**lack** [1] - 13:11
**lacked** [1] - 12:20
**laid** [2] - 11:10, 12:10
**large** [1] - 70:16
**last** [6] - 19:18, 74:14, 93:22, 94:11, 94:13, 94:21
**late** [2] - 74:23, 74:24
**laundering** [1] - 23:4
**Law** [1] - 45:5
**law** [5] - 14:10, 22:23, 23:15, 40:3, 83:15
**lawfully** [1] - 56:23
**lawyer** [2] - 66:3, 68:21
**lease** [2] - 80:7, 80:13
**leased** [1] - 79:24
**leasing** [1] - 80:2
**least** [4] - 13:25, 27:21, 88:15, 91:7
**leaves** [1] - 87:9
**leaving** [1] - 85:2
**left** [7] - 17:23, 20:10, 26:3, 26:5, 85:2, 85:24, 95:1
**legal** [3] - 23:22, 40:5, 40:7
**legitimate** [1] - 89:12
**LEO** [1] - 1:11
**Leo** [4] - 2:5, 2:6, 2:10, 62:3
**less** [1] - 28:15
**letter** [2] - 3:13, 32:5
**letters** [2] - 16:6, 71:1
**lie** [2] - 46:8, 77:24
**lied** [1] - 77:22
**line** [4] - 36:19, 73:18, 73:20, 74:4
**lines** [1] - 94:6
**lineup** [2] - 15:2, 15:10
**LIOUNIS** [4] - 1:7, 1:16, 65:11, 97:8
**Liounis** [87] - 2:9, 2:23, 3:5, 3:6, 3:15, 7:22, 10:19, 12:17, 14:6, 14:16, 14:23, 15:17, 15:22, 15:25, 16:2, 16:6, 16:20, 16:24, 17:2, 17:5, 17:12, 17:19, 21:8, 21:10, 23:6, 23:23, 23:25, 24:2, 24:19, 25:13, 25:19, 25:21, 25:23, 25:25, 26:6, 26:7, 26:13, 26:21, 27:8, 29:8, 29:25, 31:20, 33:4, 33:12, 33:15, 34:7, 34:21, 35:3, 35:6, 39:18, 42:13, 42:20, 43:10, 44:5, 45:20, 45:23, 46:9, 48:19, 54:17, 60:20, 60:25, 62:4, 62:8, 64:24, 65:17, 65:18, 66:1, 71:18, 73:10, 74:1, 76:12, 76:24, 77:22, 81:20, 83:15, 84:3, 86:2, 87:10, 88:7, 91:4, 93:12, 93:14, 93:18, 93:23, 94:1, 94:7, 94:20

**Liounis'** [7] - 7:14, 16:23, 18:21, 19:3, 34:22, 54:22, 86:7
**listed** [2] - 54:7, 83:25
**listen** [2] - 9:22, 24:22
**listening** [1] - 10:1
**lists** [1] - 73:14
**lived** [1] - 69:23
**living** [4] - 8:15, 8:16, 8:17, 22:8
**located** [4] - 31:21, 43:23, 47:18, 62:15
**location** [3] - 47:19, 66:21, 67:4
**locked** [3] - 50:10, 50:11, 91:22
**lodged** [1] - 32:3
**long-term** [1] - 24:24
**look** [10] - 3:12, 5:25, 8:25, 35:25, 39:14, 53:20, 54:19, 61:18, 69:16
**looked** [2] - 5:5, 46:4
**looking** [3] - 6:6, 19:21, 70:6
**looks** [2] - 67:18, 74:5, 86:10
**LORETTA** [1] - 1:13
**low** [1] - 9:6
**lunch** [12] - 27:12, 27:14, 27:18, 56:11, 59:2, 61:4, 62:1, 62:5, 85:15, 85:17, 85:18, 87:6
**luncheon** [1] - 61:19
**lying** [1] - 81:9
**LYNCH** [1] - 1:13

## M

**M12-0379** [1] - 41:11
**M12-379** [1] - 41:7
**M120379** [2] - 36:6, 40:24
**M12079** [1] - 36:5
**machine** [1] - 27:23
**Mad78910@yahoo.com** [1] - 1:21
**magistrate** [2] - 18:8, 41:24, 79:4
**Magistrate** [2] - 42:23, 83:18
**mail** [3] - 1:21, 13:10, 80:23
**mails** [2] - 3:17, 20:5
**main** [1] - 66:21
**Marilyn** [3] - 42:1, 43:7, 79:4
**mark** [4] - 36:7, 37:14, 45:2, 58:21
**Mark** [13] - 4:7, 4:16, 4:23, 5:2, 5:4, 5:7, 5:11, 11:4, 12:12, 25:19, 25:21, 54:17, 55:19
**marked** [12] - 25:9, 29:3, 31:2, 32:8, 37:13, 37:18, 40:13, 53:8, 53:14, 53:15, 58:23, 73:9
**MARSHAL** [1] - 61:24
**Mary** [1] - 1:20
**material** [4] - 14:2, 14:3, 14:5, 14:8
**matter** [5] - 2:12, 7:16, 15:14, 25:16, 55:14
**matters** [1] - 65:6
**McHale** [2] - 9:4
**MDC** [4] - 33:2, 61:18, 87:3, 91:25
**mean** [9] - 8:9, 8:18, 9:1, 10:3, 39:12, 49:5, 49:16, 54:10, 69:11
**meaning** [2] - 60:14, 85:5

**measured** [1] - 9:5
**medical** [19] - 31:20, 31:25, 32:25, 49:7, 49:8, 49:13, 49:20, 49:24, 50:7, 50:25, 51:1, 51:22, 70:11, 70:12, 71:4, 75:1, 75:2, 77:17, 86:15
**Medical** [1] - 32:10
**medication** [15] - 28:4, 28:9, 28:14, 28:16, 28:17, 28:20, 32:4, 49:11, 50:1, 50:5, 51:20, 57:22, 58:13, 86:18
**medications** [15] - 29:25, 47:16, 49:13, 51:12, 57:19, 57:20, 57:25, 58:6, 58:8, 58:17, 70:11, 70:21, 70:24, 71:5, 75:6
**medicine** [6] - 50:23, 52:5, 70:16, 77:20, 85:24, 86:3
**memorandum** [8] - 16:18, 19:1, 58:21, 60:7, 60:8, 60:14, 60:16, 60:18
**Memorandum** [1] - 45:5
**mention** [1] - 75:11
**mentioned** [2] - 47:15, 62:22
**Mercedes** [4] - 34:15, 34:16, 34:17, 66:18
**merit** [2] - 7:16, 8:4
**meritless** [1] - 13:12
**mess** [1] - 6:5
**message** [1] - 30:23
**messages** [1] - 31:7
**met** [3] - 7:5, 7:8, 11:11
**Metropolitan** [1] - 32:3
**MICHAEL** [1] - 1:17
**Michael** [3] - 3:4, 90:15, 93:15
**MICHELLE** [1] - 1:18
**Michelle** [2] - 3:3, 13:8
**middle** [3] - 73:18, 73:20, 82:8
**midnight** [2] - 52:11, 52:16
**might** [7] - 33:20, 34:2, 64:2, 70:3, 75:22, 84:23, 84:24
**Mike** [8] - 16:3, 69:20, 69:21, 69:22, 70:6, 81:2, 81:4
**miles** [1] - 8:20
**millions** [1] - 82:2
**mind** [5] - 10:15, 34:8, 45:1, 63:9, 63:13
**minute** [6] - 36:10, 40:20, 54:19, 64:19, 73:6, 83:11
**minutes** [16] - 23:22, 24:7, 26:5, 26:14, 47:4, 47:5, 49:18, 49:19, 49:22, 63:11, 63:13, 67:10, 69:15, 70:15, 84:17
**Miranda** [20] - 28:22, 29:20, 34:22, 34:23, 44:8, 46:24, 56:1, 56:8, 56:12, 56:13, 56:18, 64:11, 66:9, 66:23, 70:24, 86:4, 86:5, 86:6, 87:7
**Mirandized** [1] - 54:24
**mislead** [1] - 81:15
**missed** [1] - 82:15
**mistaken** [1] - 37:1
**misunderstanding** [1] - 84:7
**ML350** [2] - 34:16, 66:18
**model** [1] - 34:17

