```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - - - - - - - X
 3
       UNITED STATES OF AMERICA,            :    12 CR 00350 (ILG)
 4
                       v.                   :    U.S. Courthouse
 5                                               Brooklyn, New York
       PETER LIOUNIS, et al.,               :
 6                                               January 23, 2014
                          Defendants.       :    11:30 o'clock a.m.
 7
       - - - - - - - - - - - - - - - - - - - X
 8
 9                    TRANSCRIPT OF PRETRIAL CONFERENCE
                      BEFORE THE HONORABLE I. LEO GLASSER
10                    UNITED STATES DISTRICT JUDGE.

11
       APPEARANCES:
12
       For the Government:                   LORETTA E. LYNCH
13                                           United States Attorney
                                             By:  JUSTIN D. LERER
14                                                MICHAEL YAEGER
                                             Assistant U.S. Attorneys
15                                           271 Cadman Plaza East
                                             Brooklyn, New York 11201
16
       For the Defendant:                    PETER LIOUNIS, Pro Se
17
                                             MICHAEL H. GOLD, ESQ.
18                                           Standby Counsel

19
20     Court Reporter:                       Anthony M. Mancuso
                                             225 Cadman Plaza East
21                                           Brooklyn, New York 11201
                                             (718) 613-2419
22
23
24     Proceedings recorded by mechanical stenography, transcript
       produced by CAT.
25
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

```
 1                (Case called; both sides ready.)
 2                MR. LERER:  Justin Lerer and Michael Yaeger for the
 3      United States.   Good morning, your Honor.
 4                THE COURT:   Good morning.
 5                MR. GOLD:   For the defendant as standby counsel,
 6      Michael Gold.  Good morning, your Honor.
 7                MR. LIOUNIS:   Good morning.   Peter Liounis.
 8                THE COURT:   Good morning, Mr. Liounis.
 9                We have a number of things to address.   Why don't we
10      deal with those in limine motions first that the government
11      has made.
12                Are you ready to proceed, Mr. Liounis?  Are you?
13                MR. LIOUNIS:   Yes.   I'm just confused as to what
14      we're talking about right now.
15                THE COURT:   The government has made some motions in
16      limine that you told me that you wanted some time to respond
17      to and I gave you time to respond to, and that's what I'm
18      going to address now, the government's motions in limine.   I
19      think there were five of them.
20                MR. LIOUNIS:   I was confused.   I thought you said
21      they didn't have it.   Did they have or do they have it?
22                THE COURT:   The first motion in limine that the
23      government made were to preclude cross-examination of Special
24      Agent John Szwalek and Special Agent Brian Parkhill.
25                I granted those motions on the record at a prior
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    conference, but I'll address them again.  Insofar as the

2    government's motion to preclude cross-examination, that a

3    complaint was made about Special Agent Szwalek, that motion is

4    essentially moot, because if one examined the docket sheet

5    that the government referenced, one would find that the motion

6    is moot, because the complaint against the agent was

7    withdrawn.  So, in the action against the government, the

8    Department of Homeland Security and Agent Szwalek, the

9    complaint was -- initially filed was subsequently modified,

10   and the complaint against Special Agent Szwalek was withdrawn.

11   So, the motion to preclude cross-examination of him with

12   respect to that is granted.

13          And insofar as the complaint against Special Agent

14   Brian Parkhill is concerned, that motion is granted, as well.

15          To begin with, it's rather ambiguous as to whether

16   Special Agent Parkhill is even the person against whom the

17   complaint was made.  The complaint is made against somebody by

18   the name of Parker, although Special Agent Parkhill was

19   involved very preliminarily in connection with the seizure of

20   a passport and other documents incident to the arrest of the

21   person who alleged the complaint.  The complaint has been

22   dismissed administratively, and an action was subsequently

23   filed in the Southern District of Florida, which is still

24   pending.

25          In any event, the contemplated evidence has no

1  relevance at all to any issue in this case.  The credibility

2  of a witness shouldn't be capable of being impugned by a

3  complaint which is completely unsupported, prejudicial,

4  designed to show confusion and waste time.  The authority with

5  respect to the admissibility of complaints or arrests is quite

6  enormous.  The case cited most frequently is the case of

7  Berkovich vs. Hicks, decided back in 1991 in the circuit.  So,

8  the motion to preclude cross-examination of Special Agent

9  Parkhill with respect to any complaint that was made about him

10  is granted.

11          Telephone calls recorded by a gentleman named

12  Moldrem, Mr. Liounis has submitted a rather extensive

13  statement as to why testimony of Mr. Moldrem should not be

14  admissible.

15          I don't know whether you want to add anything to

16  what you have written, Mr. Liounis.  You submitted a rather

17  extensive objection to the government's intention to call

18  Mr. Moldrem.  Mr. Moldrem's testimony will be simply for the

19  purpose of voice identification, to identify telephone calls

20  to which he was a party and which were recorded in which the

21  caller identified himself in various ways, and it's the

22  government's intention to attempt to prove the case against

23  Mr. Liounis by establishing that it is his voice on those

24  recordings, and his voice claiming to be Mark Anderson.

25          The basis upon which those recordings are sought to

1    be received is quite clearly Rule 404(b) of the Federal Rules

2    of Evidence, that permit evidence of bad acts to prove

3    identity, in addition to which, 404(b) might arguably be

4    applicable for just about everything.

5         404(b) makes such evidence admissible, evidence to

6    establish a plan, common scheme or plan, evidence to establish

7    motive, evidence to establish the absence of mistake.  I'm

8    going to permit that evidence to be received, and give the

9    jury very, very specific limiting instructions as to the

10   purpose for which that evidence is being received.

11        It's not being received at all for the purpose of

12   establishing the truth or validity of the contents of any of

13   those phone calls.  And to the extent those phone calls can be

14   redacted in some way so that the significant purpose for which

15   they are sought to be admitted -- namely, the identification

16   of voice -- will serve its purpose and, based upon the

17   submission of the government thus far, that evidence is quite

18   probative, it's significant.  And if not, the only issue in

19   this case, as far as I can tell, is the issue of voice

20   identification, and simply, that evidence is quite probative

21   and its probative value making the balancing test that I am

22   required to make under 403 and 404, I balance those

23   considerations and will receive testimony from Mr. Moldrem.

24        MR. LIOUNIS:  Your Honor, before we move on, may I

25   say something on the Moldrem calls?

1        THE COURT:  Sure.

2        MR. LIOUNIS:  If I'm not mistaken, I'm in this

3   courtroom for a company called Grayson Hewitt.

4        THE COURT:  That's correct.

5        MR. LIOUNIS:  That was sometime, I believe, at the

6   end of 2010, 2011.

