

| DAS:JDL | *271 Cadman Plaza East* |
|---|---|
| F.#2009R02161 | *Brooklyn, New York 11201* |

July 22, 2014

<u>By Hand and ECF</u>

The Honorable I. Leo Glasser
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Peter Liounis,
           <u>Criminal Docket No. 12-350 (ILG)</u>

Dear Judge Glasser:

     The government respectfully submits this letter in advance of the sentencing of the defendant Peter Liounis, which is scheduled for July 24, 2014, and in response to the defendant's sentencing letter and objections to the Presentence Investigation Report ("PSR"). For the reasons stated below, the government submits that the Court should sentence the defendant to 365 months' imprisonment, at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range. The government further submits that the Court should order the defendant to pay $4,293,803 in restitution to his victims. Because the defendant denies his involvement in two prior fraudulent schemes, as discussed below, the government requests a hearing pursuant to <u>United States v. Fatico</u>, 603 F.2d 707 (2d Cir. 1978), at which it will prove the defendant's involvement in the schemes.

I.   <u>Background</u>

     The government agrees with the description of the offense conduct and calculation of the Guidelines range as set forth in the PSR.

    A.   <u>Offense Conduct</u>

     As set forth in the PSR, between approximately December 2008 and April 2012, the defendant and his co-conspirators

executed three successive fraudulent investment schemes through which they obtained over $15 million from at least 265 investors based on false promises about investment opportunities. (PSR ¶¶ 13, 28.) A summary of these schemes is set forth below.

1.  The Rockford Group Scheme[1]

From approximately December 2008 until at least November 2009, the defendant, together with others, executed a fraudulent investment scheme through a company called the Rockford Group ("Rockford"). Rockford purported to invest in plaintiffs' rights to future recoveries in personal injury and other lawsuits. Potential investors were promised a fixed rate of return of 15% on investments and even higher returns if they invested larger amounts of money. Rockford marketed itself through unsolicited phone calls to investors, sales brochures and other marketing materials, and through its website.

The Rockford website listed the names and photographs of twenty individuals who were described as executives at Rockford. One such individual was "James Weston," who was described as "VP Client Services." Using the false identity "James Weston," the defendant defrauded Rockford investors through telephone calls and e-mails in which he attempted to solicit investments.

The investigation revealed that Rockford never invested any funds in plaintiffs' lawsuits, but instead simply wired most of the investors' funds overseas. By November 2009, Rockford ceased all contact with investors and essentially disappeared with investors' funds. At least 200 Rockford investors in the United States and Canada lost approximately $11 million as a result of the Rockford scheme.

On December 8, 2009, the Securities and Exchange Commission obtained an order ("the SEC Order") from the Southern District of New York, in which the Court froze all assets that Rockford held in the United States, based on allegations that Rockford had engaged in the fraud described above. Shortly after the SEC Order was entered, Rockford abandoned its office space and shut down its telephone service. Law enforcement authorities were able to return only a tiny fraction of the funds to investors, as nearly all of the assets from the Rockford scheme had already been dissipated.

---

[1] The Rockford scheme is discussed at paragraphs 14 through 16 of the PSR.

### 2.   The General Motors Initial Public Offering Scheme

In September 2010, one of the Rockford investors received a telephone call from a person (later identified as the defendant) whom the investor recognized to be "James Weston." This time, however, the defendant identified himself as "Andrew Black from UBS," and attempted to solicit the investor to purchase stocks, including an initial public offering ("IPO") of General Motors ("GM") stock. Law enforcement authorities determined that no person named "Andrew Black" had ever worked for UBS and that UBS was not involved in any IPO of General Motors stock. Further investigation revealed that the address where "Andrew Black" had instructed the investor to send funds was a commercial mailbox. The GM IPO scheme involved four victims and $59,600 in fraudulently obtained funds. (PSR ¶¶ 17-18.)

### 3.   The Grayson Hewitt Scheme[2]

As proved at trial, around March 2011, one of the UBS investors was contacted by the defendant, whom the investor recognized to be "Andrew Black," but who was now identifying himself as "Mark Anderson from Grayson Hewitt." Acting at the direction of law enforcement authorities, this investor recorded a series of conversations with "Mark Anderson." Law enforcement authorities compared this recording with the recording of the voice of the person purporting to be "Andrew Black" in connection with the GM IPO scheme. In both recordings, the same distinctive voice can be heard.

