```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     UNITED STATES OF AMERICA,
 3
                                    12 cr 350(ILG)
 4          versus
                                    U.S. Courthouse
 5   PETER LIOUNIS,                 225 Cadman Plaza East
                                    Brooklyn, NY 11201
 6                   Defendant.
     ------------------------------------x
 7                                  August 22th, 2014
                                    11:00  a.m.
 8

 9          TRANSCRIPT OF  CRIMINAL CAUSE FOR SENTENCING

10            BEFORE THE HONORABLE I. LEO GLASSER,

11              UNITED STATES DISTRICT JUDGE

12                         APPEARANCES

13   For the Government:        LORETTA E. LYNCH
                                United States Attorney
14                              Eastern District of New York
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201
                                BY:  DANIEL SPECTOR, ESQ.,
16                                   JUSTIN LERER, ESQ.
                                  Assistant U.S. Attorneys
17
     For the Defendant:         PETER LIOUNIS
18                              PRO SE

19   Also present:             FRANK MARSIGLIANO, USPO
                                SPECIAL AGENT DELISIO
20                              AGENT PURNAVEL, USPS

21
     Court Reporter:            LISA SCHMID, CCR, RMR
22                              Official Court Reporter
                                225 Cadman Plaza East
23                              Brooklyn, New York 11201
                                Phone:  718-613-2644
24                              Fax:  718-613-2379
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1              THE CLERK:  Criminal cause for hearing and sentencing,

 2    the United States versus Peter Liounis.

 3              Counsel, please state your appearances.

 4              MR. LERER:  Justin Lerer and Daniel Spector for the

 5    United States.  Good morning, Your Honor, and also present from

 6    the court's Probation Department is Officer Sydnee Haasnoot.

 7              MS. HAASNOOT:  Good morning, Your Honor.

 8              THE COURT:  Good morning.

 9              Good morning, Mr. Liounis.

10              MR. LIOUNIS:  Good morning, Your Honor.

11              THE COURT:  Good morning.  The only thing we have to

12    deal with is the relevant conduct, resolve the Guidelines

13    calculation.

14              You want to talk about relevant conduct?

15              MR. LERER:  Your Honor, the government would be

16    prepared to rest on its written submission or if the Court

17    wants to hear argument, I'll summarize the submission.

18              THE COURT:  Mr. Liounis, anything you want to say

19    about relevant conduct?

20              MR. LIOUNIS:  Yes, please.  I just need a minute to

21    get set up --

22              THE COURT:  Yes.

23              MR. LIOUNIS:  -- please.

24              (Pause in proceedings.)

25              MR. LIOUNIS:  (Perusing documents.)  Can I put this
```

1    down?

2              MARSHAL:  Sure.

3              MR. LIOUNIS:  Your Honor.  If it's okay, I'm going to

4    begin with the relevant conduct, stating what I believe is

5    factual, and then I would -- at the end, I would like to state

6    the cases in support of why I'm asking the relevant conduct to

7    have to not be charged to Peter Liounis.  Is that okay if I

8    start like that?

9              THE COURT:  Go right ahead, Mr. Liounis.

10             MR. LIOUNIS:  Okay.  Concerning the relevant conduct

11   on October 24th, 2013, the government voluntarily dismissed all

12   charges from the Rockford Group and the UBS Group, the UBS

13   scheme.  These were several counts charging mail fraud and

14   money laundering counts, as well.

15             I didn't ask the government to dismiss those counts.

16   I was prepared to go to trial, and I was prepared to fight

17   those counts under a different standard, beyond a reasonable

18   doubt.  The government, again, dismissed these counts on their

19   own, and now they're trying to hand it to Peter Liounis on the

20   back end, under a different standard of preponderance of

21   evidence.

22             I don't have copies.  This would be the --

23             THE COURT:  I'm familiar with that, Mr. Liounis.

24             But before you go any further, just let me tell you

25   that the dismissal of counts has no relevance to the relevant

```
 1    conduct issue, as far as the argument you're making is
 2    concerned.
 3             What is significant is that a grand jury thought that
 4    there was probable cause to believe that you committed the
 5    Rockford Group crime and the UBS crime.  And the indictment
 6    which was filed -- which is where you got that observation the
 7    other day about May rather than June or whatever the date was
 8    in the decision I read into the record -- there was an
 9    indictment filed on May 17th, 2012, in which you were charged
10    as Mark Anderson and Andrew Black and James Weston and Mark
11    Sloli, and you were charged with in or about and between
12    December of 2008 and November of 2009, you and others executed
13    a fraudulent investment scheme through a company called
14    Rockford, and then there is also an indictment which was filed
15    on that same day with respect to the UBS, the General Motors
16    IPO scheme.
17             Now, the law with respect to that -- but before I get
18    to that -- whether the government does or does not wish to
19    pursue the prosecution on those charges is a decision which the
20    government makes.  It doesn't indicate that there was no basis
21    for a grand jury to believe that you committed those crimes.
22             And before you go any further, just let me read to you
23    just a little sentence from just one of countless cases:  "Long
24    prior to the sentencing Guidelines, it was settled that a
25    sentence on a count of conviction could be based on conduct
```

```
 1    charged in dismissed counts."

 2              MR. LIOUNIS:  Okay.

 3              THE COURT:  Also, it could be based even on counts

 4    resulting in an acquittal.

 5              The law with respect to that is just voluminous.  This

 6    is a Second Circuit case.  The Supreme Court has decided that

 7    same issue on any number of occasions, as well.

 8              So whether or not the government did or did not choose

 9    to continue to prosecute you on that first indictment is not

10    going to have much significance.  It doesn't have any, for that

11    matter, with respect to relevant conduct.

12              Now, why don't you move on to something else?

13              MR. LIOUNIS:  Okay.  Next, I'm going to move on to we

14    had a conversation two days ago in the courtroom concerning the

15    relevant conduct amount and victim amount, and I had mentioned

16    that I had an affidavit from Inspector Purnavel, which

17    Mr. Lerer said, "I don't have."

18              Well, I brought it with me today, and the numbers from

19    the affidavit do not come close to the numbers of the relevant

20    conduct that the government is handing me in trying to enhance,

21    I guess, on their own, and I would like the Court to please

22    take a look at that, if that's okay.

23              THE COURT:  Have you seen it?

24              MR. LERER:  I have not seen it, Your Honor.

25              THE COURT:  Why don't you show it to Mr. Lerer?
```

```
 1              MR. LIOUNIS:  Sure.  (Complies.)  It's right there and
 2    the affidavit is right in the back.
 3              (Mr. Lerer and Mr. Spector peruse the document.)
 4              MR. LIOUNIS:  You might want to see the date on the
 5    back where it's signed.
 6              It's a sworn affidavit, Your Honor.
 7              MR. LERER:  Your Honor, I will hand up this document
 8    in a moment.  It's an affidavit in support of a search warrant
 9    in December 26th of 2009, signed by Inspector Purnavel.  The
10    government was in the midst of conducting the investigation at
11    the time.
12         Search warrant affidavits are early in the
13    investigative process.  The SEC paperwork and voluminous other
14    materials show the full loss amount.  Let me just find the
15    paragraph for you, Your Honor.  Actually, perhaps Mr. Liounis
16    could find it more easily.
17              What paragraph do you want to show the Judge?
18              MR. LIOUNIS:  Page 19.  (Indicating.)  That's page 19,
19    and then the back of it, I just want to --
20              Again, I emphasize where it's signed and sworn, that
21    would be nowhere near the date of March, which those figures
22    being quoted.  It's in December.  It's way after.
23              And Your Honor, as you're looking -- as you're looking
24    at that --
25              MR. LERER:  (Perusing document.)
```

```
 1            MR. LIOUNIS:  -- when you're looking at the civil
 2   complaint which belongs with that, there's a number -- a number
 3   of different companies.  There's a number of different
 4   entities, et cetera.  It appears to me as if I'm looking at
 5   dates of companies that were formed in 2005, 2006, 2008.  I
 6   mean, during these times, I was in federal prison.
 7            And it almost seems as if they were putting everything
 8   together under this one company, Rockford, and saying here,
 9   hold 11 million and two hundred worth of losses.  I have not
10   seen one impact -- victim impact statement.  I mean, I'm
11   getting all different numbers here which.  They are not
12   matching.
13            MR. LERER:  Your Honor, I just want to make a record
14   of what document that the defendant was referring to.  It is an
15   affidavit in support of search warrants of various Rockford
16   Group email addresses.  It was signed by Inspector Purnavel,
17   P-U-R-N-A-V-E-L, on December 26th of 2009 -- December the 29th
18   of 2009, in case M 09 1267.
19            In addition to the fact that the defendant I think
20   misunderstands the import of a search warrant affidavit, I will
21   note that even if you give the defendant the figure from this
22   affidavit of 3.7 million from Rockford and you add it to the
23   over $3.8 million from Grayson, even if you gave him his
24   argument, he would still be over the $7 Guidelines threshold.
25   So his entire argument is irrelevant as a matter of the
```

```
 1    Guidelines, in addition to being incorrect.

 2              MR. LIOUNIS:  I would like to comment on that.

 3              I beg to differ, and that this is why I brought this

 4    affidavit here today, Your Honor, to show it to you, because I

 5    don't believe those figures are anywhere near.

 6              There was a time Mr. Spector and I actually had a plea

 7    agreement session for a plea, and Mr. Spector himself -- and

 8    I'll say this under oath -- said that there was a total loss of

 9    somewhere around 6 million that included both companies.  This

10    was told to me.  And it now these numbers are eight, seven,

11    8 million, you know, whatever the numbers are.

12              I don't know if it's my right, but if it is my right,

13    I should be able to see victim impact statements.  I should be

14    able to see factual proof of the victims and their losses,

15    where these could, I mean, these play a very big part on the

16    enhancements and the amount of levels that could affect me, and

17    I really believe -- and again, I'll show you the affidavit --

18    it's not even close to the figures they're talking about.

19              Moreover, the SEC complaint that's filed is

20    December 2009 -- it's right here -- it's pretty much the same

21    time frame that Inspector Purnavel signed her sworn affidavit

22    early on in the investigation.  She's off by 7 million and

23    probably 75 victims.  That's a big difference.

24              THE COURT:  Mr. Lerer, do you want to respond any

25    further to that?
```

```
1              MR. LERER:  I do not, sir.
2              THE COURT:  Two things, Mr. Liounis.  What a federal
3    agent has placed in an affidavit for the purpose of obtaining a
4    search warrant was based upon information which was available
5    to the agent at that time.  It is not intended to be any
6    definitive declaration of a fact which is immutable.  It was
7    information which is designed to convince -- or satisfy is
8    perhaps a better word -- a judicial officer -- in this case, it
9    was a magistrate judge -- that based upon the facts which were
10   presented by the federal agent, there was reason to believe --
11   probable cause to believe that the search which was requested
12   would result in a discovery of evidence relevant to a crime.
13              Now, I have a list of Rockford Funding Group victims
14   which the government had submitted.  I don't know whether it
15   was part of the evidence during the course of the trial or not.
16   I don't have the entire file before me.  But this list runs --
17   it's a list of victims of the Rockford Funding Group event, and
18   the monies which they invested.  It consists of one, two,
19   three, four, five, six -- six and maybe a half or more than a
20   half pages.  I think there were 31 lines on each page.  The
21   sums were not totaled, but they are substantial.
22              And I don't know whether you have seen it or whether
23   you have gotten it.
24              MR. LIOUNIS:  I've seen a redacted list.
25              THE COURT:  Of the Rockford Group victims?
```

```
 1            MR. LIOUNIS:  I don't know where these victims are

 2  from, Your Honor.  I have no idea.  I don't know these names.

 3  I don't know who's what.

 4            THE COURT:  Excuse me.

 5            Will the government assist Mr. Liounis and perhaps the

 6  Court as well?  I have a list.  Written on top of this list is

 7  "Rockford Funding Group."  Is this the list which the

 8  government is relying upon as representing the victims of the

 9  Rockford Funding Group fraud?  Now, do you know what I'm

10  looking at?

11            MR. LERER:  I believe -- I believe I do, sir.  Yes,

12  sir.  And to make a thorough record, this list was Attachment

13  5, Exhibit 5 to the government's August 15th, 2014 letter.

14  That letter was sent by Federal Express to the defendant and

15  then it was handed to the defendant after court on the

16  proceeding on Wednesday of this week.

17            THE COURT:  And that was marked "Rockford Group

18  Victims"?

19            MR. LERER:  I believe that's handwritten on the

20  Court's version.  It's just Exhibit 5.  It doesn't have a title

21  in the version I'm looking at.

22            The only difference between the version that the Court

23  is looking at and the defendant is that the lines listing the

24  home address and the phone number of each victim has been

25  redacted.  The defendant has the names, but not the address and
```

```
 1    phone number.

 2              THE COURT:  What was the total?

 3              MR. LERER:  The total can be found, Your Honor, on the

 4    last page.  It is a range because --

 5              THE COURT:  Excuse me.  Would you look at this?  This

 6    is what I had annexed to tab five.  What does it say about

 7    total?

 8              MR. LERER:  It appears that the Court is looking at a

 9    slightly different version that doesn't have the total.  I can

10    hand up the version that was given to the defendant.

11              THE COURT:  That's the version I have, that is annexed

12    to tab five.

13              MR. LERER:  I don't know what to say about it, Your

14    Honor.  I can hand up the Government's 5 or I can read the

15    number into the record.

16              THE COURT:  What is the number?

17              MR. LERER:  It is a range because the loss was

18    uncertain and it was a range as to some defendants.  It is

19    between $10,862,653.  That is the low end of the range.  The

20    high end of the range is $10,875,653.

21              THE COURT:  And Mr. Liounis had this list?  You say

22    you've given him that list?

23              MR. LERER:  By FedEx and by hand.

24              THE COURT:  All right.

25              What else, Mr. Liounis?
```

```
 1              MR. LIOUNIS:  Which I'm objecting to.

 2              THE COURT:  All right.  Your objection is noted.

 3              MR. LIOUNIS:  I was -- I believe that I should be able

 4    to be able to verify, Your Honor, whether through it's victim

 5    impact statements or being given -- being given, I mean,

 6    they're talking about ranges.  I mean, this is pure guessing

 7    here.  We're not even talking about -- there's no time frames.

 8              As I said earlier, a lot of these -- a lot of these

 9    figures not only differ from the affidavit, but they stem from

10    other companies that are in the SEC complaint, and there may be

11    Statute of Limitations issues.  These are -- there's quite a

12    bit that needs to be figured out on that amount that you're

13    talking about of ten million, just to hand somebody, I mean.

14              THE COURT:  What else, Mr. Liounis?

15              MR. LIOUNIS:  Will I be able to get victim impact

16    statements?

17              THE COURT:  You were given a statement of the list of

18    the victims of the Rockford Group Fund.

19              MR. LIOUNIS:  None of it is verified, none of it, none

20    of it.

21              THE COURT:  Excuse me, Mr. Liounis.  You were given a

22    list.  You had it.  You had the list of the victims and you had

23    the list next to the names of each of the victims and the

24    amount of money which they invested and loss.  That has been

25    submitted to the Court by the government.
```

