RECEIVED

AUG 03 2021

PRO SE OFFICE

Peter Liounis, Pro-se
Reg No. 48332-054
FCI - Gilmer
P.O. Box 6000
Glenville WV 26351

July 28, 2021

Docket: 1: 12-cr-00350-1 (ILG)

Office of the Clerk
United States District Court
For the Eastern District of New York
225 Cadman Plaza, East
Brooklyn Heights NY 11201
certified mail/signature Confirmation No. 7020 1290 0002 2627 1834

Dear Clerk of the Court,

Please file the enclosed: motion For Release From
Detension Based on The COVID-19 Pandemic: Compassionate
Release From Bureau of Prisons Facility And motion For
Appointment of Counsel And motion to Expedite This
matter. along with all attached Exhibits in support
A-1 through A-103, Thank you kindly.

Very Sincerely
Pete e
Peter Liounis
Reg No. 48332-054

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA )
)
)
V. )
)
)
PETER LIOUNIS, )
        Defendant. )

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 03 2021 ★

BROOKLYN OFFICE

12-cr-00350(ILG)

RECEIVED AUG 03 2021 PRO SE OFFICE

MOTION FOR RELEASE FROM DETENSION BASED ON THE
COVID-19 PANDEMIC: COMPASSIONATE RELEASE FROM
BUREAU OF PRISONS FACILITY AND MOTION FOR
APPOINTMENT OF COUNSEL AND MOTION TO EXPEDITE
THIS MATTER

        Peter Liounis, Pro-se, hereinafter ("Defendant")
files this motion for release from detension based on the
covid-19 Pandemic: compassionate Release from the Bureau
of Prisons Facility and motion for appointment of Counsel
from the Bureau of Prisons Federal Correctional Institution-
Gilmer in West Virginia, Furthermore, Defendant prays that the above
motions be expedited because dangerous variants are quickly heading his way.
        On April 27, 2021, Defendant submitted a request for
compassionate Release to warden wolfe here at FCI-Gilmer, on
5/17/2021, warden wolfe denied Defendants motion for Compassionate
Release, Defendant now brings this motion for release from detension
based on Covid-19 Pandemic: compassionate release from the Bureau of
Prisons facility and motion for appointment of Counsel to ISRAEL
LEO GLASSER, senior united states District Court Judge for the
Eastern District of New York and prays for immediate release/
time Served based on the law. see attached Exhibit A-1: Request

for compassionate release, see also Attached Exhibit A-2 : certified mail and Return slips No, 7020 0640 0000 0320 3649, see also Attached Exhibit A-3 : Denial by warden wolfe.

## BACKGROUND

An Indictment was issued on 5/17/12. Prior to trial the government offered the Defendant a 10 years plea offer on the indictment. Defendant refused the offer and proceeded to trial under Actual Innocence. Defendant was tried on 9 non violent felony Counts, convicted, and sentenced to 292 months. Respectfully, the government felt that 10 years was sufficient punishment and as of today Defendant has served over 10 years with good-time credit. Furthermore, Defendant's sentence was substantially increased by uncharged/dismissed criminal conduct and an overstated prior criminal history category of IV. The 10 year plea offer was conveyed via Email by Defense Attorney Michael Gold.

## ARGUMENT

I. EXTRAORDINARY AND COMPELLING REASONS IN SUPPORT OF IMMEDIATE SENTENCE REDUCTION TO TIME SERVED

Defendant has a medical diagnosis of Hypertension, Asthma, shortness of breath, morbid obesity, sleep apnea requiring the use of a CPAP machine, vascular disease, chronic gout, allergic rhinitis, chronic sinusitis, Lymphoma; abnormal configuration of the left hilar region which presents a bulging contour of the left cardiac border, and slight compression of the body of T11. Defendant is at high risk of complications from Covid-19. see Attached Exhibit : A-4 through A-88, medical records of Defendant.

Page 2 of 29

Defendant has an extraordinary and compelling reason for release under the law, this despite the defendant having received two doses of the Pfizer-Bio Ntech vaccine. Pfizer has already released information to the public that their "vaccine" is likely going to need a booster shot to increase its effectiveness. see https://www.pfizer.com/news/press-release/press-release-detail/pfizer-initiates-study-exploring-coadministration-its-20 (last visited June 1, 2021). Defendant's vaccine is set to expire on July 1 2021. Defendant volunteered to be fully vaccinated because he's afraid of Covid-19. However, defendant is still in danger here at Gilmer.

## II. THE COVID-19 CRISIS IN PRISON

Covid-19 is a highly contagious disease caused by a "novel coronavirus" that spreads primarily through person to person contact. Although most people experience relatively mild symptoms such as fever and cough, "the effects of Covid-19 can be drastically more severe in older individuals or those with medical conditions." Thakker v. Doll, No. 1:20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa Mar, 31 2020). "In some cases, COVID-19 can cause serious, potentially permanent damage to lung tissue, and can require extensive use of a ventilator. The virus can also place greater strain on the heart muscle and can cause damage to the immune system and kidneys. These long term consequences and the likelihood of fatality increase in those of advanced age and those with other medical conditions. For those in high risk categories, the fatality rate is thought to be approximately fifteen percent." Id. (citations omitted).