**moment** [1] - 71:13
**Monday** [1] - 1:7
**money** [1] - 23:4
**month** [3] - 4:8, 82:15, 82:16
**monthly** [3] - 80:15, 80:17, 82:17
**months** [6] - 4:8, 90:8, 90:14, 90:21, 91:6, 91:23
**moot** [1] - 17:15
**morning** [6] - 2:12, 2:25, 3:5, 3:6, 3:13, 52:11
**most** [1] - 90:1
**mother** [1] - 80:14
**motion** [23] - 3:10, 3:20, 5:14, 6:18, 10:10, 12:18, 13:10, 13:13, 13:21, 14:2, 14:19, 17:17, 19:11, 20:8, 20:10, 21:19, 56:17, 57:8, 57:10, 83:10, 87:8
**Motions** [1] - 45:6
**motions** [16] - 3:15, 3:24, 7:25, 12:17, 17:15, 18:18, 45:4, 87:12, 87:13, 87:16, 88:19, 88:22, 88:24, 89:5, 92:5, 92:7
**Motors** [1] - 18:6
**mouth** [1] - 46:1
**move** [12] - 43:14, 44:5, 46:19, 48:20, 48:21, 48:24, 50:17, 50:20, 58:16, 58:19, 76:8, 81:17
**MP-1** [2] - 53:9, 53:15
**MR** [97] - 2:14, 2:17, 2:25, 3:4, 3:14, 7:5, 7:8, 8:1, 10:8, 10:13, 10:17, 10:22, 10:25, 12:8, 14:7, 15:6, 15:13, 16:13, 16:15, 16:19, 20:13, 20:15, 20:19, 21:3, 22:4, 22:7, 25:7, 29:1, 29:4, 29:11, 30:25, 31:3, 31:8, 32:20, 33:3, 33:22, 35:11, 37:16, 39:19, 40:1, 40:8, 42:2, 46:5, 51:3, 53:15, 53:25, 54:3, 54:21, 55:4, 59:11, 59:17, 59:23, 61:15, 62:4, 62:19, 64:5, 64:12, 64:16, 64:24, 65:8, 71:13, 71:17, 76:8, 76:23, 81:19, 83:4, 87:15, 88:1, 88:7, 88:20, 89:1, 89:4, 89:7, 89:14, 89:21, 89:24, 90:11, 90:14, 91:10, 91:13, 91:14, 93:1, 93:2, 93:13, 93:14, 94:13, 94:15, 94:23, 95:4, 95:11, 95:12, 95:24, 96:3, 96:6, 96:8, 97:5, 97:9
**multiple** [4] - 23:18, 23:19, 31:16, 31:17
**must** [2] - 18:14, 43:11

## N

**name** [26] - 4:14, 11:2, 11:4, 11:5, 12:14, 19:19, 22:2, 35:10, 35:15, 54:7, 54:10, 54:18, 57:15, 59:7, 59:14, 59:19, 65:15, 68:9, 69:21, 71:2, 72:18, 73:24, 73:25, 81:2, 81:4, 86:7
**named** [1] - 4:7
**names** [2] - 14:23, 15:14
**narrate** [2] - 65:19, 65:25
**narrative** [2] - 65:2, 65:6
**nasal** [1] - 86:19

**nauseous** [1] - 69:12
**near** [3] - 47:21, 67:4, 67:9
**necessary** [1] - 7:23
**necessity** [3] - 11:12, 19:17, 20:7
**need** [6] - 19:25, 28:2, 28:4, 51:1, 85:23, 90:5
**needed** [3] - 49:7, 49:9, 50:7
**needn't** [2] - 21:11, 31:1
**needs** [2] - 9:11, 17:19
**negotiations** [10] - 88:14, 88:17, 88:18, 89:2, 89:9, 89:17, 89:18, 90:18, 90:24, 93:23
**nervous** [3] - 67:14, 72:25, 73:1
**never** [12] - 4:18, 44:13, 50:25, 51:5, 56:18, 58:5, 75:24, 77:25, 78:18, 82:15, 92:14, 92:15
**NEW** [1] - 1:1
**New** [3] - 1:5, 2:4, 35:8
**next** [17] - 5:24, 14:19, 25:2, 26:12, 27:11, 27:16, 28:21, 29:21, 31:19, 32:19, 47:7, 52:11, 64:9, 69:9, 78:9, 90:1
**nexus** [3] - 5:8, 9:2, 12:4
**nice** [1] - 68:1
**night** [5] - 27:20, 30:21, 74:23, 74:24, 92:1
**nobody** [2] - 9:14, 71:7
**none** [2] - 32:14, 51:6
**nonresponsive** [1] - 76:9
**normal** [1] - 86:20
**normally** [1] - 32:4
**notes** [14] - 25:12, 31:6, 40:12, 52:20, 52:22, 52:23, 52:24, 52:25, 53:1, 54:16, 60:2, 60:15, 60:16
**nothing** [21] - 4:14, 4:15, 4:20, 5:9, 7:15, 12:6, 14:4, 15:21, 68:22, 71:3, 75:12, 75:17, 75:18, 76:4, 76:16, 76:20, 77:7, 82:24, 83:1, 83:4, 84:18
**noticed** [1] - 67:1
**number** [20] - 5:2, 9:11, 11:25, 12:1, 15:15, 18:11, 19:17, 20:2, 35:20, 36:17, 36:20, 36:22, 38:18, 38:21, 40:23, 41:3, 41:4, 41:10, 84:5
**numbered** [2] - 14:24, 15:5
**numerous** [2] - 90:3, 90:25

## O

**o'clock** [2] - 61:5, 61:13
**oath** [5] - 44:12, 44:14, 44:16, 45:25, 62:6
**object** [2] - 54:21, 82:23
**objecting** [2] - 55:22, 92:23
**objection** [19] - 5:11, 5:12, 33:22, 35:11, 39:19, 40:1, 40:8, 46:5, 50:17, 51:3, 53:25, 55:24, 59:23, 62:19, 64:5, 64:12, 83:3, 94:2, 94:25
**obligation** [1] - 18:17
**observation** [1] - 24:16
**observe** [2] - 24:10, 30:5