7        THE COURT:  That's correct.

8        MR. LIOUNIS:  Okay.  I have not seen any evidence of

9   Mr. Moldrem being any kind of client, any kind of victim, any

10  kind of nexus to the crimes that are charged in this

11  courtroom, and I feel he should be precluded from testifying,

12  because he's going to confuse the jury, and he has nothing to

13  do with this case at all.

14       Maybe I'm not saying it correctly.  I'm hoping you

15  understand what I am trying to say, but he has nothing to do

16  with this case at all.  The government amended the indictment.

17  They dismissed two schemes.  I believe Mr. Moldrem, based on

18  discovery, is part of those dismissed schemes.

19       So, again, I wonder why Mr. Moldrem will be

20  testifying at a trial for Grayson Hewitt Funding that has

21  nothing to do with them.  That will be very prejudicial to the

22  defendant and have no probative value whatsoever.

23       THE COURT:  Does the government want to respond in

24  any way at all?

25       MR. YAEGER:  I don't think it's necessary, your

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   Honor.  I believe we have addressed these issues in our

2   pleadings.

3             THE COURT:  Mr. Liounis, two things:  First, I

4   understand the point that you are making very well.  You made

5   that point very well in the submission that you handed up last

6   week.

7             The testimony of Mr. Moldrem will be received solely

8   for the purpose of identifying the voice.  It's not being

9   received for the purpose of proving that you're a bad man.

10            It might also be received for the purpose of

11   establishing that your alleged involvement in Grayson Hewitt

12   was part of a scheme and plan which you have been engaged in

13   for some time, at least insofar as your conviction in the

14   Southern District is concerned.  It indicates that you have

15   been involved in schemes such as the one with which you are

16   charged here, and the testimony that Mr. Moldrem is being

17   sought to be presented is being presented for the purpose of

18   establishing that the person who claimed to be black, three or

19   four other persons, and also claimed to be Mark Anderson, is

20   one and the same person.

21            It's primarily voice identification.  Identity,

22   primarily, also -- maybe not primarily -- but also to

23   establish the fact that the Grayson Hewitt event with which

24   you are charged was part of a grand scheme and plan in which

25   you were involved over a period of years.

1          And so, the point that you were making this morning

2    was made very effectively, and I gave it very careful

3    consideration in the submission you present last week.

4          With respect to --

5          MR. LIOUNIS:  Your Honor, one more thing on

6    Mr. Moldrem that's very important to add to what you just

7    said:  Will that be based on his personal experience?  Will

8    that be based on personal recordings?  What will that be based

9    on as far as his, you know, as far as Mr. Moldrem making this

10   testimony?

11         Will Mr. Moldrem be talking about schemes that I am

12   not charged with?  Will they be presenting tapes that have

13   nothing to do with this case?  I'm a little confused as to

14   which direction the government is going to go with this and

15   how this is in any way probative.  This is all prejudicial.

16   What's the direction?

17         THE COURT:  I thought I just explained what I

18   believed the justification for that evidence is.

19         But I'm going to ask the government to tell you

20   again or to tell me, as well as you, why it is that they are

21   offering that evidence.  They have told me that quite clearly

22   in their motion in limine.  I'll hear it again.

23         MR. YAEGER:  Thank you, your Honor.

24         I don't believe I can improve on the Court's

25   summary.

1          THE COURT:  I'm sorry?

2          MR. YAEGER:  I don't believe I can improve on the

3     Court's summary.

4          THE COURT:  Why don't you try.

5          MR. YAEGER:  I certainly will.

6          This is about the identity of the defendant and a

7     common plan or scheme, a method of using fake names over the

8     phone to solicit money in connection with securities frauds,

9     and Mr. Moldrem was called repeatedly by the defendant using

10    different names in different schemes.

11         He then recorded the defendant, and has those tapes,

12    and we will be playing short selections of those recordings

13    for the purpose of playing the voice that is on those tapes,

14    and that shows a common method, and it shows the identity of

15    the defendant, is more proof of his voice and his way of

16    operating over the phone, which also tends to show his

17    identity.

18         THE COURT:  With respect to the phone calls from the

19    MDC --

20         MR. LIOUNIS:  Those tapes, your Honor, those are

21    illegally obtained tapes.  I wrote that --

22         THE COURT:  Talking about the MDC?

23         MR. LIOUNIS:  I'm talking about the Moldrem tapes

24    that are recorded from Mr. Moldrem in California.  Those are

25    unlawfully recorded tapes.  There's nothing on those tapes

1    that shows that they are consensually recorded by anybody or

2    told anything.

3              THE COURT:   They are consensually recorded by

4    Mr. Moldrem, who is the party to that telephone call.

5              MR. LIOUNIS:   In California, you need consent from

6    the person that you are recording, and I'm pretty -- I've

7    checked on that, and there's nothing on any of those tapes

8    where whoever he's taping he's letting him know that they are

9    being recorded.

10             THE COURT:   Mr. Liounis, I don't believe that you

11   made a motion to suppress those telephone calls in the past.

12   I don't think so.   I know you made a motion to suppress a

13   whole variety of things, but I don't recall this being one of

14   them.   In any event, assuming that you are making that motion

15   now, I'm denying it.

16             With respect to the MDC calls, although the

17   government cited no authority at all, the leading -- I don't

18   know whether it's leading anymore -- but a case which

19   addresses all of the objections that you wrote with respect to

20   the MDC telephone calls are addressed in a case which was

21   decided by the Second Circuit not terribly long ago, and the

22   case is United States vs. Mejia.   I'll give you the citation

23   in a minute.   You'll find it in 655 Fd.3 on page 126.   It was

24   decided by the Second Circuit on the 25th of August 2011,

25   which addresses the objections that you have taken to the MDC

1    telephone calls.  I'll allow them.

2         The other motion that the government has made deals

3    with the eventuality that you are going to be testifying on

4    your own behalf, and the government's motion was to permit you

5    to be cross-examined with respect to your felony conviction in

6    the Southern District, and Rule 609(a) specifically permits

7    that.

8         And the government is also seeking permission to

9    cross-examine you on that bank fraud, although that was just a

10   misdemeanor, and that was sought to be received pursuant to

11   Rule 609(a)(2), which permits conviction of any crime, whether

12   it be a misdemeanor or a felony, if it was a crime involving

13   dishonesty or fraud.

14        And that crime which you were convicted of,

15   involving bank fraud, satisfies the prerequisites of

16   609(a)(2).  Those crimes were, I think, less than ten years

17   since you've been released from prison on the Southern

18   District conviction.  You were released in 2007, were you,

19   from the Southern District crime, about 2007?

20        MR. LIOUNIS:  Released from McKean.

21        THE COURT:  From prison.

22        MR. LIOUNIS:  2008, wasn't it?

23        THE COURT:  In any event, it was less than ten years

24   from the time the government seeks to introduce that evidence.