The investigation revealed striking similarities between the Rockford scheme and the Grayson Hewitt scheme. Like in the Rockford scheme, "Mark Anderson" told investors that Grayson Hewitt purchased plaintiffs' rights to future recoveries in personal injury and other lawsuits and promised a fixed rate of return of 15%. Indeed, the Grayson Hewitt sales brochure and website made claims similar to those made as part of the Rockford scheme, including a detailed description of Grayson Hewitt's purported business of funding lawsuits. Moreover, as with the Rockford scheme, the perpetrators of the Grayson Hewitt scheme used falsified documents as part of the scheme. As in the GM IPO scheme, the Grayson Hewitt business address was merely a commercial mailbox. Finally, like in the Rockford

---

[2] The Grayson Hewitt scheme is discussed at paragraphs 19 through 26 of the PSR.

scheme, Grayson Hewitt did not invest its funds as promised. Instead, virtually all of the Grayson Hewitt funds were wired overseas and/or used to purchase gold, meals, clothing and other consumer items. Law enforcement intercepted one package addressed to the defendant's residence, which was opened pursuant to a search warrant and found to contain $3,400 in cash. Agents permitted the package containing the cash to be delivered to the defendant in furtherance of the investigation. At least 61 Grayson Hewitt investors in the United States and Canada lost $4,293,803 as a result of the Grayson Hewitt scheme.

B.   The Defendant's Criminal History

The Rockford, GM IPO, and Grayson Hewitt schemes were not the first crimes committed by the defendant. On October 25, 1999, the defendant was arrested for his involvement in a sophisticated securities fraud and racketeering scheme. (PSR ¶ 68.) Notably, at the time of the scheme, the defendant had passed his Series 7 and Series 63 stockbroker exams and was licensed as a stockbroker. (Id. ¶ 92.) In addition to his role defrauding investors, the defendant also threatened and severely beat other members of the conspiracy. (Id. ¶ 68.) On June 13, 2001, the defendant was sentenced to 87 months' custody. (Id.) On April 23, 2007, the defendant was sentenced to four months' custody for a conviction of robbery by false pretenses, to run concurrently to his other sentence. (Id. ¶ 69.) The defendant engaged in the instant offense while on supervised release for these prior convictions. (Id. ¶ 72.)

C.   Guidelines Calculation

The defendant is assigned a Total Offense Level of 37 and a Criminal History Category of IV, which corresponds to a Guidelines range of imprisonment of 292 to 365 months. (PSR ¶¶ 31-36, 40-66, 71-73, 107.)

II.  Argument

A.   Response to the Defendant's Objections to the PSR

The defendant makes a blunderbuss objection to the PSR, attacking nearly every paragraph. Nearly all of the defendant's objections are not well made because they attack the evidence at trial or repeat old objections that the Court has previously rejected, such as claims that the indictment is invalid and that the defendant's confession was inadmissible. The defendant also denies involvement in the Rockford and GM IPO schemes. (Def.'s

PSR Objections at 1-2.)  The government is prepared to prove the defendant's involvement in these schemes at a <u>Fatico</u> hearing. The government requests that the Court schedule a hearing for August 20 or 21, 2014.

> B.  <u>A Sentence of 365 Months' Custody Is Appropriate</u>

The government respectfully submits that the Court should sentence the defendant to 365 months' imprisonment, at the top of the applicable Guidelines range.

The Court is well versed in the factors it must consider at sentencing pursuant to 18 U.S.C. § 3553(a).  The nature and circumstances of the offense, under § 3553(a)(1), militate in favor of a sentence at the top of the Guidelines range.  The Court is familiar with the defendant's crimes, so the government will not belabor them here.  The defendant left tremendous human misery in his wake.  He defrauded 265 victims of over $15 million.  As the Court saw at trial, these are not empty numbers.  They represent real human lives badly damaged -- funds set aside for college tuitions, for retirement, and for medical expenses, all stolen by the defendant.  Beyond even the losses, the defendant was especially cruel to his victims.  As the Court will remember, one victim had suffered a heart attack.  The victim's son called the defendant and asked to withdraw the balance of his father's Grayson Hewitt account to help pay for his placement in an assisted living facility.  The defendant lied to the victim's son, falsely stating that his father had only $3,000 remaining in the account, promising to return that $3,000, but never doing so.  Instead, the defendant sent the victim's father a "get well" fruit basket.  (PSR ¶ 27.)  The Court will also recall the testimony of an elderly victim, who suffered from a serious heart condition, and the testimony of a victim who lost $1.7 million, a portion of which was to be set aside for assistance for his blind son.