1              The Rules of Evidence with respect to information

2      submitted in support of sentencing is that hearsay is

3      admissible.

4              I don't recall whether that list of the Rockford Group

5      victims were introduced during the course of the trial.

6              MR. LERER:  It was not, Your Honor.

7              THE COURT:  It was not?

8              But it's sufficient now, and I have no hesitation at

9      all in finding that the submission by the government with

10     respect to the list of victims and the amount of the loss is

11     supported by a fair preponderance of the evidence.  It's your

12     burden, Mr. Liounis, to overcome that.

13             Now, what else do you object to with respect to

14     Guidelines?

15             MR. LIOUNIS:  I'm not anywhere near finished with the

16     relevant conduct, Your Honor.

17             THE COURT:  What else are you going to present with

18     respect to the relevant conduct?  The only relevant conduct

19     issues, Mr. Liounis, are the Rockford Group, UBS Group -- that

20     actually didn't amount to very much.

21             That was $59,600, I believe?

22             MR. LERER:  Yes, sir.

23             THE COURT:  UBS?

24             The Court could also consider in terms of sentencing

25     the convictions in the Southern District of New York, which

1    also dealt with securities fraud, although I'm not doing it.  I

2    am considering those convictions with respect to your criminal

3    history, but in an excess of caution, because I believe there

4    has been some observation in connection with this issue that

5    whether there was a significant time gap between the events

6    which are deemed to be relevant conduct, a question as to

7    whether it was a course of conduct may be a little doubtful, so

8    it's not being taken into account by me.

9           So what we're dealing with are the Rockford Group,

10   UBS, General Motors IPO, and those were in or about the same

11   time.  The time of the crime of conviction, the nine counts for

12   which you were convicted were between December of 2008 and

13   April of 2012.  The Rockford Group fraud, which was part of the

14   relevant conduct being considered was December 2008 to November

15   of 2009, pretty much the same period, almost the exact same

16   period as the nine counts of which you were convicted.  And the

17   UBS relevant conduct was in September of 2010, which is two

18   years before the Grayson Hewitt crime, which concluded in 2012.

19          So there is a very clear line of conduct which is

20   relevant for the Court to consider in this and is considering

21   with respect to the sentencing Guideline determination.

22          I think you've received or should have received a

23   letter today in which the amount of restitution which is only

24   based upon the crime of conviction has been significantly

25   reduced, I guess, significant.  I think it was reduced from

```
 1   four million to three million some-odd, total loss with respect

 2   to Grayson Hewitt.  Have you seen that letter?

 3             MR. LIOUNIS:  Yes, sir.

 4             THE COURT:  So the total loss with respect to Grayson

 5   Hewitt is $3,864,080.11.  It was reduced from 4,380,000.  So

 6   it's been reduced essentially a million dollars or at least a

 7   thousand dollars -- a hundred thousand dollars.

 8             All right.  So what else is there, Mr. Liounis?  What

 9   else did you want to call to my attention with respect to

10   relevant conduct?

11             MR. LIOUNIS:  Okay.  I would like to talk about that.

12   First, that I'm not even mentioned or named anywhere on that

13   SEC complaint.  I was just going to make some notes as I go

14   along.  I'm not mentioned as a defendant anywhere in this SEC

15   complaint at any time.

16             The sole person named in that is somebody named

17   Ganotti Yoganoff (phonetic), who the civil complaint describes

18   as the -- I guess the owner, the leader, the guy who put it all

19   together.  I don't know who that person is.  But again, I'm

20   emphasizing Peter Liounis has no nexus to that civil complaint

21   at all.

22             Okay.  Again, there's some references in that SEC

23   complaint which reference that there were companies created

24   during times when Peter Liounis was in federal prison.

25             THE COURT:  Mr. Liounis, we're not dealing with
```

1    whatever it is that the SEC complaint is.

2            MR. LIOUNIS:  Its relevant -- it's just relevant to

3    that.

4            THE COURT:  We're dealing with the Rockford Group and

5    we're dealing with UBS.