Page 3 of 29

"While the Covid-19 pandemic is devastating in every region it invades", it "presents an extraordinary and unprecedented threat to incarcerated individuals", who are not "free to take the protective measures" recommended by the public health experts, such as frequent handwashing and maintaining six feet of distance from others. Samy, 2020 WL 1888842 at *4, Sepacta, 2020 WL 1910481, at *9, United States v. Esparza, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7 2020). "Social distancing" which is "a crucial part of containing the spread of Covid-19", is "nearly impossible" in the "congregate settings" of prisons, where "large numbers of inmates are held in crowded, closed facilities", and prison staff circulate in and out every day, carrying the virus back and forth between the prisons and the surrounding community. Banks v. Booth, No. cv 20-849 (CKK), 2020 WL 1914896, at *4, *7 (D.D.C. Apr. 19 2020), United States v. Williams, No. 3:04 cr 95/mcr, 2020 WL 1751545, at *2 (N.D. Fla. Apr. 1 2020). See also CDC, Interim Guidance on management of coronavirus disease 2019 (COVID-19) in correctional and Detention facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detension/guidance-correctional-detension-html (last visited June 9, 2021).

The spread of Covid-19 in prisons is further exacerbated by "poorly ventilated" facilities and "limited access to hygiene products" Banks 2020 WL 1914896, at *4, Sepacta, 2020 WL 1910481, at *7. And because prisons lack the medical staff and equipment needed to monitor and treat large numbers of infected patients, those who develop severe complications may not receive timely treatment, making

Schnepel Design. pdf ("the daily churn of staff and visitors along with the admission and release of imprisoned people may facilitate the spread of the virus both inside and outside of the prison"). "Once a case of COVID-19 is identified in a facility, it will likely be too late to prevent a widespread outbreak." united states v. Gileno, No. 3:19-CR-161-(VAB)-1, 2020 WL 1916773, at *4 (D. conn. Apr. 20, 2020) (brackets omitted). "The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks." Id., and "each day, perhaps each hour, that elapses threatens incarcerated defendant's with greater peril." united states v. Atkinson, No 2:19-CR-55 JCM (CWH), 2020 WL 1904585, at *2 (D. Nev, Apr. 17, 2020) (quoting united states v. Gross, No. 15-CR-769 (AJN), 2020 WL 1673244, at *3 (SDNY, Apr. 6, 2020)). Accordingly, public health experts and government officials have called for the immediate and dramatic reduction of the nation's prison population, beginning with those most vulnerable to COVID-19. see COVID-19: Public Health Experts Implore President Trump to Release people in Federal Prisons and Ice Detension centers (mar. 27, 2020), https://www.publichealthpublicsafety.org/; mem. from Atty Gen. William Bar to Director of BoP(Apr. 3, 2020), https://www.justice.gov/file/126661/download. And an "overwhelming" number of federal courts have answered that call by granting compassionate release to prisoners whose advanced age or preexisting medical conditions place them at heightened risk of complications from COVID-19. Samy, 2020 WL 1888842, at *4 (ocollecting cases), even when the BoP facility has not yet reported a confirmed case of COVID-19, recognizing that to wait for a confirmed outbreak may be too late. see e.g. united states v. Harris, No. 19-356, 2020 WL 1503444

Page 6 of 29

them less likely to recover and survive, see Danielle Ivory, "we are
not a Hospital": A prison Braces for the coronavirus, N.Y. TIMES (Mar.
17, 2020), https://www.ny times.com/2020/03/17/us/coronavirus-
prisons-jails.html ("we don't have ventilators on hand at all, we
are not a hospital, we don't have the medical staff"), "In light of
this reality, courts around the country have recognized that the risk
of COVID-19 to people held in jails and prisons is significantly higher
than in the community, both in terms of risk of transmission,
exposure, and harm to individuals who become infected," williams,
2020 WL 1751545, at *2 (collecting cases), see also Banks 2020
WL 1914896, at *4. Indeed, despite the BOP's aggressive measure
to combat the spread of COVID-19, including confining all inmates
to their cells for 14 days see BOP, COVID-19 Action Plan: Phase Five, https:
//www.bop.gov/resources/news/20200331 covid 19 action plan 5.jsp.;
The question whether the government can protect inmates from COVID-19
is being answered every day, as "new" outbreaks appear daily in BOP
facilities, Rodriguez, 2020 WL 1627331 at *1. For example, as of
June 9, 2021, the current COVID-19 infection rate within the
BOP is 209 (84 federal inmates and 125 BOP staff), and there have
been 238 federal inmate deaths and 4 BOP staff members deaths
attributed to the disease, see BOP, COVID-19 Cases, https://www.
bop.gov/coronavirus/index.jsp (updated daily), And while the data
reported by the BOP almost certainly underrepresents the number of
actual cases, Esparza, 2020 WL 1696084, at *2, even the reported
data shows that the rate of infection in BOP facilities is
significantly higher than the general public, see https://cdn.ymaws.
com/councilonci.org/resource/resmgr/covid commission/FINAL.

Page 5 of 29

(D.D.C. mar. 27, 2020) ("uncertainty is endemic in the present circumstances, and that uncertainty cannot preclude courts from acting until the damage has been done"), united states v. Feilela, 3:19-cR-79, 2020 WL 1457877, at *1 (D. Conn. mar. 20, 2020); Asaro, 2020 WL 1899221, at *6, williams, 2020 WL 1751545, at *3, see also, e.g., matthew J. Akiyama et al, Flattening the Curve for Incarcerated populations -Covid-19 in Jails and Prison, N. ENG. J. MED. (Apr. 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687.

Respectfully, covid-19 is still a developing pandemic. Not all the risk factors are known, still more dangerous is the virus variants now rapidly spreading throughout the united states. Public-health officials warn that even if more people are vaccinated, the pandemic will not end until midsummer (at the earliest) without ongoing social distancing - which is virtually impossible in prison. (see matthew Conlen et al, why Vaccines Alone will not End the Pandemic, N.Y. Times (Jan 24, 2021) http://www.nytimes.com/interactive/2021/01/24/us/covid-vaccine-rollout.html.