**observing** [1] - 24:12
**obtain** [2] - 7:23, 16:25
**obtained** [4] - 3:16, 14:22, 56:23, 87:10
**obviously** [2] - 5:23, 84:9
**occasions** [1] - 18:12
**occurred** [2] - 75:17, 94:25
**October** [3] - 91:9, 94:3, 94:22
**OF** [3] - 1:1, 1:3, 1:10
**offer** [4] - 16:16, 18:15, 18:16, 85:21
**offered** [7] - 27:1, 27:12, 27:18, 49:8, 49:24, 85:19
**offers** [3] - 29:11, 31:8, 32:20
**offhand** [2] - 18:13, 34:17
**office** [11] - 23:23, 31:21, 43:23, 43:25, 44:6, 48:4, 49:20, 62:15, 70:12, 90:1, 94:5
**officer** [1] - 40:3
**offices** [1] - 67:18
**Official** [1] - 1:20
**old** [1] - 92:22
**on-going** [3] - 89:16, 90:17, 91:21
**once** [5] - 6:3, 9:21, 43:18, 64:1
**One** [1] - 45:18
**one** [53] - 4:1, 5:13, 5:24, 5:25, 6:2, 6:3, 6:4, 7:21, 8:10, 8:11, 8:15, 9:11, 9:14, 10:12, 15:13, 18:5, 18:14, 23:18, 24:13, 24:17, 25:20, 26:5, 42:9, 42:10, 42:11, 42:13, 44:22, 44:24, 45:12, 53:11, 59:6, 60:2, 60:5, 60:16, 68:7, 68:22, 69:4, 70:1, 71:5, 71:13, 71:22, 71:25, 72:18, 81:14, 81:20, 83:12, 89:25, 92:8, 92:21, 94:16, 94:21
**one-way** [2] - 24:13, 24:17
**open** [3] - 2:1, 2:2, 93:10
**opinion** [1] - 9:2
**opportunity** [1] - 94:20
**opposition** [3] - 45:3, 45:4, 93:18
**Opposition** [1] - 45:5
**orally** [1] - 11:13
**order** [4] - 4:11, 21:2, 84:21, 90:3
**orders** [2] - 81:22, 81:23
**original** [2] - 5:17, 5:22
**outside** [4] - 15:19, 17:10, 54:23, 90:4
**outstanding** [1] - 87:12
**overbreadth** [1] - 13:11
**overbroad** [1] - 12:20
**overcoming** [2] - 92:2, 92:3
**overhearing** [1] - 6:20
**overruled** [3] - 35:12, 40:2, 46:7
**owed** [2] - 82:10, 82:12
**own** [5] - 26:7, 46:13, 65:5, 66:3, 66:4

## P

**p.m** [16] - 23:14, 33:16, 39:3, 47:13, 52:4, 52:8, 62:2, 66:17, 74:8, 74:9, 74:17, 74:18, 83:16, 93:4, 93:8, 96:11
**package** [1] - 81:4

**packages** [1] - 16:3
**page** [3] - 16:17, 41:12, 45:6
**pages** [2] - 53:11, 83:20
**paid** [1] - 82:16
**pails** [1] - 8:18
**panic** [1] - 30:11
**paper** [4] - 55:16, 73:20, 79:10, 79:11, 79:13, 79:17
**papers** [6] - 7:14, 8:2, 10:18, 11:13, 59:10, 79:15
**paragraph** [3] - 7:21, 16:20, 74:15
**pardon** [6] - 7:7, 11:20, 16:14, 33:6, 54:2, 65:22
**park** [2] - 47:23, 47:25
**parked** [1] - 48:3
**parking** [1] - 9:25
**Parkway** [1] - 67:8
**part** [4] - 5:21, 20:22, 20:24, 81:24
**Particulars** [4] - 17:16, 17:17, 17:18, 17:22
**parties** [3] - 93:24, 94:21, 95:8
**party's** [1] - 89:8
**passing** [1] - 9:6
**past** [2] - 4:17, 43:16
**pause** [2] - 53:6, 71:15
**pay** [1] - 82:14
**payment** [1] - 82:17
**payments** [2] - 80:15, 80:18
**pedigree** [2] - 26:17, 85:8
**peeking** [1] - 69:14
**pen** [2] - 61:24, 78:5
**pending** [3] - 88:19, 89:6, 92:6
**people** [5] - 8:16, 8:17, 8:22, 9:20, 81:14
**percent** [2] - 33:17, 82:18
**perfect** [2] - 70:25
**perfectly** [4] - 5:18, 6:5, 84:10, 84:14
**perhaps** [5] - 39:11, 62:16, 83:14, 87:19, 94:15
**period** [6] - 26:5, 26:20, 69:10, 70:17, 87:18, 94:8
**permission** [1] - 61:22
**permitted** [2] - 30:16, 87:2
**person** [6] - 8:16, 9:22, 9:23, 18:14, 20:1, 81:5
**personal** [4] - 4:13, 7:12, 18:15, 89:25
**perspective** [1] - 84:23
**pertinent** [1] - 65:7
**PETER** [4] - 1:7, 1:16, 65:11, 97:8
**Peter** [11] - 2:9, 2:23, 23:6, 33:11, 35:5, 39:18, 42:13, 54:17, 65:17, 74:1, 93:12
**phone** [34] - 4:13, 4:15, 4:16, 4:17, 4:23, 5:2, 5:8, 8:21, 10:1, 11:2, 11:4, 11:5, 11:9, 11:15, 11:25, 12:1, 12:6, 12:10, 12:12, 12:13, 16:9, 16:11, 16:21, 18:21, 25:5, 25:18, 25:20, 25:22, 30:16, 30:24, 31:7, 75:10

**phones** [1] - 11:10
**phonetic** [1] - 14:1
**photographed** [1] - 85:8
**photographs** [1] - 86:20
**physical** [1] - 86:20
**physician** [2] - 51:14, 52:10
**pick** [2] - 9:22, 96:1
**piece** [12] - 26:8, 44:17, 45:25, 46:2, 46:4, 55:16, 68:16, 68:23, 79:10, 79:11, 79:13, 79:17
**pitches** [2] - 9:6
**place** [8] - 47:24, 48:4, 63:3, 63:12, 67:15, 71:6, 73:24, 75:12
**placed** [9] - 24:6, 25:13, 26:20, 46:23, 50:13, 66:23, 84:16, 84:20, 91:10
**places** [1] - 27:9
**plainly** [1] - 13:24
**planned** [1] - 62:14
**play** [4] - 25:14, 44:10, 68:4, 72:8
**played** [9] - 15:9, 25:4, 25:5, 25:17, 44:17, 45:19, 45:24, 72:13, 72:14
**playing** [7] - 25:24, 45:22, 68:6, 68:7, 68:10, 68:19, 72:16
**plea** [14] - 88:14, 88:16, 88:18, 89:2, 89:9, 89:17, 90:18, 90:24, 94:17, 94:18, 95:9, 95:24, 96:1
**pled** [1] - 81:6
**podium** [1] - 20:17
**point** [39] - 15:6, 26:1, 27:1, 27:19, 28:1, 28:7, 28:8, 28:11, 43:2, 43:10, 43:15, 46:22, 46:25, 47:7, 48:2, 48:3, 50:6, 51:8, 51:10, 55:9, 55:10, 55:15, 57:2, 58:6, 61:1, 68:7, 68:15, 68:18, 69:23, 70:2, 72:25, 76:5, 81:21, 83:11, 85:9, 87:23, 88:4, 93:24
**pole** [1] - 17:10
**portion** [2] - 29:9, 88:21
**posing** [3] - 25:19, 25:21, 70:5
**possession** [1] - 8:21
**possibility** [4] - 33:20, 34:2, 64:2, 64:4
**possible** [2] - 13:18, 94:10
**possibly** [3] - 19:7, 47:12, 63:11
**post** [2] - 14:22, 17:5
**postal** [2] - 13:8, 22:21
**Postal** [6] - 1:18, 3:2, 5:16, 8:12, 9:15, 22:21
**potential** [1] - 89:9
**potentially** [1] - 25:4
**pre** [2] - 17:5, 62:14
**pre-planned** [1] - 62:14
**precaution** [1] - 32:2
**precise** [1] - 85:5
**precisely** [1] - 61:1
**prefer** [1] - 65:1
**preference** [1] - 20:16
**preliminary** [5] - 78:1, 78:4, 78:12, 78:14, 79:6