25        I don't think there was anything else in those

1    motions in limine, except there have been some other motions,

2    which the government has just made.  I guess you received

3    copies of them, Mr. Liounis.  Before I deal with that, I'll

4    give you an opportunity to address them.

5              MR. LIOUNIS:  Are you finished with the motion in

6    limine?

7              THE COURT:  I think so.

8              MR. LIOUNIS:  There were some other issues on there.

9              THE COURT:  Which ones were they?

10             MR. YAEGER:  There was a forfeiture motion.

11             THE COURT:  That's not a motion in limine, I don't

12   think.

13             MR. YAEGER:  It was simply that there was no need to

14   do forfeiture before the jury.  That's all the government was

15   saying.

16             THE COURT:  What else?  I don't think there was

17   anything else by way of a motion in limine --

18             MR. YAEGER:  No, your Honor.

19             THE COURT: -- except there is now.  You've just

20   filed a motion --

21             MR. YAEGER:  Yes, your Honor.

22             THE COURT:  -- seeking to introduce evidence

23   pursuant to Rule 807 of the Federal Rules of Evidence.

24             I don't know whether you have received it.

25             MR. LIOUNIS:  This?

1          MR. GOLD:  That is the stack with the tabs.  That

2     one.

3          THE COURT:  They are, in effect -- they are wire

4     transfers, bank records of wire transfers which are sought to

5     be received under Rule 807.  The prerequisites of Rule 807

6     appears to be satisfied.

7          There is authority for the proposition that money

8     orders and checks are receivable.  They don't counter the

9     hearsay rule, violate the hearsay rule.  These documents are

10    not being received for the purpose of their content, just

11    received for the purpose that they were made.  I'll give you

12    an opportunity, if you want, to respond to that, although I

13    know you have not had a chance to do it yet.  If you can, do

14    it on Monday before we start trial motions.

15         The other motion that the government has made is a

16    motion to preclude any alibi defense you may have contemplated

17    making.  You never indicated what alibi you may be offering,

18    as near as I can tell.  I'm going to grant the government's

19    motion to preclude.

20         MR. LIOUNIS:  Your Honor, excuse me.  On the

21    preclusion, you gave me time to put it in, and then I came to

22    court and I had told you that I was in court, which you gave

23    me five days to put the alibi defense in.

24         If you check MDC, I put something in the mail to the

25    Court, and I brought one with me today to personally hand in,

1    and that alibi defense is very, very important as far as my

2    case.  It doesn't make sense that you are not going to allow

3    that when you gave me permission to put that in.

4              THE COURT:  First of all, Mr. Liounis, the fact that

5    it doesn't make any sense, I think I told you, when you agreed

6    that you wanted to proceed pro se, that you are going to be

7    held responsible to comply with all the Rules.  A request of

8    you to provide information of an alibi defense was made months

9    ago, and that should have been provided fourteen days or so

10   after it was asked of you.  So, the fact that it doesn't make

11   any sense, Mr. Liounis, it may be that I'm bending over very,

12   very backward in giving you the leeway that I am giving you.

13   Do you understand that?  Hand it up.

14             MR. LIOUNIS:  Thank you.

15             THE COURT:  And give the government a copy of it.

16             MR. LIOUNIS:  Thank you, your Honor.

17             THE COURT:  With respect to the motion to preclude

18   an expert with respect to cell sites, you have not provided

19   what it is that the Federal Rules of Criminal Procedure

20   requires with respect to that, and I'm going to preclude any

21   expert evidence with respect to cell sites.  Now, as far as

22   the Rule 807 evidence is concerned, I told you I'm going to

23   give you until Monday morning.

24             Now, let me deal with Mr. Liounis's submissions.  I

25   don't know whether a letter that you wrote, again complaining

1  about -- I guess "complaining" is an accurate word -- about

2  having been deprived of your right to counsel, I don't know

3  whether I should interpret that, Mr. Liounis, as a request

4  that you're making now for the appointment of counsel.  I

5  don't know whether you are or you aren't.

6            MR. LIOUNIS:  If I may answer?

7            Your Honor, I don't want to go backwards and create

8  any kind of aggravation.  What happened here is, bottom line,

9  it's in my best interest to have an attorney for a trial.

10  Okay.  I'm sure everybody agrees on that.  Okay.  And what has

11  happened here is, I was clearly -- again, I was not given a

12  choice.  It was either stay with Ms. Sharkey or not.

13  Ms. Sharkey and I just couldn't be in the same room anymore.

14             THE COURT:  Excuse me.

15            MR. LIOUNIS:  I don't --

16            THE COURT:  I don't want to go through that again.

17  I've been through that with you at least twice.

18            MR. LIOUNIS:  So, the answer to your question is --

19            THE COURT:  Excuse me.  I've been through that with

20  you at least twice, and I've read the transcripts to you here

21  in open court twice on that issue.  I don't want to review

22  that again.

23            Now, the question that I am asking you is:  Are you

24  requesting again to withdraw your waiver of counsel, and are

25  you making a request of me now to have counsel appointed to

1    represent you at your trial?

2            I want you to understand a number of things.  First,

3    whether I will or will not, or should or shouldn't, grant that

4    request if you're making it is discretionary with me.

5            Second, if I grant your request and do appoint

6    counsel to represent you at trial, you will not be permitted

7    to act as cocounsel.  You will not be permitted to participate

8    in any way in the capacity as counsel at that trial.  Hybrid

9    representation, meaning representation pro se and with

10   counsel, is not looked upon with any degree of favor.  So, I

11   want you to understand that.

12           If I grant your request and do appoint counsel to

13   represent you, you will not be permitted to be acting on your

14   own behalf as counsel, and, second, the counsel that I appoint

15   to represent you will be the counsel that I appoint.  I think

16   I told you on some prior occasion that you don't have a right

17   to choose who it is that should be representing you if counsel

18   is to be appointed.

19           So, the question that I am putting to you,

20   Mr. Liounis, very directly, is:  Are you now withdrawing your

21   waiver of counsel, and are you requesting the Court to appoint

22   counsel to represent you at trial?

23           One third thing I should tell you.  I think I

24   indicated that the last time you were here:  If I grant that

25   request, there will not be a continuance of the trial.  The

1    trial will go forward on Monday morning.

2            MR. LIOUNIS:  I'm confused on the last part.  I'm

3    sorry.

4            THE COURT:  If I grant your request to appoint

5    counsel to represent you, there will not be a continuance.

6    The trial will not be put off beyond the 27th of January,

7    which is Monday, at 10:00 o'clock.  I think I indicated that

8    to you or indicated that in court the last time you were here.

9            So, let's deal with that first.  Are you asking me

10   to permit you to withdraw your request to proceed pro se, and

11   are you asking me to appoint counsel to represent you?