The history and characteristics of the defendant, under § 3553(a)(1), also suggest that a sentence at the top of the Guidelines range is appropriate.  The defendant is an incorrigible fraudster.  He has two prior federal convictions for crimes of dishonesty.  His prior sentence of 87 months' custody seems to have done nothing to deter the defendant; he committed the instant crimes while on supervised release for his Southern District of New York convictions.  A substantially longer sentence is thus called for in this case.  Furthermore, the defendant's personal history offers no mitigation for his crimes.  He is a high school graduate, attended some college,

and was a licensed stockbroker. Based on his professional background and the wiretapped calls in this case, it is clear that the defendant is a clever person, who could have made an honest living, but he chose a life of crime and easy money. The Court has also had the opportunity to observe the defendant throughout the pendency of this case and to form an opinion as to his character. The defendant took the stand and perjured himself. Worse still, he offered testimony that falsely implicated a completely innocent person:

> MR. YAEGER     Who do you believe is Mark Anderson?
>
> DEFENDANT     My landlord who went to jail for a Ponzi scheme already. Yes, my landlord, that's who it is. His name is [REDACTED], something you should know.

(Tr. 751:18-21.) The defendant's actions throughout the case have exhibited the same disregard for the truth. He has repeatedly made unfounded accusations against federal agents, Assistant United States Attorneys, his own defense counsel, and the Court itself. It is clear that the defendant believes he can deceive the Court, just as he has scammed hundreds of victims. The defendant stands revealed before the Court as a deeply dishonest man.

The purposes of punishment, as codified at § 3553(a)(2), also strongly argue for a sentence at the top of the Guidelines range. The seriousness of the offense here is made clear by the damage done to the lives of the 265 victims. The need to promote respect for the law is of great importance in this case, where the defendant has shown complete disrespect for the law at every turn. The need to provide just punishment is implicated by the scope and cruelty of the defendant's crimes and by the failure of his prior sentence of 87 months to reform the defendant's ways. The need for deterrence, both specific and general, is also strongly implicated. While the government is unsure if the defendant can be deterred, it is clear that the prior sentence failed to do so and only a substantially longer sentence might cause the defendant to consider the error of his ways. The need for general deterrence would be met by a lengthy sentence showing other recidivist fraudsters that their conduct will be brought to a decisive end by the law. Finally, the need to protect the public from further crimes of the defendant is paramount here. In simplest terms, the defendant's conduct and history suggest that he will resume committing fraud crimes upon his release. A sentence separating the defendant from society

for 365 months will substantially diminish the harm he can
cause.

In sum, all relevant factors militate in favor of a
sentence at the top of the Guidelines range.  The defendant's
personal history offers no mitigation and, in fact, underscores
the appropriateness of a lengthy prison sentence.

      C.    The Court Should Order $4,293,803 in Restitution

The government respectfully requests that the Court order
the defendant to pay $4,293,803 in restitution to his victims
and $3,400 in criminal forfeiture.  As proved at trial, the
restitution figure of $4,293,803 represents the total losses
associated with the crime of conviction, the Grayson Hewitt
scheme.  (PSR ¶¶ 28-29, 119; see GX 50, 51[3] (establishing
$4,314,446 in deposits into Grayson Hewitt's bank account)).

## III. Conclusion

For these reasons, the government respectfully submits that
the Court should sentence the defendant to 365 months'
imprisonment and should order the defendant to pay $4,293,803 in
restitution to his victims.  The government also requests that
the Court schedule a Fatico hearing at which the government will
prove the defendant's involvement in the Rockford and GM IPO
schemes.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By:  /s/ Justin D. Lerer
     Justin D. Lerer
     Assistant U.S. Attorney
     (718) 254-6124

cc:  Peter Liounis, MDC (by Federal Express)

---

[3] GX 50 and 51 will be sent to the Court under separate cover, to
be filed ex parte and under seal, because they list the names of
victims.