6            MR. LIOUNIS:  Okay.

7            THE COURT:  And I am satisfied that the government has

8    established by more than a fair preponderance of the evidence

9    that the Rockford Group and UBS, the conduct involved in those

10   events were relevant.  They're almost precisely the same

11   conduct as the conduct with which you were convicted involving

12   Grayson Hewitt.

13           In the government's submission dated August 15th,

14   there was an annexed tabs two and tab maybe three or four, in

15   which there are these very, very, slick sophisticated brochures

16   used to induce people to send money to this fictitious entity

17   known as Grayson Hewitt and this fictitious entity known as

18   Rockford.  They are virtually identical in every respect.

19           Now, I'm finding that relevant conduct has been

20   established, conduct being the Rockford Group, the UBS scheme,

21   the General Motors IPO, and that the amount of loss, the amount

22   of money which that or those frauds managed to accumulate was

23   clearly in excess of $7 million, which is the Guideline

24   reference for increasing the base offense level from seven to

25   20.  It's Guideline -- if you're interested, Guideline 2B1.1.

1   Subdivisions (b)(1)(D) and subdivision (b)(2)(C) with respect

2   to the number of victims, which I'm finding has also been

3   established by a fair preponderance of the evidence.

4         Now, I think that's all there was with respect to the

5   Fatico hearing.  It was just relevant conduct.  I think you had

6   some problems -- or not problems, but objections to the

7   enhancement for obstruction of justice.  I think I dealt with

8   that.

9         MR. LIOUNIS:  Yes.

10        THE COURT:  I think I determined without any question

11  at all in my mind that your testimony during the course of the

12  Grayson Hewitt trial was perjurious.

13        If there's nothing else than what we have --

14        MR. LIOUNIS:  Okay.

15        THE COURT:  Pardon?

16        MR. LIOUNIS:  I'm sorry, Your Honor.  I just -- I

17  wasn't -- I just want to make the Court aware that I had some

18  more stuff that I had --

19        THE COURT:  Okay.

20        MR. LIOUNIS:  -- that I need to put on the record.

21        THE COURT:  Go ahead.

22        MR. LIOUNIS:  I'm sorry to cut you off.

23        As far as this relates to evidence, I'd like to just

24  put on the record that the government is using a victim,

25  someone by the name of name of Mr. Ed Moulden, who very

```
 1   importantly is not a victim.  This is a victim who they're
 2   using to identify me as being the same person as James Weston
 3   and Mark Anderson and Andrew Black, and it's important that
 4   Mr. Moulden is not a victim, number one, of the Grayson Hewitt,
 5   although he did testify at trial.  But Mr. Moulden has also
 6   previously identified someone else as the same fraudster, and
 7   there is not one single tape -- one tape of the Rockford scheme
 8   voice of James Weston, not one tape.
 9            THE COURT:  Mr. Liounis?
10            MR. LIOUNIS:  Yes, sir?
11            THE COURT:  I'm trying very, very hard to give you as
12   much leeway and opportunity to say what you believe is
13   important to say, but I've told you I think at least twice on
14   Wednesday that we're not here to retry the indictment
15   containing nine counts of wire fraud, mail fraud of which you
16   were convicted.
17            If you think, Mr. Liounis, that there were some
18   deficiencies in that trial, if you believe that the Court
19   erred, that is, made mistakes in its evidentiary rulings in
20   admitting some evidence which you believe shouldn't have been
21   received, those are arguments which you can make when you
22   appeal your conviction and sentence, but we're not here to
23   retry the United States versus Liounis, on Docket Number 12 CR
24   350.  That's over.
25            MR. LIOUNIS:  Okay.
```

```
 1              THE COURT:  We're not here to try the validity of
 2    search warrants, arrest warrants.  That's over.  We have had
 3    hearings with respect to that.  We have had suppression
 4    hearings.  We have had motions challenging the validity of an
 5    indictment.  All of that is past.
 6              All that is before me now is a determination of the
 7    objections you raised to the pre-sentence report, which I have
 8    dealt with, and a determination of the Guideline calculation,
 9    which the Court of Appeals has instructed the Court, the
10    district court repeatedly over and over and over again, the
11    first thing the district court must do, should do in sentencing
12    is make a determination of the appropriate Guideline.  So
13    that's where we are.
14              Now, with respect to relevant conduct, we've dealt
15    with the Rockford and USB relevant conduct, which has been
16    deemed to be relevant conduct for purposes of sentencing.  I
17    have told you that the authority, the law in this circuit -- as
18    a matter of fact, in this country because the Supreme Court has
19    dealt with it in a case known as Witte, W-I-T-T-E, many, many
20    years ago.  The court -- and there is a section of the United
21    States Code, 3661 of Title 18, which says there is no
22    information which the Court should not consider and cannot
23    consider in determining what a sentence -- an appropriate
24    sentence should be.  That's why the Court can consider all the
25    conduct, your whole criminal history.  That's why the Court has
```

```
1    a pre-sentence report that advises the Court of your whole

2    life, pretty much, the story of the life of Peter Liounis.  All

3    of that is perfectly proper for the Court to consider.

4            So where we're at now, Mr. Liounis, is not the SEC

5    letter by Joseph Bruno.  We're beyond that.  The relevant

6    conduct that was an issue, I've already dealt with.  The

7    government has established to my satisfaction by a fair

8    preponderance of the evidence that the Rockford event which you

9    were indicted back in May of 2012, the General Motors IPO,

10   which was -- the UBS event was all relevant conduct, all

11   relevant part of the same scheme, common scheme, common course

12   of conduct, count of conviction.  So we're finished with that

13   and I've determined that.

14           Now, my determination is that with respect to the

15   Guideline calculation, there was a base offense level of seven.

16   That level is increased by 20, based upon a loss which exceeds

17   $7 million, a loss caused not only by Grayson Hewitt, but also

18   by Rockford and UBS, in addition to which there's an additional

19   six points added to that, because there were more than 250

20   victims of Rockford and Grayson Hewitt.  The list of victims of

21   Rockford Group -- add them up -- I think add up to something

22   like 204, and there were 61 victims of the Grayson Hewitt scam.

23   That's 265.

24           MR. LIOUNIS:  Yes.

25           THE COURT:  And there were four UBS victims.  That's
```

1    269.  And I'm finding that that has been established to my

2    satisfaction by a fair preponderance of the evidence.

3         What we have, adding those up, the way in which this

4    Grayson Hewitt fraud was devised and executed was extremely

5    sophisticated.  A mere glancing through that slick brochure of

6    Grayson Hewitt brochure, the photographs of the executives and

7    founders and officers of Grayson Hewitt is remarkable.  And

8    it's interesting that some of the people on the Grayson Hewitt

9    brochures are also photographed in the Rockford brochure.

10        MR. LIOUNIS:  Your Honor, that has nothing to do with

11   me, Your Honor.

12        THE COURT:  I know.  You're not -- you weren't Mark

13   Anderson.

14        MR. LIOUNIS:  No.  I'm saying the evidence points to

15   someone named Ruslan Rapoport that the government introduced

16   that did all these things.

17        THE COURT:  Yes?

18        MR. LIOUNIS:  And it appears that they're trying to

19   hand everything to what would appear to be Mark Anderson, who

20   was a cold caller in one out of the three things that were just

21   described.

22        Your Honor, again, before you make any sentencing or

23   rulings, I have -- I have case law, Second Circuit case law in

24   support of -- to be honest with you, the opposite of what

25   you're saying as far as relevant conduct.  I understand all --

```
 1    that you can decide or take all these factors, but I have to be
 2    able to put this on the record, because I'm objecting to all of
 3    this.
 4              THE COURT:  All right.  Your objections are noted.
 5    They're on the record.
 6              MR. LIOUNIS:  But I'm not -- the cases, none of this
 7    is being allowed in.  I have cases in support of my legal
 8    argument that I'm trying to put in.
 9              THE COURT:  Those are arguments you can make on
10    appeal.
11              MR. LIOUNIS:  Your Honor --
12              THE COURT:  You don't have to make that on the record
13    now.  The fact that you've made an objection to all of that is
14    enough.  And during the course of an appeal -- which I assume
15    you're going to make -- you can argue all that, that all the
16    things that I have determined in connection with the sentencing
17    proceeding you believe to be completely wrong and you have the
18    cases to establish it.  You can call that to the attention of
19    the Court of Appeals.
20              MR. LIOUNIS:  The government put a submission in, in
21    writing.  I was given two days.  I didn't have a chance to
22    respond in writing.  I was told -- I explained to the Court
23    that I would be back and I would be able to verbally make my
24    presentation to the Court before sentencing.  There's not much.
25    There's not much here.
```

1          But as far as evidence in the Second Circuit, has held

2    that relevant conduct must be proved by specific evidence, and

3    I'm quoting *U. S. versus Archer*.  That's the Second Circuit in

4    2011.  Must insure evidence of relevant conduct, solid.  I'm

5    quoting Shenobi (phonetic). Okay?

6          I have a complete list, a complete list of evidence

7    that proves otherwise -- and I know it's not a trial, but as

8    far as the relevant conduct goes, there are things that I have

9    to put on the record.

10          I'm also speaking about jointly-undertaken activity.

11   "The Second Circuit is required to make a particularized

12   finding of the scope of the criminal activity agreed upon by

13   the defendant."  *U. S. versus Studley*.  This is 1995, the

14   Second Circuit.  "Thus, if the judicial court holds the

15   defendant accountable for conduct that was foreseeable to him

16   over the period during which he was a participant in a

17   conspiracy, the sentence will be reversed and the case remanded

18   for particularized finding as to the scope of the defendant's

19   agreement."

20          *U. S. versus Hernandez*, *Santiago*, Second Circuit,

21   1996, "The Sentencing Commission has stressed that criminal

22   activity that the defendant agreed to jointly undertake is not

23   necessarily coextensive with the foreseeable conduct of others

24   in furtherance of it."