An article published on April 29, 2021, in the New England Journal of medicine highlights the very issue regarding Covid-19, vaccine and prisons: "the goal of widespread vaccination is to prevent disease and to enable broad swaths of the population to eventually achieve herd immunity to the virus. As more people are vaccinated, the virus will have fewer opportunities to replicate and spread, and it will cease being a population-level threat. Yet David Paltiel and colleagues have shown that even a highly efficacious vaccine will have suboptimal preventive effects in high spread, congregate Settings." see https://

Page 7 of 29

www.nejm.org/doi/full/10.1056/NEJMp2100609 (Attached as Exhibit ___ ). A vaccine with low efficacy (e.g. 25%) can have powerful preventive effect in areas where the effective reproduction number of the virus is low (e.g. $R_t = 1.5$). By Contrast, a vaccine with much higher efficacy (e.g., 75%) can nonetheless fail to prevent a large proportion of severe cases and deaths when deployed in areas where the effective reproduction number is high (e.g., $R_t = 2.1$). Therefore, Paltiel et al. explain, "even a vaccine with seemingly adequate efficacy, pace, and coverage may be insufficient to alter the fundamental population dynamics that produce high disease prevalence." This warning points to the need to combine vaccination with "a sustained commitment to the public health practices and tools known to reduce the spread of Covid-19." see https://www.nejm.org/doi/full/10.1056/NEJMp2100609.

When applied to the U.S. carceral context, with its approximately 2.3 million incarcerated people, 420,000 guards, and 11 million jail admissions and releases per year—churn that results in 55% turnover in the jail population each week, providing a constant supply of people who may not have been previously exposed to SARS-CoV-2 and ensuring that carceral and community health are intertwined— this warning is ominous. In this setting, even a vaccine with 90% efficacy will leave many people at ongoing risk for Covid-19, given the extraordinarily high rate of transmission in jails and prisons attributable to rampant overcrowding, inadequate testing and health care, high-volume daily inflow and outflow of staff and detainees, lack of personal protective equipment, and normalized systematic neglect of the welfare of incarcerated people. In fact, Lisa Puglisi and colleagues found the SARS-CoV-2 basic

reproduction number in a large urban U.S. jail to be 8.44 - the highest known basic reproduction number in any context in the world. From this and several other studies, it is clear that transmission dynamics in many jails and prisons exceed the threshold for what Paltiel and colleagues identify as high-severity environments, in which the effectiveness of vaccines is considerably diminished. see https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 1, 2021).

Finally, we should anticipate high rates of vaccine hesitancy among staff and especially among incarcerated people, who have been offered little to no educational material about Covid-19 vaccines and have abundant reasons for distrust, given U.S. carceral facilities' long-standing violations of basic human rights and histories of abuse. For example, a recent survey in a Massachusetts jail that had already had more than 130 Covid-19 cases found that only 40% of detained persons would volunteer for vaccination - a finding that is more likely to be the norm than the exception. It will therefore be a considerable challenge to foster the especially high rate of vaccine uptake required in carceral facilities to reduce effective reproduction numbers to levels adequate to end epidemic transmission chains. see https://www.nejm.org/doi/full/10.1056/NEJMp2100609 (attached as Exhibit A-89 through A-91.

Taken in isolation, Defendant agrees that the mere presence of COVID-19 does not equate to an extraordinary and compelling reason. However, Defendant lives on a cellblock with 128 inmates making it impossible to social distance. FCI-Gilmer

has recently received many additional inmates due to many private prison closures adding to the overcrowded conditions, many inmates and staff either wear their masks under their chins or do not wear a mask sat all. many inmates and staff on Defendants' cellblock have refused the vaccine and this further complicates issues for the continued spread of covid-19, Defendants' pfizer vaccine is set to expire on July/2021, and dangerous virus variants are quickly spreading throughout the united States. all of this coupled with Defendants' medical diagnosis of Hypertension, Asthma, shortness of breath, morbid obesity, sleep Apnea requiring the use of a CPAP machine, vascular disease, chronic gout, allergic rhinitis, chronic sinusitis, Lymphoma, abnormal configuration of the left hilar region which presents a bulging contour of the left cardiac border, and slight compression of the body of T11, is what creates an extraordinary and compelling reason.

      Courts have granted compassionate release motions in light of defendants' respiratory conditions on numerous occasions, see e.g., united states v. Rich, cr. No. 17-cr-094-Lm, 2020 WL 2949365, at *3-4 (D. N. H. June 3, 2020) (concluding that defendants' history of bronchitis and other respiratory issues, combined with the increased likelihood that he would contract COVID-19 in federal prison, constituted an extraordinary and compelling circumstance supporting his release). In addition, courts have granted compassionate release even in cases where defendants' have previously contracted COVID-19 and/or where they have been fully vaccinated, see united states v. Benson, 2020 WL 7239983, at *1 (D. md. Dec. 9, 2020) (granting compassionate release to defendant who served 10 years on cocaine

conviction, tested positive for COVID-19, defendant had the following conditions: hypertension, hyperlipidema, overweight, prediabetic),, united states v. Martinez, 2020 WL 7447513 at *1 (D.N.M, Dec. 18 2020) (granting compassionate release to defendant who served 24 months of 60 months sentence, tested positive, had bad symptoms and continued to have bad symptoms, and diagnosed with diabetes and hypertension), united states v. Easton, 1:18cr22 (EO NO) ("The fact he has already tested positive for COVID does not mean he is no longer at risk, although it does prove the BoP cannot protect him from the virus"). united states v. Keys, 2020 WL 6700412, at *1 (FD. Cal. Nov. 13, 2020) (defendant served 47 months of his 84-month sentence for heroin, diagnosed with asthma, hepatitis B, possible hypertension, high cholesterol, extreme obesity and tested positive, "Lack of scientific certainty regarding whether reinfection is possible"), united states v. Hernandez, 2020 WL 5521035, at *1 (D. Haw. Sept. 14, 2020)(defendant sentenced to 240 months, served 15 years, was 59 years old and obese, tested positive for COVID, no symptoms), united states v. Galu, 2020 WL 5521034, at *1 (D. Haw. Sept. 14, 2020) (48-year old defendant with underlying medical conditions (morbid obesity, hypertension, sleep apnea, asthma, and kidney disease), served 7 years on then-mandatory minimum of 20 years, tested positive, court found "while Galu might not be in immediate danger of being reinfected, the possibility that he will be exposed to the virus again in the future cannot be ignored"), united states v. Nelson, 2020 WL 5203567, at *2 (D.S.C. Sept. 1, 2020)(63 year old defendant serving life sentence contracted covid-19 and was in the ICU for two days, Life Sentence.