**prepare** [1] - 90:5
**prepared** [4] - 6:9, 20:11, 64:25
**present** [25] - 2:2, 9:5, 10:4, 17:21, 23:17, 24:8, 24:9, 31:17, 42:14, 44:22, 45:12, 45:19, 45:21, 53:2, 53:3, 53:23, 54:6, 54:11, 54:12, 54:13, 54:14, 60:3, 67:25, 68:23, 78:7
**Present** [1] - 1:17
**presiding** [1] - 2:5
**pretrial** [4] - 45:4, 57:8, 57:10, 92:7
**Pretrial** [1] - 45:6
**pretty** [2] - 8:8, 67:6
**pretzels** [3] - 27:23, 27:24, 85:20
**previous** [2] - 15:14, 65:24
**previously** [6] - 4:17, 16:23, 25:9, 39:11, 53:8, 53:13
**print** [1] - 73:24
**printed** [2] - 86:7, 86:8
**printer** [2] - 92:14, 92:16
**prints** [1] - 64:3
**prisoner** [1] - 32:6
**private** [2] - 31:23, 31:24
**PRO** [1] - 1:16
**pro** [2] - 46:10, 46:19
**probable** [10] - 5:14, 6:10, 11:11, 12:24, 18:1, 18:2, 18:8, 19:7, 19:12, 83:21
**probation** [1] - 82:16
**problem** [2] - 75:24, 78:25
**problems** [2] - 75:1, 75:2
**procedural** [1] - 7:16
**procedures** [1] - 46:11
**proceed** [14] - 3:7, 3:12, 21:19, 22:4, 26:24, 28:18, 28:19, 46:10, 58:2, 58:3, 58:4, 65:1, 65:4, 66:4
**proceeded** [1] - 50:9
**Proceedings** [1] - 1:23, 62:1, 93:4, 93:8, 96:11
**processed** [16] - 26:15, 47:9, 49:3, 49:19, 51:9, 51:10, 51:18, 52:1, 52:2, 52:3, 63:10, 63:22, 63:23, 64:1, 69:6, 85:7
**processing** [6] - 26:18, 47:8, 63:24, 64:3, 69:4, 69:5
**produced** [4] - 1:24, 6:1, 43:7
**promise** [1] - 42:4
**promised** [1] - 63:15
**proof** [2] - 18:15, 18:16
**properly** [1] - 54:24
**proposed** [1] - 95:9
**proposition** [1] - 43:13
**prosecutor** [1] - 81:13
**protocol** [2] - 49:12, 49:15
**proved** [1] - 55:14
**provide** [8] - 12:14, 12:25, 14:4, 14:23, 18:2, 19:7, 20:3, 20:6
**provided** [18] - 14:2, 14:17, 14:20, 15:11, 15:15, 15:21, 15:25, 16:7, 17:6, 17:18, 18:1, 18:3, 18:7, 19:13, 26:16,

29:5, 29:23, 83:20
**provides** [2] - 12:24, 13:3
**providing** [1] - 39:13
**public** [1] - 67:21
**pull** [1] - 34:7
**pulled** [8] - 34:12, 34:14, 34:21, 66:17, 66:18, 67:1, 67:15, 67:21
**pulling** [1] - 9:25
**pulse** [1] - 86:19
**Purnavel** [12] - 3:3, 5:16, 6:13, 8:12, 8:25, 9:15, 9:16, 9:25, 12:23, 13:8, 54:8
**PURNAVEL** [1] - 1:18
**Purnavel's** [1] - 7:18
**purpose** [3] - 13:4, 56:21, 89:19
**purposes** [1] - 17:22
**pursuant** [7] - 23:6, 83:17, 84:21, 84:22, 95:13, 95:14, 95:15
**pursued** [1] - 19:23
**put** [20] - 5:17, 24:7, 37:3, 40:11, 44:7, 55:19, 69:8, 69:9, 71:22, 76:6, 84:3, 85:10, 87:13, 90:20, 90:21, 91:19, 92:4, 94:4, 94:16, 95:2
**putting** [1] - 92:22

## Q

**questioned** [7] - 51:23, 70:23, 70:24, 71:22, 71:25, 74:24, 85:18
**questioning** [10] - 26:10, 28:11, 28:18, 46:21, 57:17, 57:18, 57:21, 57:24, 70:10, 74:10
**questions** [22] - 6:8, 8:1, 29:23, 33:3, 36:11, 43:3, 46:14, 46:15, 48:21, 52:18, 56:4, 56:10, 62:12, 64:14, 65:2, 65:21, 65:24, 68:11, 72:15, 84:3, 85:10
**quick** [1] - 64:19
**quickly** [1] - 71:3
**quiet** [2] - 68:5, 68:19, 72:4, 72:16, 72:17, 72:22, 72:23, 79:3, 79:4
**quite** [5] - 10:14, 11:10, 13:3, 69:1, 80:19

## R

**raised** [1] - 15:14
**Rapoport** [1] - 15:24
**Rapoport's** [1] - 15:23
**RD-2** [4] - 31:2, 31:8, 31:11, 97:14
**RD-4** [1] - 25:9
**re** [4] - 4:10, 4:12, 9:4, 9:7
**re-enacted** [1] - 9:7
**re-up** [1] - 4:12
**re-up'd** [1] - 4:10
**react** [1] - 25:25
**reaction** [1] - 49:14
**read** [15] - 28:22, 28:23, 32:12, 32:16, 34:22, 38:7, 38:18, 41:9, 44:7, 45:15, 71:3, 73:25, 74:15, 86:4, 91:2

**reading** [1] - 34:23
**ready** [8] - 3:7, 6:9, 10:4, 36:11, 36:12, 88:6, 92:17
**real** [2] - 81:5, 89:9
**realized** [1] - 67:21
**really** [10] - 8:4, 8:13, 10:17, 11:6, 11:8, 11:14, 12:9, 54:22, 69:10, 91:24
**reason** [6] - 50:3, 50:4, 76:6, 88:13, 88:17, 90:18
**reasonably** [1] - 14:17
**reasons** [7] - 18:25, 89:24, 90:20, 90:23, 90:25, 92:23, 95:16
**recalled** [2] - 62:2, 93:8
**receipts** [1] - 16:3
**receive** [1] - 70:19
**received** [13] - 3:13, 16:7, 29:12, 31:10, 32:22, 51:14, 55:2, 56:14, 56:22, 66:6, 86:6, 86:17
**recess** [2] - 59:2, 61:19
**recessed** [1] - 62:1
**reckless** [12] - 5:19, 5:22, 6:13, 6:14, 6:17, 8:15, 8:23, 9:1, 10:2, 19:3, 19:5
**recollection** [2] - 45:22, 48:2
**record** [9] - 2:24, 16:1, 22:2, 45:16, 55:20, 65:16, 76:6, 91:11, 91:19
**recorded** [1] - 1:23
**recording** [3] - 15:2, 15:8, 68:10
**recordings** [11] - 15:7, 17:9, 25:16, 25:18, 25:24, 44:10, 44:12, 44:17, 45:19, 45:22, 45:23
**recourse** [1] - 21:17
**redirect** [2] - 64:15, 64:16
**reenactment** [3] - 6:8, 8:11, 9:2
**reference** [2] - 34:11, 43:24
**referenced** [2] - 35:20, 38:11
**referencing** [1] - 5:2
**referred** [2] - 14:24, 68:11
**referring** [9] - 7:13, 11:2, 11:6, 11:25, 15:3, 15:5, 45:6, 52:22, 59:25
**regard** [1] - 20:6
**regarding** [1] - 16:8
**reiterate** [1] - 12:3
**related** [7] - 5:9, 9:24, 12:2, 12:5, 13:4, 16:11, 20:23
**relating** [3] - 12:5, 46:14, 66:4
**release** [1] - 82:9
**released** [2] - 82:6, 82:21
**relevance** [7] - 5:9, 35:11, 42:21, 43:3, 43:4, 48:21, 50:17
**relevant** [4] - 9:4, 13:24, 39:20, 42:3
**relies** [1] - 10:19
**remain** [1] - 68:2
**remaining** [1] - 17:16
**remember** [18] - 2:18, 2:20, 48:17, 48:18, 58:12, 58:13, 58:14, 74:10, 76:24, 78:6, 78:17, 79:7, 79:10, 79:13, 79:15, 79:17, 81:24
**repaying** [1] - 80:21
**repeat** [1] - 43:21