12           MR. GOLD:  Your Honor, he has some questions of me.

13   May I have a moment?

14           THE COURT:  Yes.

15           (Pause.)

16           MR. LIOUNIS:  Your Honor, I spoke to Mr. Gold.  I

17   just want to put on the record that my family and friends have

18   retained an attorney for me to do trial.  However, the

19   attorney came to see me -- excuse me -- the attorney came to

20   see me on Friday at MDC Brooklyn.  The attorney was paid, due

21   to donations from family and friends, who I have asked for

22   help, because I have been unable to get a lawyer from this

23   court, and she was willing to come on and take this case.

24           Unfortunately, there was only a week for her to

25   prepare for the trial, and that was a very big problem.  She

1    had contacted Mr. Gold for the details.  Mr. Gold had

2    explained that the Court is not granting any kind of

3    continuance, and I would like to put it on the record that the

4    attorney that my family hired to represent me I have a lot of

5    confidence in and faith in, which I would of course allow her

6    to do what she has to do to represent me and, you know, not be

7    involved in any way, shape or form, unless asked to be

8    involved.

9            I'm being left no choice -- it sounds as if I'm

10   going to trial Monday, regardless of what I choose.  Again, I

11   would feel much better and I think it's in my best interest to

12   have an attorney, and the attorney I would like is the one

13   that my family retained and feels comfortable with and I feel

14   comfortable with to represent in this complex case.

15           I don't know what else to really say.  I don't want

16   to do this pro se at this point, absolutely not.  But at the

17   same time, if you appoint an attorney tomorrow, I don't know

18   how good they are going to do for me.

19           If we start trial on Monday, either way, and I feel

20   that whoever the attorney is that's going to take this case --

21   again, it was deemed a complex case -- they are going to need

22   time to prepare, question witnesses, exhibits, I have CD's.

23   These are things that need to be done prior to trial.

24           And I'm answering the question.  I don't want to do

25   this on my own.  I don't feel I can do this on my own.  This

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    has been nothing but overwhelming.  And yes, I want a lawyer,

2    but I want the lawyer that my family and friends looked into

3    and checked and they are comfortable with and I'm comfortable

4    with, and she is retained, and if this Court will give even a

5    small continuance --

6              THE COURT:  Mr. Liounis.

7              MR. LIOUNIS:  -- I'm not talking about a big

8    continuance, she will come into the case.

9              THE COURT:  Excuse me.  There will not be a

10   continuance of this trial.  If you wish to have your own

11   lawyer or the lawyer your family retained for you to appear,

12   have that lawyer file a notice of appearance and be prepared

13   to be here on Monday morning to represent you.

14             Is there anything further?

15             MR. LIOUNIS:  I don't know what to say, your Honor.

16             THE COURT:  Well, what you can say, Mr. Liounis --

17             MR. LIOUNIS:  I don't know what to say.

18             THE COURT:  What you can say, Mr. Liounis, is that

19   you wish to have your family's lawyer appear for you.  You may

20   perfectly have that done.  Have that lawyer file a notice of

21   appearance, and that lawyer should be informed that this trial

22   will not be continued beyond Monday.  It is now Thursday, the

23   23rd of January, and the trial date is the 27th.  It's rather

24   late in the day to determine that you don't want to proceed

25   pro se, and this trial is going forward on Monday morning.

1          Now, if you wish to have an attorney appointed for
2    you by the Court, you will be required to file an affidavit of
3    indigency, an affidavit which will say under oath that you
4    cannot afford to hire your own lawyer, and if such an
5    affidavit of indigency is presented, I'll appoint a lawyer to
6    represent you.
7          Now, you'll have to make up your mind as to whether
8    the lawyer that your family has obtained for you will be
9    prepared to represent you on Monday morning, or if she isn't
10   and you are indigent and can't afford to hire a lawyer on your
11   own, I'll appoint a lawyer to represent you.  And I'll tell
12   you that the lawyer that I will appoint to represent you is
13   Mr. Gold, because Mr. Gold has been intimately involved since
14   I appointed him as standby counsel, and is fully prepared, I
15   should think, with what the facts in this case are to
16   represent you effectively on Monday morning.
17         Now, make up your mind.  If you can't make up your
18   mind this morning, you can make up your mind this afternoon,
19   but I want an answer to that question no later than
20   1:00 o'clock this afternoon.  Is that clear?
21         MR. LIOUNIS:  That's going to be impossible, because
22   I might not be back at MDC until 8:30, 9:00 o'clock tonight,
23   depending on the marshals, your Honor.
24         THE COURT:  Mr. Liounis, what we have now is simply
25   this:  I, at this point, don't know whether you are requesting

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    to withdraw your pro se status and asking me to appoint a

2    lawyer to represent you, or whether you're going to have your

3    retained lawyer to represent you.  And if you're going to make

4    a request to be represented by counsel by a court-appointed

5    lawyer, I tell you now that whether I will grant that request

6    or not is discretionary.  This Court will not be manipulated

7    three days before trial.  Is that clear?

8            Now, there are other things which you have presented

9    to the Court in a lengthy submission.  You said something

10   about separation.  You want something sealed.  Now, there was

11   nothing indicated on the record in court as to what that

12   separation was all about.  It wasn't a matter of concern for

13   me as to what the separation was all about.

14           I received a letter from the government, I think the

15   very next day or maybe later the same day, telling me that

16   they have directed the MDC to vacate or disregard or terminate

17   whatever separation order there was.  I don't know what your

18   letter was all about.

19           MR. LERER:  Your Honor, if I could bring the Court

20   up to date?  A lot has transpired in efforts to deal with this

21   situation.  I'll just say in summary, the defendant refuses to

22   comply with the MDC's solutions to solve the issue of the

23   separation.  I'll speak to this very briefly.

24           A while back, the government -- the government can

25   only request a separation.  It's the MDC's decision.

1    MR. LIOUNIS:   Your Honor, this is the point.

2    MR. LERER:   I believe it's my turn.

3    THE COURT:   Excuse me.

4    MR. LIOUNIS:   This is the point I'm making.

5    THE COURT:   Excuse me.

6    MR. LIOUNIS:   This is what happened last time.

7    THE COURT:   I said "Excuse me."   I'll give you an

8    opportunity to respond in due time.

9    MR. LIOUNIS:   I don't want this stuff -- why is this

10   being said?  You know what you are doing.   What are you doing?

11   He knows what he's doing.   He's being malicious right now.

12   MR. LERER:   I don't know what the defendant is

13   talking about.   There was a separation between the defendant

14   and another inmate.

15   The government -- the way it works at the MDC, there

16   is a legal-visit room, and there's a uniform rule if it opens

17   at 8:00 a.m., whoever gets there first, if there's a separate,

18   gets to use the legal-visit room.