25          There has not been one witness that entered this

```
 1   courtroom and said that there was any kind of agreement to

 2   conspire, to steal.  There was not one witness.  That goes for

 3   all three schemes, all three of them that were mentioned here,

 4   Your Honor.

 5           THE COURT:  Excuse me.  Excuse me, Mr. Liounis.

 6           MR. LIOUNIS:  Yes?

 7           THE COURT:  You are, again, ignoring what I have

 8   attempted --

 9           MR. LIOUNIS:  Maybe I'm not understanding.

10           THE COURT:  Oh, you understand.  I think you

11   understand very well.

12           Now, let me tell it to you one more time.  When you

13   decided to represent yourself, you told me you're competent,

14   your drafting competence.  You can draft pleadings.  You're

15   familiar with the facts.  You're perfectly competent to

16   represent yourself.  I went through that with you at the time.

17           You've been through three convictions in the Southern

18   District of crimes which are precisely the same -- at least two

19   are -- the Southern District indictment and the Nevada

20   indictment.

21           Now, let me tell you again for the fourth time.

22           MR. LIOUNIS:  Those are not the same.

23           THE COURT:  Excuse me.  Let me tell you again for the

24   fourth time, we are not retrying United States versus Liounis.

25   If you believe that there was no evidence to implicate you in
```

```
 1    the trial of United States versus Liounis, that's something for
 2    you to argue on appeal.  Now, you understand that, don't you?
 3              MR. LIOUNIS:  Yes.
 4              THE COURT:  Yes.  You understand that?
 5              MR. LIOUNIS:  That, I understand.
 6              THE COURT:  And so what you're telling me now that
 7    there wasn't one witness, there was no evidence, that really
 8    relates to deficiencies which you believe were rampant
 9    throughout your trial.  You raise those on appeal.  We're
10    beyond that here.
11              MR. LIOUNIS:  Okay.
12              THE COURT:  What else do you want to put on the record
13    --
14              MR. LIOUNIS:  Please give me one second.
15              THE COURT:  -- with respect to the pre-sentence report
16    --
17              MR. LIOUNIS:  Okay.
18              THE COURT:  -- with respect to Guidelines, with
19    respect to relevant conduct?  That's all we're here for.  We're
20    not retrying your case.
21              MR. LIOUNIS:  (Perusing documents.)
22              (Pause in proceedings.)
23              THE COURT:  All right, Mr. Liounis?
24              MR. LIOUNIS:  I just need one minute.  I'm sorry.  I'm
25    just reading something.  (Perusing document.)
```

```
 1              Your Honor, as far as the level of calculation and the
 2    Guidelines --
 3              THE COURT:  Yes?
 4              MR. LIOUNIS:  Okay.  First, I'd like to ask why the
 5    base offense level, the wire fraud base offense level, is it
 6    not six levels?  Can someone explain why it's seven levels?  I
 7    thought that it was six.
 8              THE COURT:  The base level -- the base offense level
 9    for the nine crimes of which you were convicted is seven.
10    That's what you start with.
11              MR. LIOUNIS:  Okay.
12              THE COURT:  It's 2B1.1 of the United States Sentencing
13    Guidelines.
14              MR. LIOUNIS:  Okay.
15              THE COURT:  It's a base offense level of seven.  Now,
16    if you continue to read that Guideline and you go down to
17    2.2B1.1(k), the Guideline says, "If the loss" -- and the loss
18    includes not only the loss of the crimes of conviction, but the
19    loss of relevant conduct -- if the loss is $7 million and more,
20    you increase that base offense level of seven by 20.  So the
21    Guideline at that point becomes 27.
22              And then the Guideline goes on to say in Subdivision
23    (b)(2)(c), that if the offense involved more than 250
24    victims -- it includes relevant conduct as well -- increased by
25    six.  So you have 27 and six is 33.
```

1          And then the Guideline says if this fraud was

2     committed by sophisticated means, increase by two.  So you're

3     now up to 35.

4          And then the Guidelines provide for an increase of the

5     offense level if there was an obstruction of justice.  An

6     obstruction of justice includes perjury committed during the

7     course of the trial.

8          I think I read to you the other day a very pertinent

9     observation by the Supreme Court with respect to why perjury is

10    deemed to be an obstruction of justice.  I think I read to you

11    from *United States versus Dunnigan*.  In any event, it's there.

12    So there was another two points for that.

13         And then there were two more points for -- (perusing

14    document) -- I think we had it all.  So it adds up to 37 as the

15    adjusted offense level, and with a criminal history of IV --

16    the adjusted offense level of 37 and a criminal history of IV

17    results in an advisory Guideline of 292 to 365 months, and that

18    is the Guideline.

19         MR. LIOUNIS:  Your Honor, I'm objecting to that

20    Guideline.

21         THE COURT:  Yes.

22         MR. LIOUNIS:  And I'd like to read something into the

23    record.

24         THE COURT:  Sure.

25         MR. LIOUNIS:  In *Studley*, the mere fact that he worked

1    alongside with others in a boiler room setting was insufficient

2    to attribute him to the other employee's frauds.  See *Studley*,

3    47 F. 3d, at 576.

4           Peter Liounis did not help design or develop these

5    said schemes, did not share in any profits and did not

6    contribute resources doing it, all weigh in favor of the now

7    jointly undertaken criminal activity to his own fraudulent

8    activity.  "The fact that the defendant has knowledge of

9    additional criminal acts of another participant in the offense

10   of a conviction is not enough to make the defendant responsible

11   for those acts.  More is required, such as evidence that the

12   defendant has pooled profits or resources with other

13   participants or otherwise directly tied his success to the

14   activities of the other."  *Studley*, 47 F. 3d at 575.

15          THE COURT:  All right, Mr. Liounis.

16          MR. LIOUNIS:  I'm just about done.  I have one small

17   paragraph:  "In conspiracy cases, a defendant's relevant

18   conduct does not include the conduct of others occurring before

19   the defendant joined the conspiracy, even if the defendant was

20   aware of that conduct upon joining the conspiracy -- even if

21   the defendant was aware of that conduct upon joining the

22   conspiracy."  See SS 1B1.3, and the see *U.S. versus

23   Miranda-Ortiz*, 926 F. 2d 172,178-78, 2d, Second Circuit, 1991.

24          "Total sales" -- this is an example -- "total sales of

25   cocaine during a four-year conspiracy is not relevant conduct

```
 1    for defendant who joined on the last day and could not have
 2    known the amount sold in the preceding years."
 3            I'm objecting to that Guideline sentence based on what
 4    trial evidence has shown.  What Mr. Lerer has handed me prior
 5    to this sentencing clearly establishes during the trial that
 6    Mark Anderson -- if he was Peter Liounis -- if he was Peter
 7    Liounis, okay?  Handled less than 50 victims, is responsible
 8    for less than 2.5 million in losses; and moreover, came into
 9    the conspiracy in the middle of 2011.  This is after, as you
10    can see by this list, victims were handled by two other
11    individuals, Lance Berman and Sam Freed.
12            And I would like to go down this entire list with the
13    Court, because it's factually in black and white from the
14    government.  And if -- and if Mark Anderson is Peter Liounis
15    and he entered during that period as a cold caller and nothing
16    more -- because there's no trial evidence.  There is nothing
17    proven anything more than a cold caller.  There's not even a
18    dollar, a penny from any of these schemes, not one penny linked
19    from any of these victims or any of these fraudulent bank
20    accounts, nothing that has gone to Peter Liounis, not one
21    penny.
22            So if we're going to say Peter Liounis is Mark
23    Anderson -- again, which I am denying, Mark Anderson is only
24    responsible for this list.  And when he came into the
25    conspiracy is sometime, again, in 2011.  None of the conduct
```

```
 1    prior to that -- none of that -- should be handed to a cold
 2    caller, okay?  Someone who got nothing, zero, nothing, who did
 3    not play, again, a part in setting up any company, is not an
 4    owner, not a principal, has no ties to bank accounts, has no
 5    ties to any office, has no ties to any of the coconspirators.
 6    All of this came out during trial.
 7              And for this Court to ignore all of this and hand
 8    Peter Liounis a Guideline range based on everything that was
 9    just said is not fair at all.  It's not fair at all.  And I am
10    objecting to every one of those enhancements, the dollar
11    amount, the victim amount -- I'm objecting to everything, Your
12    Honor.  I'm objecting to everything.
13              THE COURT:  Your objection is noted.
14              Now, let's proceed to sentencing.  Do you want to be
15    heard with respect to sentencing, Mr. Liounis?  Anything you
16    want to say --
17              MR. LIOUNIS:  Yeah, I'd like to say one last thing.
18              THE COURT:  -- with respect to --
19              MR. LIOUNIS:  That during these schemes, I had a full
20    time job, which my probation officer was visiting me frequently
21    in the front in -- in front of the store during these periods.
22    How could I possibly be doing these crimes when I'm at work --
23              THE COURT:  Mr. Liounis.
24              MR. LIOUNIS:  -- at a job?
25              THE COURT:  Mr. Liounis, what would you like to say to
```

```
1    me in mitigation of sentence.  Anything?

2            MR. LIOUNIS:  Yes, I do, Your Honor.

3            THE COURT:  Go ahead, please.

4            MR. LIOUNIS:  I need a minute.  I'm sorry.  I have to

5    look through my notes.

6            THE COURT:  Yes.

7            MR. LIOUNIS:  (Perusing documents.)  I'm missing a

8    page.

9            (Pause in proceedings.)

10           THE COURT:  Please proceed, Mr. Liounis.

11           MR. LIOUNIS:  Yes.  I do.  Okay.  Your Honor, I ask

12   that if it's a possible, what we discussed as far as the

13   wording on the PSR being changed --

14           THE COURT:  Yes?

15           MR. LIOUNIS:  -- is that possible that that could be

16   confirmed prior to filing the Judgment and Conviction, to make

17   sure that it was done?

18           THE COURT:  Mr. Liounis, I eliminated -- I struck from

19   the pre-sentence report language relating to your conduct --

20           MR. LIOUNIS:  The same thing --

21           THE COURT:  -- affecting -- excuse me.

22           MR. LIOUNIS:  I'm sorry.  I thought you were finished.

23           THE COURT:  Relating to violence, right?  You wanted

24   that eliminated?

25           MR. LIOUNIS:  Yes.
```

```
 1          THE COURT:  Correct?  And it was.  And I directed the
 2     probation officer to eliminate that portion of the pre-sentence
 3     report which reflected that, but while we're on that --
 4          MR. LIOUNIS:  The only reason I'm asking is because
 5     the same thing was done in the SD New York and it was never
 6     done and I was not able to get the drug program which I needed
 7     at that time very badly.  That's why I'm asking.
 8          THE COURT:  All right, Mr. Liounis.  With respect to
 9     that, I'm reading from the sentencing proceeding before Judge
10     Hellerstein on your combined sentence, sentence combining your
11     Southern District indictment and your Nevada indictment.
12          This is Mr. Bachner, your lawyer, on page -- whatever
13     the page is of the -- on page 16, which are paragraphs 51 and
14     52 of the PSI, there's a reference over there, "In connection
15     with the extortion counts, that on October 1st, 1997, Rizzuto,
16     I think it indicates, at the direct of Culkin, Liounis and
17     Rizzo engaged in behavior relating to the extortion.  It's my
18     position, Your Honor, and I think the government would agree
19     with this, that the words of the direction -- let me not talk
20     on the behalf of the government, but let me talk on behalf of
21     Mr. Liounis -- it has always been Mr. Liounis' position as well
22     as frankly the position of the other defendants that whatever
23     physical assault occurred on the victim in this case was never
24     at the 'direction' of Mr. Liounis, or frankly, any of the other
25     co-defendants.  It was a foreseeable event to them, but it was
```