Page 11 of 29

III.   DEFENDANT IS NOT A DANGER TO THE SAFETY OF ANY OTHER PERSON OR TO THE COMMUNITY AND IS REHABILITATED

Here, Defendant denies any involvement in the instant case and Defendant was previously convicted of similar criminal offenses prior to beginning this current sentence. But Courts employing this analysis weigh a defendants' criminal conduct against any mitigating elements, focusing on the defendants' "current" risk to the community. See, e.g., Hopson, 2020 WL 2739533 at *5. [Emphasis added], (noting the seriousness of defendants' crimes, but finding that "the relevant factors unrelated to [defendants'] offenses and criminal history" supported the finding that he did not pose a danger to the community). see Also Hopson, 2020 WL 2739533, at *4 (finding that "[defendant's] efforts at rehabilitation established that [his] release does not endanger the safety of any other person or the community"). Bartrum 2020 WL 3618563, at *7 (granting compassionate release and explaining that defendant committed the underlying offenses "30 years ago... [and] has made significant steps toward rehabilitation").

Respectfully, Defendant is now 49 years old, not a danger to the safety of any other person or the community, and is in fact rehabilitated and thinking clearly as follows. Defendant is not the same person that entered prison in 2012. Here, Defendant proceeded to trial under Actual Innocence. However, Defendant does sincerely apologize to ISRAEL LEO GLASER, senior united states District Court Judge for his disruptive and disrespectful behavior throughout the proceedings. From 2012 through 2014 Defendant was taking prescription pills that belonged to other inmates and therefore

acted like a crash dummy. See Letter of Defendant A-92 through A-94. Upon arrival to FCI-Gilmer in 2014, Defendant chose to stop taking drugs and live a clean, healthy, and productive life. From 2014 to present, Defendant attends religious services which can be confirmed by chaplin Hong here at FCI-Gilmer. has completed the HVAC program in full, received his Associate Degree in Science and Bachelor Degree in Business Management from Glenville State College; completed the Drug Education Program, and completed the following ACE Programs: Decision Making, Critical Thinking, Web Design, Adobe Level 1, Develop Leadership Problem Solving, and Financial Budgeting. Additionally, Defendant has a low recividism score under the First Step Act, and unit team will be reducing Defendants custody classification from low to minimum security level within the next 6 months. Unit Team states: "Inmate Liounis arrived at FCI-Gilmer in September 2014. During his initial classification he was instructed to enroll in educational programs, and to obtain institutional employment. He has continuously complied with the unit team's recommendations since that time, and as a result his custody classification will be reducing to a minimum security within the next six months." See Attached Exhibit A-95 through A-99: Summary Reentry Plan - Progress Report ("SRP-Progress Report") Id at page 1.

Defendant has maintained employment. Unit Team states: "Inmate Liounis is currently employed as a B1 unit orderly where he receives positive work evaluations.

Page 13 of 29

He complies with all required tasks and completes them in a timely manner. Prior to this employment, inmate Liounis has continuously maintained institutional employment and his work evaluations were always positive." Id at page 1 of SRP-Progress Report.

Defendant received one minor write up in over 9 years. Prior to arriving at FCI-Gilmer, Defendant received a 306 violation for refusing work / PEM statement. Respectfully, Defendant is and continues to be a model inmate. Unit Team states: "Inmate Liounis has maintained clear conduct since 2014. He complies with all institutional rules and regulations, and he follows instructions given by staff members. He has developed a good rapport with other inmates and staff. Additionally, he has assisted other inmates with procedural documents." Id at page 2 of SRP-Progress Report. Lastly, Defendant is complying with his FRP Payment Plan. Unit Team states: "Inmate Liounis is participating in the Inmate Financial Responsibility Program and is making his Court ordered payments as agreed." Id at pages 3 and 4 of SRP-Progress Report.

Defendant's record while in custody shows that he has been a model inmate and that he is committed to his faith, education, improvement, relationships, and work duties. Defendant has had an overall positive adjustment to incarceration and has spent the last 7 years as a drug free inmate passing all Drug tests, voluntarily participating

in programs, and preparing to be a productive member of society despite having a 292 month sentence. Defendant is a changed man who possesses the skills and confidence to succeed. Defendant is now 49 years old and has substantially changed his outlook on life and his decision making process, grown a stronger family support system, vows to remain drug free, and is deep into his faith. Here, Defendant has demonstrated that he is capable of living a normal, drug free, and productive life as a law abiding citizen upon release, see Exhibit A-92 through A-94, Letter of Defendant. Furthermore, Defendant has served over 16 years in federal prison between his 2001, 2007, and 2014 convictions, and the Defendant has no write-ups for any violence or any aggressive behavior. Defendant is not a violent individual in any way shape or form. All combined Defendant has proven that he is not a danger to the safety of any other person or the community, and that he is rehabilitated. see united states v. ONeil, No. 3:11-cr-00017, 2020 WL 2899236, at *8 (s.o. Iowa June 2, 2020)("Defendant is now forty-five years old, making him about half as likely to be convicted of a crime as a defendant released in his twenties." (citing u.s. Sent'g Comm'n, the Effects of Aging on Recidivism Among Federal offenders, 23 (2017)), united states v. Reyes, No. 04 cR 970, 2020 wL 1663129, at *3-4 (N.O.Ill., Apr. 3, 2020)(noting that "recidivism is less likely with age" and that because of [defendant's] age he is less likely to re-offend"). Defendant is 49 years old and sadly it has taken him a long time to realize what is important in life and what is not, see Letter of Defendant Id at page 2.