**repeating** [2] - 10:18, 21:9
**replete** [1] - 19:12
**Reporter** [2] - 1:20, 1:20
**represent** [1] - 66:2
**representation** [1] - 91:2
**request** [8] - 29:24, 87:15, 90:8, 93:19, 94:2, 94:3, 94:19, 94:20
**requested** [11] - 14:16, 15:17, 15:22, 16:6, 17:5, 17:7, 17:11, 17:12, 86:25, 88:13, 88:24
**requesting** [2] - 18:14, 90:16
**requests** [2] - 14:23, 89:10
**require** [3] - 32:4, 32:5, 89:25
**required** [3] - 19:7, 19:9, 40:4
**requirement** [1] - 19:20
**requirements** [3] - 11:12, 14:10, 20:7
**requires** [1] - 49:13
**requiring** [1] - 8:5
**resemble** [1] - 44:3
**residence** [1] - 16:7
**resolve** [2] - 93:19, 94:21
**resolving** [1] - 87:17
**respect** [24] - 5:10, 5:11, 6:11, 6:20, 7:9, 11:1, 12:25, 14:21, 16:8, 18:5, 18:20, 19:10, 19:13, 21:14, 21:16, 21:19, 55:15, 65:6, 81:21, 81:23, 84:7, 88:2, 90:6, 94:24
**respects** [2] - 84:11, 86:14
**respond** [9] - 7:4, 7:24, 10:7, 10:8, 11:8, 11:17, 11:19, 11:21, 26:22
**response** [13] - 10:11, 10:12, 10:16, 14:20, 15:3, 15:23, 16:4, 17:3, 17:9, 18:24, 26:9, 45:4, 84:25
**restitution** [2] - 81:25, 82:9
**result** [1] - 93:25
**resume** [2] - 61:5, 61:13
**retrieve** [2] - 28:14, 86:3
**return** [4] - 61:17, 61:18, 75:23, 95:6
**returned** [1] - 58:5
**returns** [1] - 61:16
**review** [4] - 37:24, 40:20, 52:20, 52:25
**reviewed** [3] - 5:5, 29:18, 59:21
**Richard** [4] - 3:2, 20:20, 22:3, 83:13
**RICHARD** [3] - 1:17, 21:22, 97:4
**ride** [2] - 24:3, 48:5
**rights** [14] - 28:22, 28:24, 34:22, 34:23, 44:8, 46:24, 64:11, 66:23, 73:14, 86:4, 86:5, 86:7, 86:12, 87:7
**Rights** [2] - 29:7, 73:12
**rise** [1] - 2:3
**Rockford** [3] - 13:6, 17:14, 18:5
**room** [48] - 24:7, 24:9, 24:11, 24:13, 24:14, 24:16, 24:20, 26:4, 26:6, 26:15, 27:2, 27:3, 27:6, 27:13, 27:14, 27:18, 44:7, 44:22, 45:21, 46:21, 47:8, 50:10, 50:11, 50:13, 50:15, 56:11, 62:23, 63:9, 67:25, 68:23, 68:25, 69:1, 69:3, 69:4, 69:5, 69:7, 69:8, 69:9, 70:5, 72:3, 85:2, 85:13, 85:15, 85:17, 85:19,

87:6
**roommate** [2] - 69:23, 70:7
**roughly** [2] - 74:9, 80:11
**round** [1] - 11:3
**route** [2] - 48:18, 67:6
**RPR** [1] - 1:20
**Rule** [3] - 14:19, 14:21, 17:14
**ruled** [1] - 20:24
**rules** [2] - 46:11, 46:18
**Rutger** [1] - 13:25

## S

**salary** [1] - 82:18
**salesman** [1] - 9:24
**Samsung** [2] - 16:9, 16:21
**sat** [2] - 27:18, 68:19
**satisfied** [1] - 20:7
**saw** [1] - 73:7
**scared** [1] - 70:19
**Scarpa** [1] - 13:25
**scary** [1] - 67:20
**scene** [1] - 47:21
**scheduling** [1] - 89:22
**scheme** [7] - 4:24, 13:5, 13:9, 13:23, 18:4, 18:6, 25:20
**schemes** [4] - 4:20, 9:18, 12:5, 52:18
**Schwartz** [1] - 14:15
**scope** [1] - 54:23
**se** [2] - 46:10, 46:19
**SE** [1] - 1:16
**search** [17] - 3:17, 12:18, 12:23, 13:1, 13:2, 16:7, 16:22, 35:7, 36:6, 37:7, 37:8, 37:13, 41:3, 67:2, 67:3, 76:10, 84:13
**searched** [1] - 35:2
**searches** [1] - 14:22
**searching** [1] - 34:25
**seated** [1] - 3:1
**Second** [1] - 21:18
**second** [11] - 3:20, 6:2, 7:1, 7:17, 13:13, 20:22, 59:6, 60:5, 60:11, 67:24, 90:3
**Secret** [1] - 54:8
**section** [3] - 28:25, 73:22, 74:14
**secured** [4] - 23:21, 23:22, 28:5, 47:18
**Securities** [1] - 17:13
**Security** [7] - 22:14, 22:18, 35:4, 43:25, 67:18, 83:13, 83:14
**Security's** [1] - 23:23
**see** [11] - 6:7, 9:22, 28:2, 37:16, 38:3, 40:4, 49:9, 61:14, 73:20, 74:14, 89:18
**seeking** [1] - 88:9
**seeks** [2] - 16:20, 17:1
**segments** [1] - 84:20
**seize** [1] - 13:4
**seized** [5] - 6:23, 12:2, 83:23, 83:24
**seizure** [2] - 30:9, 77:10
**send** [4] - 16:24, 30:23, 49:19, 49:21