19   Mr. Liounis has never -- I shouldn't say "never" --

20   Mr. Liounis typically does not get there first, does not have

21   his people come there early, not his lawyer or his

22   investigator gets there early.

23   The government and the MDC didn't rest on that.   The

24   government requested that the separation be lifted.   The

25   defendant, through Mr. Gold, vociferously argued that the

1   separation be returned, so that he continued to be separated

2   from this other individual.

3           I then spoke to the general counsel's office for the

4   MDC about another solution, and the solution that was reached,

5   the MDC's idea, was that the separation would remain, but

6   Mr. Liounis would be moved to the other wing of the prison,

7   because there is a separate visit room in the other wing.

8           The MDC went to move Mr. Liounis to the other wing,

9   so he could have unfettered access to the other room, the

10  other visit room.  Mr. Liounis refused to move to the other

11  wing, and since then, Mr. Liounis has requested that instead,

12  the other inmate be moved, and has alternatively requested

13  that the separation be dropped entirely.

14          I communicated with the MDC, and it was their

15  position that they had done all they could, and that on the

16  facts currently with the inmate actually having requested the

17  separation and taken it back and forth, that they are not

18  confident in security that they wish to continue a separation,

19  that they have given the defendant the opportunity to move to

20  the other wing and he has refused, and at this point, the MDC

21  states that the room is available starting at 8:00 a.m., and

22  if he wishes to meet with people, he should have them arrive

23  at 8:00 a.m..  the MDC general counsel is also available to

24  get on the phone if the Court wants.

25          THE COURT:  As I understand what you are saying,

1    it's the MDC's view that from their point of view, in terms of

2    their concern with security, they believe separation is

3    important?

4              MR. LERER:  Yes, sir.

5              THE COURT:  I do not run penal institutions.  I do

6    not run prisons.  I don't second-guess wardens.  If as a

7    matter of the security, they believe a separation is in order,

8    I'm not going to interfere with it.

9              MR. LERER:  I would ask that the one sentence --

10             MR. LIOUNIS:  I don't know what he's talking about.

11   I don't know what he's talking about.

12             MR. LERER:  All reference to --

13             MR. LIOUNIS:  I don't know what he's talking about.

14   I don't know what he's talking about.  It's not right what

15   he's doing.  I want that off the record.  I'm asking that to

16   be stricken off the record, everything he mentioned that

17   starts with that word stricken off that record.

18             And I have to, also, your Honor, I should be given

19   an opportunity to answer that.  Okay.

20             The reason I refused to move from one side to the

21   other is due to a medical reason that the institution knows.

22   I'm allergic to the mattresses that are in the dorms, and I

23   have special mattresses in my room for that reason.

24             More importantly -- I'm just answering what he just

25   said, it's very important -- on the separation, it was lifted

1   by the government.  I never insisted they put it back.  I

2   e-mailed Michael Gold, saying, Keep it off, keep it off, take

3   it off, because this is ridiculous.  I can't get a legal

4   visit.  I can't get a legal visit.  I did not insist on

5   keeping them on.  The letter I wrote to you had to do with

6   exactly what he's doing again in court on the record, speaking

7   recklessly on the record and creating a situation that

8   shouldn't be.  This needs to be lifted.  I want the

9   separations lifted.  It's preventing me from are getting legal

10  visits for defending my case.  I'm telling you, it's not a

11  problem.  MDC is leaving it there because of what he just

12  said.

13          THE COURT:  With respect to whether there will or

14  will not be a separation is a matter that the Bureau of

15  Prisons believes in their judgment and their expertise should

16  be maintained, and I'm not going to interfere with that.

17          MR. GOLD:  Your Honor, if I may, briefly?

18          THE COURT:  Yes.

19          MR. GOLD:  I'm not going to belabor the record with

20  how everything happened, but suffice it to say when I

21  requested the Bureau of Prisons lift the separation order, I

22  received an e-mail from them yesterday that if the government

23  is writing requests that the separation be lifted, they will

24  lift it.  That's what this e-mail to me was.  I don't know

25  whether that is before or after Mr. Lerer's conversations with

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   them, but as of yesterday, that is what -- yesterday

2   afternoon, that's what they informed me.

3          MR. LIOUNIS:  I'm willing to lift it.  I'm here.

4   I'm telling you.

5          MR. GOLD:  It's Mr. Liounis's request that the

6   government in fact send something in writing to the Bureau of

7   Prisons, MDC, to lift the separation order.

8          MR. LIOUNIS:  Obviously, I'm not insisting.  I'm

9   asking to lift them.  I'm not insisting to keep them on, as he

10  just said.  I'm asking to lift them.  So, please comply.

11         THE COURT:  My understanding is, I think I received

12  a letter from Mr. Lerer informing me that they requested the

13  separation to be terminated.  Didn't you write me such a

14  letter, Mr. Lerer?

15         MR. LERER:  I did.

16         THE COURT:  What's this all about now?  There seems

17  to be some confusion.  What you are telling me is completely

18  different than what I am hearing from Mr. Gold.  Mr. Gold

19  says, if I understood him -- excuse me.

20         MR. LERER:  Sorry, your Honor.  Your Honor, would

21  you like me to attempt to clarify?

22         THE COURT:  Excuse me.

23         MR. LERER:  Sorry.

24         THE COURT:  You told me a minute ago that it's the

25  Bureau of Prisons's position that separation is required for

1    purposes of security, in their view.

2         Mr. Gold tells me that he received an e-mail from

3    the Bureau of Prisons indicating that they would lift the

4    separation if the government wrote a letter saying separation

5    is not, in their view, required.  You wrote a letter to me,

6    didn't you, telling me that you no longer are requesting

7    separation?  Didn't you?

8         MR. LERER:  Yes, your Honor.

9         THE COURT:  All right.  So, why should there be a

10   need for another letter?

11        MR. GOLD:  If I may, your Honor?

12        When Mr. Lerer wrote that letter to the Bureau of

13   Prisons last week, subsequent to that letter, I did object to

14   the lifting of the separation.

15        THE COURT:  I see.

16        MR. GOLD:  Then Mr. Liounis communicated to me he in

17   fact wanted it lifted.  I went back to the BOP and Mr. Lerer,

18   and that's where we are now.

19        THE COURT:  Well, this is a matter for the Bureau of

20   Prisons and you people to deal with.  I don't think it

21   requires any order by me.  So, you write a letter, and the

22   Bureau of Prisons has no problem.  I suppose that takes care

23   of that.

24        MR. LIOUNIS:  Your Honor, were you instructing the

25   government to write a letter to remove that?  It's very

1  important as to my defense.  This separation has stopped me

2  from getting legal visits.  It's stopped me from getting my

3  investigator.  I have not even seen an investigator in five

4  months.  I mean, it really has.  I want to make sure that this

5  gets lifted, especially now during trial.