1    never at their direction".

2         And he went onto say, "Indeed, Your Honor, the

3    individuals who physically did what the indictment charges

4    would not take direction from Mr. Liounis or anyone else.  They

5    took direction from other people, Your Honor, in other

6    positions.  Indeed, Your Honor, the monies that were owed to

7    Mr. Liounis were owed by Mr. Liounis to other people.  The

8    other people who wanted that money paid back don't take

9    direction from Mr. Liounis or anyone else.  When Mr. Liounis

10   complained about the fact that the money hadn't been paid, it

11   was done essentially, Your Honor, on their own, to go down

12   there and pay a visit, but it was foreseeable to Mr. Liounis

13   that if individuals like this paid a visit and money wasn't

14   paid that a physical assault could occur and might occur, and

15   it was certainly foreseeable to him and in no way in anyway

16   attempt to mitigate his plea or any of the behavior involved."

17        All right.  Now, what else did you want to say?

18        MR. LIOUNIS:  I would like to put on the record --

19        THE COURT:  Yes?

20        MR. LIOUNIS:  -- a few cases for accumulative effects.

21   "On the addition of overlapping enhancements results in a

22   significant increase in the sentencing range, a departure may

23   be considered under 5K2.0."  See *U. S. versus Abiodun*,

24   A-B-I-O-D-U-N, 536 F. 3d 162, 170, Second Circuit, 2008.

25        THE COURT:  Mr. Liounis, these are matters that you

```
 1    can raise on appeal.

 2              MR. LIOUNIS:  I thought I had to put that on the

 3    record.  Okay.

 4              THE COURT:  All right.  Now, what do you want to say

 5    to me in mitigation of sentence?  Is there anything you'd like

 6    to say?

 7              MR. LIOUNIS:  Your Honor, what I'd like to say is, as

 8    I mentioned a while back, that at one time in life, you know, I

 9    went through a little bit of a rough time -- I shouldn't say

10    that it ever really ended -- but Peter Liounis did have a very

11    severe drug problem, alcohol problem and a gambling problem,

12    and this is something that -- I could sit here and say I never

13    really -- never got the help that I probably did need.  And

14    it's no excuse.  I know I should help myself.  But when you're

15    dealing and struggling with not one, but three different vices,

16    it's a little rough in life.

17              And I just want the Court to understand that there are

18    two Peter Liounises, and there's one who's not high, not drunk

19    or, you know, who's not messed up, and that person is a loving,

20    caring person and will do anything for anyone in this world and

21    has done that.

22              And then there's that person that -- it's hard to

23    explain, that I don't even know who he is at times.  And again,

24    unless you have any experience with what I'm talking about,

25    which I'm sure you do not, it's just something that I would
```

1    like the Court to consider that I never did receive any help.

2         That's why I mentioned that the wording, if it could

3    be possibly changed, in case this Court would recommend any

4    kind of programs that could help me, because the last time I

5    tried to get the residential program, it was denied because of

6    the reason I stated.  The wording was never -- was never

7    changed on the PSR to show that, you know, I really -- I had --

8    that I didn't have anything to do with the violence, that I

9    didn't order it.  And again, it's just something, you know,

10   that this dates back since childhood.  This is not something

11   that is new.

12        And I just want the Court to take under consideration

13   that Peter Liounis is not -- is not who he thinks he is and,

14   you know, and for the person who is the person on drugs and the

15   person who doesn't know any better because he's an idiot, that

16   person does apologize.  I apologize for that part of Peter

17   Liounis that is -- that is something that I really couldn't

18   ever really control.  And I'd like the Court to know that

19   before that you sentence me.

20        Somebody on drugs is very easily manipulated.  Someone

21   on drugs doesn't really know too much about what they're doing.

22   Sadly, they don't think about too many people.  They don't even

23   think about their immediate loved ones.  You know, when people

24   are on drugs, some people will stop at nothing.  And again,

25   they don't -- they don't consider it, and they don't consider

```
 1   any harm they do to anyone, whether it's a stranger, whether

 2   it's a loved one.  It could be a child.  It could be anybody.

 3   It's only about getting drugs, getting high.

 4        I was interviewed by my PSR officer, the probation

 5   officer, and he had asked me if I had any addictions and I was

 6   very clear on it, that I had addictions to oxycodone.  I had

 7   addictions to cocaine.

 8        I mean, if you hear discovery, there's discovery on my

 9   cell phone, of Peter Liounis' cell phone, I mean, which you

10   could clearly -- you could hear me talking about buying, you

11   know, a test, a pee-pee test, I usually would call it, from a

12   pharmacy to make sure that my urine is clean.  Well, Your

13   Honor, to be very upfront, I mean, I have purchased many, many,

14   many of those tests to make sure that my urine was clean.  And

15   again, I was really -- I was messed up out there.  And that's

16   the truth.  I was really messed up and I was messed up for a

17   long time.

18        And I apologize, but I never went and got the

19   treatment I needed.  I went right back to drugs.  I went right

20   back to alcohol.  And again, you know, when you're in that

21   circle, you start to meet up with people who are also in that

22   circle, doing the same drugs and drinking, and gambling.  And

23   you start to surround yourself with people like that, and

24   unfortunately, you start to -- you start to behave in old ways.

25        And no one put a gun to my head, but my vices, they
```

```
 1    were not small.  My vices were very, very severe.  I wasn't

 2    taking one pill.  I would take three, four pills.  I wasn't

 3    using a little bit of cocaine.  I was using a lot of cocaine.

 4    There was times I didn't sleep for three, four days because of

 5    what we would call a party, just being high, not realizing.

 6            And I really believe the Court should know this before

 7    you sentence me, that someone who's in their right mind is not

 8    ever going to harm anyone.  They're not.  And whenever I was in

 9    my right mind, Your Honor, I never hurt anyone in this world.

10            Even going back to that PSR, let me explain that.  The

11    God's honest truth, I did not send anyone.  I found out about

12    the violence after.  I never hurt anyone.  If the government

13    could bring someone in this courtroom that Peter Liounis ever

14    hurt -- I never hurt anyone.  I went through high school.  I

15    never even got suspended.  I never got in trouble.  I'm not a

16    violent person.  I'm a nonviolent offender.  I never hurt

17    anyone, never.

18            If I picked up a phone call during my last case and I

19    called Sharp Capital, there was more reasons than the Court

20    knows.  They were shorting the stock.  You could interpret it

21    either way, anyway you want.  But they were shorting the stock

22    and the stock was dropping.  When the stock drops, victims lose

23    money, people lose money.

24            If you look at my sentencing, Your Honor, on those

25    transcripts, there's a part there where I believe it's Ms.
```

1    Zornberg, the prosecutor even states that people were

2    misleading and misleading and misleading.  Well, she also

3    states Peter Liounis was not one of those people.  She makes it

4    very clear in the sentencing.  And I'm not saying that it was

5    Peter Liounis, because I -- it wasn't.  I'm not going to go

6    backwards.  At this point, I'm just -- I'm being upfront with

7    the Court.

8            Drug addiction, it's not a joke.  It's not a joke.

9    And you may think and Mr. Lerer may think prison is the

10   solution, and I don't think it's the solution, Your Honor.  I

11   don't think it's the solution because Peter Liounis went to

12   jail for seven years and in that seven years, I received no

13   help, zero, nothing.  I did a 20 hour program that really

14   was -- did nothing for me.  I returned back to society with

15   nothing, no training, no nothing, zero, nothing.  I had

16   nothing.  I had no money.  I literally was taken in by a

17   friend.  I had nothing.  Zero.

18           And it's, you know, you become depressed.  (Pausing.)

19   Give me one second.  (Pausing.)

20           And you become depressed -- depressed and you go

21   backwards.  There was nothing, nothing.  The only thing I knew

22   about was in high school, I became a stockbroker.  I didn't

23   know anything else.  I had no training, no skills.