IV.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WEIGH IN
      FAVOR OF MODIFYING DEFENDANT'S SENTENCE TO TIME SERVED

        Here, the government offered the Defendant a plea
offer of 10 years regarding the non-violent instant
offense. The government felt that 10 years was sufficient
punishment for the non-violent criminal offenses. Respectfully,
had the Defendant taken the plea offer of 10 years, the
Defendant would have been released from prison almost a
year ago with good time credit. Defendant has been
incarcerated over 9 straight years. Emphasis Added! Defendant
proceeded to trial under Actual Innocence on all charges,
and after being convicted at trial, the Defendant's sentence
was substanially increased by uncharged/dismissed conduct and
his overstated criminal history. Defendant received a 292 months
Sentence which far exceeds the plea offer of 10 years. Furthermore,
Defendant is not the same person that entered prison in 2012.
Defendant sincerely apologizes to ISRAEL LEO GLASSER, Senior
united states District Court Judge for his disruptive and discrespectful
behavior throughout the pre-trial and trial proceedings.
Defendant admits to taking prescription pills that belonged to
other inmates during the said period and therefore acted like
a crash dummy. (see Defendant letter). From 2014 to present
the Defendant regularly attends religious services, maintains
employment, and is a model inmate, received his Associate Degree in
Science and his Bachelor Degree in Business management from
Glenville state College, completed the Drug Education Program,
completed the HVAC Program in full, and completed many Ace programs
                        Page 16 of 29

as follows: Decision making, Critical Thinking, Web Design, Adobe Level 1, Develop Leadership Problem Solving, and Financial Budgeting. Additionally, Defendants security classification has been reduced from medium to low and will in fact be reduced to minimum within the next 6 months. In Support, FCI-Gilmer unit team states the following: "Inmate Liounis arrived at FCI-Gilmer in September 2014. During his initial classification he was instructed to enroll in educational programs, and to obtain institutional employment. He has continuously complied with the unit teams recommendations since that time, and as a result his custody classification will be reducing to a minimum security within the next 6 months" see SRP-Progress Report Id at page 1. Lastly, Defendant has a low recidivism score under FSA.

Defendants record while in custody shows that he is committed to his faith, education, improvement, relationships, and work duties. Defendant has had an overall positive adjustment to his incarceration, has spent the last 7 years as a drug free inmate passing all Drug Tests, voluntarily participating in programs, and preparing to be a productive member of society despite having a 292 month sentence. Respectfully, Defendant is now 49 years old and has substantially changed his decision making process, grown a stronger family support system, and demonstrated that he is capable of living a normal, drug free, productive life as a law-abiding citizen. See Defendant letter.

Respectfully, for all the reasons stated above

Page 17 of 29

this Honorable court is not barred from granting Defendants compassionate release motion. See Jones v. United States No.'s 20-co-424 and 20-co-425 (D.c. ct. App. July 31, 2020) (remanding case in which defendant was convicted of first degree murder while armed, armed robbery, and armed carjacking, to the trial court and directed that the court explain "its findings on dangerousness, specifically addressing whether appellant remains a danger to the community if released, despite his age and what the trial court acknowledged to be his low chance of recidivism and favorable and remarkable prison record"), United States v. Mackall, No. 1993 FEL 12822, slip op. at 7 (D.c. Super. ct July 17, 2020) (Edelman, J.) (granting compassionate release to defendant who "stabbed [the victim] in the chest and killed him"). In United States v. Lopez, 2020 u.s. Dist. LEXIS 200076 (D. Haw. 2020), based in part, and because the BOP had reduced his security level and "although Lopez's crimes were serious and violent, those crimes occurred more than two decades ago and nothing in his prison disciplinary record raises any concern about him having a continued propensity for violence". (quoting United States v. clausen, 2020 u.s. Dist. LEXIS 131070 (E.O. Pa. 2020)). Compassionate Release has been granted to John Bass because of his prison record. United States v. Bass, No. 97-CR-80235 (E.O. Mich. 2021), Bass was serving multiple life sentences for the murder of his own brother in connection with a drug trafficking enterprise. It was Bass's positive attitude that convinced the Court of his rehabilitation. See United States v. Nacoe Brown, 2020 u.s. Dist. LEXIS 176757 (D. md). Browns prison record and history of helping others, convinced

Page 18 of 29

the court of his rehabilitation even though he had filed numerous challenges to his convictions. Brown had committed no violent acts while imprisoned since 2001. compassionate release has been granted to Julius Brown, imprisoned since may of 2000 for drug related offenses and a murder. Brown v. united states, 2020 U.S. Dist. LEXIS 238008 (D. md.). The 49 year old Defendant humbly asks this Honorable Court to consider not only who he was, but also who he has become over the past 7 years of his life and to please grant compassionate release based upon Defendants aforementioned compelling reasons for compassionate release under factors in ss 3142 (g) and 3553(a).

V.      THE HISTORY, CHARACTERISTICS, AND EMPLOYMENT OF DEFENDANT WEIGH IN FAVOR OF MODIFYING HIS SENTENCE TO TIME SERVED.