**SENIOR** [1] - 1:11
**sense** [1] - 91:11
**sent** [9] - 16:3, 49:17, 50:3, 50:5, 51:19, 57:24, 80:23, 80:24, 81:2
**sentence** [2] - 74:14, 84:24
**sentencing** [1] - 25:3
**separate** [2] - 24:13, 26:15
**separation** [1] - 92:10
**September** [3] - 95:5, 95:7, 95:20
**serious** [1] - 24:23
**Service** [2] - 22:22, 54:8
**service** [1] - 25:21
**session** [3] - 2:5, 63:7, 63:8
**set** [7] - 10:18, 13:7, 18:25, 87:11, 87:21, 88:10, 89:19
**sets** [1] - 89:8
**seven** [1] - 53:11
**several** [1] - 15:8
**shade** [1] - 70:9
**sham** [1] - 56:19
**share** [2] - 3:13, 8:17
**Sharkey** [7] - 78:3, 78:9, 78:11, 78:13, 78:23, 79:1, 79:2
**sheet** [1] - 56:13
**shhhh** [1] - 67:13
**shipping** [1] - 16:2
**shit** [7] - 26:8, 44:17, 45:25, 46:2, 46:4, 68:17, 68:24
**short** [2] - 26:20, 90:3
**shorter** [1] - 47:6
**shortly** [3] - 52:16, 85:11, 96:5
**shot** [1] - 92:13
**show** [5] - 35:23, 37:11, 40:16, 45:7, 58:23
**showed** [3] - 25:3, 70:25, 86:21
**showing** [8] - 18:14, 19:16, 25:9, 29:3, 31:2, 32:8, 36:3, 73:9
**shown** [1] - 18:16
**shows** [1] - 32:14
**shush** [1] - 79:2
**sick** [5] - 49:6, 51:5, 63:19, 70:1, 70:18
**sign** [3] - 29:9, 29:14, 29:16
**signature** [10] - 41:12, 70:25, 74:2, 74:4, 74:5, 86:8, 86:9, 86:10
**signed** [15] - 28:25, 29:20, 35:13, 35:17, 35:19, 35:21, 39:11, 41:16, 41:25, 42:23, 56:14, 71:3, 71:4, 80:14, 86:5
**significant** [3] - 83:25, 88:21, 90:5
**significantly** [1] - 18:24
**signing** [3] - 71:1, 79:15, 86:12
**signs** [3] - 32:15, 86:19, 86:22
**silent** [1] - 68:2
**silver** [2] - 16:8, 16:21
**similar** [2] - 6:1, 15:9
**Sinex** [1] - 86:19
**sire** [1] - 39:25

**sit** [3] - 69:6, 88:4, 92:18
**site** [1] - 8:19
**sitting** [2] - 66:25, 91:14
**situation** [2] - 67:20, 89:25
**size** [1] - 58:14
**sleep** [1] - 30:22
**Sloli** [7] - 16:3, 69:20, 69:21, 69:22, 70:6, 81:3, 81:4
**Sloli's** [1] - 81:4
**smuggling** [1] - 23:4
**someone** [1] - 32:4
**someplace** [1] - 2:19
**soon** [1] - 2:11
**sooner** [3] - 47:14, 75:7, 94:8
**sorry** [9] - 7:2, 13:20, 36:4, 43:20, 59:6, 60:6, 72:18, 90:13, 94:3
**sought** [4] - 17:2, 56:22, 83:24, 87:5
**Southern** [1] - 81:7
**speaks** [2] - 30:21, 55:7
**special** [2] - 22:9, 22:17
**Special** [4] - 1:17, 3:2, 20:19, 83:12
**specific** [1] - 16:21
**specifically** [2] - 13:3, 55:18
**specificity** [2] - 12:21, 13:11
**specified** [1] - 83:22
**Spector** [18] - 3:1, 7:3, 10:5, 10:10, 11:21, 40:16, 40:17, 40:18, 58:23, 58:24, 58:25, 71:11, 81:17, 88:5, 90:16, 91:20, 94:4, 94:11
**SPECTOR** [78] - 1:14, 2:14, 2:17, 2:25, 3:14, 7:5, 7:8, 8:1, 10:8, 10:13, 10:17, 10:22, 10:25, 12:8, 14:7, 15:6, 15:13, 20:13, 20:15, 20:19, 21:3, 22:4, 22:7, 25:7, 29:1, 29:4, 29:11, 30:25, 31:3, 31:8, 32:20, 33:3, 33:22, 35:11, 37:16, 39:19, 40:1, 40:8, 42:2, 46:5, 51:3, 53:15, 53:25, 54:3, 54:21, 55:4, 59:11, 59:17, 59:23, 61:15, 62:19, 64:5, 64:12, 64:16, 71:13, 71:17, 76:8, 76:23, 81:19, 83:4, 87:15, 88:20, 89:1, 89:4, 89:21, 89:24, 90:11, 90:14, 91:13, 93:1, 93:13, 94:13, 95:11, 95:24, 96:3, 96:6, 97:5, 97:9
**speeches** [1] - 46:13
**speedily** [1] - 14:6
**speedy** [6] - 20:25, 21:14, 21:16, 92:5, 92:6, 94:2
**spell** [2] - 22:1, 65:15
**spent** [1] - 93:22
**sport** [1] - 34:18
**spot** [2] - 23:22, 49:25
**spray** [1] - 86:19
**stable** [1] - 32:19
**stand** [7] - 3:4, 16:10, 16:25, 61:20, 62:5, 64:25, 93:14
**stand-by** [5] - 3:4, 16:10, 16:25, 61:20, 93:14
**standing** [3] - 18:21, 31:1, 78:9
**Stanley** [1] - 1:19
**starred** [1] - 38:21

**start** [3] - 2:12, 3:9, 3:10
**started** [9] - 27:25, 57:21, 57:23, 67:20, 68:6, 69:19, 75:1, 75:4
**state** [4] - 2:23, 22:1, 65:15, 66:12
**statement** [17] - 15:9, 15:23, 15:25, 26:2, 26:9, 45:20, 53:24, 54:11, 54:22, 57:6, 59:6, 59:18, 62:25, 64:11, 81:11, 85:5, 87:10
**Statement** [2] - 29:7, 73:12
**statements** [22] - 7:19, 17:6, 20:11, 21:20, 24:21, 45:23, 52:21, 54:25, 55:23, 55:25, 56:22, 60:23, 66:6, 66:7, 83:10, 84:19, 85:1, 87:4, 87:5, 87:6, 87:7
**Staten** [5] - 23:12, 28:6, 47:18, 49:2, 66:20
**states** [1] - 45:18
**STATES** [3] - 1:1, 1:3, 1:11
**States** [9] - 1:5, 1:14, 1:15, 2:3, 2:8, 2:23, 14:14, 21:17, 93:11
**station** [1] - 66:21
**status** [2] - 87:21, 95:24
**stay** [2] - 68:5, 72:4
**stayed** [1] - 26:6
**stenography** [1] - 1:23
**step** [1] - 83:6
**sticker** [1] - 80:11
**still** [7] - 9:13, 28:6, 47:2, 62:6, 70:24, 82:10, 82:12
**stop** [3] - 23:11, 57:23, 70:22
**story** [1] - 66:4
**straight** [1] - 4:8
**street** [3] - 6:21, 23:22, 35:1
**stricken** [1] - 84:5
**strike** [1] - 76:8
**style** [1] - 65:6
**subject** [3] - 5:1, 11:3, 11:25
**subpoenas** [1] - 61:17
**subsequent** [1] - 93:21
**substance** [1] - 54:22
**substantial** [2] - 18:14, 89:9
**successful** [1] - 89:17
**suffer** [2] - 30:9, 30:11
**suffered** [1] - 50:18
**suffering** [4] - 49:14, 49:16, 70:19, 86:15
**suffice** [1] - 8:3
**sufficient** [2] - 19:16, 90:18
**sufficiently** [1] - 8:2
**suggest** [1] - 89:12
**suggesting** [2] - 42:21, 42:22
**supplied** [3] - 14:9, 14:10, 51:12
**support** [14] - 12:23, 13:7, 19:11, 19:22, 35:17, 37:12, 39:5, 39:24, 40:4, 41:9, 42:6, 42:7, 42:8, 43:13
**supported** [2] - 13:6, 83:19
**supposed** [1] - 77:17
**suppress** [11] - 3:16, 3:20, 12:18, 13:10, 13:14, 13:21, 20:8, 20:10,