6          THE COURT:  Mr. Lerer, as near as I can tell, the

7  Bureau of Prisons is requesting a letter from you if they will

8  lift the separation?

9          MR. LERER:  Your Honor, I don't believe that's

10  accurate.  Right before I walked into the courtroom a few

11  minutes -- maybe an hour ago, I spoke to the general counsel's

12  office, and they said that at this point, it is their request,

13  not ours.  However, I will communicate to the Bureau of

14  Prisons that the government is not requesting a separation and

15  that it's in their discretion.  I will communicate that.  It

16  is not my understanding that they will remove the separation,

17  based on the government's opinion.

18          THE COURT:  Apparently, they want it in writing.

19          MR. GOLD:  I will read the e-mail they sent to me,

20  January 22, 3:26 p.m.:  "Mr. Gold, I have reviewed all of your

21  e-mails regarding your client.  With that said, inmates are

22  separated by the AUSA, and those separations are not removed

23  unless the AUSA provides us with a written request."  This was

24  in response to my request that the separation be lifted, and

25  this was sent to me on, as I said, yesterday at 3:26 p.m.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1          THE COURT:  Let me see:  What else is there before

2     me?  I think that's about it, so far as the -- the only thing

3     that's left is Rule 807 that Mr. Liounis hasn't had an

4     opportunity to look at.  Did you receive Mr. Liounis's alibi

5     request?  Has he given you a copy of that?

6          MR. YAEGER:  Yes, your Honor.  We have this request.

7          THE COURT:  Okay.

8          As far as the cell site expert is concerned, I'm

9     precluding the cell site expert's testimony.

10          One other thing.  If Mr. Liounis is going to proceed

11     pro se during the trial on Monday, there will not be an

12     opening statement.  There will be no openings.  We'll proceed

13     right to calling witnesses.  Is that clear?  If Mr. Liounis is

14     going to be represented by counsel, of course, counsel can

15     make an opening statement, if he wishes.  If Mr. Liounis is

16     going to appear pro se, then there will be no opening

17     statement, either by Mr. Liounis or by the government.  We'll

18     proceed directly to the government's case in chief.

19          If there's nothing further, I think these

20     proceedings are concluded.

21          MR. LIOUNIS:  Excuse me, your Honor.

22          First and foremost, there was a thing about voir

23     dire questions that I could submit?

24          THE COURT:  Yes.

25          MR. LIOUNIS:  I've made them.  Is it okay if I

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    submit these?

2              THE COURT:   Surely.

3              MR. LIOUNIS:   Your Honor, more importantly, before

4    we leave this courtroom, again, the explanation of the

5    separation in any way, shape or form, I'm asking that if that

6    could be stricken from the record and from these transcripts?

7              THE COURT:   The motion is granted.   Okay.

8              MR. LIOUNIS:   Your Honor, can we please do the same

9    for the following proceeding -- the previous one, where

10   Mr. Lerer did the same exact thing on the record when

11   explaining the separation.   Can we please have that removed

12   from the transcript?

13             THE COURT:   I don't know what it is you are

14   referring to.   If the transcript would be made available to

15   me, I'll look at it and make a determination.

16             MR. LIOUNIS:   It's exactly what was said today,

17   verbatim.   When you asked to explain the separation, he

18   explained it in detail on the record.   It's the exact same

19   reason you're striking it from the record today, and I'm

20   asking you please to order that it be stricken prior to those

21   transcripts being made public.

22             THE COURT:   Mr. Liounis, I'm telling you that I have

23   no specific recollection of having heard, any time prior to

24   just now, that there was a separation or what the reason for

25   it was.   If there were such statements made --

1          MR. LIOUNIS:  Tell him.

2          THE COURT:  If there were such statements made and

3   there's a record which reflects it, I'll look at it if

4   somebody will provide me with the transcript of the statements

5   which you are referring to, but I have no independent

6   recollection at this point of ever having heard any reason for

7   a separation or that there was one.  All right.

8          Now, you reminded me, by handing up these voir dire

9   questions, I think one of the things that I talked about the

10  last time we were here, in terms of trial procedure, if

11  Mr. Liounis is going to be proceeding pro se and if

12  Mr. Liounis will testify, as he has a perfect right to do, on

13  his own behalf, should that testimony be in the form of

14  narrative or in the form of questions and answers?  And I

15  suggested that it might be useful, if it were doable, to have

16  a list of questions that Mr. Liounis would ask himself on

17  direct examination or, if he were represented by counsel, what

18  he would want counsel to ask on the direct examination, and we

19  could proceed in that fashion.  Otherwise, we'll determine how

20  we'll proceed if he does proceed pro se and is going to be

21  testifying on his own behalf.

22          Just let me explain.  There seems to be some

23  consternation as to why I am precluding opening statements.

24          To begin with, I'm precluding them because Rule 611

25  of the Federal Rules of Evidence permits me to determine what

1  the order of the trial should be, and, second, for purposes of
2  -- it's a matter of procedure, or legal issues which are
3  interesting, if Mr. Liounis is going to proceed pro se and
4  make an opening statement, should he be making those
5  statements under oath?  Should those statements be very
6  carefully tailored to make sure that a lot of irrelevant or
7  material that would not be admissible in evidence would be
8  precluded from an opening statement?
9           You normally tell a jury, in an opening statement,
10  that what they hear in openings are not evidence.  It's a
11  rather tricky kind of thing to do if a pro se defendant is
12  going to be making statements on his own behalf.  So, there
13  will be no opening statements if Mr. Liounis is appearing pro
14  se at trial.
15          Mr. Liounis, you're going to let me know, and you'd
16  better let me know quickly, I'll give you until about 3:00
17  o'clock this afternoon to let me know whether you want to
18  withdraw your determination to proceed pro se or whether you
19  want counsel to be appointed to represent you.
20          If there's nothing else, I think we are concluded.
21          MR. YAEGER:  One very minor thing.  I wanted to
22  inform the Court, in addition to having a case agent at the
23  government's table, the government was also intending to have
24  one agent in the back of the room just to bring witnesses in
25  and out.  It's possible that agent, he -- we expect that agent

1  in the back of the room will also testify.  We believe that

2  the use of these two agents is necessary, in part because they

3  are familiar with the witnesses and keep the pacing of the

4  trial on track.

5          THE COURT:  If that agent is going to testify,

6  there's no reason why he should be sitting in the back of the

7  courtroom.  You can have the agent who is sitting at counsel

8  table go out and call the next witness who is going to be

9  called to testify.  You don't need two agents to do that.

10  That's the kind of thing that happens as a matter of form in

11  virtually every case.

12          Is there anything else that you have in the way of

13  housekeeping?