24           But I came home, I couldn't find a job.  There was

25   nothing for me.  Zero.  But what was there?  People from the

```
 1    past, people who did drugs, people who promised you the world,

 2    people -- the point I'm making is, I came home.  I didn't have

 3    a shot.  I didn't have a prayer -- not a prayer, nothing.  I

 4    didn't have no money.  I didn't have nothing.  And when you go

 5    on drugs, Your Honor, you can't understand unless you live it.

 6         You would never understand what it's like to be on

 7    drugs for three or four days and not even know where you are,

 8    nothing.  And there's no income.  There's nothing.  There's

 9    nothing.  And then it just leads to other vices and other vices

10    and other vices.  It's like a rollercoaster ride.

11         I would rather go to a five year program, seven year

12    program, an eight year program, if that would -- if that would

13    help me.  I would admit myself to a program like that, which if

14    you asked me this question while I was free, I probably

15    wouldn't have done it.

16         But I've had time.  I have been in prison now for a

17    year.  And I'm not doing drugs here, and when you're in prison

18    and you're not doing drugs, you start to reflect and you start

19    to see what the decisions you've made.

20         I need programming.  I need help.  I don't need

21    prison.  Mr. Lerer says, "Oh, Mr. Liounis didn't learn his

22    lesson.  He did seven years.  Mr. Liounis didn't learn his

23    lesson."

24         Your Honor, I never got any help.  I never got help

25    for these addictions.
```

```
1            THE COURT:  Are you finished?

2            MR. LIOUNIS:  Yes.

3            THE COURT:  Does the government want to be heard?

4            MR. LERER:  Yes, Your Honor.

5       The government seeks a sentence of 365 months

6  imprisonment, the top of the Guideline range determined by the

7  Court.  The government does not seek a sentence like that

8  lightly.

9            In reviewing the materials, the government can find

10 nothing in the defendant's background, in the cruelty of the

11 offense, in his conduct during his entire life to warrant

12 anything other than the top of the Guidelines.

13           The Court is well familiar with the scheme.  The Court

14 is well familiar with the defendant's prior convictions.  He

15 received 87 months custody from Judge Hellerstein.  This

16 appeared to have absolutely no effect on the defendant.  He

17 returned to a life of crime immediately, committing the instant

18 offense while on supervised release.

19           The defendant pleads that no help was available to

20 him, but that's what's remarkable.  While on supervised

21 release, when the Probation Department was there to try to get

22 him on his feet, he turned immediately to crime.

23           The defendant claims that he was influenced by

24 addictions to drugs.  The Peter Liounis we hear on the calls

25 that we heard at the trial is extremely cogent, sophisticated,
```

 1   not a raving drug addict, a cold blooded criminal.

 2          The defendant says that he never hurt anyone.  There

 3   are 265 victims in this case.  All of them were hurt.

 4   Devastated --

 5          MR. LIOUNIS:  I was --

 6          MR. LERER:  It's my turn, sir.

 7          -- by Peter Liounis posing as Mark Anderson, James

 8   Weston, all the other names.

 9          I will just give a small sample of the victims.

10   Mr. Nissen, his father going into assisted living, the

11   defendant deprived him of the money in his account, then sent

12   him a fruit basket instead.  Mr. Zahler, a man in his eighties

13   with a heart condition.  Mr. Zahler called the government this

14   week, inquiring about the case.  Mr. Cuthbertson, who lost over

15   $1.5 million, some of which is money set aside to care for his

16   blind son.  The defendant has no remorse for what he did to

17   these individuals and is only seeking pity for himself.  The

18   crime here is remarkably cruel.

19          The defendant's history offers no mitigation, prior

20   convictions.  He's educated.  He graduated high school, some

21   college.  He was a licensed stockbroker.  He did not have to

22   commit these crimes.

23          He perjured himself in this court.  He accused an

24   innocent man, Chris Mertz, of the crime.  He has shown a

25   complete disregard for the truth throughout the entire

```
 1   proceedings in this case.
 2           But if I could make one point, out of the 3553(a)
 3   factors that arises above everything else and counsels for a
 4   lengthy prison sentence, it would be protecting the public.
 5   The defendant is unrepentant.  The defendant will commit this
 6   crime again the moment he is released from prison.  That
 7   appears to be a certainty.  Before Judge Hellerstein, he said
 8   that he would go straight, get an honest job, and he
 9   immediately committed crime.  It is a certainty that he will
10   commit this crime again.
11           The public needs to be protected from this man.  The
12   longer he is in jail, the longer a time it is before he can
13   prey on innocent people again.  The government seeks 365
14   months, Your Honor.
15           MR. LIOUNIS:  Your Honor, can I comment on that,
16   please?
17           THE COURT:  Sure.
18           MR. LIOUNIS:  Your Honor, if you listen to some of
19   these tapes, I think it's important where Mr. Lerer says, oh,
20   the person is disguising their voice, the person is disguising
21   their voice.  Your Honor, I'm not sure if you've ever heard
22   somebody who is a drunk or high or not doing well, but their
23   voice does change.  Okay?
24           I want to talk about my education.  I went to high
25   school.  I was an average student.  I studied very, very hard
```

```
 1    for my Series 7.  That license was taken away.

 2             When I came home, I did work.  I worked.  The only

 3    jobs I could find -- I found in Bella Mia Cafe, which I was a

 4    counterperson.  I worked every day.  I worked for All City

 5    Meats.  I maintained employment.  I worked very, very hard.  I

 6    tried.  I did everything I could.

 7             Mr. Lerer, I don't believe -- I'm sure doesn't have

 8    any past drug use.  To sit here and say any of that, it tells

 9    me you don't have anything -- any knowledge of drug abuse.

10             Drug abuse and alcohol abuse, even gambling are three

11    very serious vices.  They're very serious.  And if they're not

12    treated properly -- they're not treated -- I did not get any

13    help.  I didn't get any help.  You can't show me any help that

14    I received.

15             The PSR wasn't even changed on the last case.  When I

16    was pushing for the residential drug program, I was going to my

17    counselor constantly.  "I really need this program.  I need my

18    program."  They kept saying, you can't, because there's

19    violence written throughout the thing, and I kept telling them,

20    no, it's not.  It was changed.  Apparently, I was wrong.  It

21    was never changed.  I never got any help.  I never received any

22    help.

23             If you look at my family -- you look at my family

24    tree, sir.  I could stand here and I could say proudly, my

25    family, there are no criminals in my family.  Find me one.  I
```

```
 1    have I believe seven or eight doctors in my family.  Okay?  My
 2    mom and dad worked hard all their life.  My sister worked hard.
 3    I always worked hard.  How dare you?  How dare you say any of
 4    that?  I resent all of that.
 5          Drugs and alcohol, I don't wish on my worse enemy and
 6    you're asking for a sentence that absolutely -- absolutely is
 7    disgusting, when I'm sitting here and telling you from my heart
 8    that I've never gotten any help, that I have massive vices, and
 9    someone on drugs doesn't know what they're doing.  Okay?  They
10    don't know what they're doing.
11          My mother, I loved to death.  I would die for my
12    mother.  Do you have any idea how much money I have taken from
13    my own mother to buy drugs?  Do you have a clue?  I don't think
14    you have a clue, sir.  And I resent that you're saying these
15    things and I'm telling you now, it's not fair.  It's not fair.
16          THE COURT:  All right, Mr. Liounis.
17          MR. LIOUNIS:  No one here has an idea what drug abuse
18    is like.  I don't believe anyone in this courtroom has an idea
19    of that.
20          THE COURT:  All right.  Thank you very much,
21    Mr. Liounis.
22          Now, let me proceed to the sentence being imposed on
23    Mr. Liounis.
24          Let me deal with the 3553 factors.  The history and
25    characteristics of Mr. Liounis are pretty well summarized in
```

 1   the pre-sentence report.  He was born in Brooklyn in 1972.  His
 2   father was a retired waiter.  His mother, also retired, owned a
 3   beauty salon.  They lived together in Toms River, New Jersey.
 4   He has a sister, older.  She's unemployed.  She lives in
 5   Brooklyn.  Says he has a close relationship with her.
 6        Mr. Liounis married Lori Tesman in September of '09 in
 7   Staten Island.  She's a receptionist.  He has had no contact
 8   with her for two years.  There have been no children.  There
 9   were divorced in 2011, January 1st.
10        Mr. Liounis had lived in Brooklyn until the age of 25.
11   He then moved to Staten Island.  He was in prison from ages 29
12   to the 36.  He returned to Staten Island when he was released
13   and continued to live there until he was arrested in this case.
14        While he was in prison, he participated in educational
15   and vocational programs, and he had one minor disciplinary
16   infraction.
17        As far as his physical condition is concerned, he has
18   some allergies.  He has asthma.  He has a vascular problem in
19   his legs for which he had two surgeries while he was
20   incarcerated.  Occasionally, he has outbreaks of gout.
21        Now, he had a gambling addiction.  He suffered from
22   depression.  His mental health counsel -- or had mental health
23   counseling in New York for three months.  He had gambling
24   addiction treatment in 2008.  He requested, but didn't receive
25   counseling while he was at the MDC.

1              Now, in terms of his substance abuse, his pre-sentence

2    report reports he reported to his probation officer who

3    prepared this pre-sentence report that he began drinking

4    alcohol in his late teens, and when he wasn't incarcerated, he

5    consumed only a few drinks on social occasions, he said.  He

6    explained that his alcohol consumption was never excessive and

7    never an issue.

8              He informed the probation officer that he began

9    smoking marijuana in his late teens, used the drug infrequently

10   for a brief period of time.  He noted that he started using

11   cocaine in his late twenties, and used the drug approximately

12   once a month.