In evaluating the "history and characteristics" of Defendant, this court may consider factors such as his character, physical and mental condition, family ties, employment, financial resources, community ties, past conduct, and history relating to drug or alcohol abuse. 18 U.S.C. ss 3142(g)(3)(A). In addition, "courts have... considered a defendants rehabilitation in granting compassionate release," united states v. Brown No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020), appeal dismissed, No. 20-2053 (8th cir. June 16, 2020), see also Bartrum, 2020 WL 3618563, at *3 (considering "evidence bearing on [defendants] rehabilitation" in granting compassionate release), united states v Decator, No. cr CCB-950202, 2020 WL 1676319, at *4 (D. md. Apr. 6, 2020) (placing "great weight on [defendants] post sentencing

Page 19 of 29

conduct" as "the most up-to-date picture of [his] 'history and characteristics'") (citing PEPPER v. united states, 562 U.S. 476, 492 (2011)). These factors support a grant of compassionate Release.

Defendant has a history of drug use and as of today Defendant is drug free for over 7 years and will remain drug free. Defendant completed the Drug Education program here at FCI-Gilmer on 4/17/2015 and has passed all drug tests here at FCI-Gilmer. see SRP-Progress Report I at page 3 "current Drug Assignments" Furthermore, Defendant sincerely apologizes to ISRAEL LEO GLASSER, Senior united states District Court Judge for his disruptive and disrespectful behavior during pre-trial proceedings, trial, and at sentencing. Defendant was taking prescription pills that belonged to other inmates during the said time periods and therefore acted like a crash dummy. see Defendant letter. Defendant will voluntarily attend drug treatment facilities upon release. Defendant has located the following drug treatment facilities near his home in Toms River NJ: ocean medical Services Addiction Treatment Center, Evolve Recovery Center, and Quantum Behavior Health Services. Additionally, Defendant maintains strong family ties. Defendant is Blessed to have such a loving, caring, and supportive family. Defendant will live with his mom and dad, and make them proud. see letter from mary and George Liounis A-100 through A-102, see Also Letter of Defendant A-92 through A-94.

Defendant was convicted of a violent crime in 2001. Over 20 years later and the Defendant has no additional

Page 20 of 29

violent charges, acts, or write ups. Defendant has served over 16 years in federal Prison between his 2001 conviction and the non violent instant offense, and during the 16 year period Defendant received one minor write up in early 2014 for a 306 violation - refusing work. Respectfully, Defendant is not a violent individual and Defendant is in fact a model inmate. In Support: FCI-Gilmer unit team states the following:
"Inmate Liounis has maintained clear conduct since 2014. He complies with all institutional rules and regulations, and he follows instructions given by staff members. He has developed a good rapport with other inmates and staff, Additionally, he has assisted other inmates with procedural documents." Id at page 2 of SRP- Progress Report.

Defendant is complying with his FRP Payment Plan. In Support: FCI-Gilmer unit team states the following: "Inmate Liounis is participating in the Inmate Financial Responsibility Program and is making his Court ordered payments as agreed." Id at pages 3 and 4 of SRP- Progress Report.

Defendant has a low recividism score under the First Step Act. moreover, Defendants custody classification has been reduced from medium to low, and Defendants custody classification will be reduced to minimum security level within the next 6 months. In support: FCI-Gilmer unit Team states the following: "Inmate Liounis arrived at FCI-Gilmer in September 2014. During his initial classification he was instructed to

Page 21 of 29

enroll in educational programs and to obtain institutional employment. He has continuously complied with the unit teams recommendations since that time, and as a result his custody classification will be reducing to a minimum security within the next 6 months." Id a page 1 of SRP-Progress Report.

Respectfully, Defendants character and history during his lengthy incarceration have resulted in transformation.

Additionally, courts have consisently emphasized that a defendants educational efforts and employment while in prison testify to the Defendants character and can weigh heavily in determining whether to grant compassionate release. See e.g., united States v. Rodriguez, No, 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa Apr. 1, 2020) (noting that defendants educational efforts were relevant to the courts decision to grant compassionate release). Bartrum, 2020 WL 3618563, at *5 (granting compassionate release and explaining that defendant "immersed himself in a wide variety of educational and rehabilitative programs," including obtaining a GED and earning certificates for training programs), united States v. Whitley, NO. 07-20559-2, 2020 WL 2507626, at *3 (E.D. Mich. May 15, 2020) (granting compassionate release of defendant who "[c]learly ... availed himself of the educational opportunities that existed while [he was] incarcerated).

Despite Defendant knowing that he must serve a 292 month sentence, Defendant diligently sought to rehabilitate himself and remain drug free. From 2014 to present Defendant is drug free and will remain drug free. From

Page 22 of 29

2014 to present, Defendant regularly attends religious services; completed the Drug Education Program; has completed the HVAC program in full, ID # 1008429490220, received his Associate Degree in Science and Bachelor Degree in Business management from Glenville State College, Defendant was named to the Provost's Honor List in recognition of academic excellence in the Fall 2019 and Spring 2020, and completed the following ACE Programs: Decision making, Critical Thinking, Web Design, Adobe Level 1, Develop Leadership Problem Solving, and Financial Budgeting. Additionally, Defendant has maintained employment. In Support: FCI-Gilmer unit team states the following: "Inmate Liounis is currently employed as a B1 unit orderly where he receives positive work evaluations. He complies with all required tasks and completes them in a timely manner. Prior to this employment, inmate Liounis has continuously maintained institutional employment and his work evaluations were always positive." Id at page 1 of SRP - Progress Report, see also Exhibit A-103: Letter of Counselor D. Kemper.

In Sum, Defendant's accomplishments while in custody, and his continuous efforts to prepare himself for reentry into the community, show that he has rehabilitated himself, remained drug free, and is not a danger to anyone or the community.