21:20, 83:10, 87:8
**suppressed** [1] - 87:5
**suppresses** [1] - 66:8
**SUPPRESSION** [1] - 1:10
**Suppression** [1] - 2:8
**suppression** [2] - 11:7, 65:7
**surely** [1] - 35:24
**surveillance** [3] - 20:3, 20:5, 25:1
**sustained** [8] - 40:9, 62:20, 62:21, 64:6, 64:7, 64:13, 82:25, 83:3
**sustaining** [1] - 50:16
**SUV** [2] - 34:15, 34:20
**swear** [1] - 39:7
**swearing** [1] - 45:25
**swore** [2] - 39:15, 42:15
**sworn** [3] - 21:23, 38:3, 65:12
**symptoms** [1] - 49:7

**T**

**table** [1] - 3:2
**tall** [1] - 70:8
**tampered** [1] - 42:22
**tapes** [11] - 9:22, 62:24, 68:4, 68:6, 68:7, 68:19, 72:8, 72:13, 72:14, 72:16, 73:4
**tapped** [2] - 4:17, 9:12
**tapping** [1] - 12:10
**technique** [2] - 19:25, 20:3
**Telephone** [1] - 1:21
**telephone** [10] - 4:7, 5:1, 6:22, 9:21, 16:24, 16:25, 17:3, 20:5, 61:18, 75:20
**telephones** [1] - 84:20
**temperature** [1] - 86:20
**ten** [2] - 69:15, 82:18
**term** [2] - 24:24, 45:25
**terms** [1] - 19:23
**terribly** [1] - 86:16
**test** [1] - 9:16
**testified** [10] - 21:23, 44:2, 45:13, 54:12, 54:13, 65:12, 74:7, 85:16, 86:1, 86:24
**testify** [2] - 56:2, 65:6
**testifying** [1] - 62:22
**testimony** [5] - 34:13, 56:6, 56:9, 62:24, 86:2
**tests** [1] - 9:24
**text** [2] - 30:23, 31:6
**thanked** [2] - 31:16, 31:17
**THE** [289] - 1:11, 2:11, 2:16, 2:19, 3:6, 3:8, 3:10, 3:15, 3:19, 3:20, 3:22, 3:23, 3:25, 4:1, 4:2, 4:4, 4:5, 5:10, 5:13, 6:11, 6:14, 6:16, 6:17, 6:18, 7:1, 7:3, 7:7, 7:24, 8:6, 8:7, 10:5, 10:10, 10:14, 10:21, 10:23, 11:16, 11:17, 11:18, 11:19, 11:20, 11:21, 11:23, 11:24, 12:7, 12:16, 13:15, 13:17, 13:18, 13:19, 13:20, 13:21, 14:8, 15:11, 15:16, 16:14, 16:17, 16:20, 20:14, 20:18, 20:21, 21:1, 21:4, 21:5, 21:8,

22:3, 22:5, 22:14, 22:16, 25:8, 29:2, 29:12, 31:1, 31:10, 32:22, 33:4, 33:5, 33:6, 33:7, 33:8, 33:10, 33:23, 33:24, 34:1, 35:12, 35:23, 35:24, 36:2, 36:4, 36:7, 36:9, 37:11, 37:14, 37:15, 37:17, 37:19, 37:21, 37:23, 39:20, 39:21, 39:23, 40:2, 40:9, 40:10, 40:13, 40:14, 40:16, 40:17, 40:19, 40:20, 40:22, 41:5, 41:6, 42:4, 42:20, 42:25, 43:2, 43:4, 43:10, 43:15, 43:17, 44:5, 44:25, 45:9, 45:11, 45:15, 45:17, 45:18, 46:7, 46:9, 46:16, 46:17, 46:20, 48:19, 48:22, 48:24, 48:25, 49:1, 50:16, 50:18, 50:20, 50:21, 53:4, 53:7, 53:10, 53:11, 53:13, 53:18, 53:19, 54:2, 54:5, 54:7, 54:9, 55:1, 55:5, 55:10, 55:12, 55:17, 55:21, 56:5, 56:6, 56:16, 56:17, 56:20, 56:21, 56:24, 56:25, 57:2, 57:4, 57:5, 57:7, 57:11, 57:14, 57:15, 57:16, 58:16, 58:17, 58:19, 58:20, 58:23, 58:24, 59:1, 59:3, 59:10, 59:13, 59:16, 59:24, 60:2, 60:4, 60:5, 60:7, 60:8, 60:10, 60:11, 60:12, 60:13, 60:16, 60:18, 60:20, 60:22, 60:25, 61:6, 61:8, 61:9, 61:10, 61:11, 61:13, 61:16, 61:21, 61:24, 62:6, 62:7, 62:8, 62:9, 62:10, 62:11, 62:20, 62:21, 64:6, 64:7, 64:8, 64:13, 64:14, 64:15, 64:17, 64:19, 64:21, 64:22, 64:23, 65:5, 65:9, 65:17, 65:18, 65:19, 65:22, 65:23, 66:1, 66:11, 66:12, 66:14, 66:15, 66:16, 71:11, 76:10, 76:12, 76:13, 76:14, 76:16, 76:17, 76:19, 76:21, 76:22, 81:17, 82:23, 82:25, 83:1, 83:3, 83:5, 83:8, 83:9, 88:2, 88:10, 88:23, 89:2, 89:5, 89:11, 89:15, 89:23, 90:10, 90:13, 90:15, 90:16, 91:15, 91:16, 91:18, 91:19, 92:24, 93:3, 94:22, 94:24, 95:5, 95:8, 95:13, 95:21, 95:23, 96:1, 96:4, 96:7, 96:10, 97:6
**themselves** [1] - 9:13
**thereafter** [3] - 85:11, 86:16, 96:5
**therefore** [1] - 12:13
**thick** [1] - 44:25
**thinking** [2] - 67:20, 67:22
**third** [8] - 4:8, 4:9, 4:12, 4:18, 4:25, 6:3, 6:4, 11:3
**thoroughly** [1] - 5:6
**thoughts** [1] - 67:20
**thousands** [1] - 8:22
**threatened** [1] - 63:17
**three** [14] - 4:8, 4:11, 4:22, 8:16, 8:24, 13:25, 17:23, 17:24, 24:12, 67:25, 91:13, 94:17
**thrown** [1] - 4:21
**timeline** [1] - 48:23
**tissues** [3] - 50:2, 50:8
**Title** [7] - 4:10, 18:19, 19:8, 19:12, 19:20, 19:22, 84:22
**today** [8] - 6:6, 6:9, 9:5, 39:14, 42:18,