14          MR. LERER:  Yes, your Honor, just housekeeping.  I

15  spoke to the marshals --

16          THE COURT:  I spoke to the marshals, as well.

17          What else?

18          MR. LERER:  Nothing from the government.

19          MR. LIOUNIS:  Your Honor, are you going to address

20  my motion in limine --

21          THE COURT:  Yes.

22          MR. LIOUNIS:  -- the one that I put in?

23          THE COURT:  Yes.  Let's do that.

24          Mr. Liounis, what you submitted was a rather

25  extensive document, and I'm not sure whether you were making a

1    motion or what it was you were doing with respect to much of

2    this.  I thought I addressed most of your motions, or most of

3    what you submitted were in the way of objecting to the

4    government's motions in limine.  If there are motions imbedded

5    in here, let me hear them.  I'll deal with them.

6              MR. LIOUNIS:  The first one has to do with a

7    statement and the involuntariness of the said statement.

8              We've had a hearing on Miranda.  However, the

9    involuntariness, as I put in many, many motions to the Court,

10   that this said statement at the time that anything was even

11   said, was during a period where I was sick.  I was refused

12   medical attention, and my medications were not taken at that

13   point.  In fact, the agents were sent forty-five minutes away

14   each way to get my medications while I was being questioned.

15   I think I made it very, very clear that at that point, I was

16   very sick.  I had fell to one knee.  I was very sick, and I

17   was not given the proper medical attention.  I was not taken

18   to a hospital.

19             And again, the questions I was being asked, I mean,

20   the only attention I was given prior to those questions was a

21   bag of pretzels, cold water, and agents were fanning me, and I

22   don't think that that was proper, and I was not in my right

23   state of mind, and again, it has to do with the

24   involuntariness and coercion.

25             THE COURT:  What is your motion?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1          MR. LIOUNIS:  That the government cannot bring in

2    this statement for those reasons.

3          THE COURT:  That was the subject of a motion to

4    suppress earlier, wasn't it?

5          MR. LIOUNIS:  No.  It was Miranda.  This has to do

6    with involuntariness.

7          THE COURT:  That was part of that motion to suppress

8    a long time ago.  I think I dealt with that.  I think this is

9    a repetition of a motion that was made before, that has

10   already been decided.  What other motion do you have that you

11   want to address?

12         MR. LIOUNIS:  Your Honor, I'm objecting to -- the

13   government, again, they said that they had dismissed two

14   schemes, the Rockford scheme and the UBS scheme.

15         But on the indictment, okay, there's still names of

16   apparent aliases that are on those schemes.  They are not part

17   of the Grayson Hewitt scheme.  This also includes dates.

18         I'm focusing on two things.  The alias names and the

19   dates of these said schemes are going to cause me massive

20   prejudice as compared to any probative value, because I'm not

21   charged with them.  They dismissed them.  Yet, the remnants of

22   the conspiracy date is going to 2008.  I understand that dates

23   are inclusive and approximate, but we're talking about over

24   almost a two-year if not longer time frame, and that's not

25   very approximate.

1          And the alias names that are related to those said

2     schemes, they are still on the indictment, they are still in

3     the conspiracy date, and I'm asking that they be precluded.

4          THE COURT:  I don't have the --

5          MR. LIOUNIS:  It's in my motion in limine part two.

6          THE COURT:  I know.

7          Does the government have a response?  Does the

8     government know what it is Mr. Liounis is referring to?

9          MR. YAEGER:  Yes, your Honor.

10          The names of the aliases in the caption of the

11     indictment are names that were spoken to Mr. Moldrem.  The

12     name James Weston, the name Andrew black, the name Santo

13     Crivera.  These aliases are just very much related to the

14     testimony regarding identity.

15          Mr. Moldrem knew the defendant by those names.  He

16     did not know the defendant's name.  That's how he can identify

17     what happened to him.  It is part of the government's evidence

18     of identity, and that is how we are going to speak to

19     Mr. Moldrem and elicit his testimony, by using the names that

20     he knew, and that is why those are in the caption.

21          MR. LIOUNIS:  Your Honor, that's going to be very

22     highly prejudicial.  I'm not charged.  These are uncharged

23     acts.  They have been removed by the government.  The

24     government removed them on their own, as their motion states,

25     when they amended the indictment.  They dropped both schemes.

1          And what they are trying to do now is use Mr.

2    Moldrem to introduce this as relevant conduct, which is very

3    prejudicial to me.  I mean, I'm not charged with these crimes.

4          And the fact that the jury is going to see five or

5    six aliases, that's not why I'm in this courtroom, and, as I

6    said, it leads back to Mr. Moldrem and being allowed to

7    testify.  This is going to be highly prejudicial.  This

8    becomes like a trial of uncharged crimes, which will affect

9    why I'm in this courtroom.  I mean, it's got to be removed.

10          THE COURT:  Mr. Liounis, I just don't have --

11          MR. LIOUNIS:  I have a copy for you, if you would

12    like.

13          THE COURT:  Just a minute.  I'll deal with that.

14          What else?  Is that all the government has to say

15    with respect to that?

16          MR. YAEGER:  One more than thing, which is that

17    these aliases are not the kind of prejudicial aliases one sees

18    in violent cases, not Johnny the Snake or any kind of

19    nickname.  They are normal, simple names and not inherently

20    prejudicial.  That's all I have to add.

21          MR. LIOUNIS:  Your Honor, I think they are.

22          THE COURT:  Excuse me.  What other motions do you

23    have?  Is that it?

24          MR. LIOUNIS:  I want to just make sure.

25          Yes.  I also have these wiretaps, that prior to

1   these wiretaps being introduced into trial, I would like the

2   government to prove that the voice is in fact my voice on

3   those tapes.

4           You're bringing in evidence that -- if it's me,

5   prove that it's me prior to trial.  In other words, I'm trying

6   to say, Why would there be evidence introduced into this

7   courtroom that's not Peter Liounis, that has nothing to do

8   with Peter Liounis?  That's what I am trying to say, as far as

9   the wiretaps.

10          I mean, the government used an order in '09 for a

11  company in 2011.  This is -- it appears what they are doing

12  is, they are using this Mr. Moldrem to in every way, shape and

13  form bring in two schemes that they dismissed into this trial

14  in every single way.  They are using it through the wiretap

15  orders.  They are using Mr. Moldrem to introduce schemes that

16  they dismissed.  They are leaving fraud amounts in the

17  conspiracy of up to $15 million for companies that they

18  dismissed.  This is very prejudicial.

19          This Grayson Hewitt scheme involved one name.  The

20  name was Mark Anderson.  It involved, I believe, a fraud

21  amount, based on what the government produced, less than three

22  or four million.

23          If you don't change this, there's five aliases,

24  there's three schemes, there's now fifteen million worth of

25  fraud.  I mean, this needs to be cleared up prior to trial,

1   your Honor.

2          THE COURT:  I've already cleared it up.  I have made

3   a ruling with respect to that about an hour and a half ago.