13             He explained that his biggest substance abuse problems

14   stem from his excessive use of oxycodone pills in the six

15   months prior to his arrest and incarceration for the instant

16   offense.  He explained that he suffered physical withdrawal in

17   the first few days of his incarceration which he dealt with on

18   his own.

19             He reported no history of substance abuse treatment,

20   as verified by the Probation Department supervision records;

21   however, he attended substance abuse treatment while confined

22   to a community correction center between October 2007 and March

23   of 2008.

24             Notably, he did not undergo any form of substance

25   abuse treatment while on supervised release for his prior

```
 1    federal conviction, and all of his random drug tests during his

 2    prior term of supervision were negative for the presence of

 3    illegal substances.

 4            He was a high school graduate, went to Fort Hamilton

 5    High School and he attended one semester of Staten Island

 6    College.  He had a Series 7 and 63 brokers license, which was

 7    suspended in 2001.

 8            His employment record is -- well, he's been unemployed

 9    since September of 2010.  From May through September of 2010 --

10    those are four months -- he worked for All City Meats in Jersey

11    City.  In April of 2009 to I think it's August or maybe

12    February of 2010, he worked for the Bella Mia Bakery and Cafe

13    in Bayonne, New Jersey.  For about a year, he worked for Noble

14    Review in Staten Island, and then from August 1st to March of

15    '08, from August of 2001 to March of 2008, he was incarcerated.

16    His tax return filings are very spotty.

17            His financial condition, he had a $200 checking

18    balance.  He owes in restitution $5,126,273.  He also owes

19    ConEd, ATT and an auto lease 3000 plus.  He owns 449 Brighton

20    Street in Staten Island that he bought in 1996 for $350,000,

21    and he has a 2012 Volkswagen.  There are outstanding judgments

22    in excess of $100,000.

23            His criminal history category, I think we've already

24    alluded to on several occasions.  He has a criminal history

25    category of IV.  The nature and circumstances of the offense
```

1    and also the history and characteristics of the defendant -- in

2    a cover letter that he sent to the Court -- cover letter

3    referring to his sentencing memorandum and his PSR

4    objections -- in his cover letter, he said he completed 300

5    hours of community service that was imposed by Judge

6    Hellerstein on his Southern District convictions.  That seems

7    to be belied -- it is.  It seems to be belied by paragraph 68

8    of his pre-sentence report, which says that he failed to

9    complete the required hours of community service.

10        He said in his cover letter that the victims who

11   testified suffered and it's very sad, but he's not the person

12   who did it to them.  He was held in contempt because he

13   couldn't handle all the lies and his own attorney's inactions.

14        It's not Mark Anderson.  He's innocent.  Mr. Gold, his

15   lawyer, who is his lawyer, he says, told the jurors he was

16   guilty.  He didn't receive a fair trial.  Gold's summation to

17   the jury he says was malicious, vindictive and false.

18        He testified under oath at trial.  He said he didn't

19   participate in this scheme to defraud investors in Grayson

20   Hewitt.  He says he never got a package in the mail in the name

21   of Mike Sloli, although I seem to recall there was a video of a

22   postal struck coming to the house in which he lived, I think,

23   addressed to Mike Sloli, which I believe to be Mr. Liounis,

24   came to the truck to pick up.

25        He didn't take money from a bank under false

```
 1    pretenses.  He deposited a check in his own name.  He said this
 2    is his trial testimony:  "It was a check in my name for under a
 3    thousand dollars that was not supposed to be deposited," but he
 4    deposited it.
 5         In pleading guilty to that bank fraud or robbery
 6    charge, he said he stole money in excess of a thousand dollars
 7    from a bank by stealing checks, cashing them at the bank, by
 8    fraudulently withdrawing money from accounts of third parties.
 9    That seems to be quite inconsistent with his testimony that it
10    was a check in his name for under a thousand dollars that was
11    not supposed to be deposited, but he deposited it.
12         At sentencing in April 2007, the Assistant United
13    States Attorney said, "Every time one of those checks was
14    stolen, every time someone's investment account was broken into
15    and fraudulent wire transfers were arranged, there was a
16    victim.  For example, a woman with diminished capabilities lost
17    her life fortune when Liounis and his cohorts transferred money
18    out of her account.  A man living in France suffering with
19    cancer wanted everyone to know without his knowledge, more than
20    half a million dollars was wire transferred out of his account.
21    And the person on the phone talking to the bank, pretending he
22    was the account owner to arrange the transfer was Peter
23    Liounis."  The transcript --
24              MR. LIOUNIS:  Where does it say that?
25              THE COURT:  -- at pages 12 and 13.
```

1          His attorney at sentencing said, "He knows what he did

2    was just horrible behavior.  He doesn't for a moment mitigate

3    the seriousness of what he did and the pain that he caused to a

4    lot of innocent people."  This was before Grayson Hewitt.  This

5    was with respect to the Southern District conviction and

6    sentence.

7          And then in his sentencing, he said to Judge

8    Hellerstein, "This is my opportunity to express openly how sad

9    and remorseful I am for all the pain that I have caused

10   innocent people.  For what I did, I deserve to be punished.  I

11   know my punishment will be serious and I accept that.  Maybe

12   jail is what I need to shock myself back to reality.  I beg you

13   to show me and my family some mercy in sentencing me.  There

14   really is a lot of good in me.  I ask you to please allow me a

15   chance to prove it."  This is a transcript in 99 CR 937, in

16   addition to the Nevada transcript.  They were both combined for

17   sentencing.  So it's a transcript of May 1, 2001, at pages 18

18   and 19 of that transcript.

19         And it wasn't long after he was released from prison

20   in 2008, after this plea before Judge Hellerstein that he knew

21   that he caused innocent people a lot of pain, he was sad about

22   it, he was remorseful, he then proceeded to incur and impose an

23   incredible amount of pain on an awful lot of innocent

24   hard-working people whose testimony I listened to during the

25   course of that trial.

```
 1              The Southern District New York crimes were not

 2    convictions following a trial by jury.  What is known about the

 3    pain caused to innocent people are only the statements that

 4    were made by the defense counsel and the government at

 5    sentencing.  I read some of those statements.

 6              The judges in those cases, McKenna and Hellerstein,

 7    didn't hear and almost feel the pain of his victims as they

 8    related that pain from the witness box.  I did.  I heard it

 9    from the mouths of those victims, and it was almost palpable.

10              I heard Mr. Nissen, who is a policeman from Kentucky,

11    talk about his father who needed some money to take care of

12    himself.  I think he was in a nursing home.  And Mr. Liounis

13    tells him there was just $3000 left, which he never sent him

14    anyway, when in fact, there was $23,000 left in that account,

15    and what Mr. Nissen's father got instead was a basket of fruit.

16              Arthur Zahler, a man in his eighties, remarried.

17    Invested not only his money but his wife's, his second wife's.

18    They were both hoping to retire on what they had saved, were

19    induced to send that money to Mr. Liounis, thinking they were

20    investing in Grayson Hewitt.

21              Ronald Cuthbertson, unbelievable.  He sent over a

22    million dollars to be invested in Grayson Hewitt.  And there

23    were others, Mr. Lamaggia, one or two others whose names I

24    didn't bother to write down.

25              These are people whose monies were saved as a result
```

```
 1    of hard work.  They saved it for retirement.  They saved it for

 2    children's education.  They saved it to pass on to

 3    grandchildren in the event of serious illness.  Mr. Nissen, he

 4    cared for an invalid.

 5              In listening to those telephone calls by Mr. Liounis

 6    to those innocent gullible people, callous, completely

 7    indifferent to all of that.  His only concern, his only aim was

 8    to extract from his innocent gullible victims more saved,

 9    hard-earned money by a very sophisticated scheme -- and all of

10    that while the patina of more than seven years in prison for

11    the same crime had barely begun to wear off on him.  History

12    and characteristics of Mr. Liounis.

13              That brings me to the 3553(a) Subdivision (2),

14    seriousness of the offense.  How does one calculate the

15    seriousness of this offense?  How does one calculate four or

16    three -- this was reduced 3,800,000 some-odd thousand dollars

17    extracted from 61 people of Grayson Hewitt, and for more than

18    200 some-odd people in Rockford, and the four victims in UBS,

19    who sent him $59,000.  How do you calculate the seriousness of

20    that offense?

21              We normally think of serious offenses as being an

22    assault, kidnapping, a murder.  It's one event.  One

23    significant piece of harm inflicted on one person, we regard

24    that as a serious offense.  This was harm of a different order.

25    This was depriving people of a lot of money which they earned
```

1    as a result of hard work, and hoped to be able to ease their

2    lives as they went on.

3            These crimes are serious.  These crimes are serious.

4    The 3553(a)(2) also speaks of the need for sentence to promote

5    respect for the law.  It says the statute is what the judge

6    tries to impress upon the defendant being sentenced, the

7    objective is to promote respect for the law.

8            What that means is not that by these statements that a

9    judge makes at sentencing and sort of verbally injects into the

10   head of the defendant some respect for the law.  It doesn't

11   mean that.  It means to get the defendant to understand and

12   understand in the very core of his being that the law means

13   what it says.  The law means what it says when you don't steal,

14   when you don't steal checks, when you don't extract money from

15   accounts that don't belong to you, when you lie, cheat,

16   deceive, innocent gullible people of their monies which they

17   worked hard to accumulate.