VI.   DEFENDANT CHARACTER, FAMILY TIES AND COMMUNITY TIES

Courts have recognized that a defendants strong family and community ties can support a sentence reduction under sections 3142(g) and 3553(a), see Bartrum, 2020 WL

3618563, at *5 (noting that "the strength of [defendant's] family and community connections, along with the well-considered release plan he submitted, provides considerable assurance that [his] release does not endanger the community"), Mackall, No. 1993 FEL 12822, slip op. at 10 (stating that "the depth of [defendant's] family and community connections, along with the thoughtful release plan he submitted" supported that he was not a danger to the community), united states v. mondaca, No. 89-CR-0655 DMS, 2020 WL 1029024, at *4 (S.D. Cal, mar. 3, 2020) (granting compassionate release where defendant had "numerous family ties, including family members who will provide for him").

Here, the Defendant has a strong network of people who are willing to support him and to keep him safe upon his release. If released early, Defendant will live with his fully vaccinated and loving parents at their home located in a safe neighborhood in Toms River, NJ 08753. Defendant's parents live in a 4 bedroom, spacious, and detached home, and Defendant will have his own bedroom, which provides security and stability. Furthermore, Defendant's parents are financially stable, will support Defendant in all ways, and will allow the Defendant to drive their second vehicle, and Defendant will regularly attend St. Barbara's Greek church together as a family and Defendant will assist the church as a volunteer. See Attached Exhibit A-100 through A-102, Letter of Mary and George Liounis.

Additionally, if released early, Defendant will be employed full time by Freedom Electric and receive full benefits, see Exhibit 103, Letter of Employment, will continue to live a drug free life and regularly attend the following drug

Page 24 of 29

treatment facilities located in Toms River, NJ 08753: Ocean medical Services Addiction Treatment Center, Evolve Recovery Center, and Quantum Behavior Health Services, will regularly attend and volunteer at St. Barbara's Greek church located in Toms River, NJ 08753. will help his loving and caring parents with any physical home maintenance, cooking, cleaning, shopping, yard work or any other chores and will take his parents to doctor appointments, will slowly but surely obtain his Master's Degree in Counseling so he could help others battle their addictions and help them to make better decisions in life, will obtain his drivers license which was valid and clean prior to incarceration, but has since expired. and will obtain his Birth Certificate and social Security Card, the Defendant has confirmed that his former roommate Scott has the said documents in his possession and will have the documents in hand when he picks up the Defendant upon release. see Exhibit A-92 through A-94: Letter of Defendant.

       Defendants' strong ties are further displayed by the resources and opportunities that are available to him upon release. Defendants' drug treatment options along with his family, economic, and community connections and the presence of people concerned for his well being and who believe in the changes he has made - support a reduction in his sentence under section 3142(g) and 3553(a).

       Letters, from those closest to Defendant further evidence his significant and christian faith growth, as well as the breadth of support that he can expect should he

have the chance to showcase his growth and skills outside of prison walls. Especially given Defendants' demonstrated rehabilitation and good prison record, his "stable family situation, community support, and employment opportunit[ies] substantially reduce whatever remaining danger he poses to the safety of the Community". <u>Bartrum</u>, 2020 WL 3618563, at *5.

VII.  <u>THE NEED FOR THE SENTENCE IMPOSED IS SATISFIED BY DEFENDANTS TIME SERVED</u>

      Under 18 u.s.c. section 3553(a), courts are required to "impose a sentence sufficient, but not greater than necessary". In determining whether a sentence meets this criterion, courts must consider whether the need for sentence imposed is sufficient: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Section 3553(a)(2)(A). In considering a compassionate release motion, courts assess whether, pursuant to these factors, "compassionate release would undermine the goals of the original sentence," <u>United States v. Ebbers</u>, 432 F. Supp. 3d 421, 430-31 (S.D.N.Y. 2020).

      Here, an indictment was issued on 5/17/12. Prior to trial the government offered the Defendant a <u>10</u> year

Page 26 of 29

plea offer on the Indictment. Defendant refused the offer and proceeded to trial under Actual Innocence on all charges. Defendant was tried on 9 non violent felony counts, convicted, and sentenced to 292 months. Here, the government felt that 10 years was sufficient punishment and had the Defendant accepted the 10 year offer, the Defendant would be home at this time. Defendant has served over 9 straight years in prison and has also accumulated good time credit. Furthermore, Defendants sentence was substantially enhanced by uncharged and/or dismissed criminal conduct and a over-stated prior criminal history category of 4.

Here, Defendant proceeded to trial under Actual Innocence and putting that aside for now, Defendant has served an extensive period of incarceration. Based on all of the above the sentence imposed should respectfully be satisfied by the time Defendant has already served. Respectfully, converting Defendants sentence to time served in this case would not undermine the seriousness of the offenses or the respect for the law or the need for deterrence or for public safety.

Here, Defendant fully understands that he must remain drug free, must succeed, and that failure is not an option when released or if released early. During Defendants incarceration he lost his grandparents, God father, God sister, aunts, uncles, and dear freinds. The 9 years in prison has changed the Defendant and his way of thinking. should Defendant be released early he will remain drug free and attend drug treatment programs, will be employed full time, will regularly attend St. Barbara's church with his family and be a volunteer.

will slowly but surely obtain his masters Degree in Counseling so he could help others to battle their addictions, and will care for his loving elderly parents. when released the Defendant will not dissapoint God, his loving family, this Honorable Court, or himself. Sadly, it has taken a long time for the Defendant to realize what is important in life and what is not. Defendant will be a successful, productive, and law-abiding citizen, see Exhibit A-92 through A-94 : Letter of Defendant.