57:9, 74:10, 82:12
**together** [2] - 6:4, 94:5
**took** [13] - 4:12, 9:17, 32:1, 47:24, 48:4, 48:18, 59:6, 63:12, 67:6, 67:15, 70:21, 75:12, 82:21
**top** [1] - 38:20
**total** [2] - 79:18, 79:22
**touch** [1] - 9:19
**toward** [2] - 29:4, 31:3
**Townes** [1] - 4:6
**tracks** [1] - 66:20
**traffic** [5] - 48:6, 48:7, 48:8, 48:9, 48:14
**train** [2] - 66:20, 66:21
**transcript** [2] - 81:10, 81:12
**TRANSCRIPT** [1] - 1:10
**Transcript** [1] - 1:23
**Transcription** [1] - 1:24
**transferred** [1] - 87:2
**transpired** [2] - 56:3, 71:10
**transport** [3] - 66:24, 66:25, 67:11
**transported** [5] - 23:23, 23:25, 33:2, 35:3, 84:15
**trash** [1] - 15:18
**travel** [1] - 90:6
**treated** [1] - 31:15
**treating** [1] - 31:17
**trial** [22] - 14:11, 14:17, 20:25, 21:14, 21:16, 55:14, 55:23, 87:11, 87:14, 87:23, 88:9, 89:20, 90:8, 90:10, 90:23, 91:12, 92:5, 92:6, 94:2, 95:3, 96:1, 96:4
**tried** [1] - 75:23
**trips** [2] - 82:20, 82:21
**trouble** [4] - 30:3, 73:2, 73:5, 73:6
**truck** [15] - 34:16, 34:19, 34:20, 34:21, 34:22, 34:25, 35:2, 47:16, 47:18, 48:3, 66:18, 66:22, 67:2, 70:16, 71:21
**true** [8] - 71:8, 76:1, 77:24, 79:20, 79:22, 79:24, 80:6, 80:22
**truthful** [2] - 21:13, 89:10
**try** [4] - 87:19, 87:25, 93:19, 94:21
**trying** [2] - 48:22, 56:25
**turn** [1] - 41:12
**turned** [2] - 68:21, 79:2
**two** [33] - 4:17, 5:2, 5:10, 5:12, 6:19, 6:24, 8:10, 8:17, 11:25, 24:8, 25:18, 25:19, 25:22, 25:23, 32:1, 33:2, 42:8, 42:9, 48:1, 48:10, 50:13, 59:25, 61:6, 61:11, 64:2, 67:3, 67:25, 69:24, 82:21, 91:13, 92:21, 94:11, 94:17
**type** [1] - 49:14
**typed** [13] - 36:20, 36:22, 36:24, 38:7, 38:9, 38:12, 38:14, 38:16, 41:18, 41:20, 41:21, 41:22, 84:4

## U

**ultimately** [3] - 27:21, 28:24, 30:24

**um-huh** [1] - 73:19
**unaware** [1] - 14:3
**under** [8] - 36:17, 44:12, 44:14, 44:16, 45:25, 62:6, 63:10, 91:5
**undercover** [1] - 20:1
**undermined** [1] - 20:2
**understood** [4] - 28:24, 86:5, 86:11, 96:6
**undertook** [1] - 66:1
**unfamiliar** [2] - 54:1, 54:3
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [9] - 1:5, 1:14, 1:15, 2:3, 2:8, 2:23, 14:14, 21:17, 93:11
**unlawfully** [2] - 66:6, 87:10
**unless** [1] - 8:1
**unreasonable** [1] - 90:7
**unusual** [1] - 65:3
**up** [11] - 3:11, 4:12, 9:25, 67:7, 67:9, 67:16, 69:21, 73:7, 87:25, 92:12, 95:2
**up'd** [1] - 4:10
**upset** [1] - 68:8
**upstairs** [1] - 67:23
**US** [2] - 22:9, 22:21
**useful** [1] - 89:18
**usefulness** [1] - 20:6
**utility** [1] - 34:18
**utilized** [1] - 25:22

## V

**valid** [3] - 40:5, 40:7, 84:14
**validity** [3] - 61:3, 84:8, 84:12
**variety** [2] - 18:25, 23:3
**various** [1] - 12:17
**vehicle** [11] - 23:11, 34:15, 34:18, 58:18, 66:22, 66:24, 67:1, 71:22, 80:14, 85:24
**vehicles** [1] - 66:19
**vending** [1] - 27:22
**verbatim** [1] - 78:13
**Verrazano** [1] - 67:8
**versus** [3] - 2:23, 14:14, 93:12
**victim** [1] - 9:19, 9:20
**victims** [8] - 4:19, 12:4, 90:4, 90:7, 90:25, 91:1, 91:3
**video** [3] - 17:7, 17:9, 17:10
**viewed** [1] - 85:5
**visits** [1] - 92:11
**vital** [1] - 86:19
**voice** [6] - 6:20, 9:17, 9:23, 15:7, 15:10, 18:21
**voices** [2] - 9:5, 9:17
**Volkswagon** [1] - 79:25
**voluntarily** [2] - 66:10, 86:13
**voluntariness** [2] - 57:3, 57:5
**voluntary** [1] - 87:8

## W

**wait** [1] - 28:17

**waiting** [1] - 28:16
**waive** [5] - 64:11, 78:1, 78:4, 78:12, 79:6
**waiver** [4] - 28:25, 73:22, 74:14, 86:12
**waives** [1] - 78:13
**walked** [3] - 51:13, 70:3, 73:6
**warehouse** [10] - 43:9, 43:18, 43:21, 43:24, 43:25, 44:3, 67:17, 67:18, 73:7
**warned** [1] - 46:18
**warnings** [7] - 56:1, 56:2, 56:8, 56:13, 56:18, 66:9
**warns** [1] - 86:7
**warrant** [52] - 3:17, 12:18, 12:20, 12:21, 12:23, 13:1, 13:2, 13:3, 13:7, 18:8, 23:6, 35:7, 35:8, 35:9, 35:14, 35:18, 35:19, 35:20, 36:5, 36:6, 36:13, 36:15, 37:7, 37:8, 37:13, 39:6, 39:22, 39:25, 40:4, 40:5, 40:7, 40:24, 41:3, 41:4, 41:9, 42:7, 42:23, 43:5, 43:12, 76:11, 83:17, 83:19, 83:22, 84:1, 84:4, 84:8, 84:9, 84:10, 84:13, 84:14, 91:6
**water** [3] - 27:22, 70:13, 85:21
**week** [2] - 79:3, 94:13
**weeks** [4] - 91:13, 94:12, 94:17, 94:18
**welcome** [1] - 64:23
**whatsoever** [3] - 4:16, 9:2, 12:4
**whole** [1] - 63:24
**wide** [1] - 70:9
**willing** [3] - 5:20, 64:10, 87:16
**willingness** [1] - 96:9
**wire** [3] - 4:6, 13:4, 23:4
**wiretap** [13] - 4:2, 4:6, 7:10, 7:19, 7:23, 9:9, 11:8, 11:9, 11:14, 20:22, 24:25, 25:6, 25:12
**wiretapped** [1] - 11:4
**wiretaps** [5] - 5:6, 11:3, 17:23, 17:24, 20:9, 20:24
**wish** [1] - 71:11
**wishes** [2] - 64:25, 65:3
**withdraw** [2] - 94:2, 94:11
**withdrawn** [1] - 7:15
**WITNESS** [8] - 22:3, 22:16, 41:6, 54:7, 60:7, 62:7, 64:23, 65:17
**witness** [10] - 6:7, 20:14, 29:8, 36:3, 37:22, 45:8, 53:12, 53:25, 54:3, 83:12
**witnesses** [1] - 10:3
**wondering** [1] - 87:1
**word** [2] - 75:14, 89:15
**words** [2] - 19:3, 26:8
**works** [1] - 82:13
**worse** [2] - 69:13
**worth** [2] - 80:10, 87:24
**wrap** [1] - 87:25
**write** [1] - 61:22
**written** [6] - 18:11, 19:17, 36:15, 42:10, 73:25, 84:5
**wrote** [1] - 13:24

| **Y** |
| --- |
| **year** [1] - 88:12 |
| **years** [9] - 6:23, 6:24, 14:1, 18:12, 22:19, 22:25, 69:24, 92:21, 92:22 |
| **YORK** [1] - 1:1 |
| **York** [3] - 1:5, 2:4, 35:8 |
| **yourself** [1] - 66:2 |

| **Z** |
| --- |
| **Zyrtec** [1] - 86:18 |