4   Is there anything else?

5          MR. LIOUNIS:  I'm asking that it be precluded from

6   the indictment, the conspiracy dates and the aliases be

7   precluded from what they dismissed.  That's what I am asking.

8          THE COURT:  Anything else?

9          MR. YAEGER:  No, your Honor.

10          MR. GOLD:  Your Honor, if I may?  It's somewhat of

11   an awkward position I'm in at this point.  I would just like

12   to refer to the Court's earlier admonition to Mr. Liounis

13   about whether he proceeds pro se or whether he's going to have

14   the appointment of counsel.

15          I appreciate the Court's confidence in my ability to

16   be ready to try this case on Monday.  I would note, though,

17   that while I have been involved as standby counsel for the

18   past year or so and have consulted with Mr. Liounis as needed,

19   I think, as the Court is very well aware, he has charted his

20   own course, and I have not been privy and in fact still am not

21   privy to the number of defense witnesses, who they are, why he

22   intended to call them, what the purpose is.  I certainly have

23   not prepared cross-examinations or made an evaluation of how

24   to proceed on the thirty to forty government witnesses that

25   we've been told would appear.

1        Again, I appreciate what the Court said, that I am
2    familiar in a general way, obviously more so, perhaps -- not
3    perhaps -- certainly than any other individual who would be
4    coming in at the last moment.  But with all due respect, your
5    Honor, it is now Thursday afternoon.  It would be beyond my
6    comprehension to be able to say that I could do a competent,
7    professional job under these circumstances by Monday.
8        THE COURT:  Mr. Gold, I am deeply appreciative of
9    your remarks.  They reflect what has been, I think, your
10   hallmark of professional integrity and competence.  But
11   Mr. Liounis has been aware of the problems which appearing pro
12   se would present.  He has had a year and a half, at least,
13   within which to withdraw his insistence, constitutionally
14   right insistence, upon proceeding pro se.  He elected to
15   withdraw that waiver of counsel on the eve of trial, and he
16   will not get a continuance.
17       I have anticipated the possibility of this
18   occurring.  I have had a memorandum prepared some time ago
19   with respect to what the authorities are and what the law
20   would be, where a defendant who has elected to proceed pro se
21   decides, on the eve of trial, that he would like to have
22   counsel appointed to represent him.
23       There are cases which say that that request can be
24   denied.  There are cases which are almost uniformly of the
25   view that if the request will be granted, there should be no

1   requirement of a continuance, because the administration of

2   court proceedings, the administration of judicial proceedings,

3   require this trial to go forward on Monday.

4            There have been witnesses who have been -- I've

5   heard before why we put the matter off -- that have to be

6   brought from a variety of places.  They have been prepared,

7   required to appear on Monday.  The trial will not be

8   continued.  I have every confidence, Mr. Gold, if you are

9   appointed to represent Mr. Liounis, he will receive very

10  competent representation.  I have no doubt about that.

11           We're adjourned.

12           And Mr. Liounis, I want a response from you

13  promptly.

14           MR. LIOUNIS:  May I say two quick things?

15           THE COURT:  Don't tell me that you are not going to

16  be able to get back to the MDC until 8:30 or 9:00 o'clock.

17  There are telephones which function.

18           MR. LIOUNIS:  Your Honor --

19           THE COURT:  Yes.

20           MR. LIOUNIS:  -- I have confidence in Mr. Gold, as

21  well.  Okay.  And I'm going to ask you, if that is okay, I

22  would like to have Mr. Gold represent me at this trial.  I'll

23  give you the answer now, rather than later.

24           And I just want to know one thing:  Are you going to

25  rule on that motion in limine, since it's the last thing I'll

1   be able to ask, about removing that stuff from the indictment

2   that's prejudicial that's been dismissed?

3          THE COURT:   Mr. Liounis, I think I have ruled on

4   that motion when I discussed the Moldrem telephone calls.

5          Now, I think I told you that under 404(b), bad

6   acts -- and those would be bad acts -- are admissible for the

7   purpose of establishing identity, for the purpose of

8   establishing a common scheme or a plan, for the purpose of

9   establishing intent, motive.  For all the things which 404(b)

10  says, bad acts may be received in evidence.

11         Now, those bad acts which are received in evidence

12  are almost always not bad acts which have anything to do with

13  the crime with which the defendant is charged.  They are

14  offered to prove other things.  They are offered to prove

15  identity, which is crucial in this case.  And the jury is very

16  carefully instructed that that evidence is not being received

17  for the purpose of establishing propensity.  All right.  Now,

18  I have been through that.

19         As far as aliases are concerned, I don't have those

20  clearly in mind.  My view is that aliases -- and I've written

21  on this on I don't know how many cases in the past, most of

22  them dealing with organized crime -- aliases are not

23  objectionable, for the most part, in indictments.

24         Let me look at these.  My tentative ruling is, your

25  motion to have them stricken is denied.  If I determine,

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    looking at that indictment carefully, that there may be some

2    basis for excluding them, I will, but my tentative ruling is

3    that they are denied.   Okay.

4              MR. LIOUNIS:   If that remains that way, your Honor,

5    I'm asking the Court if I can have a pretrial hearing to prove

6    that those alias are in fact me, prior to trial, out of the

7    presence of a jury?

8              THE COURT:   The answer is no.

9              Mr. Gold, I'm going to grant Mr. Liounis's request

10   to have counsel appointed, and I would appoint you.   And I

11   would be grateful to you, as I would be to any CJA lawyer who

12   undertakes to represent defendants who are indigent and can't

13   afford to represent themselves and it's a sacrifice, financial

14   sacrifice I know lawyers make in proceeding CJA, but you have

15   appeared before me many times and your competence is just

16   beyond question.   Mr. Liounis is fortunate to have had you as

17   standby counsel.

18             I want an affidavit of indigency from you.   You know

19   what an affidavit is.   It's a statement under oath.

20             Anything else?

21             MR. GOLD:   Two things, your Honor.

22             I understand that the Court was not intending on

23   sitting Fridays?

24             THE COURT:   That's correct.

25             MR. GOLD:   May I affirmatively request that we not

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    sit on Fridays?

2              THE COURT:   We will not sit on Fridays.

3              MR. GOLD:   Thank you, your Honor.

4              The other issue, your Honor, if I could have five

5    minutes before Mr. Liounis is taken downstairs, so he could

6    fill out this affidavit, because otherwise, I'm not going to

7    be able to get it to him downstairs and have him fill it out.

8              THE COURT:   Mr. Gold, your request is granted.

9    Thank you very much.

10             MR. GOLD:   Thank you, your Honor.

11             MR. YAEGER:   Thank you, your Honor.

12                     ooooooOooooo

13

14

15

16

17

18

19

20

21

22

23

24

25