18           But you didn't believe that.  You didn't believe the

19   law means what it says.  Not only were you convicted of three

20   crimes in the Southern District of New York, all of which were

21   pretty much in piece for the crime for which you were convicted

22   here, but it wasn't long after you got out of prison that you

23   were at it all over again --

24           MR. LIOUNIS:  Drugs.

25           THE COURT:  -- inducing people from Grayson Hewitt,

```
 1   thinking they were investing money in a company that was buying
 2   hopefully the proceeds of lawsuits, that they would succeed.
 3          The record makes clear that you didn't believe that
 4   the law applied to you.  You have no respect for the law, for
 5   the sanctity of an oath.  I've heard your testimony that
 6   established that.
 7          What's just punishment?  3553(a)(2), tells the Court
 8   to consider -- should be significant enough to make you
 9   understand that the law does mean what it says when it says
10   certain conduct is unlawful.
11          All the factors that 3553(a) advise the Court to
12   consider courts from time and memorial have been considering
13   deterrence as a significant objective of sentencing.
14   Unfortunately, it doesn't really work.
15          Specific deterrence didn't work in Mr. Liounis' case.
16   If it had worked after he had been sentenced to 87 months, he
17   would have learned not to commit crime again, would have
18   deterred him from committing crime again, but it didn't deter
19   him at all.  And general deterrence --
20          MR. LIOUNIS:  Your Honor --
21          THE COURT:  -- of all the victims --
22          MR. LIOUNIS:  Drugs, Your Honor.  You don't
23   understand.
24          THE COURT:  I'm sorry?
25          MR. LIOUNIS:  I did drugs.  I did drugs.  Nobody's
```

1    understanding how serious drugs -- no one's even talking about

2    that.

3                THE COURT:  Well, your pre-sentence report --

4                MR. LIOUNIS:  You don't think about anything, Your

5    Honor, when you're on drugs.  You don't think about nothing,

6    nothing, zero.

7                THE COURT:  Your pre-sentence report which I've read

8    didn't suggest that your drug problem was all that serious.

9    But in any event --

10               MR. LIOUNIS:  It's very serious.

11               THE COURT:  -- excuse me.  But in any event, being on

12   drugs doesn't excuse the commission of crime.

13               MR. LIOUNIS:  And all these things that are being

14   said, Your Honor, you're saying 250 people is attributable to

15   me.  Why?  Why is that attributable to Peter Liounis?

16               THE COURT:  Let me proceed with respect to the

17   sentence.

18               On Count 1 -- this is after I've considered -- I have

19   considered carefully the 3553 factors, and I've considered and

20   thought carefully during the seven days of this trial -- I

21   think it was seven full days of this trial -- in the weeks and

22   months since, how much pain, how much suffering has been caused

23   to people who were induced to part with money which they worked

24   very hard to accumulate and how much harm that caused those

25   people and their families.

```
 1              Count 1, I'm going to commit Mr. Liounis to the
 2    custody of the Attorney General for a period of 240 months,
 3    three years of supervised release, $100 special assessment and
 4    restitution to be paid to the known victims of the Grayson
 5    Hewitt fraud, and they're known and the amounts of their loss
 6    is known, in an amount of $3,864,080.11.  Restitution is to
 7    paid at the rate of $25 a month while he's in custody and ten
 8    percent of his gross monthly income thereafter.
 9              On Counts 2 through 7 and 8, each of those counts, 240
10    months concurrent to each other and with Count 1, and three
11    years of supervised release on each count, $100 special
12    assessment on each count.
13              And then on Count 9, 52 months in the custody of the
14    Attorney General, consecutive to all the others, plus three
15    years of supervised release and $100 special assessment, for a
16    total special assessment of $900.
17              The three years supervised release term will all be
18    concurrent.  I believe the law requires it.
19              There's no fine.  According to information reflected
20    in the pre-sentence report, he doesn't have it.
21              As far as the supervised release is concerned, the
22    terms of the supervised release should include that he comply
23    with the order of restitution, that he make full financial
24    disclosure to the Probation Department, as they may direct him
25    to, to participate in mental health treatment programs approved
```

1    by the Probation Department, contribute to the cost of those

2    programs to the extent that he's reasonably able to do so.

3          He is prohibited from any employment involving

4    securities, and his employment, if he does have any, it will be

5    verified by the Probation Department.

6          He is to participate in either an inpatient or

7    outpatient drug treatment and detoxification programs approved

8    by the Probation Department and submit to drug testing as the

9    Probation Department may require him to.

10         I believe there's still an underlying indictment that

11   may still be out there, is there?  The first indictment, in

12   which the Rockford Group and the UBS, those counts were

13   dismissed.  Is that indictment still there?

14         MR. LERER:  Your Honor, I think there were counts of

15   this indictment.  There are open counts, sir.

16         THE COURT:  Pardon?

17         MR. LERER:  There were open counts, sir, yes.

18         THE COURT:  The counts were dismissed?

19         MR. LERER:  Yes, sir.

20         THE COURT:  So what's left of the open counts?  There

21   is no other underlying indictment, is that correct?

22         MR. LERER:  Yes, sir.  Yes, sir.

23         THE COURT:  Now Mr. Liounis, I'm advising you that you

24   have a right to appeal your conviction and your sentence, and

25   if you can't afford to pay for the cost of an appeal, you can

1    make an application to have the costs waived.

2            These proceedings are concluded.

3            MR. LIOUNIS:  Your Honor, can I just put something on

4    the record for the sentencing?

5            THE COURT:  Surely.

6            MR. LIOUNIS:  I just want to put on the record that

7    I'm objecting to the reasonableness of the sentence, and that

8    the Court has not adequately considered any of my issues raised

9    regarding the sentencing; moreover, the Court has failed to

10   meaningfully consider the defendant's arguments and failed to

11   explain one or more aspects of the sentences imposed as it

12   compares to any type of culpability to the defendant at all.

13           I have -- I have some things I would like to ask the

14   Court related to the sentencing.  Number one is, I would ask if

15   the Court could -- I would definitely -- I want to file a

16   direct appeal, and if the Court could perhaps appoint me

17   appellate counsel --

18           THE COURT:  The Second Circuit will do that.

19           MR. LIOUNIS:  -- from the public defenders office?

20           THE COURT:  I think the Second Circuit will do that.

21   I think the Court of Appeals will do that.

22           MR. LIOUNIS:  I don't know how to do that.  I'm saying

23   I don't know how to do any of that.  That's why I'm asking if I

24   could have appellate counsel appointed to help me with that.

25           THE COURT:  I'll ask somebody in the Federal Defenders

```
 1    office to assist you, to the extent they will.

 2            What else?

 3            MR. LIOUNIS:  I also -- the drug program.  Can you

 4    recommend a residential drug program for myself?

 5            THE COURT:  To the extent that that might be

 6    appropriate, I'll tell the Bureau of Prisons to consider it.

 7            MR. LIOUNIS:  I was also wondering --

 8            THE COURT:  Yes?

 9            MR. LIOUNIS:  -- if you could recommend to have a

10    program where you could be with your family a little bit

11    sooner?  It's called home confinement.  Judges are making

12    recommendations up to two years.  Could you recommend that?

13            THE COURT:  Not at this point, Mr. Liounis.

14            MR. LIOUNIS:  I'd like to ask you about credit for

15    time served.

16            THE COURT:  Those are determinations that are made by

17    the Bureau of Prisons.  They make a determination with respect

18    to time served.

19            MR. LIOUNIS:  The credit?  I'm sorry?

20            THE COURT:  The Bureau of Prisons makes those

21    determinations.  I think the statute is very specific about

22    that.

23            MR. LIOUNIS:  Now, Your Honor, does this -- does this

24    sentence in any way related to my sentence in the SD New York

25    --
```

```
 1              THE COURT:  Nothing to do with this.

 2              MR. LIOUNIS:  -- any of the charges?  Is there

 3    anything under 5(g)(1) that would relate to any of this?

 4              THE COURT:  Nothing will.

 5              MR. LIOUNIS:  Now, as far as the time that I've been

 6    in prison right now, I've been in prison for I believe it's two

 7    and-a-half years.  You're saying that would automatically --

 8    I'm confused.

 9              THE COURT:  Mr. Liounis, the Bureau of Prisons will be

10    aware of all the time you have you a spent in prison in

11    relation to the case.

12              MR. LIOUNIS:  Would be nine and-a-half years?

13              THE COURT:  And then --

14              MR. LIOUNIS:  Go ahead.  I'm sorry.

15              THE COURT:  I said in relation to this case, not in

16    relation to the time you served as a result of your Southern

17    District sentence.  That's over.  You have served that term.

18    You're finished with that.  You then proceeded to commit new

19    crimes for which you've been convicted and for which you have

20    just been sentenced.

21              And as far as your computation of time, time served

22    that you may be entitled to credit for, that will be a

23    determination made by the Bureau of Prisons, not by me.

24              MR. LIOUNIS:  Were there any -- aren't some of those

25    counts related to counts that were not dismissed from my SD New
```

1    York?  There was approximately eight counts that were not

2    dismissed.

3              THE COURT:  I have nothing to do with the Southern

4    District of New York.  I have no jurisdiction of indictments

5    that have been filed in the Southern District of New York.  I

6    have nothing to do with those except that those convictions

7    have been considered in determining what your criminal history

8    category is.

9              MR. LIOUNIS:  You said -- just to recap -- you said

10   240 months on Count 1?

11             THE COURT:  240 months on Count 1, Counts 2 through 7

12   and 8, and 52 months on Count 9, consecutive to the concurrent

13   counts of 240 months on the preceding eight.

14             MR. LIOUNIS:  Thank you.  Is there a -- how many years

15   in prison is that?

16             THE COURT:  If you divide 292 by 12, I think that will

17   give you the answer.

18             MR. LIOUNIS:  Divide 292 by 12?  Is that what he said,

19   divide 292 by 12?

20             THE COURT:  I think we're finished.

21             Anything else?

22             MR. LERER:  No, Your Honor.

23             (Proceedings concluded.)

24

25