       Lastly, courts must issue a sentence that provides the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. section 3553(a)(2)(D), Here, Defendant has continuously focused on self-improvement during his incarceration. From 2014 to present the Defendant has remained a model inmate and drug free, maintained employment, has earned a low recidivism score under the First Step Act, has lowered his security classification to low and within the next 6 months it will be lowered to minimum, has regularly attended religious services, has received his Associate Degree in Science and Bachelor Degree in Business management and was named to the Provost's Honor List in recognition of academic excellence in the Fall 2019 and Spring 2020 college semesters, has completed the HVAC 6 month program in full, has completed Drug Education, and has successfully completed the following ACE Programs : Decision making, Critical Thinking, Web Design, Adobe Level 1, Develop Leadership Problem Solving, and Financial Budgeting. Upon release Defendant will remain drug free, be successful, be productive, and be a law-abiding citizen. Defendant's extensive rehabilitation and life changing decisions while in prison has prepared him to do so. Defendant's release plan shows, he will

live with his parents in their home located in Toms River NJ 08753, will work for Freedom Electric, will attend drug treatment facilities located in Toms River NJ 08753, will drive his parents second vehicle to and from work, will attend St. Barbara's church as a family and become a volunteer, will slowly but surely obtain his masters Degree in Counseling and help others to battle their addictions, will help care for his elderly parents, will obtain his Drivers license which was valid and clean prior to his incarceration, but has since expired, will obtain his Birth Certificate and Social Security card from his former roommate scott who has confirmed that the said documents are in his possession, and Defendants loving family is ready and able to assist him in his transition from prison to a whole new world. see Letter of Defendant, see also Letter of mary and George Liounis, see also Reyes, 2020 WL 1663129, at *5 (noting that defendant has shown "that he has taken advantage of the educational and vocational opportunities available to him while incarcerated, and now it would be best if he puts the skills he obtained to use in his community"). In Sum, consideration of the relevant factors shows that time served is sufficient as defined in 18 U.S.C. section 3553 (a).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court Expedite his motion for Compassionate Release because the dangerous variants are quickly heading his way; Grant a reduction in his Sentence to time Served, appointment of Counsel, or any other relief this court deems appropriate.

Respectfully Submitted

Date: July 28, 2021

Peter L

Peter Liounis #48332-054
FCI-Gilmer, P.O. Box 6000
Glenville WV 26351

Page 29 of 29

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

A - 1

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) WARDEN WOLFF | DATE: April 27, 2021 |
|---|---|
| FROM: Peter Liounis | REGISTER NO.: 48333-054 |
| WORK ASSIGNMENT: Unit B-1 orderly | UNIT: B-1 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

I, am requesting compassionate Release with or without conditions
under the First Step Act along with the Appointment of Counsel, I, am
in danger here at FCI-Gilmer due to Covid 19 and the following
underlying medical conditions; Sleep Apnea requiring a CPAP machine;
morbid obesity; shortness of breath, Asthma, Hypertension,
chronic sinusitis, maxillary; Allergic rhinitis, and vascular
disease that required 2 recent surgeries, please GRANT the requested
relief, thank you kindly.
certified mail/Return Receipt for merchandise NO. 7020 0640 0000 0320 3649

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
|  |  |

Record Copy - File; Copy - Inmate

PDF                    Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER                    **SECTION 6**

A-2

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____       Postmark
☐ Certified Mail Restricted Delivery  $ _____        Here
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

APR 2 2021
peter Lissunis
#48332-054
Unit B-1
compassionate release

Postage
$
Total Postage and Fees
$

Sent To   WARDEN WOLFE FCI-Gilmer
Street and Apt. No., or PO Box No.   201 FCI-Lane
City, State, ZIP+4®   Glenville WV 26351

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7020 0640 0000 0320 3649

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

Article Addressed to:

WARDEN WOLFE
cI-Gilmer
101 FCI-Lane
Glenville WV 26351

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 4305 8190 5974 90

Article Number *(Transfer from service label)*
7020 0640 0000 0320 3649

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery
                                    4/29/21

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053      Domestic Return Receipt

B1

INMATE REQUEST TO STAFF MEMBER RESPONSE

NAME:  Liounis, Peter
REG. NO.:  48332-054

A-3

This is in response to your Inmate Request to Staff Member in which
you request consideration for a Reduction in Sentence (RIS) /
Compassionate Release.  Specifically, you wish to be considered due
to extraordinary or compelling circumstances.

Title 18 of the United States Code, section 3582(c)(1)(A), allows
a sentencing court, on motion of the Director of the BOP, to reduce
a term of imprisonment for extraordinary or compelling reasons.
BOP Program Statement No. 5050.50, Compassionate Release/Reduction
in Sentence: Procedures for Implementation of 18 U.S.C. §§
3582(c)(1)(A) and 4205(g), provides guidance on the types of
circumstances that present extraordinary or compelling reasons, such
as the inmate's terminal medical condition; debilitated medical
condition; status as a "new law" elderly inmate, an elderly inmate
with medical conditions, or an "other elderly inmate"; the death
or incapacitation of the family member caregiver of the inmate's
child; or the incapacitation of the inmate's spouse or registered
partner.  Your request has been evaluated consistent with this
general guidance.

The BOP is taking extraordinary measures to contain the spread of
COVID-19 and treat any affected inmates.  We recognize that you,
like all of us, have legitimate concerns and fears about the spread
and effects of the virus.  However, your concern about being
potentially exposed to, or possibly contracting, COVID-19 does not
currently warrant an early release from your sentence.  Accordingly,
your RIS request is denied at this time.

If you are not satisfied with this response to your request, you
may commence an appeal of this decision via the administrative remedy
process by submitting your concerns on the appropriate form (BP-9)
within 20 days of the receipt of this response.

Date:  5/17/21

R. M. Wolfe, Warden

cc:  Medical Records
     Unit Team